UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

DEVIN G. NUNES,

            Plaintiff,

v.

WP COMPANY LLC, d/b/a THE
WASHINGTON POST and ELLEN
NAKASHIMA,

            Defendants.

Case No. 1:20-cv-1405 (LO/IDD)

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

WILLIAMS & CONNOLLY LLP

Kevin T. Baine (admitted *pro hac vice*)
Thomas G. Hentoff (admitted *pro hac vice*)
Nicholas G. Gamse (admitted *pro hac vice*)
Adithi S. Grama (VSB No. 93531)

725 Twelfth Street, N.W.
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
agrama@wc.com

*Counsel for Defendants*

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

BACKGROUND ....................................................................................................................3

    A.    Representative Nunes........................................................................................3

    B.    The Post Article ...............................................................................................4

    C.    The Amended Complaint.................................................................................5

    D.    The Retraction Demand and the Post's Response ..........................................6

LEGAL STANDARD.............................................................................................................7

ARGUMENT ..........................................................................................................................8

I.     THE AMENDED COMPLAINT FAILS TO STATE A DEFAMATION CLAIM. ..........8

    A.    The Contested Statements Are Neither Materially False nor Defamatory. .............9

         1.    The Trump Tower Statement is Not Materially False and
             Defamatory. ........................................................................................11

         2.    The Midnight Run Statement is Not Materially False and
             Defamatory. ........................................................................................15

    B.    Plaintiff Does Not Plausibly Allege Actual Malice................................................16

    C.    Plaintiff Is Entitled to Seek Only Special Damages, Which He Fails to
        Plead..................................................................................................................22

         1.    The Case Is Governed by California Law................................................22

         2.    Plaintiff Is Entitled to Seek Only Special Damages Under
             California's Retraction Statute................................................................28

         3.    Plaintiff Fails to Plausibly Allege Special Damages. ..............................29

II.    THE AMENDED COMPLAINT FAILS TO STATE A NEGLIGENCE CLAIM. .........30

CONCLUSION......................................................................................................................30

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Adventure Outdoors, Inc. v. Bloomberg*, 2007 WL 9735875 (N.D. Ga. Dec. 18, 2007) ........................................................................................................................24

*Arpaio v. Zucker*, 414 F. Supp. 3d 84 (D.D.C. 2019) ..........................................8, 17, 18

*Arthur v. Offit*, 2010 WL 883745 (E.D. Va. Mar. 10, 2010) ...........................................8

*Ascend Health Corp. v. Wells*, 2013 WL 1010589 (E.D.N.C. Mar. 14, 2013).......................24, 27

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)............................................................2, 8, 17

*Bell Atl. v. Twombly*, 550 U.S. 544 (2007) ...............................................................3, 8

*Besen v. Parents & Friends of Ex-Gays, Inc.*, 2012 WL 1440183 (E.D. Va. Apr. 25, 2012) ............................................................................................16, 17, 22

*Biospherics Inc. v. Forbes, Inc.*, 989 F. Supp. 748 (D. Md. 1997)................................15

*Biro v. Conde Nast*, 963 F. Supp. 2d 255 (S.D.N.Y. 2013)........................................21

*Bose Corp. v. Consumers Union*, 466 U.S. 485 (1984) ...............................................16

*Cantrell v. Forest City Publ'g Co.*, 419 U.S. 245 (1974) ............................................17

*Chapin v. Greve*, 787 F. Supp. 557 (E.D. Va. 1992) ..................................................11

*Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087 (4th Cir. 1993)............................. *passim*

*Cockrum v. Donald J. Trump for President, Inc.*, 365 F. Supp. 3d 652 (E.D. Va. 2019) ........................................................................................................................26

*Downs v. Schwartz*, 2015 WL 4770711 (E.D. Pa. Aug. 12, 2015)................................14

*Dragulescu v. Va. Union Univ.*, 223 F. Supp. 3d 499 (E.D. Va. 2016)........................11

*FAA v. Cooper*, 566 U.S. 284 (2012)..........................................................................29

*Fairbanks v. Roller*, 314 F. Supp. 3d 85 (D.D.C. 2018)..............................................17

*Farah v. Esquire Mag.*, 736 F.3d 528 (D.C. Cir. 2013) ...............................................30

*Flanagan v. Pittsylvania Cnty.*, 2020 WL 2754754 (W.D. Va. May 27, 2020)............................27

*Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505 (4th Cir. 1999)..................30

*Garrison v. Louisiana*, 379 U.S. 64 (1964) .................................................................16

*Gaspar Physical Therapy v. Roberts*, 2018 WL 5617699 (S.D. Cal. Oct. 29, 2018)...................30

*Gilmore v. Jones*, 370 F. Supp. 3d 630 (W.D. Va. 2019).......................................... *passim*

*Hall v. Virginia*, 385 F.3d 421 (4th Cir. 2004) ...........................................................12

*Harris v. City of Seattle*, 152 F. App'x 565 (9th Cir. 2005) .........................................19

*Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657 (1989) ...............................18, 19

*Harvey v. CNN*, 2021 WL 615138 (D. Md. Feb. 17, 2021) .............................13, 14, 18

*Hatfill v. Foster*, 415 F. Supp. 2d 353 (S.D.N.Y. 2006)..............................23, 24, 26, 27

*Hatfill v. N.Y. Times Co.*, 488 F. Supp. 2d 522 (E.D. Va. 2007) .........................9, 13, 15

*Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222 (7th Cir. 1993) .....................................9, 13

*Hoffman v. Wash. Post Co.*, 433 F. Supp. 600 (D.D.C. 1977) .....................................21

*Horace Mann Ins. v. Gen. Star Nat'l Ins.*, 514 F.3d 327 (4th Cir. 2008) .....................22

*Hudson Assocs. Consulting, Inc. v. Weidner*, 2010 WL 1980291 (D. Kan. May 18, 2010) ............................................................................................................24

*Hustler Mag. v. Falwell*, 485 U.S. 46 (1988) .............................................................30

*Kahl v. Bureau of Nat'l Affairs, Inc.*, 856 F.3d 106 (D.C. Cir. 2017) ...........................16

*King v. Am. Broad. Cos.*, 1998 WL 665141 (S.D.N.Y. Sept. 28, 1998)........................29

*Lemelson v. Bloomberg LP*, 253 F. Supp. 3d 333 (D. Mass. 2017)...............................19

*Logan v. District of Columbia*, 447 F. Supp. 1328 (D.D.C. 1978)................................21

*Lohrenz v. Donnelly*, 350 F.3d 1272 (D.C. Cir. 2003) ...............................................20

*Lokhova v. Halper*, 441 F. Supp. 3d 238 (E.D. Va. 2020).......................................3, 20

*Lundin v. Discovery Commc'ns*, 352 F. Supp. 3d 949 (D. Ariz. 2018).........................15

*Martin v. Wells Fargo Bank*, 2018 WL 6333688 (C.D. Cal. Jan. 18, 2018) ................29

*Masson v. N.Y. Mag.*, 501 U.S. 496 (1991) ...............................................2, 9, 16, 30

*Mayfield v. NASCAR*, 674 F.3d 369 (4th Cir. 2012)......................................16, 17, 22

*McFarlane v. Esquire Magazine*, 74 F.3d 1296 (D.C. Cir. 1996) ................................16

*Michel v. NYP Holdings, Inc.*, 816 F.3d 686 (11th Cir. 2016) .....................................................17

*Mirafuentes v. Estevez*, 2015 WL 8177935 (E.D. Va. Nov. 30, 2015)...........................8, 9, 10, 14

*Morrissey v. WTVR, LLC*, 432 F. Supp. 3d 617 (E.D. Va. 2020)..................................................11

*N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964).....................................................................2, 16

*Nanji v. Nat'l Geographic Soc'y*, 403 F. Supp. 2d 425 (D. Md. 2005) .........................................10

*Nelson Auto Ctr. v. Multimedia Holdings*, 951 F.3d 952 (8th Cir. 2020)...........................2, 21, 22

*Nunes v. CNN*, 2020 WL 2616704 (E.D. Va. May 22, 2020).........................................................3

*Nunes v. Fusion GPS*, 2020 WL 8225339 (E.D. Va. Feb. 21, 2020) ..............................................3

*Nunes v. Lizza*, 476 F. Supp. 3d 824 (N.D. Iowa 2020) .........................................................14, 18

*Nunes v. WP Co.*, 2020 WL 2616707 (E.D. Va. May 22, 2020)...........................................3, 4, 20

*Nunes v. WP Co.*, 2020 WL 7668900 (D.D.C. Dec. 24, 2020).....................................1, 4, 17, 18

*OAO Alfa Bank v. Ctr for Pub. Integrity*, 387 F. Supp. 2d 20 (D.D.C. 2005)..............................19

*Parsi v. Daioleslam*, 890 F. Supp. 2d 77 (D.D.C. 2012) .............................................................18

*Quillen v. Int'l Playtex*, 789 F.2d 1041 (4th Cir. 1986)........................................................22, 23

*Reuber v. Food Chem. News, Inc.*, 925 F.2d 703 (4th Cir. 1991).................................................20

*Robertson v. Cartinhour*, 867 F. Supp. 2d 37 (D.D.C. 2012).....................................................10

*Ryan v. Brooks*, 634 F.2d 726 (4th Cir. 1980) ............................................................................30

*Sierra Club v. Trump*, 379 F. Supp. 3d 883 (N.D. Cal. 2019).....................................................12

*Smith v. Clinton*, 886 F.3d 122 (D.C. Cir. 2018) ..................................................................10, 11

*St. Amant v. Thompson*, 390 U.S. 727 (1968)..............................................................................16

*Steele v. Goodman*, 2019 WL 3367983 (E.D. Va. July 25, 2019)................................................20

*Steele v. Goodman*, 2020 WL 3620427 (E.D. Va. July 2, 2020).....................................................3

*Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236 (2d Cir. 2017) .....................10

*Time Inc. v. Pape*, 401 U.S. 279 (1971).....................................................................................21

*Todd v. Lovecruft*, 2020 WL 60199 (N.D. Cal. Jan. 6, 2020).....................................................29

*Va. Citizens Def. League v. Couric*, 910 F.3d 780 (4th Cir. 2018)........................................7, 8, 10

*Velocity Micro, Inc. v. J.A.Z. Mktg.*, 2012 WL 3017870 (E.D. Va. July 23, 2012)......................25

*Weinstein v. Friedman*, 1996 WL 137313 (S.D.N.Y. Mar. 26, 1996)...........................................14

*Wells v. Liddy*, 186 F.3d 505 (4th Cir. 1999)..................................................................23, 24, 25

*Wheeler v. Twenty-First Century Fox*, 322 F. Supp. 3d 445 (S.D.N.Y. 2018)............................14

*Wiest v. E-Fense, Inc.*, 356 F. Supp. 2d 604 (E.D. Va. 2005) ......................................................25

*Zerangue v. TSP Newspapers*, 814 F.2d 1066 (5th Cir. 1987) ....................................................21

## STATE CASES

*Anschutz Entm't Grp. v. Snepp*, 90 Cal. Rptr. 3d 133 (Ct. App. 2009) .........................................30

*Gomes v. Fried*, 186 Cal. Rptr. 605 (Ct. App. 1982)....................................................................29

*Jones v. R.S. Jones & Assocs.*, 431 S.E.2d 33 (Va. 1993) ...........................................................26

*McMillan v. McMillan*, 253 S.E.2d 662 (Va. 1979) ...............................................................22, 24

*Nunes v. Twitter*, 2019 WL 5549825 (Va. Cir. Ct. Oct. 2, 2019) .................................................27

## STATUTES AND OTHER AUTHORITIES

Cal. Civ. Code § 45............................................................................................................10

Cal. Civ. Code § 48a....................................................................................................... *passim*

Fed. R. Civ. P. 9(g) ..........................................................................................................29

Robert D. Sack, *Sack on Defamation* (5th ed. 2017)..........................................8, 10, 29

Va. Code Ann. § 8.01-223.2 ............................................................................................27

W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* (5th ed. 1984)............................10

## INTRODUCTION

This is the latest in a series of defamation actions brought against the press by California Congressman Devin Nunes over the past two years—the fifth in Virginia alone, and the second against the Washington Post.  While filing lawsuits against his perceived critics may satisfy some of Rep. Nunes's political supporters, the courts are more demanding.  "[T]he First Amendment's press and speech clauses greatly restrict the common law [of libel] where the defendant is a member of the press, the plaintiff is a public figure, or the subject matter of the supposed libel touches on a matter of public concern. Where, as here, all of these considerations are present, the constitutional protection of the press reaches its apogee."  *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1091–92 (4th Cir. 1993) (citation omitted).

Rep. Nunes's prior defamation case against the Post was recently dismissed for failure to state a claim upon which relief can be granted, *Nunes v. WP Co.*, 2020 WL 7668900, at *3–6 (D.D.C. Dec. 24, 2020), and this case should be dismissed as well.  Here, Rep. Nunes's claims relate to a November 9, 2020 Post article authored by Ellen Nakashima, titled "White House official and former GOP political operative Michael Ellis named as NSA general counsel" (the "Article").  The Article reported that Ellis, who previously worked as Rep. Nunes's chief counsel before leaving for a job at the White House, had been appointed to the position of NSA general counsel.  In discussing Ellis's professional background, the Article briefly mentioned Rep. Nunes in two statements that the Amended Complaint contends are defamatory.  First, the Article stated:  "In March 2017, [Ellis] gained publicity for his involvement in a questionable episode involving Nunes, who was given access at the White House to intelligence files that Nunes believed would buttress his baseless claims of the Obama administration spying on Trump Tower."  Second, the Article continued:  "News reports stated that Ellis was among the White

House officials who helped Nunes see the documents — reportedly late at night, earning the episode the nickname 'the midnight run.'"

There are several reasons why the Amended Complaint fails to state a claim.

*First*, to state a claim for defamation, Rep. Nunes must identify something in the Article that is "not only false, but also defamatory." *Chapin*, 993 F.2d at 1092. That he has failed to do. With respect to the first statement, he does not allege that it was false for the Post to report that he received intelligence files in an exchange at the White House. He merely alleges that although he has repeatedly and publicly claimed that the Obama administration spied on Trump and his associates, he never claimed that the administration spied "on Trump Tower" in particular. Am. Compl. ¶ 17(c). As for the second statement, Rep. Nunes's only complaint is that the exchange happened during daylight hours, rather than at night. Am. Compl. ¶ 22(a). Rep. Nunes "may not rely on [such] minor or irrelevant inaccuracies to state a claim for libel." *Chapin*, 993 F.2d at 1092; *Masson v. New Yorker Mag.*, 501 U.S. 496, 517 (1991).

*Second,* as a public official, Plaintiff must plausibly allege that Defendants published a defamatory falsehood with actual malice—that is, with "knowledge that [the Article] was false or with reckless disregard of whether it was false or not." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964). The Amended Complaint purports to allege actual malice, but its allegations to that effect are inadequate under *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). And the Post's prompt correction of the minor inaccuracies alleged negates any conceivable inference of actual malice. *See, e.g.*, *Nelson Auto Ctr. v. Multimedia Holdings*, 951 F.3d 952, 958 (8th Cir. 2020).

*Third*, under California's retraction statute, which applies to Plaintiff's defamation claim because he is domiciled in California, the Post's correction of the alleged inaccuracies limits Plaintiff to "special damages," which he has not sufficiently pled. *See* Cal. Civ. Code § 48a.

Rather than oppose Defendants' motion to dismiss, Rep. Nunes filed an Amended Complaint. But the minimal changes in the amendment do not cure any of these fatal defects. The Court should dismiss the case, with prejudice.[1]

## BACKGROUND

### A.    Representative Nunes

Rep. Nunes is a Republican Congressman from California who serves as the Ranking Member of the House Permanent Select Committee on Intelligence, commonly known as the House Intelligence Committee, and previously served as its chairman. Am. Compl. ¶¶ 1, 9, 17(e) n.2. In his capacity as a member of the House Intelligence Committee, Rep. Nunes "participates in oversight of the U.S. national security apparatus." Am. Compl. ¶ 9.

Rep. Nunes is also a frequent defamation litigant. Represented by the same counsel as in this action, he has filed a number of lawsuits alleging defamation and related claims, including at least four cases in Virginia courts since 2019 alone.[2] This is the second case he has filed against the Post in this District in less than a year. In the other case, Rep. Nunes sued the Post over a

---

[1] Defendants have also filed a Motion to Transfer to the District Court for the District of Columbia, which remains pending.

[2] *See Nunes v. WP Company LLC*, No. 3:20-cv-00146 (E.D. Va.); *Nunes v. McClatchy Co.*, No. CL-19-629 (Va. Cir. Ct. Albemarle Cty.); *Nunes v. Twitter, Inc.*, No. CL-19-1715 (Va. Cir. Ct. Henrico Cty.); *Nunes v. CNN*, No. 19-cv-00889 (E.D. Va.). They also filed a RICO case, which this Court dismissed, concluding the claims were based on "conclusory allegations which fall[] short of satisfying the pleading standard per *Bell Atlantic v. Twombly*, 550 U.S. 544, 550 (2007)." *See Nunes v. Fusion GPS*, 2020 WL 8225339, at *1 (E.D. Va. Feb. 21, 2020). Counsel has recently been admonished in four defamation cases for "conduct unbefitting an officer of the Court." *See Steele v. Goodman*, 2020 WL 3620427, at *9 n.14 (E.D. Va. July 2, 2020) (Lauck, J.); *Nunes v. WP Co.*, 2020 WL 2616707, at *2 (E.D. Va. May 22, 2020) (Payne, J.); *Nunes v. CNN*, 2020 WL 2616704, at *6 (E.D. Va. May 22, 2020) (Payne, J.); *Lokhova v. Halper*, 441 F. Supp. 3d 238, 267 (E.D. Va. 2020) (Brinkema, J.) ("[S]hould Biss file further inappropriate pleadings or pursue frivolous post-judgment litigation against any of these defendants [including the Post], sanctions might well be justified.").

February 20, 2020 article entitled "Senior intelligence official told lawmakers that Russia wants

to see Trump reelected." *Nunes v. WP Co.*, 2020 WL 2616707, at *1 (E.D. Va. May 22, 2020).

The article stated that President Trump had grown angry during an Oval Office meeting with his

acting director of national intelligence after learning from Rep. Nunes that an intelligence official

had briefed members of the House Intelligence Committee that Russia wanted to see Trump

reelected.  *Id.*  On May 22, 2020, Judge Payne granted the Post's motion to transfer the case to

the District of Columbia.  *Id.* at *2.  On December 24, 2020, the transferee court granted the

Post's motion to dismiss, holding that Rep. Nunes had failed to state a claim of defamation by

implication, and had also failed plausibly to allege that the Post acted with actual malice.  *See*

*WP Co.*, 2020 WL 7668900, at *3–6.  That case is currently pending appeal to the D.C. Circuit.

**B.      The Post Article**

Plaintiff's claims in this case concern a November 9, 2020 article authored by Nakashima

titled "White House official and former GOP political operative Michael Ellis named as NSA

general counsel."  Am. Compl. ¶ 1; *see also* Ex. A (the "Article").[3]  The Article reported that

Ellis had been selected for the position of general counsel of the National Security Agency,

though his appointment had not yet been publicly announced.  Ex. A.

The Article discussed Ellis's professional background and qualifications for his new

position, noting that he had been chief counsel to Rep. Nunes, before taking a job in the White

House in 2017.  Ex. A.  The only other reference to Rep. Nunes in the Article concerned Ellis's

involvement in helping Rep. Nunes obtain access to certain intelligence files on White House

---

[3] A copy of the online version of the Article as originally published is attached as Exhibit A
(which includes a version with visible hyperlinks as it appeared online, followed by a text-only
version).  The Article also ran in print on November 10, 2020, on page A23 under the headline
"Trump loyalist named to NSA post."  A copy of the print version is attached as Exhibit B.

4

grounds in March 2017.  Specifically, the Article stated:

> In March 2017, [Ellis] gained publicity for his involvement in a
> questionable episode involving Nunes, who was given access at the
> White House to intelligence files that Nunes believed would buttress
> his baseless claims of the Obama administration spying on Trump
> Tower.
>
> News reports stated that Ellis was among the White House officials
> who helped Nunes see the documents — reportedly late at night,
> earning the episode the nickname "the midnight run."

Ex. A.

Immediately after these statements, the online Article included a hyperlink to a March 30,
2017 Post article by Greg Miller and Karen DeYoung titled "Three White House officials tied to
files shared with House Intelligence chairman."  *See* Ex. C (the "March 2017 Article").  The
March 2017 Article reported that Ellis and two other White House officials were "involved in the
handling of intelligence files that were shared" with Rep. Nunes.  Ex. C.  The March 2017
Article further reported that the intelligence files "showed that Trump campaign officials were
swept up in U.S. surveillance of foreign nationals," and had "been used to defend President
Trump's baseless claims on Twitter that he had been wiretapped at Trump Tower under a
surveillance operation ordered by then-President Barack Obama."  Ex. C.

### C.    The Amended Complaint

The Amended Complaint contains two related counts:  one claiming that Defendants
defamed Rep. Nunes in the Article, and a second claiming they acted negligently in doing so.
The Amended Complaint purports to identify two separate defamatory statements in the Article.

First, the Amended Complaint alleges that Defendants defamed Rep. Nunes by reporting
that in March 2017, he "was given access at the White House to intelligence files that Nunes
believed would buttress his baseless claims of the Obama administration spying on Trump
Tower."  Am. Compl. ¶ 2 (the "Trump Tower Statement").  The Amended Complaint alleges

that this statement is false because Rep. Nunes did not make or believe claims that anyone had wiretapped Trump Tower.  Am. Compl. ¶¶ 17(b)–(c).

Second, the Amended Complaint alleges that Defendants defamed Rep. Nunes by reporting that "[n]ews reports stated that Ellis was among the White House officials who helped Nunes see the documents — reportedly late at night, earning the episode the nickname 'the midnight run.'" Am. Compl. ¶ 2 (the "Midnight Run Statement").  The Amended Complaint alleges that this statement is false because the incident took place during daylight hours.  Am. Compl. ¶ 22(a).

The Amended Complaint alleges that Rep. Nunes incurred unspecified "presumed damages, actual damages, special damages and punitive damages" as a result of the defamatory publication.  Am. Compl. ¶¶ 8, 23, 28.

**D.      The Retraction Demand and the Post's Response**

The Amended Complaint also alleges that Plaintiff served Defendants with a retraction demand on November 17, 2020, the same day the original complaint was filed.  Am. Compl. ¶ 6. The Post promptly published corrections and edits addressing the minor inaccuracies that were alleged.  *See* Am. Compl. ¶ 7.  Those corrections and edits were made within the three-week deadline provided under the California Retraction Statute.  Cal. Civ. Code § 48a.

First, the Post added the following Correction at the top of the online version of the Article, which states:

> *Correction: As originally published, this article inaccurately attributed claims that the Obama administration spied on Trump Tower to Rep. Devin Nunes (R-Calif.), rather than to President Trump.  Nunes has stated that he did not believe there had been any wiretapping of Trump Tower.  This article has also been updated to note that Nunes says an incident known as the "midnight run" took place during daylight hours.*

*See* Am. Compl. ¶ 7; Ex. D (the "Updated Article").

The Post also updated the online Article by changing the reference to "his baseless claims" to "Trump's baseless claims," and by adding the following sentence to clarify the timing of Rep. Nunes's March 2017 White House visit:  "The precise timing of the visit is unclear, and Nunes has said it took place during daylight hours."  Ex. D.  Thus, as revised, the Updated Article now states, in relevant part:

> In March 2017, he gained publicity for his involvement in a questionable episode involving Nunes, who was given access at the White House to intelligence files that Nunes believed would buttress Trump's baseless claims of the Obama administration spying on Trump Tower.
>
> News reports stated that Ellis was among the White House officials who helped Nunes see the documents — reportedly late at night, earning the episode the nickname "the midnight run."  The precise timing of the visit is unclear, and Nunes says it took place during daylight hours.

Ex. D.

Second, the Post published a print Correction on page A2 of the December 8, 2020 newspaper, which stated:

> A Nov. 10 A-section article about the naming of Michael Ellis as general counsel of the National Security Agency incorrectly attributed claims that the Obama administration spied on Trump Tower to Rep. Devin Nunes (R-Calif.), rather than to President Trump.  Nunes has said that he did not believe there had been any wiretapping of Trump Tower.

*See* Am. Compl. ¶ 7; Ex. E (the "Print Correction").  The Print Correction did not refer to the "midnight run," because that phrase is not mentioned in the original print article.  *See* Ex. B.

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Va. Citizens Def. League v. Couric*, 910 F.3d 780, 783 (4th Cir. 2018)

(quoting *Iqbal*, 556 U.S. at 678).  The allegations "must be enough to raise a right to relief above the speculative level." *Bell Atl. v. Twombly*, 550 U.S. 544, 555 (2007).  Legal conclusions "couched as . . . factual allegation[s]" and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient.  *Iqbal*, 556 U.S. at 678.  If the facts alleged, taken as true for purposes of the motion, would not "state a claim to relief that is plausible on its face," the complaint must be dismissed.  *Id.* at 697 (quotation marks omitted).

In recognition of the threat that defamation claims pose to free speech, "[t]he Supreme Court has directed courts to expeditiously weed out unmeritorious defamation suits." *Arpaio v. Zucker*, 414 F. Supp. 3d 84, 89 (D.D.C. 2019).  Because the costs associated with the defense of even frivolous defamation claims can deter speech, "federal courts have historically given close scrutiny to pleadings in libel actions." *Arthur v. Offit*, 2010 WL 883745, at *3 (E.D. Va. Mar. 10, 2010).  As a result, "courts in Virginia and the Fourth Circuit routinely dismiss at the outset defamation claims that are based on constitutionally protected speech by media defendants." *Mirafuentes v. Estevez*, 2015 WL 8177935, at *3 (E.D. Va. Nov. 30, 2015) (O'Grady, J.); *see also Chapin*, 993 F.2d at 1092.  Indeed, defamation actions are particularly susceptible to early dismissal, because the "central event—the communication about which suit has been brought—is literally before the judge at the pleading stage." 2 Robert D. Sack, *Sack on Defamation* § 16.2.1, at 16–4 (5th ed. 2017 & Supp. 2020).

## ARGUMENT

## I.   THE AMENDED COMPLAINT FAILS TO STATE A DEFAMATION CLAIM.

To state a claim for defamation, a plaintiff must allege (1) publication of (2) a false and defamatory statement, (3) that is "of and concerning" the plaintiff, (4) with the requisite fault. *Va. Citizens Def. League*, 910 F.3d at 783.  "It is proper for the Court to determine whether the statements are actionable or not at the 12(b)(6) stage because '[w]hether a statement is actionable

8

is a matter of law to be decided by the court.'"  *Mirafuentes*, 2015 WL 8177935, at *3 (quoting *Chapin*, 993 F.2d at 1092).

Here, Rep. Nunes fails to state a claim for defamation for three independent reasons. *First*, the contested statements are not materially false and defamatory.  *Second*, the Amended Complaint fails to allege plausibly that the Defendants published the Article with actual malice. *Third*, because the Post published a timely correction under California's retraction statute, Plaintiff can recover only special damages, which he does not sufficiently plead.[4]

### A.    The Contested Statements Are Neither Materially False nor Defamatory.

"[A] statement is not considered false unless it would have a different effect on the mind of the reader from that which the pleaded truth would have produced."  *Masson*, 501 U.S. at 517 (quotation marks omitted).  "Minor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the libelous charge [is] justified."  *Id.* (quotation marks omitted).[5]  As a result, "[t]he falsity of a statement and the defamatory 'sting' of the publication must coincide—that is, where the alleged defamatory 'sting' arises from substantially true facts, the plaintiff may not rely on minor or irrelevant inaccuracies to state a claim for libel."  *Chapin*,

---

[4] The choice of law analysis in this case is somewhat complicated because the Supreme Court of Virginia has yet to address how Virginia's *lex loci delicti* choice of law principles should apply where, as here, "the defamatory content [wa]s 'published' in multiple jurisdictions . . . on a website that can be accessed worldwide."  *Gilmore v. Jones*, 370 F. Supp. 3d 630, 664 (W.D. Va. 2019).  For purposes of this motion, the only issue that is directly affected by a choice of law is the Post's argument that the case should be dismissed pursuant to the California retraction statute.  Choice of law is, therefore, discussed with that argument.  *See infra* Section I.C.

[5] *See also, e.g.*, *Hatfill v. N.Y. Times Co.*, 488 F. Supp. 2d 522, 532 (E.D. Va. 2007) ("[M]inor or irrelevant inaccuracies will not render a statement materially false."), *aff'd*, 532 F.3d 312 (4th Cir. 2008); *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1228 (7th Cir. 1993) ("A news report that contains a false statement is actionable only when significantly greater opprobrium results from the report containing the falsehood than would result from the report without the falsehood.") (quotation marks omitted).

993 F.2d at 1092.  Courts regularly dismiss defamation cases on substantial truth grounds.  *See,* *e.g.*, *Mirafuentes*, 2015 WL 8177935, at *4 (dismissing case where "[t]he statement at issue here is merely a minor inaccuracy"); *Nanji v. Nat'l Geographic Soc'y*, 403 F. Supp. 2d 425, 431 (D. Md. 2005) (dismissing case where the "gist of [the at issue] published statement is substantially true"); *Robertson v. Cartinhour*, 867 F. Supp. 2d 37, 59 (D.D.C. 2012) (granting motion to dismiss where "the statements are not capable of conveying a defamatory meaning because they are substantially true"), *aff'd per curiam*, 553 F. App'x 1 (D.C. Cir. 2014); *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 247 (2d Cir. 2017) ("[W]hen falsity is an element of a state defamation claim, federal courts have required plaintiffs to plead facts that, if proven, would allow a reasonable person to consider the statement false.") (citing cases).

Even if challenged statements are materially false, a plaintiff must also plead that they are defamatory.  Defamatory words are those that rise to the level of making "the plaintiff appear odious, infamous, or ridiculous." *Chapin*, 993 F.2d at 1092 (quotation marks omitted); *see also, e.g.*, *Smith v. Clinton*, 886 F.3d 122, 128 (D.C. Cir. 2018) (per curiam) ("An allegedly defamatory remark must be more than unpleasant or offensive; the language must make the plaintiff appear odious, infamous, or ridiculous." (quotation marks omitted)); Cal. Civ. Code § 45 (a defamatory statement is one "which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided").  "There is common agreement that a communication that is merely unflattering, annoying, irksome, or embarrassing . . . is not actionable."  1 Robert D. Sack, *Sack on Defamation* § 2.4.1 (5th ed. 2017).  Rather, defamation "necessarily . . . involves the idea of disgrace."  W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 111, at 773 (5th ed. 1984); *see also Va. Citizens Def. League*, 910 F.3d at 783–84.  "[T]he task of determining whether the statement at issue is reasonably capable of defamatory

meaning is a threshold matter of law for the trial court." *Morrissey v. WTVR, LLC*, 432 F. Supp. 3d 617, 622 (E.D. Va. 2020) (quotation marks omitted).  Courts routinely dismiss complaints where the statements at issue fall short.  *See, e.g.*, *id.*; *Dragulescu v. Va. Union Univ.*, 223 F. Supp. 3d 499, 511 (E.D. Va. 2016); *Chapin v. Greve*, 787 F. Supp. 557, 568 (E.D. Va. 1992), *aff'd sub nom. Chapin*, 993 F.2d at 1099; *Smith*, 886 F.3d at 128.

Here, neither one of the contested statements is materially false and defamatory.

### 1.    The Trump Tower Statement is Not Materially False and Defamatory.

Plaintiff claims that it was false for the Post to report that "Nunes believed [intelligence files] would buttress his baseless claims of the Obama administration spying on Trump Tower," because he did not claim that the Obama administration spied on Trump Tower.  Am. Compl. ¶ 17(c).  President Trump made that claim,[6] but Rep. Nunes alleges that he never believed it. Am. Compl. ¶¶ 17(b)–(c).

The statement, however, is substantially true.  Although Rep. Nunes did not claim that the Obama administration spied "on Trump Tower," he repeatedly claimed that the Obama administration did, in fact, spy on the Trump campaign.  For example, he released an official statement explaining that "while there was not a physical wiretap of Trump Tower, *I was concerned that other surveillance activities were used against President Trump and his associates*."  Press Release, House Permanent Select Committee on Intelligence, *Chairman Nunes Comments on Incidental Collection of Trump Associates* (Mar. 22, 2017) (emphasis

---

[6] *See, e.g.*, *A timeline of President Trump's unsubstantiated wiretapping claims*, ABC News (Apr. 6, 2017), https://abcnews.go.com/Politics/timeline-president-trumps-unsubstantiated-wiretapping-claims/story?id=46198888.

added).[7]  In particular, he said: "I recently confirmed that, on numerous occasions, the

Intelligence Community incidentally collected information about U.S. citizens involved in the

Trump transition," and that "I have confirmed that additional names of Trump transition team

members were unmasked."  *Id.*  This echoed prior statements Rep. Nunes made on the floor of

the House of Representatives in which he asserted that "surveillance activities were used against

President Trump and his associates."  *Russian Active Measures Investigation*: Hearing Before

House Intelligence Comm., 115 Cong. 3 (Mar. 20 2017).  Rep. Nunes also alleged in multiple

interviews that "the previous [Obama] administration knew that they were spying on the Trump

campaign."[8]  Indeed, the Trump White House recently singled out Rep. Nunes for his outsized

role in advancing these spying allegations in its press release announcing that he would receive

the Presidential Medal of Freedom.[9]

---

[7] *See* https://republicans-intelligence.house.gov/news/documentsingle.aspx?DocumentID=774. The Court may take judicial notice of publicly available government documents and transcripts. *See, e.g.*, *Hall v. Virginia*, 385 F.3d 421, 424 n.3 (4th Cir. 2004).  Likewise, the Court may take judicial notice of news "articles attached to the motion to dismiss when the articles discuss the subject matter of the case."  *Gilmore*, 370 F. Supp. 3d at 669 n.41 (quotation marks omitted).

[8] *See, e.g.*, *Mornings with Maria Interview with Devin Nunes*, Fox News (Aug. 13, 2020), CQ Transcriptions (LEXIS) (Rep. Nunes:  "So clearly, the previous administration knew that they were spying on the Trump campaign.  Joe Biden should have known at that time, to put a halt to this.  So he is just as guilty as everybody else.  And I don't mean guilty in the sense that he broke any laws, but he knew damn well that something was occurring using our intelligence apparatus in this country, the FBI and the Department of Justice, to target the people that his party had just got their clocks cleaned by in November of 2016 when Donald Trump surprised the world and won this election."); *Sean Hannity Interview with Devin Nunes*, Fox News (May 3, 2019), CQ Transcriptions (LEXIS) (Rep Nunes: "I'm not interested if the Trump campaign was spied on, that happened, that's fact.  I want to know how many spies, informants, whatever you want to call them, were run into the Trump campaign.").  This Court may properly take judicial notice of such "statements of government officials" as they "are not subject to reasonable dispute."  *See, e.g.*, *Sierra Club v. Trump*, 379 F. Supp. 3d 883, 892 n.2 (N.D. Cal. 2019), *aff'd,* 963 F.3d 874 (9th Cir. 2020), *cert. granted,* 20-138, 2020 WL 6121565 (U.S. Oct. 19, 2020).

[9] *See* Trump White House, *President Donald J. Trump to Award the Medal of Freedom to Devin Nunes* (Jan. 4, 2021), https://trumpwhitehouse.archives.gov/briefings-statements/president-

Rep. Nunes's complaint here seems to be that, unlike President Trump, he never said there was an actual "wiretap" of Trump Tower by the Obama administration.  Am. Compl. ¶¶ 17(b)–(c).  But the Article discusses "*spying* on Trump Tower," not a *wiretap*.  Ex. A.[10]  And to speak of spying on Trump Tower (Trump Campaign headquarters) specifically, as the Post did, rather than spying "against President Trump and his associates" or "on the Trump campaign," as Rep. Nunes has done, is the kind of "minor or irrelevant inaccurac[y]" that does not render a statement materially false.  *Cf. Hatfill v. N.Y. Times Co.*, 488 F. Supp. 2d 522, 532–33 (E.D. Va. 2007) (whether defamation plaintiff had access to wet or dry anthrax was "an irrelevant inaccuracy, one in which pleaded truth would not have a different effect on the mind of the reader"), *aff'd*, 532 F.3d 312 (4th Cir. 2008); *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1228 (7th Cir. 1993); *Harvey v. CNN*, 2021 WL 615138, at *10 (D. Md. Feb. 17, 2021) (implication that Rep. Nunes's aide met Ukrainian prosecutor was at most minor inaccuracy, where he scheduled meetings with Ukrainian officials).  Any sting would be the same if the Article said "Rep. Nunes was given access at the White House to intelligence files that Nunes believed would buttress his baseless claims of the Obama administration *spying on Trump and his campaign associates*," rather than "spying on Trump Tower."

---

donald-j-trump-award-medal-freedom-devin-nunes/ ("In 2017, Congressman Nunes launched an investigation into the Obama-Biden administration's misconduct during the 2016 election – and began to unearth the crime of the century. . . . He learned that the Obama-Biden administration had issued Foreign Intelligence Surveillance Act (FISA) warrants to spy on President Trump's campaign and illegitimately unmasked several innocent spying victims for political gain.").

[10] Notably, the White House asserted at the time that President Trump's allegations of "wiretapping" should be interpreted as allegations of "broad surveillance."  *See* "Press Briefing by Press Secretary Sean Spicer," March 16, 2017, https://trumpwhitehouse.archives.gov/ briefings-statements/press-briefing-press-secretary-sean-spicer-031617/.

In his Amended Complaint, Rep. Nunes alleges that the mere fact that the Post issued a correction necessarily means that the statements at issue were materially false.  Am. Compl. ¶ 18.  That is incorrect.  As this Court has recognized, a statement can still be substantially true even where the publisher corrects a minor inaccuracy.  *See Mirafuentes*, 2015 WL 8177935, at *4 (holding that statement was substantially true, even though it contained a "small inaccuracy" that was "corrected in the subsequent update"); *see also, e.g.*, *Wheeler v. Twenty-First Century Fox*, 322 F. Supp. 3d 445, 454 (S.D.N.Y. 2018) (dismissing complaint on substantial truth grounds, even though news channel retracted report).

Moreover, even if the Post's statement were materially false, it would not be defamatory. The statement does not make Rep. Nunes appear "odious, infamous, or ridiculous," nor does it suggest that he is unfit for his position as a Congressman.  It is simply not defamatory to suggest that the Chairman of the House Intelligence Committee, "a staunch supporter of President Trump," *see* Ex. A, viewed documents that he believed would provide support for claims of spying made by the President, *see, e.g.*, *Weinstein v. Friedman*, 1996 WL 137313, at *12 (S.D.N.Y. Mar. 26, 1996) (statements associating plaintiff with project that some may view unfavorably for "political (or political correctness) reasons" not defamatory), *aff'd*, 112 F.3d 507 (2d Cir. 1996); *Harvey*, 2021 WL 615138, at *8, *10 (implication that Rep. Nunes's aide dug up dirt on political rival not defamatory); *see also, e.g.*, *Nunes v. Lizza*, 476 F. Supp. 3d 824, 853 (N.D. Iowa 2020) (statement that Rep. Nunes supported the President not defamatory).

While the Article did say that the spying claims were "baseless," the use of that term in context "does not transform this otherwise accurate summary into a statement with a defamatory meaning."  *Downs v. Schwartz*, 2015 WL 4770711, at *16 (E.D. Pa. Aug. 12, 2015) (citing cases).  The statement indicated that Rep. Nunes believed the intelligence files might "buttress"

those claims, i.e., that his diligence might uncover some support for them.  And of course, that is precisely what happened, leading to his announcement that while there had not been a wiretap, he "was concerned about," and uncovered evidence of, other surveillance.

> ## 2.  The Midnight Run Statement is Not Materially False and Defamatory.

The Post's reference to a "midnight run" was also substantially true.  The Article stated: "[n]ews reports stated that Ellis was among the White House officials who helped Nunes see the documents — reportedly late at night, earning the episode the nickname 'the midnight run.'"  Ex. A.  Rep. Nunes's gripe here is that his White House visit took place during daylight hours.  Am. Compl. ¶ 22(a).  But even if that was the case, it is a "minor or irrelevant inaccurac[y] [that] will not render a statement materially false."  *See, e.g.*, *Hatfill*, 488 F. Supp. 2d at 532.  Indeed, courts have held in comparable circumstances that misstatements regarding the timing of an event at issue are insufficient to give rise to material falsity.  *See Biospherics Inc. v. Forbes, Inc.*, 989 F. Supp. 748, 752 (D. Md. 1997) (statement that drug company had been "developing" product for fifteen years rather than nine years was not materially false, notwithstanding the company's allegation that it implied dishonesty), *aff'd*, 151 F.3d 180 (4th Cir. 1998); *see also Lundin v. Discovery Commc'ns*, 352 F. Supp. 3d 949, 956 (D. Ariz. 2018) (statement that "production was down for two days while the guys cooled off," was not materially false, even if the delay was, in fact, much shorter), *aff'd,* 796 F. App'x 942 (9th Cir. 2020).  Here, whether Rep. Nunes's visit to the White House took place after dark, as media reports indicate, or during daylight hours, as he claims, has no materially different effect on the mind of the reader in the context of the Article.[11]

And here too, even if the statement is deemed false, it is certainly not defamatory.  The

---

[11] Rep. Nunes also claims this statement is false because he "never made a 'surreptitious visit to the White House grounds' in March 2017."  Am. Compl. ¶ 17(d).  However, the quoted language regarding a "surreptitious visit" does not appear anywhere in the Article.  *See* Ex. A.

statement that a member of the House Intelligence Committee viewed documents at night, rather

than during the day, does not make him appear "odious, infamous, or ridiculous."  If anything,

the statement that Rep. Nunes reportedly went to the White House late at night suggests that he

devoted significant time and energy to his duties, not that he was unfit for the position.

### B.      Plaintiff Does Not Plausibly Allege Actual Malice.

"To encourage and facilitate debate over matters of public concern, the Supreme Court

has held that the First Amendment protects, among other things, discussion about public officials

and public figures."  *Kahl v. Bureau of Nat'l Affairs*, 856 F.3d 106, 113 (D.C. Cir. 2017)

(Kavanaugh, J.).  A public official or figure cannot prevail in a defamation action unless he

pleads and proves that the defendant published the false and defamatory statements with "'actual

malice'—that is, with knowledge that it was false or with reckless disregard of whether it was

false or not."  *N.Y. Times Co.*, 376 U.S. at 280.  "Mere negligence does not suffice."  *Masson*,

501 U.S. at 510.  "Reckless disregard" requires proof that the defendant "in fact entertained

serious doubts as to the truth" of the publication—that it had a "high degree of . . . probable

falsity."  *Bose Corp. v. Consumers Union*, 466 U.S. 485, 511 (1984) (quoting *Garrison v.

Louisiana*, 379 U.S. 64, 74 (1964)); *St. Amant v. Thompson*, 390 U.S. 727, 731–32 (1968).

This is a deliberately "daunting" standard, *McFarlane v. Esquire Mag.*, 74 F.3d 1296,

1308 (D.C. Cir. 1996), that "embodies our 'profound national commitment to the principle that

debate on public issues should be uninhibited, robust, and wide-open, and that it may well

include vehement, caustic, and sometimes unpleasantly sharp attacks' on public figures," *Besen

v. Parents & Friends of Ex-Gays, Inc.*, 2012 WL 1440183, at *3 (E.D. Va. Apr. 25, 2012)

(quoting *New York Times Co.*, 376 U.S. at 270).  Courts in this Circuit and across the country

routinely dismiss cases for failure to plead sufficient facts to support an inference of actual

malice.  *See, e.g.*, *id.* at *6; *Mayfield v. NASCAR*, 674 F.3d 369, 378–79 (4th Cir. 2012); *Michel

*v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016); *Fairbanks v. Roller*, 314 F. Supp. 3d 85, 92–93 (D.D.C. 2018); *WP Co.*, 2020 WL 7668900, at *4. Indeed, "application of the plausibility pleading standard makes particular sense when examining public figure defamation suits," because "[f]orcing publishers to defend inappropriate suits through expensive discovery proceedings in all cases would constrict that breathing space in exactly the manner the actual malice standard was intended to prevent." *Michel*, 816 F.3d at 702.

Whether a plaintiff is a public figure or public official is a "question of law for the court to decide." *Besen*, 2012 WL 1440183, at *3. But here, there is no serious question that a well-known member of Congress like Rep. Nunes qualifies. Indeed, Rep. Nunes has not disputed that he is a public figure or public official in other defamation cases. *See, e.g.*, *WP Co.*, 2020 WL 7668900, at *4 ("At the outset, [Rep. Nunes] does not dispute that he is a 'public figure' for purposes of defamation law."). Thus, in order to survive a motion to dismiss he must plead facts sufficient to make a plausible case of actual malice as to *each* Defendant. *See Cantrell v. Forest City Publ'g Co.*, 419 U.S. 245, 252–54 (1974).

Plaintiff's Amended Complaint falls well short of this "daunting standard." It does not advance Plaintiff's claim to allege that "WaPo and Nakashima published the [d]efamatory [s]tatements with actual or constructive knowledge that they were false or with reckless disregard for whether they were false," or that they "made up facts out of whole cloth." *See* Am. Compl. ¶¶ 22, 22(a). "This kind of conclusory allegation—a mere recitation of the legal standard—is precisely the sort of allegations that *Twombly* and *Iqbal* rejected." *Mayfield*, 674 F.3d at 378; *see also Iqbal*, 556 U.S. at 678; *Arpaio*, 414 F. Supp. 3d at 91. Indeed, in Rep. Nunes's other case against the Post, the court rejected such "naked assertions" as insufficient. *WP Co.*, 2020 WL 7668900, at *4.

17

The Amended Complaint alleges that Defendants' motivation in publishing the Article was to carry out "a political and personal attack upon Plaintiff."  Am. Compl. ¶ 22(g); *see also* Comp. ¶ 22(d) ("The Article is an example of opposition research published by [Defendants] . . . as part of a lengthy campaign against Plaintiff."), ¶ 22(e) ("[The Post's] institutional hostility, hatred, extreme bias, spite and ill-will towards Plaintiff and President Trump . . . motivated [the Post] and Nakashima to publish intentionally false statements about Plaintiff.").  But as Judge Mehta explained, not only are such allegations conclusory, "caselaw resoundingly rejects the proposition that a motive to disparage someone is evidence of actual malice."  *WP Co.*, 2020 WL 7668900, at *5 (quotation marks omitted) (finding Rep. Nunes's allegations of the Post's "institutional hostility" towards him insufficient to establish actual malice); *see also Parsi v. Daioleslam*, 890 F. Supp. 2d 77, 90 (D.D.C. 2012) (citing cases); *Arpaio*, 414 F. Supp. 3d at 92 ("Even assuming the alleged 'leftist enmity' is real, the motivations behind defendants' communications—inspired by political differences or otherwise—do not impact whether defendants acted with actual malice as a matter of law."); *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 665 (1989) (a newspaper's "motive in publishing a story . . . cannot provide a sufficient basis for finding actual malice").

The same is true of Plaintiff's bare claims that Defendants "abandoned all journalistic standards and integrity, including [the Post's] own code of ethics in writing, editing, and publishing the Article."  Am. Compl. ¶ 22(d).  Judge Mehta rejected this conclusory allegation as well.  *See WP Co.*, 2020 WL 7668900, at *5 (holding that Rep. Nunes's allegation that the Post "abandoned all journalistic standards and integrity . . . in writing, editing, and publishing the [article]" was insufficient to plausibly establish actual malice); *see also Lizza*, 476 F. Supp. 3d at 858 (similar); *Harvey*, 2021 WL 615138, at *16 (similar).  Aside from the fact that they are

conclusory, these allegations cannot establish actual malice, because the test requires "more than an extreme departure from professional standards." *Harte-Hanks*, 491 U.S. at 665; *see also, e.g.*, *OAO Alfa Bank v. Ctr. for Pub. Integrity*, 387 F. Supp. 2d 20, 55 (D.D.C. 2005) (holding that ethical or professional breaches cannot "bear on the defendants' subjective knowledge of the falsity of the . . . allegations in the article").

The Amended Complaint's other actual malice allegations are similarly insufficient.  It alleges that Nakashima should have known there was no "midnight run" because Rep. Nunes's communications director Jack Langer purportedly told her *in 2017* that stories about a dead-of-night excursion were "inaccurate."  Am. Compl. ¶ 22(a).  But such "generalized denials" fall well short of demonstrating actual malice.  *See, e.g.*, *Harris v. City of Seattle*, 152 F. App'x 565, 569 (9th Cir. 2005) ("[A] reporter need not believe self-serving denials, 'as such denials are so commonplace in the world of polemical charge and countercharge.'" (quoting *Harte-Hanks*, 491 U.S. at 691 n.7)).  "If a subject's simple denial [were] sufficient to demonstrate that subsequent publication shows a reckless disregard for the truth, then no disputed fact could ever safely be published.  Alleging publication in the face of [plaintiff's] denial is simply not enough to meet the high bar required to plausibly plead 'actual malice.'"  *Lemelson v. Bloomberg LP*, 253 F. Supp. 3d 333, 340–41 (D. Mass. 2017), *aff'd*, 903 F.3d 19 (1st Cir. 2018).

The Amended Complaint also alleges that the Post acted with actual malice in relying on Rep. Adam Schiff and articles by New York Times reporters such as Adam Goldman and Maggie Haberman.  Am. Compl. ¶¶ 17(e) n.2, 22(a).  This theory makes little sense, for multiple reasons.  First, none of these purported sources are cited in any respect on the face of the Article.  Second, the allegation that the Chair of the House Intelligence Committee and the Times' Pulitzer Prize-winning journalists are "inherently unreliable" sources is entirely conclusory and

completely unsubstantiated.[12]  And even if the Post had relied on those sources, and even if they

were somehow biased against Rep. Nunes, that would still not be enough to establish actual

malice as a matter of law.  *See, e.g.*, *Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 715 (4th

Cir. 1991) (en banc) ("Actual malice cannot be proven simply because a source of information

might also have provided the information to further the source's self-interest."); *Lohrenz v.*

*Donnelly*, 350 F.3d 1272, 1284 (D.C. Cir. 2003) (that publisher "acted on the basis of a biased

source and incomplete information does not demonstrate with clear and convincing evidence that

the defendants realized that their statement was false or that they subjectively entertained serious

doubts as to the truth of their statement" (brackets and quotation marks omitted)).

The Amended Complaint's allegations that Nakashima misinterpreted prior news reports

by attributing "baseless claims" of spying on Trump Tower to Rep. Nunes rather than to his

political ally, President Trump, *see* Am. Compl. ¶ 18, are also insufficient to establish actual

malice.  In the context of the Article as a whole, it is clear that the misattribution is a simple

misstatement of the Post's prior reporting in the March 2017 Article, which is hyperlinked

immediately following the statement, and which correctly attributes the Trump Tower claims to

President Trump.  *See* Exs. A, C.  The Post's reference to "*his* baseless claims," rather than

"President Trump's baseless claims" reflects a simple mistake, not actual malice.  "Failure to

---

[12] Mr. Goldman and Ms. Haberman were part of a team that won the Pulitzer Prize for their reporting in 2018.  *See* https://www.nytimes.com/by/adam-goldman; https://www.nytimes.com/by/maggie-haberman.  The claim that the Times reporters "habitually republished false and defamatory statements supplied to them by the Democrats, the FBI, and the State Department (CIA)," Am. Compl. ¶ 22(a), is unsubstantiated, spurious, and should be stricken from the Amended Complaint.  It is the kind of ad hominem allegation that has prompted multiple judges in this Court to threaten Plaintiff's counsel with sanctions, including in two prior cases against the Post in the past year alone.  *See, e.g.*, *Nunes*, 2020 WL 2616707, at *2 ("'The Court reminds Counsel for Plaintiff[] that, as an officer of the Court, he may be sanctioned for engaging in conduct unbefitting of this Court.'") (quoting *Steele v. Goodman*, 2019 WL 3367983, at *3 (E.D. Va. July 25, 2019)); *Lokhova* 441 F. Supp. 3d at 267.

recognize a mistake or ambiguity and its potential consequences is not evidence of a reckless disregard for the truth." *Nelson Auto Ctr. v. Multimedia Holdings*, 951 F.3d 952, 958 (8th Cir. 2020); *see Time Inc. v. Pape*, 401 U.S. 279, 289–92 (1971) (omission of the word "alleged" in a summary of a prior report "reflect[s] at most an error of judgment," not actual malice).

Not only is there no factual basis for a claim of actual malice in this case, there is in this case affirmative evidence of the *absence* of actual malice.  When Plaintiff informed the Post of alleged inaccuracies in its report, the Post promptly corrected the alleged inaccuracies online and in print.  *See infra* Section I.C.2; Am. Compl. ¶ 7.  The publication of such a correction "is significant and tends to negate any inference of actual malice."  *Logan v. District of Columbia*, 447 F. Supp. 1328, 1332 (D.D.C. 1978) (quoting *Hoffman v. Wash. Post Co.*, 433 F. Supp. 600, 605 (D.D.C. 1977), *aff'd*, 578 F.2d 442 (D.C. Cir. 1978)); *Nelson*, 951 F.3d at 958–59; *Zerangue v. TSP Newspapers*, 814 F.2d 1066, 1071 (5th Cir. 1987).  That is because the willingness to correct mistakes shows a commitment to accuracy that is the opposite of reckless disregard for the truth.  *See Nelson*, 951 F.3d at 958–59 (dismissing defamation claim for failure to state a plausible claim of actual malice where defendant responded to plaintiff's retraction request by "promptly correct[ing] the mistake on its website"); *see also Biro v. Conde Nast*, 963 F. Supp. 2d 255, 283 (S.D.N.Y. 2013) (dismissing defamation claim for lack of actual malice where defendant followed up on its initial article by publishing plaintiff's subsequent denial of its accusations), *aff'd,* 807 F.3d 541 (2d Cir. 2015).[13]

---

[13] The Amended Complaint alleges that the Post "failed to publish any correction on Twitter." Am. Compl. ¶ 7.  But this is a red herring, for two reasons.  First, Rep. Nunes does not allege that there was anything on the face of the tweets that was about him, false, or defamatory.  *See* Am. Compl. ¶ 3.  Indeed, Rep. Nunes was not pictured or named in any way in the tweets.  They merely contain links to the article, which does include the Post's prominent correction.  Second, even if there had been something to correct in the tweets, and the Post failed to do so, the

Because the Amended Complaint fails plausibly to allege actual malice, it must be dismissed. *Mayfield*, 674 F.3d at 378; *Besen*, 2012 WL 1440183, at *3.

### C.      Plaintiff Is Entitled to Seek Only Special Damages, Which He Fails to Plead.

Even if it were not otherwise deficient, Rep. Nunes's defamation claim would be barred by the California retraction statute, Cal. Civ. Code § 48a.  Plaintiff sent a written retraction demand, and Defendants timely responded by publishing corrections both online and in print. *See* Am. Compl. ¶ 7; Exs. D, E.  Pursuant to Cal. Civ. Code § 48a, therefore, Rep. Nunes may only recover special damages, which his Amended Complaint does not sufficiently plead.

### 1.      The Case Is Governed by California Law.

A federal district court sitting in diversity applies the conflicts rule of the forum state to determine which state's law will govern the action.  *Quillen v. Int'l Playtex, Inc.*, 789 F.2d 1041, 1044 (4th Cir. 1986).  If the forum state's law is unsettled, then the district court must "predict how the state's highest court would rule on [the] unsettled issue."  *Horace Mann Ins. v. Gen. Star Nat'l Ins.*, 514 F.3d 327, 329 (4th Cir. 2008).  Here the best prediction is that the law of Rep. Nunes's home state, California, would apply.[14]

The Virginia Supreme Court "has consistently held that it is the place of the wrong (*lex loci delicti*) that determines which State's substantive law applies in a tort action brought in Virginia."  *Quillen*, 789 F.2d at 1044 (citing *McMillan v. McMillan*, 253 S.E.2d 662 (Va. 1979)).  Generally speaking, the operative state law is that of "the place where the last event necessary to

---

Amended Complaint does "not allege facts inferring this was anything but a mistake," and it cannot give rise to a plausible claim of actual malice.  *See Nelson*, 951 F.3d at 959 (no actual malice even where publisher neglected to correct statements on Facebook page).

[14] As described *supra* n.4, the Court need not reach this issue if the Motion is resolved on other grounds.  The Post's prior dispositive arguments do not require resolution of a choice of law conflict.  Neither Washington, D.C. nor Virginia have retraction statutes.

make an act liable for an alleged tort takes place." *Id.* (quotation marks omitted).  But that rule provides little guidance where, as here, a communication is published to readers simultaneously in 50 states.  As the Fourth Circuit recognized, "application of the traditional *lex loci delicti* rule becomes cumbersome, if not completely impractical" in multistate defamation cases involving the simultaneous publication of statements across different jurisdictions.  *Wells v. Liddy*, 186 F.3d 505, 527 (4th Cir. 1999).

"The Supreme Court of Virginia has yet to address how the 'place of the wrong' should be defined in 'situations where the defamatory content is published in multiple jurisdictions.'" *Gilmore v. Jones*, 370 F. Supp. 3d 630, 644 (W.D. Va. 2019).  For that reason, unless the case is dismissed on other grounds, this Court must predict what law the Virginia Supreme Court would apply in this multi-jurisdiction defamation suit.[15]

The prevailing view, adopted by multiple federal courts, is that the Virginia Supreme Court would apply the law of the state of the plaintiff's injury, which is generally the plaintiff's domicile (in this case, California).  *See, e.g.*, *Gilmore*, 370 F. Supp. 3d at 666; *Hatfill v. Foster*, 415 F. Supp. 2d 353, 365 (S.D.N.Y. 2006).  For example, in a recent multistate Internet defamation case, the U.S. District Court for the Western District of Virginia concluded that the Virginia Supreme Court would apply the law of "the state where the plaintiff is primarily injured as a result of the allegedly tortious online content."  *Gilmore*, 370 F. Supp. 3d at 666.  Thus, while the publication at issue was available worldwide through the Internet, the court held that the "state where the plaintiff [was] primarily injured" was Virginia, where he lived and worked.  *Id.*  Likewise, applying Virginia choice-of-law principles, a district court in the Southern District of New York reached the same conclusion in another defamation action involving a nationwide

---

[15] The Complaint alleges that the Post is a multistate publication.  *See* Am. Compl. ¶ 10.

magazine publication. *See Foster*, 415 F. Supp. 2d at 365. In that case, the court held that Virginia would apply the law of the state "where the plaintiff suffered the greatest injury," which is "where the plaintiff was domiciled, absent strong countervailing the circumstances." *Id.* at 364–65 (explaining that this is how the "vast majority" of *lex loci* jurisdictions resolve the issue); *see also Ascend Health Corp. v. Wells*, 2013 WL 1010589, at *2 (E.D.N.C. Mar. 14, 2013) (applying the similar *lex loci* rule of North Carolina and holding that the site of plaintiffs' injury would control in multistate Internet defamation case); *Adventure Outdoors, Inc. v. Bloomberg*, 2007 WL 9735875, at *3 (N.D. Ga. Dec. 18, 2007) (endorsing *Foster* and determining in a multistate case that "the place where the injury occurred" was where the plaintiff was domiciled); *Hudson Assocs. Consulting, Inc. v. Weidner*, 2010 WL 1980291, at *6 (D. Kan. May 18, 2010) (applying the law of the plaintiff's domicile in multistate case).

There are three reasons why this is the correct result. *First,* applying the law of the place of injury is most consistent with "the underlying rationale" of the *lex loci* rule, which the Virginia Supreme Court has held to be "uniformity, predictability, and ease of application." *Gilmore*, 370 F. Supp. 3d at 665 (quoting *McMillan*, 253 S.E.2d at 664). "The traditional *lex loci delicti* rule 'presumes that the defamatory statement is published (i.e., communicated to third parties) in one geographic location,' but publication via the Internet results in instantaneous 'multistate (if not[ ] worldwide) publication.'" *Id.* (alteration in original) (quoting *Ascend*, 2013 WL 1010589, at *2). As a result, "[d]efining the 'place of the wrong' as the place of publication in a case like this"—with reports published online and across the nation, and even frequently involving contributions from journalists in multiple jurisdictions—"would inevitably require the cumbersome application of a patchwork of state law," which is neither uniform nor predictable. *Id.*; *see also, e.g., Wells*, 186 F.3d at 528 ("multistate defamation is a tort for which the *lex loci*

*delicti* rule fails to reach a satisfactory result"). In short, it would be unreasonable to assume that the Virginia Supreme Court would adopt an interpretation that defeats what it has held to be the very purpose of the rule.

*Second,* "defining the 'place of the wrong' as the place of publication in a case like this raises thorny questions about the nature of online publication," and specifically about where the "publication" technically occurs. *Gilmore*, 370 F. Supp. 3d at 665. Courts are increasingly at odds and "unclear whether 'publication' of online content occurs in the state where an individual uploads content, the state where the relevant media platform or publication maintains headquarters, the state where a website's servers are located, or the state where third parties actually view the content (which, absent restrictions on the geographic reach of a particular online publication, will be in all fifty states and across the world)." *Id.* This has led to inconsistent results even within this district. *See, e.g.*, *id.* (citing several cases, including *Wiest v. E-Fense, Inc.*, 356 F. Supp. 2d 604, 608 (E.D. Va. 2005) (place of publication is "corporate headquarters" of company controlling website); *Velocity Micro, Inc. v. J.A.Z. Mktg.*, 2012 WL 3017870, at *6 (E.D. Va. July 23, 2012) (place of publication is the "place where the [allegedly defamatory] email was opened and read")).

*Third,* further underscoring how "completely impractical" the application of the traditional rule would be in a multistate defamation case, *see Wells*, 186 F.3d at 527, these questions often go beyond the scope of information included in a complaint. This reality further counsels in favor of the law of the place of injury. For example, in some cases courts have been forced to assume where the publication occurred. *See, e.g.*, *Velocity*, 2012 WL 3017870, at *6 (assuming that email to Minnesota corporation was opened and therefore published in Minnesota). In other cases, courts have applied Virginia law by default because the answer

appeared unknowable.  *See, e.g.*, *Cockrum v. Donald J. Trump for President, Inc.*, 365 F. Supp.

3d 652, 670 (E.D. Va. 2019) (applying Virginia law where "[a]gents of WikiLeaks could have

posted the DNC's information from countless locations around the world" such that the court

could not "determine where the act of publication occurred based on the Amended Complaint").

In such situations, the *lex loci* goals of "uniformity" and "predictability" plainly are not achieved.

While in an invasion of privacy context the *Cockrum* court predicted—prior to

*Gilmore*—that the Supreme Court of Virginia would define the "place of the wrong" to be "the

place where the act of publication to the Internet occurred," *id.* at 669–70, that interpretation

conflicts with how the "vast majority" of *lex loci* jurisdictions have resolved the question, *Foster*,

415 F. Supp. 2d at 364, and is wrong for each of the reasons discussed above.  It is further

premised on the incorrect proposition that looking to the site of injury would run afoul of the

Virginia Supreme Court's prior rejection of the Second Restatement's "most significant

relationship" test for choice of law.  *See Cockrum*, 365 F. Supp. 3d at 669 (citing the wrongful

death case of *Jones v. R.S. Jones & Assocs.*, 431 S.E.2d 33, 34 (Va. 1993)).  The *Gilmore* court

explained why this supposed conflict was illusory: "[t]he Court does not hold that the Supreme

Court of Virginia would apply the Second Restatement's 'most significant relationship' test,

which provides that defamation cases should be decided under the law of the state with "the most

significant relationship to the occurrence and the parties."  370 F. Supp. 3d at 665 n.37.  Instead,

*Gilmore* applied "another variant of *lex loci delicti* that defines the 'place of the wrong' as the

site of the plaintiff's injury."  *Id.*  As *Gilmore* makes clear, the tests are different; the "most

significant relationship" test looks to the "most significant relationship *to the occurrence and the*

*parties*," whereas the *lex loci* injury test looks *to the plaintiff*.  *See id.* (emphasis added).  The

*Ascend* case similarly found that the North Carolina Supreme Court would apply a *lex loci* rule

that would look to the site of the plaintiff's injury, while rejecting the "most significant relationship" test.  2013 WL 1010589, at *2 (reasoning that the plaintiff's "reputational . . . harm is centered" where the plaintiff resided).[16]

In short, the best prediction of what the Virginia Supreme Court would hold is the one recently reaffirmed in *Gilmore*: defining "the place of the wrong" in a case like this as the state where "the plaintiff is injured."  *Gilmore*, 370 F. Supp. 3d at 664; *Foster*, 415 F. Supp. 2d at 365. This approach is the most consistent with "underlying values animating the Supreme Court of Virginia's approach to *lex loci delicti*."  *Gilmore*, 370 F. Supp. 3d at 666.  Once that determination is made, the rest of the choice of law analysis is indisputable.  Rep. Nunes alleges that he is a California Congressman and citizen.  Am. Compl. ¶ 9.  California, therefore, is the location of the greatest part of any alleged injury.  *See, e.g.*, *Hatfill v. Foster*, 415 F. Supp. 2d at 365 (district where plaintiff was domiciled is presumptively the place of greatest harm); *see also, e.g.*, *Ascend*, 2013 WL 1010589, at *2.  Accordingly, California law applies.[17]

---

[16] To the extent the trial court in *Nunes v. Twitter* applied *Cockrum* and suggested that the law of the "place of publication" to the Internet should apply, its brief analysis is unpersuasive for the same reasons that *Cockrum's* analysis is unpersuasive.  *See* 2019 WL 5549825, at *2 (Va. Cir. Ct. Oct. 2, 2019).  Moreover, the court was not even undertaking a choice of law analysis, but rather was determining whether the cause of action arose "outside of Virginia" for purposes of *forum non conveniens*.  The complaint alleged that the defendants were Virginia residents who had published the social media posts at issue in Virginia.  *Id.* at *1–2.  And, while the court noted that it was rejecting a "significant relationship" rule, it apparently did not consider the separate place of injury test adopted in *Gilmore*.  *Id.*  The court did not mention *Gilmore* or *Ascend*.

[17] Alternatively, in the event that Virginia law applies, the case should be dismissed pursuant to Virginia's Anti-SLAPP statute, which "provides immunity to defamation defendants for statements [1] 'regarding matters of public concern that would be protected under the First Amendment to the United States Constitution'; and (2) not 'made with actual or constructive knowledge that they are false or with reckless disregard for whether they are false.'"  *Flanagan v. Pittsylvania Cnty.*, 2020 WL 2754754, at *10 n.6 (W.D. Va. May 27, 2020) (quoting Va. Code Ann. § 8.01-223.2(A)).  The Court should also award the Post fees pursuant to § 8.01-223.2(B).

2.     **Plaintiff Is Entitled to Seek Only Special Damages Under California's Retraction Statute.**

California's retraction statute provides that "[i]n any action for damages for the publication of a libel in a daily or weekly news publication," a defamation plaintiff "shall only recover special damages unless a correction is demanded and is not published or broadcast, as provided" by the terms of the statute. Cal. Civ. Code § 48a. To comply with the terms of the statute, a "written notice specifying the statements claimed to be libelous and demanding that those statements be corrected" must be served upon the publisher "within 20 days after knowledge of the publication or broadcast of the statements claimed to be libelous." *Id.* The publisher then has three weeks to publish a correction in "substantially as conspicuous a manner in the same daily or weekly news publication." *Id.* If the publisher does so, it is immune from liability for all but special damages. *See id.*

As required by the statute, Plaintiff must therefore plead "notice, demand and failure to correct" in order to recover anything beyond special damages. *See id.* The Amended Complaint pleads notice and demand by alleging that "[o]n November 17, 2020, Plaintiff served on Defendants at the place of publication a written notice specifying the statements in the Article that are defamatory and demanding, *inter alia*, that those statements be retracted and/or corrected and removed from the Internet." Am. Compl. ¶ 6. However, the allegations in the Amended Complaint demonstrate that the Post did in fact publish a correction and clarification as to both contested statements within three weeks of service of the retraction demand. *See* Am. Compl ¶ 7; Exs. D, E. To comply with the statutory requirement that a correction be published in "substantially as conspicuous a manner in the same daily or weekly news publication," the Post published this correction at the top of the online version of the Article, *see* Ex. D, and on page

28

A2 of the December 8, 2020 print version of the newspaper, *see* Ex. E.  Plaintiff is therefore

entitled only to special damages under Cal. Civ. Code § 48a.

### 3.    Plaintiff Fails to Plausibly Allege Special Damages.

Because Plaintiff fails adequately to plead failure to correct, he "shall only recover

special damages."  Cal. Civ. Code § 48a.  Accordingly, "without an allegation of special

damages, the complaint does not allege a legally sufficient cause of action," and it must be

dismissed.  *King v. Am. Broad. Cos.*, 1998 WL 665141, at *3–4 (S.D.N.Y. Sept. 28, 1998).

The retraction statute defines "special damages" to include damages suffered by the

Plaintiff "in respect to his or her property, business, trade, profession, or occupation."  Cal. Civ.

Code § 48a.  Whereas "general damages encompass the loss of reputation, shame and

mortification and hurt feelings in any context, including the plaintiff's trade or business,"

"special damages are defined narrowly to encompass only economic loss."  *Gomes v. Fried*, 186

Cal. Rptr. 605, 614 (Ct. App. 1982); *see* Sack on Defamation, *supra*, § 2.8.7.1 ("Special damages

refers only to pecuniary damages such as out-of-pocket loss.").  In addition, special damages

must be pleaded with specificity.  *See, e.g.*, Fed. R. Civ. P. 9(g) (special damages must be

"specifically stated"); *FAA v. Cooper*, 566 U.S. 284, 295 (2012) (similar).

The Amended Complaint does not specifically identify special damages.  *See* Am.

Compl. ¶ 21.  Rep. Nunes vaguely alleges that he has lost non-specified "professional

opportunities" and had to cancel "meetings" as a result of the article.  Am. Compl. ¶ 21.  He does

not attempt to quantify these allegations, and alleges only that the damages will be "determined

by the Jury."  Am. Compl. ¶¶ 23, 28.  Such allegations are plainly insufficient to satisfy the

requirement that special damages be pled with specificity.  *See, e.g.*, *Todd v. Lovecruft*, 2020 WL

60199, at *20 (N.D. Cal. Jan. 6, 2020) (allegation of "lost professional opportunities . . . is not

sufficient to meet the heightened pleading standard for special damages"); *Martin v. Wells Fargo*

*Bank*, 2018 WL 6333688, at *2 (C.D. Cal. Jan. 18, 2018) (special damages not sufficiently pled where there is "no estimation of the amount of pecuniary loss suffered"); *Anschutz Entm't Grp. v. Snepp*, 90 Cal. Rptr. 3d 133, 165 (Ct. App. 2009) (allegations that Plaintiffs "suffered damage to their reputations in an amount to be proven at trial" were "insufficient to meet the specific pleading requirement").  Accordingly, Plaintiff's defamation claim must be dismissed.

## II.  THE AMENDED COMPLAINT FAILS TO STATE A NEGLIGENCE CLAIM.

Plaintiff also brings a negligence claim against Defendants, asserting that they owed him a duty of care which they violated "by publishing the statement that Plaintiff made 'claims' that the Obama administration wire-tapped Trump Tower."  Am. Compl. ¶¶ 25–26.

The negligence claim is barred by the First Amendment, which requires that public officials like Rep. Nunes must establish that the Post acted with "actual malice," i.e., *more* than "mere negligence."  *Ryan v. Brooks*, 634 F.2d 726, 733 (4th Cir. 1980); *see Masson*, 501 U.S. at 510 ("Mere negligence does not suffice.").  He simply cannot "recover defamation-type damages under [a] non-reputational tort claim[ ], without satisfying the stricter (First Amendment) standards of a defamation claim."  *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 522 (4th Cir. 1999) (explaining that "such an end-run around First Amendment strictures is foreclosed" by *Hustler Mag. v. Falwell*, 485 U.S. 46 (1988)); *see also, e.g.*, *Gaspar Physical Therapy v. Roberts*, 2018 WL 5617699, at *13 (S.D. Cal. Oct. 29, 2018) ("[Defamation plaintiff] cannot recover on a freestanding negligence action because the burden of proof for a public figure is actual malice, not negligence."); *Farah v. Esquire Mag.*, 736 F.3d 528, 540 (D.C. Cir. 2013) ("Because [the plaintiff's] defamation claim fails, so do[es his] other tort claim[ ] based upon the same allegedly defamatory speech.").

## CONCLUSION

For the foregoing reasons, the Amended Complaint should be dismissed with prejudice.

Dated: February 18, 2021          Respectfully submitted,


WILLIAMS & CONNOLLY LLP

By:      */s/ Adithi S. Grama*

Kevin T. Baine (admitted *pro hac vice*)
Thomas G. Hentoff (admitted *pro hac vice*)
Nicholas G. Gamse (admitted *pro hac vice*)
Adithi S. Grama (VSB No. 93531)

725 Twelfth Street, N.W.
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
agrama@wc.com

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 18, 2021, I electronically filed the foregoing Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiff's Amended Complaint with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to registered CM/ECF participants.


*/s/ Adithi S. Grama*
*Counsel for Defendants*