IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DEVIN G. NUNES )
)
    Plaintiff, )
)
v. )        Case No. 1:21-cv-00506-CJN
)
)
WP COMPANY, LLC )
d/b/a The Washington Post )
    *et al* )
)
    Defendants. )
)

# MEMORANDUM IN OPPOSITION
# TO DEFENDANT'S MOTION TO DISMISS

    Plaintiff, Devin G. Nunes ("Plaintiff"), by counsel, pursuant to Local Civil Rule 7(b) respectfully submits this Memorandum of Points and Authorities in Opposition to the motion to dismiss [*ECF No. 26*] filed by defendants, WP Company. LLC d/b/a The Washington Post ("WaPo") and Ellen Nakashima ("Nakashima") (collectively, "Defendants").

## I.  INTRODUCTION

    "Freedom of the press under the First Amendment does not include absolute license to destroy lives or careers." *Curtis Pub. Co. v. Butts*, 388 U.S. 130, 170 (1967) (Warren, C.J., Concurring). The press has no "special immunity from the application of general laws", nor does it have a "special privilege to invade the rights and liberties of others." *Branzburg v. Hayes*, 408 U.S. 665, 684 (1972). The press has no right to "invent

1

facts" or to "comment on the facts so invented" and, thereby, convince readers that the invented facts are true. Simply put:

> "[l]iberty of the press is not license, and newspapers have no privilege to publish falsehoods or to defame under the guise of giving the news. It is held that the press occupies no better position than private persons publishing the same matter; that it is subject to the law, and if it defames it must answer for it."

*Williams Printing Co. v. Saunders*, 113 Va. 156, 73 S.E. 472, 477 (1912) (numerous citations and quotations omitted); *Dexter v. Spear*, 7 F. Cas. 624-625 (1st Cir. 1825) (Story, J.) ("No man has a right to state of another that which is false and injurious to him. A fortiori no man has a right to give it a wider and more mischievous range by publishing it in a newspaper. The liberty of speech, or of the press, has nothing to do with this subject. They are not endangered by the punishment of libellous publications. The liberty of speech and the liberty of the press do not authorize malicious and injurious defamation. There can be no right in printers, any more than in other persons, to do wrong.").

"In a country like ours, where the people purport to be able to govern themselves through their elected representatives, adequate information about their government is of transcendent importance. That flow of intelligence deserves full First Amendment protection. Criticism and assessment of the performance of public officials and of government in general are not subject to penalties imposed by law. But these First Amendment values are not at all served by circulating false statements of fact about public officials. On the contrary, erroneous information frustrates these values. They are even more disserved when the statements falsely impugn the honesty of those men and women and hence lessen the confidence in government." *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 767 (1985) (White., J., Concurring). As Justice

Clarence Thomas correctly observed, statements tending to scandalize a public figure are "reputed more highly injurious than when spoken of a private man". *McKee v. Cosby*, 139 S. Ct. 675, 679 (2019) (Thomas, J., Concurring) (quoting 3 W. Blackstone, Commentaries * 124)). At common law, libel of a public official was deemed an offense "'most dangerous to the people, and deserv[ing of] punishment, because the people may be deceived and reject the best citizens to their great injury, and it may be to the loss of their liberties.'" *Id.* (quoting M. Newell, Defamation, Libel and Slander § 533 (1890) (quoting *Commonwealth v. Clap*, 4 Mass. 163, 169-170 (1808)); *accord White* v. *Nicholls*, 3 How. 266, 290 (1845)).

Public figures are under attack by a media that refuses to self-regulate and that seems oblivious to the impact of defamation on our system of governance. Now, more than ever, the men and women who serve our citizens across the country need protection from the malicious and injurious attacks of "news" reporters who more clearly resemble political operatives. *See Sprouse v. Clay Communications, Inc.*, 158 W. Va. 427, 211 S.E.2d 674 (W. Va. 1975) (two weeks before gubernatorial election, newspaper foreswore its role as an impartial reporter of facts and joined with political partisans in an overall plan or scheme to discredit the character of a political candidate by publishing a series of articles that raised an implication of wrongdoing by the candidate in connection with certain real estate transactions).

The common law of libel protects the reputations of Members of Congress, just as it protects the reputation of every Judge on every Court. *Rosenblatt v. Baer*, 383 U.S. 75, 92-93 (1966) ("'Society has a pervasive and strong interest in preventing and redressing attacks upon reputation.' The right of a man to the protection of his own reputation from

unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty ... Surely if the 1950's taught us anything, they taught us that the poisonous atmosphere of the easy lie can infect and degrade a whole society."). Lies and the pollution of information about public officials should not be tolerated by any Court, and the public cannot continue to be misinformed about public matters by publishers with an axe to grind who look to "sensationalize" the news. *Tomblin v. WCHS-TV8*, 2011 WL 1789770, at * 5 (4th Cir. 2011) (unpublished) ("on the question of whether WCHS-TV8 deliberately or recklessly conveyed a false message to sensationalize the news and thus to provide factual support for a finding of malice, there are disputed facts").

Plaintiff is the latest target of WaPo's deliberate misreporting.   Claims of defamation against WaPo continue to proliferate. *See, e.g., Blankenship v. Napolitano*, 451 F.Supp.3d 596, 624 (S.D. W.Va. 2020) ("plaintiff's allegations are sufficient at this stage to create a 'plausible inference' that the defendants published their statements with actual malice ... Drawing reasonable inferences in favor of the plaintiff, the court finds that the plaintiff alleges enough facts to raise a reasonable expectation that discovery will reveal evidence of alleged wrongdoing.   The motion to dismiss is denied with respect to *The Washington Post*."); *Sandmann v. WP Company, LLC*, Case 2:19-cv-00019 (Doc 64 at 2) (E.D. Ky. Oct. 28, 2019) (WaPo published false statements that implied plaintiff engaged in racist conduct).   On November 17, 2020, Plaintiff filed a three-count complaint against WaPo and Nakashima, alleging claims of defamation, negligence and seeking a permanent injunction. He amended his complaint pursuant to Rule 15(a)(1)(B)

on February 4, 2021. This case[1] arises out of Defendants' false statements published online and via social media on November 9, 2020 and in print on November 10, 2020. [*ECF No. 22 ("Am. Compl., ¶¶ 2, 7*]. In his amended complaint, Plaintiff alleges that the Defendants published materially false and defamatory statements with actual knowledge that the statements were false. Plaintiff alleges that the defamation caused actual damage and special damage. [*Id., ¶¶ 2, 3, 4, 5, 7, 16, 17, 18, 19, 20, 21, 22, 23*]. What separates this case from the ordinary is the fact, expressly alleged in Plaintiff's amended complaint, that the Defendants not only published the defamatory matter, ***they fabricated it***. *See Schermerhorn v. Rosenberg*, 73 A.D.2d 276, 426 N.Y.S.2d 274, 285 (1980) ("we hold that the publication of Senator Beatty's defamatory charge, itself fabricated by the defendants [a newspaper and its reporter] and known by them to be false, supports the libel award on the third cause of action"). On February 18, 2021, Defendants filed a motion to dismiss pursuant to Rule 12(b)(6) asserting that Plaintiff failed to state a claim upon which relief can be granted. [*ECF No. 26*].

The matter is before the Court on Defendants' motion to dismiss. For the reasons stated below, Defendants' motion should be denied.

## II. BACKGROUND

Plaintiff is a United States Congressman and the Ranking Member of the House Permanent Select Committee on Intelligence (the "House Intelligence Committee"). The House Intelligence Committee oversees the United States national security apparatus,

---

[1]     This is not the first time Congressman Nunes has had to take legal action against WaPo to protect his rights and interests, and it may not be the last. It is irrelevant how many times Plaintiff has been forced to sue the Defendants. Defendants' references in their brief to prior litigation and litigation brought against other media defendants is nothing but an impertinent effort to distract the Court from the merits of this case and chill Plaintiff's constitutional right to vindicate his name and reputation.

including the intelligence-related activities of seventeen agencies, departments, and other elements of the United States Government.   Plaintiff's career as a United States Congressman is distinguished by his honor, dedication and service to his constituents and his country, his honesty, integrity, ethics, and reputation for truthfulness and veracity. [*Am. Compl.,* ¶ *9*].

On November 9, 2020, WaPo published an article online (the "Article") written by Nakashima entitled, "**White House official and former GOP political operative Michael Ellis named as NSA general counsel**". [*Am. Compl.,* ¶ *2*].   Defendants republished the Article to millions of their followers on Twitter and Facebook, and then republished again in print to millions more. [*Id.,* ¶¶ *3, 4*].[2]   The Article contains multiple false facts:  First, Defendants falsely attributed statements to Plaintiff that he never made

---

[2]        Defendants are liable for each republication. *Reuber v. Good Chemical News, Inc.*, 925 F.2d 703, 712 (4th Cir. 1991) ("one who repeats a defamatory statement is as liable as the original defamer."), *cert. denied*, 111 S. Ct. 2814 (1991) (citing *Lee v. Dong-A Ilbo*, 849 F.2d 876, 878 (4th Cir. 1988)); *Liberty Lobby, Inc. v. Dow Jones & Co., Inc.*, 838 F.2d 1287, 1298-1299 (D.C. Cir. 1988) ("The common law of libel has long held that one who republishes a defamatory statement 'adopts' it as his own, and is liable in equal measure to the original defamer") (citing W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on the Law of Torts* 799 (5th ed. 1984) ("Every repetition of the defamation is a publication in itself, even though the repeater states the source ... or makes clear that he himself does not believe the imputation.") (footnotes omitted), *cert. denied*, 488 U.S. 825 (1988); *Cianci v. New Times Publ'g Co.*, 639 F.2d 54, 60-61 (2nd Cir. 1980) (discussing the "black-letter rule that one who republishes a libel is subject to liability just as if he had published it originally, even though he attributes the libelous statement to the original publisher, and even though he expressly disavows the truth of the statement.") (quotation marks and citation omitted); *Watson v. NY Doe 1*, 439 F.Supp.3d 152, 161 (S.D.N.Y. 2020) ("[a] speaker who repeats another's defamatory statements is not made immune from liability for defamation merely because another person previously made the same demeaning claim.") (quoting *Enigma Software Group USA, LLC v. Bleeping Computer, LLC*, 194 F.Supp.3d 263, 287 (S.D.N.Y. 2016) (collecting cases)); *Butowsky v. Folkenflik*, 2019 WL 2518833, at * 13 (E.D. Tex. 2019) ("It is a well-settled legal principle that one is liable for republishing the defamatory statement of another.") (citing *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 386 (1973) (a "newspaper may not defend a libel suit on the ground that the falsely defamatory statements are not its own")).

and falsely attribute beliefs to Plaintiff that he never had.  Plaintiff never made the "baseless" claim – or *any* claim – that the Obama administration spied on Trump Tower. Indeed, Plaintiff points out in his complaint that he said the ***exact opposite*** – that there was no evidence of any wiretap on Trump Tower.  Plaintiff also never "believed" that any intelligence files would buttress a claim Plaintiff made that the Obama administration was spying on Trump Tower [*Am. Compl.*, ¶¶ *2, 17, 18, 22*]; *see, e.g., Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510-511 (1991) ("False attribution of statements to a person may constitute libel, if the falsity exposes that person to … [hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation]… A fabricated quotation may injure reputation in at least two senses, either giving rise to a conceivable claim of defamation.  First, the quotation might injure because it attributes an untrue factual assertion to the speaker … Second, regardless of the truth or falsity of the factual matters asserted within the quoted statement, the attribution may result in injury to reputation because the manner of expression or even the fact that the statement was made indicates a negative personal trait or an attitude the speaker does not hold.") (citations omitted); *Levesque v. Doocy*, 560 F.3d 82, 89-90 (1st Cir. 2009) (false attribution of comments to plaintiff encouraged listeners to form negative conclusions about plaintiff tending to harm his reputation); *Tharpe v. Saunders*, 285 Va. 476, 737 S.E.2d 890 (2013) ("*Saunders' statement of fact—* 'Tharpe told me that Tharpe was going to screw the Authority like he did Fort Pickett'— if believed by the hearer as coming from Tharpe, by its very nature is alleged to have defamed Tharpe and Shearin.  Therefore, regardless of the truth or falsity of the matters asserted in the quote attributed to Tharpe, Saunders' statement is an actionable statement

of fact."). Second, Plaintiff states that Defendants fabricated a story about a "surreptitious visit to the White House grounds" in March 2017 and further falsely asserted that there were "News reports" that Plaintiff was attempting to access intelligence files that would "buttress his baseless claims of the Obama administration spying on Trump Tower". [*Am. Compl.*, ¶¶ *2, 17, 22*]. Plaintiff alleges that Defendants' statements are materially false because they misidentify him as purveyor of "baseless claims" and attribute to him views and beliefs he never had. [*Id.*, ¶ *18*]. Plaintiff claims that Defendants' false statements are defamatory because they impute to him dishonesty, deceit and unethical practices, all of which severely impugns Plaintiff's integrity and prejudices him in the performance of his duties as a United States Congressman. [*Id.*, ¶¶ *1, 5, 19*]. Finally, Plaintiff alleges that the Defendants published the false statements with actual malice; that is, they knew the statements were false and published with reckless disregard for the truth. [*Id.*, ¶ *22*].

On November 17, 2020, Plaintiff served on Defendants at the place of publication a written notice specifying the statements in the Article that are defamatory and demanding, *inter alia*, that those statements be retracted and/or corrected and removed from the Internet. [*Am. Compl.*, ¶ *6*]. On December 8, 2020, Defendants publicly admitted that the statements in the Article about Plaintiff were false. On page A2 of its print edition, WaPo published the following correction:

> "*Correction: A Nov. 10 A-section article about the naming of Michael Ellis as general counsel of the National Security Agency inaccurately attributed claims that the Obama administration spied on Trump Tower to Rep. Devin Nunes (R-Calif.), rather than to President Trump. Nunes has said that he did not believe there had been any wiretapping of Trump Tower.*"

At the top of the website version of the Article, WaPo added the following:

> "*Correction: As originally published, this article inaccurately attributed claims that the Obama administration spied on Trump Tower to Rep. Devin Nunes (R-Calif.), rather than to President Trump. Nunes has stated that he did not believe there had been any wiretapping of Trump Tower. This article has also been updated to note that Nunes says an incident known as the "midnight run" took place during daylight hours.*"

WaPo added the following sentence to the online version of the Article after the reference to Plaintiff's "visit" to the White House:

> "*The precise timing of the visit is unclear, and Nunes has said it took place during daylight hours.*"

Defendants refused to retract or to make and publish any further corrections. They failed to publish any correction on Twitter. In spite of the admitted inaccuracy of the Article, Defendants continue to misreport and misrepresent in the corrected Article that "Nunes ... was given access at the White House to intelligence files that Nunes believed would buttress Trump's baseless claims of the Obama administration spying on Trump Tower." Plaintiff never held this belief. He said so publicly at the time. He never took any action to support or buttress any claim by the President of spying on Trump Tower. [*Am. Compl.*, ¶ 7].

## III.   **STANDARD OF REVIEW UNDER FED. R. CIV. P. 12(b)(6)**

A motion to dismiss under Rule 12(b)(6) for failure to state a claim tests the legal sufficiency of a complaint. *Ruifang Hu v. K4 Solutions, Inc.*, 2020 WL 1189297, at * 2 (D. D.C. 2020) (citing *Brown v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002)). The court does not resolve contests surrounding the facts, the merits of a claim, or "whether a plaintiff has any evidence to back up what is in the complaint." *Id.* (citation omitted). Federal Rule of Civil Procedure 8(a)(2) provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief" in order to

give the defendant fair notice of what the claim is and the grounds upon which it rests. *See Butler v. Enterprise Integration Corporation*, 459 F.Supp.3d 78, 90 (D. D.C. 2020).[3] To survive Rule 12(b)(6) scrutiny, a plaintiff's complaint must contain sufficient factual information to "state a claim to relief that is plausible on its face". The complaint must contain just enough information to "nudge [the] claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombley*, 550 U.S. 544, 570 (2007). A complaint achieves facial plausibility when the facts contained therein support a reasonable inference that the defendant is liable for the misconduct alleged. *Id.* at 556; *see also Ashcroft v. Iqbal*, 556 U.S. 662 (2009). In ruling on a motion to dismiss under Rule 12(b)(6) for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff, with all reasonable inferences being drawn in plaintiff's favor. *Atlas Brew Works, LLC v. Barr*, 391 F. Supp. 3d 6, 11 (D.D.C. 2019) (internal quotations and citations omitted). A 12(b)(6) motion should only be granted if, "after accepting all well-pleaded allegations ... as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999).

---

[3]    "While the Federal Rules of Civil Procedure require more specific pleading in certain cases, defamation cases are not among them." *Hatfill v. New York Times*, 416 F.3d 320, 329 (4th Cir. 2005). The District of Columbia does not use a heightened pleading standard for defamation claims. A plaintiff need only allege facts that "permit the opposing party to form responsive pleadings," including the "language or substance of the claim for defamation." *Ruifang Hu*, 2020 WL 1189297 at * 11 (citing and quoting *Oparaugo v. Watts*, 884 A.2d 63, 77 (D.C. 2005) (citing *Crowley v. North Am. Telecomms. Ass'n*, 691 A.2d 1169, 1172-1173 (D.C. 1997)).

## IV.  DISCUSSION

**A.**   **_CHOICE OF LAW_**

As a general rule, Federal Courts sitting in diversity apply the forum state's choice of law rules to determine the controlling substantive law. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).   There is a well-known exception to the general rule, however.  In *Van Dusen v. Barrack,* 376 U.S. 612 (1964), the United States Supreme Court held that, following a transfer initiated by a defendant pursuant to 28 U.S.C. § 1404(a), the transferee court must follow the choice-of-law rules that prevailed in the transferor court. *Id.* at 639.  Plaintiff commenced this action in the United States District Court for the Eastern District of Virginia.   On February 22, 2021, the District Court in Virginia entered an Order granting Defendants' motion to transfer the case to this Court pursuant to 28 U.S.C. § 1404(a). *[ECF No. 29]*.  Accordingly, Virginia law applies.

Under Virginia law, procedural matters are governed by the law of the forum state and substantive issues are governed by the law of the place of the wrong. *See, e.g., Jones v. R.S. Jones and Associates, Inc.*, 246 Va. 3, 431 S.E.2d 33 (1993) ("According to the settled rule, 'the *lex loci* will govern as to all matters going to the basis of the right of action itself, while the *lex fori* controls all that is connected merely with the remedy.'") (quotation omitted); *Hooper v. Mussolino*, 234 Va. 558, 566, 364 S.E.2d 207 (1988) ("Under settled choice-of-law principles, however, we will apply our own law in matters that relate to procedure") (citations omitted); *see id. Keeton v. Hustler Magazine, Inc,*, 465 U.S. 770, 778 fn. 10 (1984) ("Under traditional choice of law principles, the law of the forum State governs on matters of procedure").

11

In defamation cases, the "place of the wrong" is the state where the first publication occurred. *See, e.g., Meadows v. Northrup Grumman Innovation Systems, Inc.*, 2020 WL 476671, at * 4 (W.D. Va. 2020) ("In defamation actions, the place of the harm has traditionally been considered to be the place where the defamatory statement was published, i.e., seen or heard by non-parties."); *Scott v. Moon*, 2019 WL 332415, at * 3 fn. 5 (W.D. Va. 2019) ("Scott alleges that Moon published the statements at issue on a website that he controls from Florida. Accordingly, Florida law applies to Scott's claims against Moon.") (citing *Wiest v. E-Fense, Inc.*, 356 F.Supp.2d 604, 608 (E.D. Va. 2005) ("Because Plaintiff alleges that 'the website in question is controlled from Defendant E–Fense, Inc.'s corporate headquarters located in Virginia,' and the allegedly defamatory statements were published on this website, Virginia law applies.")); *Edwards v. Schwartz*, 378 F.Supp.2d 468, 502 (W.D. Va. 2019) ("In defamation cases, Virginia courts apply the substantive law of the state where the defamatory statements were first published"); *Fluor Enterprises, Inc. v. Mitsubishi Hitachi Power Systems Americas, Inc.*, 2018 WL 3016286, at * 3 (E.D. Va. 2018) (Texas law governed defamation case, where the statements at issue were published by a public company during a nationally broadcast earnings call that emanated from its headquarters in Texas); *Scott v. Carlson*, 2018 WL 6537145, at * 2 fn. 3 (W.D. Va. 2018) ("Scott alleges that Carlson, a New York resident, published the statements at issue on a website that he created and on YouTube. Accordingly, New York law applies to Scott's claims against Carlson."); *ABLV Bank v. Ctr. For Advanced Def. Studies, Inc*, 2015 WL 12517012, at * 1 (E.D. Va. 2015) ("[F]or libel claims, Virginia looks to where the statement was published") (cited in *Cockrum v. Donald J. Trump for President, Inc.*, 365 F.Supp.3d 652, 669 (E.D. Va. 2019)); *Velocity*

*Micro, Inc. v. J.A.Z. Marketing, Inc.*, 2012 WL 3017870, at * 6 (E.D. Va. 2012) ("Under Virginia law, in multi-state tort actions, commercial defamation is controlled by the law of the state in which the tort occurred, that is the say, specifically where the defamatory writing was first published.") (citing *Lapkoff v. Wilks*, 969 F.2d 78, 81 (4th Cir. 1992) ("Because the statements were made in Virginia, Virginia law applies.")); *PBM Products, LLC v. Mead Johnson Nutrition Co.*, 678 F.Supp.2d 390, 398 (E.D. Va. 2009) ("Because Mead Johnson alleges that the defamatory Press Release was issued in Virginia, Virginia law applies"); *Katz v. Odin, Feldman & Pittleman, P.C.*, 332 F.Supp.2d 909, 914 (E.D. Va. 2004) ("because all statements at issue in this case were allegedly published in Virginia, Virginia's one-year statute of limitations applies."); *St. Clair v. Righter*, 250 F.Supp. 148, 150 (W.D. Va. 1966) ("It seems well settled that in a defamation action, the place of publication (the last event necessary to render the tort-feasor liable) is the place of the wrong."); *Depp v. Heard*, 2019 WL 8883669, at * 5-6 (Fairfax Cir. Ct. Jul. 25, 2019) ("the place of the wrong in this case is the place where the act of publication of Ms. Heard's Op-Ed to the internet occurred ... [T]he Op-Ed was published on *The Washington Post's* website at Ms. Heard's instruction ... *The Washington Post's* online edition is 'created on a digital platform in Virginia and routed through servers in Virginia ... Using the servers located in Springfield, Virginia, *The Washington Post* posed it to the internet").

In *Gilmore v. Jones*, the United States District Court for the Western District of Virginia deviated from the accepted rule. *Gilmore* was unique. *Gilmore* involved a "multi-defendant, multi-state internet tort case", where the publications first occurred in "multiple jurisdictions". 370 F.Supp.3d 630, 664-665 (W.D. Va. 2019). In these unique

13

circumstances, the District Court predicted that the Virginia Supreme Court would define the "place of the wrong" as the "state where the plaintiff is primarily injured as a result of the allegedly tortious online content", *Gilmore*, 370 F.Supp.3d at 666,[4] which the Court found to be Virginia.

This case involves statements that were first published by the Defendants in the District of Columbia (online and via social media) and in Virginia (print). Applying Virginia choice of law rules, District of Columbia law or Virginia substantive law applies in this case because Virginia and the District of Columbia are the places where the Article was first published. *See Depp v. Heard*, 2019 WL 8883669, at * 5 (Fairfax Cir. 2019) ("The last event necessary for an individual to become liable for defamation in online, multi-jurisdictional cases occurs when the defamatory statement is uploaded to the internet. Therefore, the place of the wrong in this case is the place where the act of publication of Ms. Heard's Op-Ed to the internet occurred."). Additionally, Plaintiff alleges that the brunt of the injury occurred in Virginia and the District of Columbia, where Plaintiff works and where Defendants' falsehoods were first circulated to, read by, and republished to millions, damaging Plaintiff's personal and professional reputation as Ranking Member of the House Intelligence Committee. *Compare Keeton*, 465 U.S. at 777 ("The tort of libel is generally held to occur wherever the offending material is circulated. Restatement (Second) of Torts § 577A, Comment a (1977). The reputation of

---

[4]     Even if the Court were to follow the rationale in *Gilmore v. Jones*, and somehow find that this is a "multi-defendant, multi-state" defamation case, the fact is that Plaintiff's injuries are concentrated in Virginia or the District of Columbia where Plaintiff works, has his office (Longworth House Office Building, Suite 1013, Washington, D.C. 20515) and performs his oversight of the Intelligence Community as the Ranking Member of the House Intelligence Committee.

the libel victim may suffer harm even in a state in which he has hitherto been anonymous. The communication of the libel may create a negative reputation among the residents of a jurisdiction where the plaintiff's previous reputation was, however small, at least unblemished."). In cases, such as this, where the injury is eventually felt worldwide *because of the defendant's publications and republications via the Internet and Twitter,* the traditional rule – the law of the place of *first* publication – provides the most uniform and predictable result. The defendants in multistate internet defamation cases control where and how they first publish the actionable statements. Application of traditional choice of law rules, accepted and applied by Virginia Courts in *Cockrum, Velocity Micro, ABLV Bank* and many other cases cited above, demonstrates that District of Columbia or Virginia substantive law applies in this case. California law does not apply.[5]

## B.   *PLAINTIFF ALLEGES A CLAIM OF DEFAMATION*

The elements of a claim of defamation are "(1) publication of (2) an actionable statement with (3) the requisite intent." *Tharpe v. Saunders*, 285 Va. 476, 737 S.E.2d 890, 892 (2013); *see id. Ruifang Hu*, 2020 WL 1189297 at * 11 (citing and quoting *Farah v. Esquire Magazine*, 736 F.3d 528, 533-534 (D.C. Cir. 2013)). "To prevail on a claim for defamation, a party must prove by a preponderance of the evidence that the allegedly defamatory statements are both false and defamatory, so 'harm[ing] the

---

[5]      In tort actions, California applies the "most significant relationship test". Thus, even if California law applies, Virginia and the District of Columbia are the states with the most significant relationship to the parties and the events underlying this action. *See, e.g., Kesner v. Dow Jones & Company, Inc.*, 2021 WL 256949, at * 9 (S.D.N.Y. 2021) (New York law governed Florida plaintiff's defamation claim because New York had the more significant relationship to, and greater interest in, the case). *Kesner* is on point. The state with the most significant interest in regulating Defendants' misreporting and defamation is the District of Columbia, not California. The fact that Defendants requested a transfer to this Court is perhaps the best evidence that Defendants believe this Court has the most significant relating to the parties and the claims.

reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.'" *Steele v. Goodman*, 382 F.Supp.3d 403, 418-419 (E.D. Va. 2019) (quoting *Cook, Heyward, Lee, Hopper, & Feehan, P.C. v. Trump Virginia Acquisitions, LLC*, 2012 WL 1898616, at * 3 (E.D. Va. 2012)).

At the 12(b)(6) stage in a defamation case, "a court must accept as false any statements which the Complaint alleges to be false." *Goulmamine v. CVS Pharmacy, Inc.*, 138 F.Supp.2d 652, 659 (E.D. Va. 2015) (citing *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993)). "Because the Court presumes falsity at this stage, the key actionability question in deciding a motion to dismiss is whether the statements referenced in the Complaint are defamatory." *Id.*

1. **Defendants' Statements Are Materially False**

As to the element of falsity, "[t]he common law of libel takes but one approach ... regardless of the form of the communication. It overlooks minor inaccuracies and concentrates upon substantial truth." *Masson*, 501 U.S. at 516-517. "Minor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the libelous charge be justified." *Id.* Therefore, "[a] statement is not considered false unless it would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Id.* at 517.

Here, Plaintiff alleges that Defendants' statements in the Article are materially false. [*Am. Compl.*, ¶ *18*].[6] The admitted inaccuracies – falsely attributions to Plaintiff of

---

[6]     The fact that Plaintiff released a statement that he was concerned that "other surveillance activities [unmasking] were used against President Trump and his associates" does not make the Defendants' statements in the November 9, 2020 article "substantially true". Moreover, this gets into evidence that is *well beyond the four corners of the amended complaint and the purview of a motion to dismiss*.

beliefs he never held and statements he never made – are material *per se*. Defendants'
corrections demonstrate as a matter of law that the statements would have a different
effect on the mind of the reader from that which the truth would have produced. *See
Tholen v. Assist America, Inc.*, 970 F.3d 979, 985 (8th Cir. 2020) (where defendant
attributed wrongdoing to plaintiff, "there is a factual dispute over whether the challenged
statements in the case study are materially false"); *Desmond v. News and Observer
Publishing Company*, 375 N.C. 21, 846 S.E.2d 647, 676 (N.C. 2020) ("Where …
defendants publish a statement claiming that Tobin expressed that same statement of
opinion, this statement attributing an opinion critical of plaintiff to an expert in her field
is an actionable assertion of fact. In such an instance, 'the sting' is in the attribution
alone—the false *assertion of fact* that an expert in plaintiff's field holds
an *opinion* critical of plaintiff"); *Weyrich v. New Republic, Inc.*, 235 F.3d 617, (D.C. Cir.
2001) ("Although we do not here dissect each verifiable statement to provide an
exhaustive list for the District Court, potential candidates include the author's observation
that appellant, in response to Bill Pascoe's perceived betrayal, 'snapped,' erupted in a
'volcano of screaming,' 'froth[ed]' at the mouth,' and 'dispatched a letter to Pascoe's
fiancée, questioning Pascoe's loyalty and implying that he was unfit for marriage.' If
indeed the story is fabricated, we cannot say that it is not reasonably capable of any
defamatory meaning—it arguably makes appellant appear highly volatile, irrational,
unsound and otherwise "odious, infamous, or ridiculous."); *compare 100 Plus Animal
Rescue, Inc. v. Butkus*, 2020 WL 5514404, at * 9 (S.D. Fla. 2020) (defendant's statements
were materially false where defendant repeatedly and consistently published statements

boldly stating that plaintiffs were in fact found liable of criminal conduct, in explicit contradiction of the written record).

### 2.   *Defendants' Statements Are Defamatory*

Defamatory language "tends to injure one's reputation in the common estimation of mankind, to throw contumely, shame, or disgrace upon him, or which tends to hold him up to scorn, ridicule, or contempt, or which is calculated to render him infamous, odious, or ridiculous." *Schaecher v. Bouffault*, 290 Va. 83, 92, 772 S.E.2d 589 (2015) (citations omitted).  A statement is defamatory *per se* if it (1) imputes to a person "the commission of some criminal offense involving moral turpitude, for which the party, if the charge is true, may be indicted and punished", or (2) imputes an "unfitness to perform the duties of an office or employment of profit, or want of integrity in the discharge of the duties of such an office or employment", or (3) prejudices the party in his "profession or trade." *Tronfeld v. Nationwide Mutual Insurance Company*, 272 Va. 709, 713, 636 S.E.2d 447 (2006) (quoting *Fleming v. Moore*, 221 Va. 884, 889, 275 S.E.2d 632 (1981)). "False attribution of statements to a person may constitute libel, if the falsity exposes that person to [hatred, contempt, ridicule, or obloquy, or causes him to be shunned or avoided, or which has a tendency to injure him in his occupation]". *Masson.*, 501 U.S. at 510-511.

Whether the meaning of a specific communication is defamatory is ordinarily a legal question for the court.  The relative responsibilities of the judge and jury in a defamation case were articulated a century ago by the United States Supreme Court in *Washington Post v. Chaloner*, 250 U.S. 290 (1919):

> "A publication claimed to be defamatory must be read and construed in the sense in which the readers to whom it is addressed would ordinarily understand it. ... When thus read, if its meaning is so unambiguous as to reasonably bear but one interpretation, it is for the judge to say whether that signification is defamatory or not. If, upon the other hand, it is capable of two meanings, one of which would be libelous and actionable and the other not, it is for the jury to say, under all the circumstances surrounding its publication, including extraneous facts admissible in evidence, which of the two meanings would be attributed to it by those to whom it is addressed or by whom it may be read."

*Id.* at 293 (quoting *Commercial Pub. Co. v. Smith*, 149 F. 704, 706-707 (6th Cir. 1907)). Thus, the initial issue calls for a legal determination for the court to make; that is, whether a statement is capable of defamatory meaning. Once the threshold inquiry of whether the statement is capable of a defamatory meaning has been resolved in the affirmative, the case must be submitted to a jury. The jury will then determine whether the statement was understood to contain the defamatory meaning alleged, and whether the statement's publisher intended or endorsed the statement to have that effect. *White v. Fraternal Order of Police*, 707 F.Supp. 579, 588 (D. D.C. 1989).

"Pure expressions of opinion, not amounting to 'fighting words,' cannot form the basis of an action for defamation." *Chaves v. Johnson*, 230 Va. 112, 119, 335 S.E.2d 97 (1985) (statement that plaintiff was "inexperienced" was "pure expression of opinion"); "Pure expressions of opinion" include "speech which does not contain a provably false factual connotation, or ... which cannot reasonably be interpreted as stating actual facts about a person." *Besen v. Parents and Friends of Ex-Gays, Inc.*, 2012 WL 1440183, at * 3 (E.D. Va. 2012) (quotation omitted); *see id. WJLA-TV v. Levin*, 264 Va. 140, 156, 564 S.E.2d 383 (2002) ("[s]peech that does not contain a provably false factual connotation" is generally considered "'pure expression[] of opinion.'"). "Statements that are relative in nature and depend largely upon the speaker's viewpoint are expressions of opinion."

*Fuste v. Riverside Healthcare Ass'n*, 265 Va. 127, 132, 575 S.E.2d 858 (2003). Similarly, "rhetorical hyperbole, even if insulting, offensive, or otherwise inappropriate, is not actionable." *Choi v. Kyu Chul Lee*, 312 Fed.Appx. 551, 553 (4th Cir. 2009) ("the jury found in favor of Choi with regard to the statements describing Choi as a thug and a gangster. On appeal, the appellants contend that those statements should be viewed, as a matter of law, as non-actionable opinion or hyperbole. We disagree.") (citation omitted).

The United States Supreme Court has not provided categorical protection for *all* expressions of opinion. Rather, the Supreme Court has held that a statement merits protection if it "cannot 'reasonably [be] interpreted as stating actual facts about an individual.'" *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990) (alteration in original) (quoting *Hustler Magazine, Inc. v. Falwell*, 495 U.S. 46, 50 (1988)). To determine whether a statement posits facts, the United States Court of Appeals for the Fourth Circuit directs courts to look to the actual language used, as well as the context and general tenor of the statement. *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 184 (4th Cir. 1998) (citing *Milkovich*, 497 U.S. at 21)). The Supreme Court of Virginia similarly requires an examination of context. *Hyland v. Raytheon Tech. Servs Co.*, 277 Va. 40, 47-48, 670 S.E.2d 746 (2009) ("The requirement that an allegedly defamatory statement be considered as a whole also is vital to a determination of the truth or falsity of a defamation claim, because defamatory statements may be made by implication, inference, or insinuation. Thus, the factual portions of an allegedly defamatory statement may not be evaluated for truth or falsity in isolation, but must be considered in view of any accompanying opinion and other stated facts.") (citations omitted). In *Goulmamine v. CVS Pharmacy, Inc.*, 138 F.Supp.3d 652 (E.D. Va. 2015), the Court observed that there

are "two caveats to the 'opinions cannot be defamatory'" rule." First, "statements [of opinion] may be actionable if they have a provably false connotation and are thus capable of being proven true or false." 138 F.Supp.3d at 660. Second, a statement of opinion may be actionable when it "reasonably can be construed as a statement of fact" because "it is 'laden with factual content' and the underlying facts are allegedly false." *Id.* Bearing these two caveats in mind, the Court in *Goulmamine* held that many of the statements claimed to be "opinions" were actionable, "either because they may be proven false by an expert witness or because they are laden with factual content and the underlying facts are alleged to be false." *Id.* (statements of opinion regarding Goulmamine or Goulmamine's relationship with his patients: "he is bad news," variations on "you should find another doctor" or "your doctor won't be in business much longer," and "he may lose his license" were actionable).

In the Article, Defendants falsely state that Plaintiff was given access to intelligence files that Plaintiff "believed" would buttress "his baseless claims of the Obama administration spying on Trump Tower". These assertions are defamatory. Plaintiff made no "baseless claims" about the Obama administration. *See Echtenkamp v. Loudon County Public Schools*, 263 F.Supp.2d 1043, 1064 (E.D. Va. 2003) (Ellis, J.) (statements, including that "plaintiff misinterprets a lot and lies", "could be construed either to imply or to state directly that plaintiff lacks integrity or is unfit for her profession"). Defendants' assertions contain "provably false factual connotations." Whether Plaintiff ever held the "belief" or made the "baseless claims" that the Obama administration spied on Trump Tower are factual matters, not pure opinions. *Tharpe*, 737 S.E.2d at 894-895 ("It is irrelevant to their claims whether these assertions are capable of

being proven false.   Rather, *Saunders' statement of fact*—'Tharpe told me that Tharpe was going to screw the Authority like he did Fort Pickett'—if believed by the hearer as coming from Tharpe, by its very nature is alleged to have defamed Tharpe and Shearin"); *see also Socol v. Albemarle County School Board*, 399 F.Supp.3d 523, 544 (W.D. Va. 2019) (assertion that plaintiff "deliberately misused purchase cards" contained provably false factual connotations).   Additionally, Defendants' use of the term "baseless" clearly implies an assertion of fact as to Plaintiffs' state of mind or intention.   It is not an opinion. *Socol*, 399 F.Supp.3d at 544 (citing and quoting *Galarpe v. United Airlines, Inc.*, 2018 WL 1586202, at * 5 (N.D. Cal. 2018)).

   3.     ***Actual Malice – New York Times v. Sullivan***

   The actual malice rule, created by the United States Supreme Court in 1964, was judicially-imposed to solve problems peculiar to a bygone era, long-before the Internet and social media took hold of American society.   Its justifications rest on incorrect and outdated beliefs about assumed risk and access to methods of mass communication.   Not surprisingly, the rule's effects have transgressed far afield from its original intended purpose.   Prominent among the unintended consequences of the actual malice rule is self-professed immunity for media companies like WaPo and the intimidation of plaintiffs like Nunes – public figures with legitimate claims, who are the targets of hit pieces and opposition research now routinely published by main stream media *every day*.   The burden on public figures and government from the wild and unchecked proliferation of defamation on social media and the Internet justifies a thoughtful re-examination of *New York Times v. Sullivan*.

22

It has become clear that the actual malice rule is obsolete and unworkable, incapable of consistent application, and holds no footing in the modern speech landscape. Public figure defamation plaintiffs should not be subjected to the unwarranted burden of the actual malice rule.  This is not to say the importance of protecting speech from governmental censorship has diminished.  It hasn't.  Rather, the foundation of the actual malice rule has eroded as society, technology, and the platforms for electronic communication have evolved.  Gone are the days when a small group of powerful people enjoyed exclusive influence and control over public debate through unmatched access to a limited means of communication with the American public.  Now, the Internet and social media offer a "public square", a loud and far-reaching voice to virtually every citizen and empower them with an equal opportunity to decide what information and ideas flow to and from their fellow citizens and to shape the public debate.

The current speech environment is incomparable to what confronted the Supreme Court in the 1960's and 1970's.  Then, Martin Luther King Jr. was at the mercy of the press to disseminate his "Letter From Birmingham Jail" – which the *New York Times* refused to publish.  Now, one person with a cell phone has the power to instantly start a worldwide defamation campaign without any organization or funding.  It is frightening. The opportunities, access, and audience available through the Internet were unimaginable when the actual malice rule was created.  And when the rule was extended to public figures, no one could have anticipated the extraordinary ability of bad actors to now target public figures and engaging in cyberstalking and other crimes.

The continued use of the actual malice rule ignores the existing imbalance between the right to an unimpaired reputation and the need to prevent government

suppression of speech.  The Internet substantially weakened the free speech side of the rule's required balancing test; while the instantaneous, autonomous access it provides all Americans to free expression (including the dissemination of false information and defamatory speech) tilted the scales even further in favor of protecting human dignity. This imbalance continues to grow as the number of "private" people potentially exposing themselves to "public figure" status increases and social media permeates the fabric of more people's daily lives.

The right to protect one's reputation and recover compensation for the permanent harm defamation causes outweighs the outmoded policies from which the actual malice rule arose.  Continuing to apply the rule subverts personal liberty and human dignity. The rule poses a substantial risk to our democracy because it discourages qualified otherwise qualified candidates from seeking public office, and it facilitates the proliferation of false information, which has no First Amendment value.  No one questions the importance of the free speech principles *Sullivan* sought to protect. However, Pavlovian-adherence to an archaic rule ignores the Internet's profound impact on human rights and liberty.  Society changed, and with it so must the law.  At bare minimum, the actual malice rule should not be applied because the reasons for doing so no longer exist.

As Justice Thomas observed in *McKee*, the soundness of the actual malice rule is highly questionable.  The United States Supreme Court implemented the actual malice rule in response to the government using criminal laws alongside defamation lawsuits by government officials against members of the press to try to stifle the voices of Civil Rights leaders during the Civil Rights movement.  It began as a "policy-driven" means of

protecting the "breathing space" necessary for speech critical of the government. *McKee*, 139 S. Ct. at 676 (2019) (Thomas, J., concurring).   *Sullivan* and its progeny are understandably celebrated as "great cases," but their popularity is not "the road to salvation for a court of law." *Gertz* 418 U.S. at 370 (White, J., dissenting).   These decisions seem to embody of the type of well-intended judicial legislation courts are warned to avoid in the face of immediate social ills; less they exceed the defined responsibilities with which courts are charged, ignore the impartial position courts must maintain in a democracy, and lead to rules that cannot be checked and balanced by the other branches of government.  As Justice Holmes aptly stated:

> "Great cases, it is appropriate to remember, like hard cases make bad law. For great cases are called great, not by reason of their real importance in shaping the law of the future, but because of some accident of immediate overwhelming interest which appeals to the feelings and distorts the judgment.   These immediate interests exercise a kind of hydraulic pressure which makes what previously was clear seem doubtful, and before which even well settled principles of law will bend."

*Northern Securities Co. v. U.S.*, 24 S. Ct. 436, 468 (1904) (Holmes, J. dissenting).  For this reason, among others, the validity of the actual malice rule in defamation cases is highly questionable and it should reconsidered. *See generally McKee*, 139 S. Ct. 675; *Gertz*, 418 U.S. at 370 (White, J., dissenting) ("As I see it, there are wholly insufficient grounds for scuttling the libel laws of the States in such wholesale fashion, to say nothing of deprecating the reputation interest of ordinary citizens and rendering them powerless to protect themselves."); *Dun & Bradstreet*, 472 U.S. 749, 764 (1985) (Burger, J., concurring in judgment) ("I continue to believe, however, that Gertz was ill-conceived

and therefore agree with Justice White that Gertz should be overruled ... The great rights guaranteed by the First Amendment carry with them certain responsibilities as well.").[7]

### 3.   *Plaintiff Alleges Actual Malice*

In *Celle v. Filipino Reporter Enterprises, Inc.*, the Court of Appeals for the Second Circuit very carefully discussed a public figure's "demanding burden" in defamation cases. 209 F.3d 163, 182-184 (2nd Cir. 2000).  The case is instructive.  The *Celle* Court emphasized that Courts typically infer actual malice from "objective facts" alleged in a plaintiff's complaint.   In order to infer actual malice, the facts alleged "should provide evidence of 'negligence, motive and intent such that *an accumulation of the evidence and appropriate inferences* supports the existence of actual malice.'" 209 F.3d at 183 (quoting *Bose Corp. v. Consumers Union of the United States*, 692 F.2d 189, 196 (1st Cir. 1982) (emphasis added in original)); *Goldwater v. Ginzburg*, 414 F.2d 324, 342 (2nd Cir. 1969) (emphasis added) ("There is no doubt that evidence of negligence, of motive and of intent may be adduced for the purpose of establishing, by cumulation and by appropriate inferences, the fact of a defendant's recklessness or of his knowledge of falsity."); *Eramo v. Rolling Stone, LLC*, 2016 WL 5234688, at * 5 (W.D. Va. 2016) ("Although failure to adequately investigate, a departure from journalistic standards, or ill will or intent to injure will not singularly provide evidence of actual malice, the court believes that proof of all three is sufficient to create a genuine issue of material fact. Plaintiff, however, goes further.  Pointing to Erdely's own reporting notes [obtained in

---

[7]      The   arguments   raised   herein   undoubtedly   arouse   *stare   decisis* reservations.  Plaintiff is not oblivious to the implications of *stare decisis*.  Although there are instances of lower courts refusing to apply binding precedent, the appropriateness of doing so is admittedly suspect (and often depends on the eyes of the beholder or injustice motivating the departure from controlling law).   Notably, Constitutional questions are less susceptible to *stare decisis*.

discovery], plaintiff also forecasts evidence that could lead a reasonable jury to find that Erdely had 'obvious reasons to doubt [Jackie's] veracity' or 'entertained serious doubts as to the truth of [her] publication.'").

In *Celle*, 209 F.3d at 190 – as in this case – there was "evidence of ill will" between the parties from which "a reasonable juror could conclude that Pelayo knowingly and recklessly ignored the probable falsity of the story and printed it." In *Celle* – as in this case – plaintiff alleged and proved that the defendant "did not investigate the accuracy of the story." *See also Perk v. Reader's Digest Ass'n, Inc.*, 931 F.2d 408, 411 (6th Cir. 1991) (in analyzing whether failure to investigate provides circumstantial evidence of recklessness to satisfy the actual malice standard, "this Court must look at each source to determine whether it was reliable and whether it indicated that more research was required to determine what the truth was"); *Babb v. Minder*, 806 F.2d 749, 755 (7th Cir. 1986) ("[R]eckless conduct may be evidenced in part by failure to investigate thoroughly and verify the facts ... particularly where the material is peculiarly harmful or damaging to the plaintiff's reputation or good name." (internal quotation marks and citation omitted).

Plaintiff plausibly states multiple reasons why Defendants published the Article with "actual malice". [*Am. Compl.,* ¶ *22*]. Plaintiff alleges that Defendants knew their statements were false. Based on her own prior reporting ***and*** her review of reporting by numerous other media outlets, including the New York Times, CNBC, CBS, Politico, Mother Jones, Business Insider and the AP, Nakashima knew that Plaintiff had made ***no*** "claims" – "baseless" or otherwise – that the Obama administration spied on Trump Tower. Indeed, Nakashima knew that in each and every reported instance, without any

exception, Plaintiff stated the ***exact opposite***: that there was no spying on Trump Tower. [https://www.nytimes.com/2017/03/15/us/politics/trump-wiretap-claim-obama-comey-congress.html ("'I don't think there was an actual tap of Trump Tower' and that Mr. Trump, if taken literally, is simply 'wrong.'"); https://www.theguardian.com/us-news/2017/mar/15/wiretap-trump-house-intelligence-committee (**"Republican Devin Nunes says he does not believe there was 'an actual tap of Trump Tower' as committee leaders say they are still waiting for evidence"**). In spite of their actual knowledge of the truth, WaPo and Nakashima misreported a flat out lie.[8] *See, e.g., Watson v. NY Doe 1*, 2020 WL 635843, at * 7 (S.D.N.Y. 2020) ("This is a case where the alleged false statements were allegedly based on the direct knowledge of the alleged defamer that the plaintiff alleges is false. A fair inference from the Complaint is that NY Doe 2 knew that the plaintiff did not rape her but falsely made that accusation. Those circumstances are sufficient to infer actual or constitutional malice on the part of NY Doe 2 because she is alleged to have firsthand knowledge of whether the plaintiff did or did not rape her."); *Minett v. Snowden*, 2018 WL 2929339, at * 9-10 (Tex. App. 2018) (plaintiff alleged actual malice, where defendant made facts up out of whole cloth); *see St. Anant v. Thompson*, 390 U.S. 727, 732 (1968) ("Professions of good faith will be

---

[8]     WaPo and Nakashima's own prior reporting demonstrates that they knew Plaintiff never claimed that the Obama administration had spied on or wire-tapped Trump Tower. [https://www.washingtonpost.com/news/the-fix/wp/2017/03/15/the-evidence-of-trump-tower-being-wire-tapped-just-does-not-exist/ (**"Devin Nunes confirms it: The evidence of Trump Tower being wiretapped just doesn't seem to exist"**); https://www.washingtonpost.com/world/national-security/chairman-and-partisan-the-dual-roles-of-devin-nunes-raise-questions-about-house-investigation/2017/03/26/2c95ade2-1096-11e7-9b0d-d27c98455440_story.html?utm_term=.46361f5bc28e ("Nunes has been at odds with Trump in a few cases, most notably when Nunes said that Trump was simply 'wrong' about the claim that Obama had ordered a wiretap of Trump Tower to listen to the Republican presidential candidate")].

unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation"); *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 153 (1967) (deliberate falsification constitutes actual malice); *Hudnall v. Sellner*, 800 F.2d 377, 382 (4th Cir. 1986) (evidence supported finding of actual malice where the legitimate inference drawn from testimony was that defendant "knowingly concocted the accusations out of whole cloth"), *cert. denied,* 479 U.S. 1069 (1987); *Northstar Aviation, LLC v. Alberto*, 332 F.Supp.3d 1007, 1020-1021 (E.D. Va. 2018) (Ellis, J.) (defendant stated that plaintiff would "no longer be in the business of manufacturing, exporting or brokering defense articles or defense services" and falsely reported that "all activities associated with [plaintiff's contract would] cease". "The Amended Complaint also alleges that these statements are false and that defendant knew the statements were false because defendant knew that NorthStar planned to remain in the business of manufacturing helicopters and to continue its activities associated with its UAE Armed Forces contract. And the Amended Complaint alleges that these statements had a defamatory sting inasmuch as the statements suggested that NorthStar was unfit to perform the contract and thus these statements prejudiced NorthStar in its business"). The admitted material inaccuracies in the Article also provide a reasonable inference that WaPo and Nakashima acted with knowledge or reckless disregard for the truth when publishing the Article. *Tholen*, 970 F.3d at 985 ("The allegations of these inaccuracies present a reasonable inference that Assist America acted with knowledge or

reckless disregard for the truth when publishing this case study. Therefore, the Tholens have pled sufficient facts of "actual malice" to proceed.").

## C.   *CALIFORNIA'S RETRACTION STATUTE IS PROCEDURAL*

It is well-established that procedural matters are governed by Federal law and the Federal Rules of Civil Procedure or, where not covered by Federal rules, the law of the forum. *See, e.g., Burke v. Air Serv. Intern., Inc.*, 685 F.3d 1102, 1107 (D.C. Cir. 2012); *Hiatt v. Mazda Motors Corp.*, 75 F.3d 1252, 1255 (8th Cir. 1996) ("It is, of course, well-settled that in a suit based on diversity of citizenship jurisdiction the federal courts apply federal law as to matters of procedure but the substantive law of the relevant state.") (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)); *Knievel v. ESPN*, 393 F.3d 1068, 1073 (9th Cir. 2005) ("Under the [*Erie*] doctrine ... federal courts sitting in diversity must apply the Federal Rules of Civil Procedure") (citing *Hanna v. Plumer*, 380 U.S. 460, 470-471 (1965)).

In their motion to dismiss, Defendants argue that California Civil Code § 48a applies in this action. It does not. Section 48a is a procedural law[9] and, in this case, matters of procedure are governed by the law of the forum, not California.

A statute is considered procedural if it "pertain[s] to the remedy rather than the right". *Tanges v. Heidelberg North America, Inc.*, 93 N.Y.2d 48, 687 N.Y.S.2d 604, 710 N.E.2d 250, 253 (1999). The expiration of a statute of limitations, for instance, does not extinguish the underlying right, but merely bars the remedy. *Id.*

---

[9]      California Civil Code § 48a(a) provides that in an action for damages for the publication of a libel "in a daily or weekly news publication, or of a slander by radio broadcast," the plaintiff "shall only recover special damages unless a correction is demanded and is not published".

Section 48a is procedural. *See Kipper v. NYT Holdings, Inc.*, 2007 WL 1439075, at * 2 (N.Y. Sup. 2007) ("Section [48a] is inapplicable here, however, because, contrary to defendant's argument, section 48a is not a conduct-regulating law, but rather, one that provides a post-event mechanism for reparation ... Here, California has no interest in protecting a New York newspaper from defending against a defamation claim in New York or in limiting the recoverable damages, if the newspaper were found liable. Accordingly, New York defamation and damages law applies."), *rev'd on other grounds*, 47 A.D.3d 597, 852 N.Y.S.2d 56 (2008); *O'Hara v. Storer Communications, Inc.*, 231 Cal.App.3d 1101, 282 Cal.Rptr. 712, 732 (4th Dist. 1991) ("Section 48a has not changed the nature of the tort of defamation from a personal injury into a property injury, but rather has placed a limit on the type of damages that can be recovered if the plaintiff does not properly seek a retraction.").

**D.    PLAINTIFF ALLEGES SPECIAL DAMAGES**

Subdivision 4(b) of § 48a defines special damages as "all damages which plaintiff alleges and proves that he has suffered in respect to his property, business, trade, profession or occupation, including such amounts of money as the plaintiff alleges and proves he has expended as a result of the alleged libel, and no other". *See O'Hara*, 231 Cal.App.3d at 1112 (the "classical definition of special damage in a defamation case" is "business loss suffered by the plaintiff as a result of damage to her reputation") (citing *Terwilliger v. Wands*, 17 N.Y. 54, 60 (1858) ("As to what constitutes special damages, Starkie mentions the loss of a marriage, loss of hospitable gratuitous entertainment, preventing a servant o[r] bailiff from getting a place, the loss of customers by a tradesman; and says that in general whenever a person is prevented by the slander from

receiving that which would otherwise be conferred upon him, though gratuitously, it is sufficient. In *Olmstead v. Miller* ... it was held that the refusal of civil entertainment at a public house was sufficient special damage. So in *Williams v. Hill* ... was the fact that the plaintiff was turned away from the house of her uncle and charged not to return until she had cleared up her character. So in *Beach v. Ramey*, was the circumstance that persons, who had been in the habit of doing so, refused longer to provide fuel, clothing, &c. These instances are sufficient to illustrate the kind of special damage that must result from defamatory words not otherwise actionable to make them so; they are damages produced by, or through, impairing the reputation."); *compare In re U.S. Office of Personnel Management Data Security Breach Litigation*, 928 F.3d 42, 66 (D.C. Cir. 2019) ("We have not yet addressed whether Rule 9(g)'s heightened pleading standard applies to Privacy Act claims, and we have no occasion to do so here. Gonzalez-Colon's specific allegations about the time lost from work addressing the fraudulent tax return and Verizon Wireless account suffice either way.") (citing 5A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1311 (4th ed 2019) ("[A]llegations of special damage will be deemed sufficient for the purpose of Rule 9(g) if they are definite enough to notify the opposing party and the court of the nature of the damages and enable the preparation of a responsive pleading."); *Conejo v. Am. Fed'n of Gov't Emps., AFL-CIO*, 377 F.Supp.3d 16, 32 (D. D.C. 2019) (allegations that plaintiff "suffered and continues to suffer career damage, loss of consideration for career advancement, personal and professional embarrassment and humiliation, and emotional pain and suffering" "met the pleading standard for the purposes of overcoming a motion to dismiss."); *see also Hood v. Dun & Bradstreet, Inc.*, 486 F.2d 25, 33 (5th Cir. 1973) (plaintiff's complaint

specifically alleged that he "suffered special damages of incurring pecuniary loss in terms of total hours expended in removing from the minds of certain business associates the harmful effect of the false statements"); *Fleck Bros. Co. v. Sullivan*, 385 F.2d 223, 225 (7th Cir. 1967) (plaintiff "averred that as a result of the letter plaintiff ... has expended time, money, and effort to reestablish its credit."); D. Dobbs, *Law of Remedies* § 7.2, p. 520 (1873) ("Special damages in defamation cases mean pecuniary damages, or at least 'material loss;" (footnote omitted)).

In this case, Plaintiff's amended complaint sufficiently alleges that Plaintiff suffered special damages, including career damage, including loss of future employment, loss of future earnings, impaired and diminished earning capacity, and impact upon his prospects for career advancement, including, without limitation, Senate-confirmed offices. [*Am. Compl.*, ¶¶ *9, 21*]. The specific dollar amount(s) of the special damages, including the damage to Plaintiff's career and future earnings capacity, do not have to be alleged and will be proven by expert testimony. Although Defendants dispute that the Article was a proximate cause of the Plaintiff's special damages, it is well-established that "proximate cause" is an issue of fact for the jury. *See, e.g., Atlanta Channel, Inc. v. Solomon*, 2020 WL 4219757, at * 8 (D. D.C. 2020) ("Questions of proximate cause are nearly always left to the jury to decide").

## CONCLUSION

The Defendants' personal attacks on Congressman Nunes and his counsel in their brief are emblematic of a main stream media that has become hyper-partisan and spiteful — a press that has lost focus on newsgathering. The law of defamation protects a fundamental interest: an individual's right to personal security including his

uninterrupted entitlement to enjoyment of his reputation. In *Fuller v. Edwards*, the Virginia Supreme Court recognized that "[o]ne's right to an unimpaired limb and to an unimpaired reputation are, in each instance, absolute and has been since common law governed England. Indeed, an impaired reputation is at times more disastrous than a broken leg." 180 Va. 191, 198, 22 S.E.2d 26 (1942); *id. Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 12 (1990) ("Good name in man and woman, dear my lord, Is the immediate jewel of their souls. Who steals my purse steals trash; 'Tis something, nothing; 'Twas mine, 'tis his, and has been slave to thousands; But he that filches from me my good name Robs me of that which not enriches him, And makes me poor indeed.") (quoting WILLIAM SHAKESPEARE, OTHELLO, act 3 sc. 3)). Public figures who are intentionally maligned by the media must have a remedy. There must be some accounting of the misconduct.

For the reasons stated above and at the hearing of this matter, Plaintiff respectfully requests the Court to deny Defendant's motion to dismiss.[10]

DATED:        March 4, 2021

---

[10]     In its memorandum in support of motion, Defendant makes numerous impertinent and inaccurate statements. On page 1 of its memorandum, for instance, Defendant represents that "as even Plaintiff recognized when it previously retained Canadian counsel to press its claims in Canada under Canadian law, this is a dispute that should have been litigated, if at all, in a Canadian court." These untrue statements violate Rule 12(f) and should be struck by the Court.

DEVIN G. NUNES

By: ___*/s/ Richard S. Basile*_____
        Richard S. Basile
        (D.C. Bar No. 374069)
        6305 Ivy Lane, Suite 416
        Greenbelt, MD 20770
        Telephone:   301-441-4900
        Facsimile:    301-441-2404
        Email:        rearsb@gmail.com

        *Counsel for the Plaintiff*

        Steven S. Biss (VSB # 32972)
        300 West Main Street, Suite 102
        Charlottesville, Virginia 22903
        Telephone:    (804) 501-8272
        Facsimile:     (202) 318-4098
        Email:         stevenbiss@earthlink.net

        *Counsel for the Plaintiff*
        *(Motion for Admission Pro Hac Vice*
            *to be filed)*

## CERTIFICATE OF SERVICE

I hereby certify that on March 4, 2021 a copy of the foregoing was filed electronically using the Court's CM/ECF system, which will send notice of electronic filing to counsel for the Defendants and all interested parties receiving notices via CM/ECF.


By:  */s/ Richard S. Basile*
           Richard S. Basile
           (D.C. Bar No. 374069)
           6305 Ivy Lane, Suite 416
           Greenbelt, MD 20770
           Telephone:  301-441-4900

           Steven S. Biss (VSB # 32972)
           300 West Main Street, Suite 102
           Charlottesville, Virginia 22903
           Telephone:    (804) 501-8272
           Facsimile:    (202) 318-4098
           Email:        **stevenbiss@earthlink.net**
           *(Motion for Admission Pro Hac Vice*
                *to be filed)*

           *Counsel for the Plaintiff*