UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DEVIN G. NUNES,

   *Plaintiff*,

 v.

WP COMPANY LLC, et al.,

   *Defendants*.

Civil Action No. 1:21-cv-00506 (CJN)

## MEMORANDUM OPINION

Representative Devin Nunes alleges that the Washington Post and its reporter Ellen Nakashima (together, "the Post") defamed him in an article published on November 9, 2020. *See* Am. Compl., ECF No. 22. Defendants move to dismiss Nunes's Amended Complaint. *See* Mem. Supp. Defs.' Mot. to Dismiss ("Defs.' Mot."), ECF No. 27. Although the question is a close one, Nunes's allegations suffice to survive dismissal as to his defamation claim, but not as to his negligence claim. Defendants' Motion is therefore granted in part and denied in part.

### I.  Background

Nunes is the Ranking Member of the House Permanent Select Committee on Intelligence. Am. Compl. ¶ 1. On November 9, 2020, the Post published an article about the selection of Michael Ellis as general counsel of the National Security Agency. *Id.* Ellis had once served as Nunes's chief of staff. *Id.* The article focused principally on Ellis—including that his appointment was made "under pressure from the White House"—but it also discussed Nunes. In particular, the article stated that:

> In March 2017, [Ellis] gained publicity for his involvement in a questionable episode involving *Nunes, who was given access at the White House to intelligence*

1

> *files that Nunes believed would buttress his baseless claims of the Obama administration spying on Trump Tower*.

*Id.* (emphasis added).  The online version of the article (but not the print version) included another sentence that mentioned Nunes:

> News reports stated that Ellis was among the White House officials who helped Nunes see the documents—*reportedly late at night, earning the episode the nickname "the midnight run."*

Defs.' Mot., Ex. A at 5 (emphasis added); *id.* Ex. B at 2.  Nakashima is listed as the author of both versions of the article.

This was not the first time that the Post (and other news outlets) had reported on claims that the Obama administration had spied on Trump Tower or that intelligence gathering had been directed toward the Trump campaign.  Those reports began three and a half years earlier.  In March 2017, then-President Trump tweeted that President "Obama had [Trump's] 'wires tapped' in Trump Tower."[1]  Thereafter, various officials made public statements about whether there had been a wiretap on Trump Tower phones or other intelligence gathering directed toward the Trump campaign.[2]  For his part, Nunes stated publicly that there was never "a physical wiretap of Trump Tower" nor a "FISA warrant . . . to tap Trump Tower."[3]  But Nunes also expressed his "concern[] that other surveillance activities were used against President Trump and his associates,"[4] and that

---

[1] Arnie Seipel & Brian Naylor, *As Senate Investigators Push Back, White House Defends Trump Surveillance Claims*, NPR (Mar. 15, 2017), https://www.npr.org/2017/03/15/520252977/house-intelligence-chair-no-evidence-of-alleged-trump-tower-wiretap.  In deciding whether to dismiss a claim under Rule 12(b)(6), the Court may consider, in addition to the facts alleged in the Complaint, documents attached as exhibits or incorporated by reference in the Complaint and matters about which the Court may take judicial notice.  *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 625 (D.C. Cir. 1997).
[2] Seipel & Naylor, *As Senate Investigators Push Back, White House Defends Trump Surveillance Claims*, NPR (Mar. 15, 2017).
[3] Michele Salcedo, *Intel documents offer no evidence of spying on Trump Tower*, PBS NewsHour (Mar. 19, 2017), https://www.pbs.org/newshour/politics/intel-no-evidence-spying-trump-tower.
[4] Press Release, House Permanent Select Committee on Intelligence, *Chairman Nunes Comments on Incidental Collection of Trump Associates* (Mar. 22, 2017), https://republicans-intelligence.house.gov/news/documentsingle.aspx?DocumentID=774.

he thought it was "very possible" that Trump (or others at the White House) might have been swept up in surveillance targeting foreign nationals on U.S. soil.[5]

As particularly relevant here, during this period, the Post published at least two articles emphasizing that a meaningful difference separated Trump's and Nunes's positions. In one article (published on March 15, 2017), the Post laid out "a brief list of people who have said that President Trump's allegation that President Barack Obama ordered a wiretap of Trump Tower . . . is simply not true."[6] Nunes was the first person on the list; the Post identified him as "one of the few defenders of Trump's claims," but explained that he had "made clear . . . that there is *zero* evidence to suggest Trump Tower was wiretapped."[7] In a second article, published eleven days later, the Post described the situation as the "most notabl[e]" example of the "few cases" in which "Nunes [was] at odds with Trump."[8]

But the Post's November 9, 2020 article did not draw this distinction, and eight days after its publication, Nunes notified the Post that he believed the article was false and defamatory. Am. Compl. ¶ 6. He also demanded that it remove the statements about Nunes making "baseless claims" and visiting the White House "late at night" and issue a retraction or correction. *Id.* ¶¶ 2, 7. On December 8, the Post revised its online article to state that "[i]n March 2017, . . . *Nunes . . . was given access at the White House to intelligence files that Nunes believed would buttress*

---

[5] Natasha Bertrand, *'Clearly the president is wrong': House intel committee says it's seen 'no evidence' that Obama wiretapped Trump Tower*, Insider (Mar. 15, 2017), https://www.businessinsider.com/obama-wiretapped-trump-tower-evidence-intelligence-committee-2017-3?amp.

[6] Chris Cillizza, *Devin Nunes confirms it: The evidence of Trump Tower being wiretapped just doesn't seem to exist*, Wash. Post. (Mar. 15, 2017), https://www.washingtonpost.com/news/the-fix/wp/2017/03/15/the-evidence-of-trump-tower-being-wire-tapped-just-does-not-exist/.

[7] *Id.* (emphasis in original).

[8] Greg Miller & Karoun Demirjian, *Chairman and partisan: The dual roles of Devin Nunes raise questions about House investigation*, Wash. Post. (Mar. 26, 2017), https://www.washingtonpost.com/world/national-security/chairman-and-partisan-the-dual-roles-of-devin-nunes-raise-questions-about-house-investigation/2017/03/26/2c95ade2-1096-11e7-9b0d-d27c98455440_story.html. Nakashima was a contributor to the March 26, 2017 article. *Id.*

3

*Trump's baseless claims of the Obama administration spying on Trump Tower*," and that while "*[t]he precise timing of the visit is unclear, . . . Nunes says it took place during daylight hours*." Defs.' Mot., Ex. D at 3 (emphasis added). It also issued a correction at the top of the article, which stated that:

> As originally published, this article inaccurately attributed claims that the Obama administration spied on Trump Tower to Rep. Devin Nunes (R-Calif.), rather than to President Trump. Nunes has stated that he did not believe there had been any wiretapping of Trump Tower. This article has also been updated to note that Nunes says an incident known as the "midnight run" took place during daylight hours.

*Id.* And on December 8, 2020, the Post ran the following print retraction:

> A Nov. 10 A-section article about the naming of Michael Ellis as general counsel of the National Security Agency inaccurately attributed claims that the Obama administration spied on Trump Tower to Rep. Devin Nunes (R- Calif.), rather than to President Trump. Nunes has said that he did not believe there had been any wiretapping of Trump Tower.

Defs.' Mot., Ex. A at 2. On the same day that he demanded that the original article be retracted or corrected, Nunes initiated this lawsuit in the Eastern District of Virginia. *See generally* Compl., ECF No. 1. He later amended his Complaint to reflect the online updates and print retraction, alleging that both the original and updated versions of the article are defamatory and that the Post was negligent in publishing it. *See generally* Am. Compl. The case was transferred to this Court on February 22, 2021.

The Post's Motion to Dismiss is now fully briefed. The Post argues that (1) the article is neither materially false nor defamatory; (2) Nunes has not plausibly alleged that the Post published the article with actual malice; (3) Nunes may only recover special damages under California's retraction statute (which he has failed to allege); and (4) the First Amendment bars the negligence claim. *See generally* Defs.' Mot. The Court heard oral argument on the Motion on May 18, 2021. *See* Min. Entry of May 18, 2021.

4

## II.    Legal Standard

When evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff the benefit of all inferences that can be derived from the facts alleged." *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 165 (D.C. Cir. 2003) (internal quotation omitted). Although the Court accepts all well-pleaded facts in the complaint as true, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "While a complaint . . . does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of [its] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (internal quotations and citations omitted). The claim to relief must be "plausible on its face," and a plaintiff's pleadings must "nudge[ the] claims across the line from conceivable to plausible." *Id.* at 570.

## III.    Analysis

### A.  Defamation Claim

In general, a plaintiff alleging defamation under District of Columbia law[9] must plead:

> (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm.

*Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 858 (D.C. Cir. 2006) (quoting *Beeton v. District of Columbia*, 779 A.2d 918, 923 (D.C. 2001)). If the plaintiff is a public official, the First

---

[9] The Parties disagree regarding what law applies here. For the reasons discussed *infra* Part III.A.3, the Court applies D.C. law to Nunes's defamation claim. But the choice-of-law analysis is irrelevant to the Post's arguments regarding material falsity, defamatory meaning, and actual malice because the elements of a defamation claim (as required by the First Amendment) are the same in each state. *See Va. Citizens Def. League v. Couric*, 910 F.3d 780, 783 (4th Cir. 2018) (quoting *Schaecher v. Bouffault*, 290 Va. 83, 91 (2015)); *Bowles v. Constellation Brands, Inc.*, 444 F. Supp. 3d 1161, 1172 (E.D. Cal. 2020).

5

Amendment requires more: a public official must plead that the defendant published the statement "with 'actual malice,' that is, with 'knowledge that it was false or with reckless disregard of whether it was false or not.'" *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1292 (D.C. Cir. 1988) (quoting *N.Y. Times Co. v. Sullivan*, 370 U.S. 254, 280 (1964)).

### 1. Material Falsity and Defamatory Meaning

The Post first argues that Nunes has failed to allege that the article is materially false. Defs.' Mot. at 9–16. A materially false statement has "a different effect on the mind of the reader from that which the pleaded truth would have produced." *Shipkovitz v. Wash. Post. Co.*, 408 Fed. App'x 376, 378 (D.C. Cir. 2010) (quoting *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991)). "Minor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the libelous charge be justified." *Masson*, 501 U.S. at 517 (interpreting California law) (internal quotation omitted); *accord Liberty Lobby, Inc.*, 838 F.2d at 1296 (noting that a statement is nonactionable if "[t]he sting of the charge . . . is substantially true").

Nunes alleges that the article is false because he has never claimed that the Obama administration spied on Trump Tower. The Post doesn't really contend that Nunes has ever made that claim; instead, it argues that the article is substantially true because a claim about the Obama administration "spying on Trump Tower" is not materially different from Nunes's public claims about the Obama administration "spying on the Trump campaign" and conducting "surveillance activities" against President Trump and his associates. Defs.' Mot. at 11–15; *see Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 247 (2d Cir. 2017) ("[W]hen falsity is an element of a state defamation claim," plaintiff must plead facts that would allow reasonable juror to consider the statement false.).

This argument might be persuasive if the article stated merely that Nunes had made claims about spying on Trump Tower; without more, a reader might think there is no meaningful difference between "spying on Trump Tower" and "surveillance activities . . . used against President Trump and his associates." But the article also labeled Nunes's claims as "baseless," Am. Comp. ¶ 2, and the Court must consider the article as a whole, *see Tavoulareas v. Piro*, 817 F.2d 762, 779–80 (D.C. Cir. 1987) (en banc) ("[A] court is to consider both the words themselves and the entire context in which the statement occurs."). By November 2020, there *was* evidence to support (at least to a certain extent) Nunes's claims about intelligence activities that touched on the Trump campaign; by that time, an Inspector General report had concluded there had been an investigation "to determine whether individual(s) associated with the Trump campaign are witting of and/or coordinating activities with the Government of Russia," and that the investigation targeted certain U.S. persons affiliated with the campaign.[10] What remained baseless in November 2020 (or at least what Nunes alleges remained baseless) was the claim President Trump asserted in his March 2017 tweet: that the Obama administration had wiretapped Trump Tower. But Nunes alleges he never made such a claim. This is an important difference: A reasonable juror could conclude that there is a material difference between stating that Nunes had made a claim supported by evidence (that the Obama administration had undertaken intelligence activities related to individuals involved in the Trump campaign) and stating that Nunes had made a baseless claim (that the Obama administration had wiretapped Trump Tower). A reasonable juror could therefore conclude that the article was materially false because it stated that Nunes had made such a baseless claim (when he had not).

---

[10] *See Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation*, OIG Report at ii (Dec. 8, 2019), https://www.documentcloud.org/documents/6571528-120919-Examination.

But even if the article was materially false, it must also have defamatory meaning; that is, it must rise to the level of making Nunes "appear odious, infamous, or ridiculous," *Smith v. Clinton*, 886 F.3d 122, 128 (D.C. Cir. 2018) (per curiam), or "tend[] to injure [him] in his trade, profession or community standing, or lower him in the estimation of the community," *Jankovic v. Int'l Crisis Grp.*, 494 F.3d 1080, 1091 (D.C. Cir. 2007) (quoting *Moss v. Stockard*, 580 A.2d 1011, 1023 (D.C. 1990)). "Whether a statement is capable of defamatory meaning is a question of law, but '[i]t is only when the court can say that the publication is not reasonably capable of any defamatory meaning and cannot be reasonably understood in any defamatory sense that it can rule as a matter of law[] that it was not libelous.'" *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 627 (D.C. Cir. 2001) (quoting *White v. Fraternal Order of the Police*, 909 F.2d 512, 518 (D.C. Cir. 1990)).

The Post argues that the suggestion that Nunes "viewed documents that he believed would provide support for claims of spying made by the President" does not make him "appear odious, infamous, or ridiculous" nor suggest that he is unfit for his position as a congressman. Defs.' Mot. at 20. As the Post puts it, "it was not defamatory to say that the Chairman of the House Intelligence Committee, 'a staunch supporter of President Trump,' viewed documents that he believed could lend credence to the President's claims." Reply Mem. Defs.' Mot. to Dismiss ("Defs.' Rep."), ECF No. 38 at 6. But again, that is not all that the article says. Taken as a whole, the article says (or at least a reasonable juror could understand the article to say) that Nunes had made baseless claims about spying on Trump Tower and then visited the White House to inspect documents that might support those baseless claims. And a reasonable juror could conclude that an elected official is ridiculous or unfit for office if he searched for evidence to support baseless claims. Indeed, the online article stated that Nunes had searched for this evidence "late at night," suggesting something

8

untoward about the outing. Although the Post argues that such timing suggests merely that Nunes "devoted significant time and energy to his duties," Defs.' Mot. at 16, a reasonable juror could conclude that the article carried a different meaning.

The Post further urges the Court to discount the relevance of its use of the term "baseless" for purposes of the defamatory meaning analysis because, without that word, the article would be "otherwise accurate"—presumably on the theory that a single word cannot transform an "otherwise accurate" article into one with defamatory meaning. *Id.* at 20 (quoting *Downs v. Schwartz*, 2015 WL 4770711, at *16 (E.D. Pa. Aug. 12, 2015)). But that argument proves too much; the Court is required to consider the article as a whole, and the insertion of a single word *can* substantially change the meaning of a statement. (Consider the difference between a "claim" and a "false claim," or between "food" and "rotten food."). Even if it would not have been defamatory to say that Nunes went to the White House in search of evidence for his own claims (in part because he did end up uncovering some evidence for the claims he *was* making, Defs.' Mot. at 21), "baseless" is the type of word that transforms the "gist" of the article by insinuating that Nunes is the type of official who would spend his time searching for evidence to support claims with no foundation in fact.

### 2. Actual Malice

The article is only actionable if the Post published it with actual malice, which requires that the Post either knew the article was false or recklessly disregarded the truth. *Liberty Lobby, Inc.*, 838 F.2d at 1292.[11] A defendant acts in reckless disregard of the truth if it "in fact entertained serious doubts as to the truth of [its] publication" or acted "'with a high degree of awareness of . . . probable falsity.'" *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) (quoting *Garrison v.*

---

[11] Nunes does not dispute that he is a public figure who must plead actual malice to state a claim for defamation.

9

*Louisiana*, 379 U.S. 64, 74 (1964)). The "'serious doubt' standard requires a showing of subjective doubts by the defendant." *Tavoulareas*, 817 F.2d at 789; *see also St. Amant*, 390 U.S. at 731 (explaining that "reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing" the statement); *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 589 (D.C. Cir. 2016) ("[I]t is not enough to show that defendant should have known better; instead, the plaintiff must offer evidence that the defendant in fact harbored subjective doubt."). Subjective doubt can be proven through "the cumulation of circumstantial evidence, as well as through direct evidence." *Jankovic*, 822 F.3d at 589 (internal quotation marks and citation omitted).

Nunes alleges that the Post acted with actual malice because it "made up facts out of whole cloth," Am. Compl. ¶ 22a, "abandoned all journalistic standards and integrity," *id.* ¶ 22d, and published the article out of "institutional hostility, hatred, . . . bias, spite and ill-will" toward Nunes, *id.* ¶ 22e, and as "revenge" for other instances in which he has feuded with the Post, *id.* ¶ 22g. He also alleges that the Post improperly relied on unreliable and biased sources despite Nunes's denial that he had participated in any "midnight run," *id.* ¶ 22a, and that the Post's actual malice is evinced by the fact that in March 2017 it had correctly reported Nunes's repudiation of President Trump's unfounded claims, *id.,* but then changed course in November 2020.

Most of Nunes's allegations, without more, do not demonstrate actual malice. As an initial matter, Nunes's bald assertions that the Post knew that its statements were false are no more than "labels and conclusions" referencing the relevant legal standard. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). And his conclusory references to the Post's purported animus and lack of standards fare little better; actual malice requires more. *See Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 665 (1989) ("[A] public figure plaintiff

must prove more than an extreme departure from professional standards and[] a newspaper's motive in publishing a story . . . cannot provide a sufficient basis for finding actual malice."); *Arpaio v. Zucker*, 414 F. Supp. 3d 84, 92 (D.D.C. 2019) ("[T]he motivations behind defendants' communications—inspired by political differences or otherwise—do not impact whether defendants acted with actual malice as a matter of law."). Nunes's allegations regarding his denials are similarly unavailing: "A publisher need not accept 'denials, however vehement; such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error.'" *Tah v. Glob. Witness Publ'g, Inc.*, 991 F.3d 231, 242 (D.C. Cir. 2021) (quoting *Lohrenz v. Donnelly*, 350 F.3d 1272, 1285 (D.C. Cir. 2003)).

But Nunes pleads more than just legal conclusions. In March 2017 the Post itself had reported that Nunes had *denied* President Trump's claims about a wiretap at Trump Tower. *See supra* Part I; *see, e.g.*, Miller & Demirjian, *Chairman and partisan: The dual roles of Devin Nunes raise questions about House investigation*, Wash. Post. (Mar. 26, 2017) ("Nunes has been at odds with Trump in a few cases, most notably when Nunes said that Trump was simply 'wrong' about the claim that Obama had ordered a wiretap of Trump Tower to listen to the Republican presidential candidate."). In the article at issue here, the Post reported that Nunes made that baseless claim himself. A newspaper's *own* prior (and correct) reporting that is inconsistent with its later (and incorrect) reporting could certainly give the paper reason to seriously doubt the truth of its later publication—just as a source's pre-publication recantation may be evidence that a

publisher had reason to doubt the source's original claims. *See Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257, 283–84 (D.D.C. 2017).[12]

The Post urges the Court to conclude that its November 9, 2020 article merely misattributed the baseless claims to Nunes (rather than to President Trump) and was therefore a "simple misstatement of the Post's prior reporting." Defs.' Mot. at 26. That may very well be true. But at this stage in the proceedings, where the Court is limited to the allegations in the Amended Complaint and the reasonable inferences that can be drawn from them, the Court cannot determine what in fact led to the incorrect statements in the article. The same can be said for the Post's updates and retraction; although a defendant's correction "is significant and tends to negate any inference of actual malice," *Logan v. District of Columbia*, 447 F. Supp. 1328, 1332 (D.D.C. 1978) (quoting *Hoffman v. Wash. Post Co.*, 433 F. Supp. 600, 605 (D.D.C. 1977), *aff'd*, 578 F.2d 442 (D.C. Cir. 1978)), even a full retraction, without more, does not foreclose the possibility that a defendant acted with actual malice. *Hoffman v. Washington Post Co.*, 433 F. Supp. 600, 605 (D.D.C. 1977), *aff'd*, 578 F.2d 442 (D.C. Cir. 1978) (noting that readiness to print a retraction may weigh against a finding of malice, but that it does not foreclose the possibility). And although the Post's retraction did note that "Nunes has stated that he did not believe there had been any wiretapping of Trump Tower," it also added that "*Nunes believed [intelligence files] would buttress Trump's baseless claims*"—which a reasonable juror could conclude meant that Nunes did believe the baseless claims. Defs.' Mot. Ex. D at 2 (emphasis added). Later in this case, Nunes will have to establish by clear and convincing evidence that, even in light of the corrections the Post *did* issue, it published its statements with actual malice. *See McFarlane v. Sheridan Square*

---

[12] Because Nakashima was a contributor to at least one of the articles distinguishing Nunes's position on the wiretap claims from the former President's stance, it is appropriate to consider the prior reporting with respect to both Defendants' subjective states of mind.

12

*Press*, 91 F.3d 1501, 1508 (D.C. Cir. 1996). But for now, he has sufficiently pleaded that, in November 2020, the Post published its article with at least reckless disregard of the truth that it had previously reported.

### 3. Choice of Law

Nunes has therefore adequately alleged the elements of his defamation claim. The Post argues it should be dismissed for another reason: California's retraction statute limits a plaintiff's recovery to special damages unless "a correction is demanded and is not published," Cal. Civ. Code. § 48a(a), and Nunes had not pleaded special damages.

This argument (unlike the prior arguments) requires the Court to decide what law applies to Nunes's defamation claim. The Court begins with Virginia's conflicts rules.[13] As a general proposition, in tort actions, "Virginia applies the doctrine of *lex loci delicti*, meaning the law of the place of the wrong governs all matters related to the basis of the right of action." *Dreher v. Budget Rent-A-Car Sys., Inc.*, 634 S.E.2d 324, 327 (Va. 2006) (emphasis added). "Virginia courts typically define the 'place of the wrong' as the 'state in which the wrongful act took place, wherever the effects of that act are felt.'" *Gilmore v. Jones*, 370 F. Supp. 3d 630, 664 (W.D. Va. 2019) (quoting *Gen. Assur. of Am., Inc. v. Overby-Seawell Co.*, 893 F.Supp.2d 761, 777–78 (E.D. Va. 2012)). For an allegedly defamatory publication, Virginia courts define the place of the wrong as the state where the initial publication occurred. *ABLV Bank v. Ctr. for Advanced Def. Studies*, No. 1:14-cv-1118, 2015 WL 12517012, at *1 (E.D. Va. Apr. 21, 2015) ("[F]or libel claims, Virginia looks to where the statement was published.").

---

[13] Following a change in venue under 28 U.S.C. § 1404, a transferee court applies the choice-of-law rules of the transferor Court. *Ferens v. John Deere Co.*, 494 U.S. 516, 519 (1990). Because the Court is sitting in diversity, it applies Virginia conflicts rules. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941) (noting that a federal court sitting in diversity applies choice-of-law rules of forum state). The Parties agree that Virginia conflicts rules apply.

13

But because a statement is "published" when it is communicated to a third party, *Katz v. Odin, Feldman & Pittleman, P.C.*, 332 F. Supp. 2d 909, 915 (E.D. Va. 2004) (defamatory communication published when first read and understood by third party), internet publications that are instantaneously made available to third parties in multiple states (indeed, around the globe) evade easy categorization under the *lex loci* rule. The Supreme Court of Virginia has not yet addressed how the rule applies in such cases; the Court therefore must predict how it would determine the place of the wrong. *See Nunes v. Cable News Network, Inc.*, 2021 WL 665003, at *2–3 (S.D.N.Y. Feb. 19, 2021) (citing *Gilmore*, 370 F. Supp. 3d at 664)) [hereinafter *CNN*].

The "underlying rationale for [Virginia's *lex loci* rule] is that approach's 'uniformity, predictability, and ease of application.'" *CNN*, 2021 WL 665003, at *3 (quoting *Gilmore*, 370 F. Supp. 3d at 665). But there is no clear place of publication for statements widely disseminated over the internet, and merely identifying where third parties are exposed to the statements or where the defendant last acted to upload the information provides little guidance in furtherance of those goals. *Id.* A patchwork of state laws could apply, for example, to a radio show simultaneously broadcast across and heard in several states. *Id.* And determining when and where a defendant took the last step necessary for publication runs into questions about what constitutes the defendant's last relevant action: Is it where the defendant uploaded content to the internet, or where it maintains its headquarters, or where it maintains its servers? *Id.*; *see also Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1028 n.4 (2021) (noting that the internet raises challenging "doctrinal questions" all its own). An approach focusing on conduct prior to a third party's observation of the publication would also be in tension with the Supreme Court of Virginia's broader discussion of the *lex loci* rule, which explains in the context of other torts that "the occurrence of the plaintiff's injury marks the last event necessary to establish liability." *Ford*

*Motor Co. v. Nat'l Indem. Co.*, 972 F. Supp. 2d 850, 856 (E.D. Va. 2013) (discussing the *lex loci* analysis for tortious interference with contract claim).

The Court therefore concludes that the Supreme Court of Virginia would define the "'place of the wrong'" as "the state where the plaintiff is primarily injured as a result of the allegedly tortious online content." *See Gilmore*, 370 F. Supp. 3d at 666. The Southern District of New York recently reached a similar conclusion after noting that "'in practice, lex loci jurisdictions have shown remarkable consistency in how to resolve the [place of the wrong] question,' looking to '. . . the jurisdiction where the plaintiff suffered the greatest injury.'" *CNN*, 2021 WL 665003, at *4 (quoting *Hatfill v. Foster*, 415 F. Supp. 2d 353, 364 (S.D.N.Y. 2006)). Absent "strong countervailing circumstances," a defamation plaintiff will typically suffer the greatest harm where he or she is domiciled. *Hatfill*, 415 F. Supp. 2d at 365. This approach serves the *lex loci* goals of "uniformity, predictability, and ease of application" by avoiding the overly technical (and sometimes unanswerable) inquiries inherent in an approach that focuses on the defendant's upload, headquarters, or servers. And it is consistent with Virginia's broader application of the rule, which applies the law of the place where the last act required to impose liability occurred. It is proper to focus on the place where third parties understood the publication—and therefore where the plaintiff was injured and liability arose.[14]

---

[14] Nunes urges the Court to define the "place of the wrong" as the state where the defendant put its statements into circulation. Pl.'s Mem. in Opp'n to Def.'s Mot. to Dismiss, ECF No. 36 at 11–14. Some of the cases he cites do not implicate multistate internet publications at all. *See, e.g.*, *Katz*, 332 F. Supp. 2d at 914–15 & n.4 (E.D. Va. 2004) (applying a Virginia statute of limitations to statements in a letter); *St. Clair v. Righter*, 250 F. Supp. 148, 151 (W.D. Va. 1966) (implicating a personal jurisdiction analysis regarding letters sent from an out-of-state publisher). And many of the cases that do involve internet publications were communicated to a limited audience. *See, e.g.*, *Meadows v. Northrop Grumman Innovation Sys.*, 436 F. Supp. 3d 879, 887 (W.D. Va. 2020) (noting that defamation by email is published where email is opened and read); *Edwards v. Schwartz*, 378 F. Supp. 3d 468, 502–03 (W.D. Va. 2019) (same); *Velocity Micro, Inc. v. J.A.Z. Mktg., Inc.*, 2012 WL 3017870, at *6 (E.D. Va. July 23, 2012) (same); *Fluor Enters., Inc. v. Mitsubishi Hitachi Power Sys. Ams.*, 2018 WL 3016286, at *3 (E.D. Va. June 15, 2018) (applying Texas law to company call to shareholders and other interested parties emanated from Texas). To the extent that some of the cases decided that a statement is published where a third party observes it (e.g., where a recipient opens and reads an email), they are generally consistent with the holding here, which focuses on where audiences read the defamatory statement instead of where the the defendant publishes it. Other cases do not engage with the *lex loci*

But in which state did Nunes suffer his injury? The Post argues that Nunes's "predominant injury is [in] California" because he is a citizen of California and because that is the state that "sends him to Congress as the representative of his district." Defs.' Rep. at 15. The Post relies on a recent decision in another defamation case brought by Nunes, in which the court concluded that any alleged injury caused by CNN's evening news program and online platforms was primarily suffered by Nunes in California. *CNN*, 2021 WL 665003, at *5. But the court reached that conclusion only after recognizing that the place of greatest harm could be somewhere other than where the plaintiff is domiciled, *see id.* (applying law of domicile only after determining that plaintiff had "proffered no facts from which the Court could find that there are extraordinary circumstances indicating that . . . the allegedly defamatory material garnered greater third-party attention in a single jurisdiction other than his home state"), and only after determining that Nunes had failed to plead any facts or "'strong countervailing circumstances'" to counter the presumption that he was primarily injured where he was domiciled, *id.*

Here, in contrast, Nunes does plead injuries he suffered in other jurisdictions. In particular, he alleges that he has suffered "pain, suffering, insult, embarrassment, humiliation, and injury to

---

analysis but make a mere assertion that a certain state's law applies or note that the place of publication was not disputed. *See, e.g.*, *Scott v. Moon*, 2019 WL 332415, at *3 n.5 (W.D. Va. Jan. 24, 2019) (applying without discussion law of the state where internet forum was controlled when defendant ran the internet forum, then dismissing complaint for failure to state a claim); *Scott v. Carlson*, 2018 WL 6537145, at *2 n.3 (W.D. Va. Dec. 12, 2018) (applying New York law when plaintiff pleaded that the defendant resided in New York but dismissing complaint for failure to state a claim); *ABLV Bank*, 2015 WL 12517012, at *2 ("[I]t is undisputed that ABLV's report was published from its office in Washington, D.C. It is irrelevant that the negative effects of that publication were felt in New York; any reputational damage caused by [the publication] occurred everywhere due to the nature of online publication. Thus, D.C. law shall govern the case."); *PBM Prods., LLC v. Mead Johnson Nutrition Co.*, 678 F. Supp. 2d 390, 398–399 & n.4 (E.D. Va. 2009) (implicating no dispute over location of publication for press release published in Virginia). Nunes cites two cases that came out the other way. In the first, the Circuit Court of Virginia decided that an online op-ed was published in Virginia because that is where the defendant's online edition was "created and routed through servers. . . [and] upload[ed] to the internet." *Depp v. Heard*, 2019 WL 8883669, at *6 (Va. Cir. July 25, 2019). The second case did not even contemplate a defamation claim; it examined the publication issue in the context of a claim for public disclosure of private facts. The court decided that the place of publication was "the location from which the information was published," but then applied the law of the forum state because it could not determine where the act of publication (i.e., where the content was uploaded to the internet) occurred. *Cockrum v. Donald J. Trump for President, Inc.*, 365 F. Supp. 3d 652, 669–70 (E.D. Va. 2019).

16

his personal and professional reputations" in the form of insults on social media, threatening phone calls to his office, canceled in-district meetings and public appearances, and lost professional opportunities, including appointment to Senate-confirmed offices. Am. Compl. ¶ 21. Nunes alleges that those injuries are concentrated in the Washington, D.C. metropolitan area because that is where he works, has an office, and performs his role as Ranking Member of the House Intelligence Committee. Pl.'s Opp'n at 14 n.4.

Moreover, while the Post does have an audience beyond the Washington metropolitan area, it reports on local D.C. news and is more directed toward D.C. audiences than media outlets such as CNN. This distinction is significant in the context of a multistate publication governed by the law of a *lex loci* jurisdiction, because the *lex loci* rule typically looks to a plaintiff's domicile as the place where he suffers the most harm "based on an assumption that the information would be of most interest to third parties in that state and would be opened and read by a substantial number of persons there." *CNN*, 2021 WL 665003, at *4; *see also Miller v. Lear Siegler, Inc.*, 525 F. Supp. 46, 56 (D. Kan. 1981) (applying Kansas *lex loci* rule). It is a reasonable inference that the readership of the Post is such that the most concentrated impact of its publications is felt in and around the District of Columbia. *Cf. Calder v. Jones*, 465 U.S. 783, 788–89 (1984) (identifying, for purposes of minimum contacts analysis, California as "focal point of the story and the harm suffered" when the "allegedly libelous story concerned the California activities of a California resident . . . impugned the professionalism of an entertainer whose television career was centered in California[,] [t]he article was drawn from California sources, and the brunt of the harm, in terms both of respondent's emotional distress and the injury to her professional reputation, was suffered in California"). And the types of reputational harm suffered by Nunes—who in his capacity as the Ranking Member of the House Intelligence Committee regularly meets with heads of agencies,

17

Members of Congress, White House staff, and other public officials in and around the District—are less concentrated in his domicile than they would be if he lived and worked in the same jurisdiction. *See Weyrich*, 235 F.3d at 626–27 (noting that the defamation plaintiff suffered injury by reason of loss of reputation in location of plaintiff's livelihood and place of work at time article was published).

The Court thus concludes that Nunes's injuries—at least as alleged in the Complaint—are primarily suffered in the District of Columbia. That is where he alleges he meets and interacts with other public officials, was considered for appointed positions, received numerous threats, and performs the majority of his duties as Ranking Member of the House Intelligence Committee. It also happens to be where much of the Post's readership resides, where the Post is headquartered, and where the events underlying the article occurred. As a result, based on Nunes's allegations, D.C. law applies to his defamation claim and California's retraction statute is inapplicable.[15]

## IV. Conclusion

For the foregoing reasons, the Court therefore grants the Post's Motion as to Nunes's negligence claim and denies it as to his defamation claim. An Order will be entered contemporaneously with this Memorandum Opinion.

DATE: August 11, 2021

CARL J. NICHOLS
United States District Judge

---

[15] Nunes's Amended Complaint also asserts a claim for negligence arising from the Post's violation of a duty of care owed to Nunes. Am. Compl. ¶¶ 24–28. But that claim is barred by the First Amendment, which requires more than negligence to establish the Post's liability for its speech. *See Moldea v. New York Times Co.*, 22 F.3d 310, 320–21 (D.C. Cir. 1994) ("[A] plaintiff may not use related causes of action to avoid the constitutional requisites of a defamation claim."). In any event, Nunes waived the negligence claim when he presented no response to the Post's motion to dismiss it.