# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

DEVIN G. NUNES,

        Plaintiff,

v.

WP COMPANY LLC, d/b/a THE
WASHINGTON POST and ELLEN
NAKASHIMA,

        Defendants.

Case No. 1:21-cv-00506 (CJN)

## **DEFENDANTS' MOTION TO COMPEL DISCOVERY FROM PLAINTIFF**

WILLIAMS & CONNOLLY LLP

Kevin T. Baine (D.C. Bar No. 238600)
Thomas G. Hentoff (D.C. Bar No. 438394)
Nicholas G. Gamse (D.C. Bar No. 1018297)
Sean M. Douglass (D.C. Bar No. 1033069)

680 Maine Avenue, SW
Washington, DC 20024
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
thentoff@wc.com

*Counsel for Defendants*

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

BACKGROUND .............................................................................................. 3

LEGAL STANDARD.......................................................................................... 8

ARGUMENT .................................................................................................... 9

I.     NUNES FAILED TO CONDUCT A REASONABLE SEARCH IN
RESPONSE TO THE POST'S DOCUMENT REQUESTS. .................................. 9

     A.    Nunes's Designation of a Spokesman as His Sole Custodian Is
Unreasonable. ................................................................................. 9

     B.    Nunes's Production Omits Internal Communications and Other
Documents, and His Assertions That No Documents Exist Are
Implausible.................................................................................. 13

     C.    Nunes's Production Omits Requested Metadata. ........................... 22

II.    NUNES FAILED TO ANSWER THE POST'S INTERROGATORIES. ................ 23

     A.    Nunes's Interrogatory Responses Are Deficient Because They
Fail To Reflect Information Available from Staff or Records...................... 24

     B.    Nunes's Interrogatory Responses Are Incomplete, Evasive, or
Contradictory. .............................................................................. 26

III.   NUNES FAILED TO PROVIDE ANY COMPUTATION TO SUPPORT
INITIAL DISCLOSURES CLAIMING $200 MILLION IN ALLEGED
DAMAGES................................................................................................. 31

CONCLUSION.................................................................................................. 33

STATEMENT PURSUANT TO LCVR 7(M) ....................................................... 33

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Am. Prop. Constr. Co. v. Sprenger Lang Found.*, 274 F.R.D. 1 (D.D.C. 2011)...........................32

*Amari v. Griffin*, No. 5:20-cv-50 (W.D. Va. May 9, 2022) ..............................................32

*Angrignon v. KLI, Inc.*, 2009 WL 10667097 (S.D. Fla. Apr. 20, 2009).........................................24

*Armenian Assembly of Am., Inc. v. Cafesjian*, 746 F. Supp. 2d 55 (D.D.C. 2010) ......................31

*Axis Ins. Co. v. Am. Specialty Ins. & Risk Servs., Inc.*, 2021 WL 2910814 (N.D. Ind. July 12, 2021) ............................................................................................................................15

*\* Barnes v. District of Columbia*, 283 F.R.D. 8 (D.D.C. 2012) ...............................................24, 31

*Berger v. Seyfarth Shaw, LLP*, 2008 WL 4570687 (N.D. Cal. Oct. 14, 2008).............................20

*Citizens for Resp. & Ethics in Washington v. U.S. Dep't of Homeland Sec.*, 527 F. Supp. 2d 76 (D.D.C. 2007) ............................................................................................................16

*Collett v. Socialist Peoples' Libyan*, 2005 WL 8167600 (D.D.C. Nov. 23, 2005).................14, 16

*Cont'l Cirs. LLC v. Intel Corp.*, 435 F. Supp. 3d 1014 (D. Ariz. 2020)........................................20

*\* Covad Commc'ns Co. v. Revonet, Inc.*, 258 F.R.D. 17 (D.D.C. 2009)....................26, 27, 28, 29

*D'Onofrio v. SFX Sports Grp., Inc.*, 247 F.R.D. 43 (D.D.C. 2008) ..............................................22

*Dage v. Leavitt*, 2005 WL 8167603 (D.D.C. Aug. 18, 2005)...................................................13, 16

*\* Escamilla v. Nuyen*, 2015 WL 4245868 (D.D.C. July 14, 2015)....................................13, 24, 26

*F.D.I.C. v. Halpern*, 271 F.R.D. 191 (D. Nev. 2010) .................................................................25

*Hagenbuch v. 3B6 Sistemi Elettronici Industriali S.R.L.*, 2006 WL 665005 (N.D. Ill. Mar. 8, 2006) ......................................................................................................................22, 23

*Hiramanek v. Cal. Jud. Council*, 2016 WL 6427870 (N.D. Cal. Oct. 31, 2016)..........................32

*In re Barnwell Enters. Ltd.*, 265 F. Supp. 3d 1 (D.D.C. 2017).....................................................10

*In re Grand Jury Subpoena John Doe, No. 05GJ1318*, 584 F.3d 175 (4th Cir. 2009).................10

---

\* *Authorities upon which counsel chiefly rely are marked with asterisks.*

\* *Inova Health Care Servs. v. Omni Shoreham Corp.*, 2021 WL 6503725 (D.D.C. Jan. 29, 2021) ................................................................................................................8, 13, 30

*Jewish War Veterans of the U.S. of Am., Inc. v. Gates*, 506 F. Supp. 2d 30 (D.D.C. 2007) .........10

*Klayman v. Jud. Watch, Inc.*, 2008 WL 11394169 (D.D.C. Mar. 12, 2008) ............................8, 16

*Kleen Prods. LLC v. Packaging Corp. of Am.*, 2012 WL 4498465 (N.D. Ill. Sept. 28, 2012) ......................................................................................................................................9, 12

*Leopold v. N.S.A.*, 196 F. Supp. 3d 67 (D.D.C. 2016) ..................................................................13

*Mann v. City of Chicago*, 2017 WL 3970592 (N.D. Ill. Sept. 8, 2017)........................................13

*Maurer v. Jones*, 2019 WL 3890924 (W.D. Ky. Aug. 19, 2019) ...........................................24, 26

*Nat'l Cmty. Reinvestment Coal. v. NovaStar Fin., Inc.*, 2009 WL 10719757 (D.D.C. July 13, 2009) ..............................................................................................................................31, 32

*Nunes v. Lizza*, 2021 WL 7186264 (N.D. Iowa Oct. 26, 2021)....................................................20

*Nunes v. WP Co.*, No. 20-cv-1403 (D.D.C.) .................................................................................20

*O'Rourke v. Audio Stats Educ. Servs., Inc.*, 1987 WL 11998 (D.D.C. May 26, 1987)...........24, 26

\* *Olmert v. Nelson*, 60 F.R.D. 369 (D.D.C. 1973) ........................................................................24

*Organo Gold Int'l, Inc. v. Aussie Rules Marine Servs., Ltd.*, 2019 WL 7371831 (S.D. Fla. Sept. 20, 2019) ...........................................................................................................................15

\* *Owens-Hart v. Howard Univ.*, 317 F.R.D. 1 (D.D.C. 2016) .......................................................9

*Oxbow Carbon & Minerals LLC v. Union Pac. R.R.*, 322 F.R.D. 1 (D.D.C. 2017).......................8

*Phila. Sunday Press, Inc. v. Consumers United Cap. Corp.*, 1987 WL 10242 (D.D.C. Apr. 16, 1987)..............................................................................................................................32

*Sarieddine v. D&A Distribution, LLC*, 2018 WL 5094937 (C.D. Cal. Apr. 6, 2018) .................15

*Shvartser v. Lekser*, 321 F.R.D. 23 (D.D.C. 2017)......................................................................26

\* *U.S. Commodity Futures Trading Comm'n v. Trade Exch. Network Ltd.*, 61 F. Supp. 3d 1 (D.D.C. 2014) ......................................................................................................................14, 15

\* *Weaver v. Gross*, 107 F.R.D. 715 (D.D.C. 1985) ..................................................................9, 12

*Williams v. Johanns*, 2006 WL 3826967 (D.D.C. Dec. 28, 2006) ........................................26, 28

\* *Williams v. Johnson*, 278 F.R.D. 10 (D.D.C. 2011) .................................................................31

## OTHER AUTHORITIES

Fed. R. Civ. P. 26 ................................................................................................8, 31

Fed. R. Civ. P. 33 .................................................................................8, 23, 24, 26, 31

Fed. R. Civ. P. 34 ............................................................................................8, 9, 22

Fed. R. Civ. P. 37 .........................................................................................................8

8B Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure (3d ed.) .................24

## <u>INDEX OF EXHIBITS</u>

**Exhibit A:**   Plaintiff's Objections, Answers and Responses to Defendants' Discovery Requests (November 24, 2021)

**Exhibit B:**   Plaintiff's Supplemental Answers and Responses to Defendants' Discovery Requests (December 22, 2021)

**Exhibit C:**   Plaintiff's Objections, Answers and Responses to Defendants' Second Discovery Requests (January 20, 2022)

**Exhibit D:**   Plaintiff's Supplemental Answers and Responses to Defendants' Second Discovery Requests (February 23, 2022)

**Exhibit E:**   Plaintiff's Objections, Answers and Responses to Defendants' Third Discovery Requests (April 3, 2022)

**Exhibit F:**   Devin Nunes Website (http://www.devinnunes.com)

**Exhibit G:**   Defendants' Discovery Dispute Submission (April 29, 2022)

**Exhibit H:**   Plaintiff's Rule 26(a)(1) Disclosures (October 22, 2021)

**Exhibit I:**   Email Correspondence of Parties' Counsel (December 9-10, 2021)

**Exhibit J:**   Letter from T. Hentoff to S. Biss (December 10, 2021)

**Exhibit K:**   Letter from T. Hentoff to S. Biss (February 17, 2022)

**Exhibit L:**   Letter from N. Gamse to S. Biss (March 22, 2022)

**Exhibit M:**   Defendants' First Set of Interrogatories (October 20, 2021)

**Exhibit N:**   Defendants' Second Set of Interrogatories (December 21, 2021)

**Exhibit O:**   Defendants' First Set of Requests for Production of Documents (October 20, 2021)

**Exhibit P:**   Defendants' Second Set of Requests for Production of Documents (December 21, 2021)

**INTRODUCTION**

Plaintiff Devin Nunes, former Chairman of the House Intelligence Committee, sued The Washington Post and Ellen Nakashima (collectively, the "Post") for defamation arising out of a November 2020 article (the "Article") which referred in two sentences to Nunes's so-called "midnight run" to the White House on March 21, 2017.  Nunes's lawsuit has placed squarely at issue a number of topics, including the truth of what happened that day and any claimed injury to him resulting from the Article's publication more than three-and-a-half years later.  Nunes asserts that statements regarding the so-called "midnight run" are false because his White House visit occurred during daylight hours and because it was not motivated to support baseless claims of wiretapping made by former President Donald Trump.  Accordingly, the Post served discovery requests on Nunes seeking documents and information relating to the timing and purpose of his White House visit, Nunes's communications before and after that visit made national headlines, and harms Nunes claims to have suffered in late 2020 from the Article's reference to that visit.  But Nunes has failed to comply with his most basic obligations under the discovery rules to collect and produce documents and information concerning those topics.

In a case in which he has claimed $200 million in alleged damage to his reputation, Nunes has made little more than a superficial effort to satisfy his discovery obligations.  He has not produced any communications from himself or within his staff, and has not even tried to collect non-public documents from anyone other than his spokesman.  Aside from his spokesman, he has refused to consult with any of the staff in his employ during the events in question.  For example, even though his schedule on March 20 and 21, 2017 is directly at issue because Nunes claims he was defamed by the statement that his White House trip occurred "reportedly late at night," Nunes refused to consult the scheduler on his staff at the time, Jennifer Morrow, or collect her documents.  At an even more basic level, in response to an interrogatory

seeking the accounts, repositories, or other sources housing any relevant documents, he refused to identify where documents are located for his staff, or even for himself, frustrating the Post's ability to understand what responsive documents should exist, where they should be stored, and whether they were preserved and collected.  Nunes likewise failed to seek out information available to him from staff and documents to respond to interrogatories, instead relying primarily on his unrefreshed memory and consultation with his spokesman, regarding fundamental matters he acknowledges he cannot recall but which he placed at issue in this lawsuit.

Many of Nunes's responses to interrogatories are also evasive or contradicted by his own statements or the public record.  That is true even for requests seeking basic information about the identities of witnesses or the locations of sources of information that relate to his allegations.

Nunes's initial disclosures are also deficient.  In violation of the rules of civil procedure, he refused to provide the bases for his assertion in his initial disclosures that he suffered hundreds of millions of dollars in damages from publication of the Article—even after representing to the Court and the Post that he would supplement his initial disclosures "by April 29, 2022," which he failed to do.  Ex. G (Discovery Dispute Submission), at 4.

The Post seeks the Court's intervention to enforce the rules of discovery so the Post can obtain basic information needed to pursue discovery, such as the identities of knowledgeable witnesses and the internal documents and communications needed to probe the bases for Nunes's allegations and claimed damages.  The Post respectfully requests that the Court order Nunes to comply with the Post's discovery requests—including by conducting a diligent search for documents and information from his staff, and supplementing his initial disclosures, document production, and interrogatory responses accordingly.

**BACKGROUND**

In November 2020 the Post published the Article, which reported on the appointment of Michael Ellis, a former staffer to Congressman Devin Nunes, as NSA general counsel.  Nunes— who had served for the past four years as Chairman of the House Permanent Select Committee on Intelligence ("Intelligence Committee")—sued the Post and Post journalist Ellen Nakashima for defamation for two statements in the Article's background section.  The first statement: "In March 2017, [Ellis] gained publicity for his involvement in a questionable episode involving Nunes, who was given access at the White House to intelligence files that Nunes believed would buttress his baseless claims of the Obama administration spying on Trump Tower," which Nunes asserts is false because he did not make or believe claims of wiretapping, ECF No. 22 ("Am. Compl.") ¶¶ 17(a)-(c).  The second statement: "News reports stated that Ellis was among the White House officials who helped Nunes see the documents — reportedly late at night, earning the episode the nickname 'the midnight run,'" which Nunes asserts is false because the events occurred during daytime, *id.* ¶ 22(a).

After the Court denied a motion to dismiss, the parties met and conferred to discuss fact discovery, including the Post's request for "Plaintiff to confirm that in responding to Defendants' discovery requests, he would collect and produce documents or information from his congressional and campaign offices and staffers" over which "he has actual or constructive possession, custody, or control."  ECF No. 44 ¶ 16(b).  In an October 1, 2021 submission to the Court, Nunes represented that "in response to party discovery he will produce any documents or information that may be in the possession or control of his congressional staff," and do so "without the need for third-party discovery."  *Id.*

In initial disclosures served weeks later, Nunes identified only one staff member likely to have discoverable information relating to his allegations of defamation: Jack Langer, Nunes's

spokesman and communications director.  Ex. H (Pl.'s Initial Disclosures), at 2.  Nunes also

claimed $200 million in damages, including $100 million in "actual injuries," $50 million in

"presumed damages," $25 million in "special damages," and $25 million in "punitive damages"

without any computation or explanation of those figures.  *Id.* at 3-4.

The Post subsequently served Nunes with discovery requests relating to his defamation

claim and claimed damages.  Among other things, the Post's requests sought any documents and

information relating to Nunes's White House visit on March 21, 2017, Nunes's public and

private statements before and after that visit made national headlines, and the harms Nunes

purportedly suffered in late 2020 from the Article's reference to that visit.  The Post's requests

sought documents and information from Nunes's Congressional Office staff (employees at

Nunes's congressional offices, including between 13 and 18 employees at any given time

between 2017 and 2020), Intelligence Committee staff (employees who reported to or were hired

by Nunes as Chairman or Ranking Member of the Intelligence Committee, including 22

employees in 2017 and 2018 when Nunes was Chairman), and Campaign staff (employees of the

Devin Nunes Campaign Committee or other campaign committees Nunes controls, including his

campaign manager and political consultants).

Rather than search for documents and information responsive to those requests among his

many agents, Nunes opted to rely on certain documents of one staffer:  his spokesman, Langer.

Nunes admitted: "The only person I communicated with in preparing the documents, aside from

my attorney, was Jack Langer."  Ex. E (Pl.'s Resps. to Defs.' 3d Discovery Requests), at 5.

Thus, in his responses to the Post's requests for production of documents, Nunes

produced only 109 emails—all from Langer—none of which reflect any "internal" discussion

with Nunes or among Nunes's Congressional Office, Intelligence Committee, or Campaign staff.

Three-quarters (85) of the emails constitute "external," media-facing correspondence between Langer and journalists, and the remaining (24) emails simply contain public news articles or press releases—including "Nunes in the News" compilations circulated by a "DC Intern" in Nunes's office.  The only other documents Nunes produced include a two-page "agenda" for two days in March 2017, three widely reported letters from the Intelligence Committee to U.S. government agencies, and 51 Word or PDF documents that reflect publicly available information (e.g., financial disclosure reports, statements of disbursements, and staff lists) or appear to have been created for use in this litigation (e.g., documents titled "Appendix" and subtitled "Social Media attacks," "Sources Impeaching WaPo Russia Collusion Coverage," "Threats," or "WaPO Timeline").  Nunes did not produce any of the metadata the Post requested for any of those documents, including metadata that would identify a document's custodian or the date when it was created or last modified.  Nunes also did not produce any internal communications, notes, drafts, or other documents, and did not produce any external communications with individuals other than journalists, such as White House employees.  In response to most of the Post's document requests, Nunes denied that documents exist (stating "None" for Request Nos. 4, 7-19, 24, 28-29, 34-36, 38, 41), or cited a few documents (such as the "Appendices") without committing to search for all responsive documents in his possession, custody, or control (e.g., stating: "See Appendix A; Appendix E; Appendix F; Press releases cited in response to request no. 1" for Request Nos. 8-10).  See Ex. A (Pl.'s Resps. to Defs.' 1st Discovery Requests) at 16–28; Ex. C (Pl.'s Resps. to Defs.' 2d Discovery Requests), at 7-10.

Nunes also failed to provide basic information in response to the Post's interrogatories, such as the identities of any staffers other than Langer with "knowledge or information concerning the allegations in this action," Ex. B (Interrog. No. 2), at 3-5, "knowledge

of . . . damages," *id.* (Interrog. Nos. 6, 11), at 6-13, 17-18, or "relevant documents," *id.* (Interrog. No. 16), at 7.  Instead, Nunes asserted, "I have no relevant documents in my custody, possession, or control aside from the documents I have already provided," *id.* (Suppl. Resp. to Interrog. No. 16), and claimed that any other staffers had "no knowledge of these areas aside from what [he/she] read in the press," *id.* (Suppl. Resp. to Interrog. No. 15), at 3-6.  Nunes limited many responses to what he personally could "recall."  *Id.* at 8-9 (Suppl. Resp. to Interrog. No. 17: "I cannot recall how my visits to the Eisenhower Executive Office Building or the White House were arranged."); Ex. B, at 5 (Suppl. Resp. to Interrog. No. 2: "I cannot recall with whom I worked on specific statements and press releases five years ago, but most likely it was HPSCI communications director Jack Langer."); *id.* at 3 (Suppl. Resp. to Interrog. No. 1: "No specific times were provided because I do not have a minute-by-minute account of my activities that day, or any day for that matter.").  In response to interrogatories relating to his claimed damages of $200 million, Nunes either restated allegations, *id.* (Resps. to Interrog. Nos. 6, 7, 9, 11), at 6-18, or objected without answering, Ex. A (Resp. to Interrog. No. 13), at 13.

On December 6, 2021, Nunes announced that he would resign from Congress to lead former President Donald Trump's new social media company, Trump Media and Technology Group.[2]  The Post promptly asked Nunes to confirm that he would "ensure the preservation of and continued access to all documents that may be relevant to his ongoing litigation with the Washington Post after he leaves office, including those documents held by his current or former Campaign Staff, Congressional Office Staff, or Intelligence Committee Staff."  Ex. I (Dec. 9, 2021 Email from N. Gamse to S. Biss).  Nunes responded that his departure from Congress "has

---

[2] *Devin Nunes Will Quit the House To Take Over Trump's Media Company*, N.Y. TIMES (Dec. 6, 2021), https://www.nytimes.com/2021/12/06/us/politics/devin-nunes-trump.html.

no impact on his efforts to preserve relevant documents and information," and that "[a]ny and all relevant documents have been preserved."  *Id.* (Dec. 10, 2021 Email from S. Biss to N. Gamse).

The Post identified the deficiencies in Nunes's discovery responses in detailed letters. *See* Ex. J (Dec. 10, 2021 Letter from T. Hentoff to S. Biss); Ex. K (Feb. 17, 2022 Letter from T. Hentoff to S. Biss).  The parties exchanged further correspondence regarding Nunes's discovery responses, which culminated in a telephonic meet-and-confer on March 17, 2022.  During the meet-and-confer, Nunes's counsel responded that in addressing discovery requests, Nunes "generally relied on his own personal recollection, and had no documents."  Ex. L (Mar. 22, 2022 Letter from N. Gamse to S. Biss), at 2.  Both on the call and in later correspondence, the Post identified multiple individuals likely to have possessed information or documents responsive to requests, such as Nunes's former scheduler (Jennifer Morrow) and chiefs of staff (Jillian Plank and Anthony Ratekin), Nunes's Intelligence Committee assistants (Scott Glabe, George Pappas, and the late Damon Nelson), and Nunes's Campaign manager (Jake Mizner).  *Id.* at 3.  Nunes's counsel stated that he would consider seeking discovery from those individuals. *Id.* at 2-3.  Only Nunes knows the identities of other key agents—for example, the unidentified staffer who Nunes publicly stated was accompanying him before his March 21, 2017 visit to the White House, and the unidentified staffer who drafted content about this lawsuit for Nunes's campaign-funded website—and Nunes's counsel agreed to identify those individuals.  *Id.*  The Post requested that Nunes supplement his responses accordingly.  *Id.* at 4.

Nunes never responded.  When the Post advised Nunes's counsel that the Post intended to raise this discovery dispute with the Court, Nunes's counsel asserted that he "conducted a reasonable search for responsive material," "there is no further information to provide," and "there are no other custodians, including staffers and other employees at Plaintiff's

congressional, committee, and campaign offices who are in possession of any responsive documents." Ex. G, at 2.  Nunes's counsel did so even though he failed to provide information he had agreed to collect regarding the individuals the Post identified as likely to have responsive information or documents.  Nunes also represented that he would "supplement his initial disclosures by April 29, 2022 to include a more specific computation of each category of his damages," *id.* at 4, which he failed to do.  The Court authorized this motion on June 6, 2022.

## LEGAL STANDARD

A party may discover "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1).  Interrogatories each "must, to the extent it is not objected to, be answered separately and fully in writing under oath," with any grounds for objecting "stated with specificity." Fed. R. Civ. P. 33(b)(3)-(4).  Requests for production of documents require a responding party to produce discoverable documents in its "possession, custody, or control," Fed. R. Civ. P. 34(a)(1), and impose "the same specificity requirement" on any objections to doing so. *Inova Health Care Servs. v. Omni Shoreham Corp.*, 2021 WL 6503725, at *1 (D.D.C. Jan. 29, 2021).  Courts "typically reject" as "inadequate" any "partially responsive" answers or "generic," "non-specific" objections to discovery requests. *Id.* at *1, *4-5; *Klayman v. Jud. Watch, Inc.*, 2008 WL 11394169, at *3 (D.D.C. Mar. 12, 2008).

Under Federal Rule of Civil Procedure 37(a)(1), "a party may move for an order compelling disclosure or discovery."  "The party that brings the motion to compel bears the initial burden of proving that the opposing party's answers were incomplete, and explaining how the requested information is relevant." *Oxbow Carbon & Mins. LLC v. Union Pac. R.R. Co.*, 322 F.R.D. 1, 5-6 (D.D.C. 2017) (citations omitted).  "If the movant satisfies this burden, the burden then shifts to the non-movant to explain why discovery should not be permitted." *Id.* at 6.

## ARGUMENT

**I.      Nunes Failed To Conduct a Reasonable Search in Response to the Post's Document Requests.**

Nunes should be required to supplement his responses to the Post's first two sets of document requests (Request for Production Nos. 1-41) because of pervasive deficiencies in those responses and in his document production. First, Nunes's search for responsive documents was unreasonably limited to the files of a single custodian—his spokesman, Jack Langer. Second, Nunes's production omitted any internal communications and other documents likely generated by Nunes's Congressional Office, Intelligence Committee, and Campaign staffers, and his responses do not commit to producing all responsive documents in his possession, custody, or control. Nunes's assertions that other documents do not exist are implausible, particularly given his limited search. His attempts to evade document requests by citing specific documents he chooses to produce, or by objecting without specifying the bases for objections, are inadequate.

**A.      Nunes's Designation of a Spokesman as His Sole Custodian Is Unreasonable.**

Nunes's failure to collect and produce documents from anyone other than his spokesman is unreasonable. In responding to document requests, a party must produce any responsive, non-privileged documents in his "possession, custody, or control," Fed. R. Civ. P. 34(a)(1), including those the party has "the legal right, authority or ability to obtain," *Owens-Hart v. Howard Univ.*, 317 F.R.D. 1, 6 (D.D.C. 2016). A party "has a duty to seek" documents "reasonably available to him from his employees, agents, or others subject to his control," and "cannot take a purposefully restricted approach to discovery by furnishing only that information within his immediate knowledge or possession." *Weaver v. Gross*, 107 F.R.D. 715, 717 (D.D.C. 1985); *see Kleen Prods. LLC v. Packaging Corp. of Am.*, 2012 WL 4498465, at *15 (N.D. Ill. Sept. 28, 2012) (document custodian selection "must be designed to respond fully to document requests

and to produce responsive, nonduplicative documents during the relevant period").

Nunes's selection of a single document custodian among his many staffers reflects a "purposefully restricted approach" that renders his discovery responses inadequate.  *Weaver*, 107 F.R.D. at 717.  Before he departed Congress, Nunes represented to the Court that he would "produce any documents or information that may be in the possession or control of his congressional staff," ECF No. 44 ¶ 16(b), and promised the Post that his departure would have "no impact" on production of responsive documents from current or former Congressional Office, Intelligence Committee, or Campaign staff, which "have been preserved," Ex. I.[3]  Yet by his own admission, Nunes did not even attempt to collect documents from any staffer other than his spokesman, Jack Langer.  Ex. E, at 5 (Resp. to Interrog. No. 18: "The only person I communicated with in preparing the [responses to the Post's requests for production of documents and interrogatories], aside from my attorney, was Jack Langer.").

Nunes's failure is all the more serious because the Post's discovery requests expressly call for documents from Nunes's "Congressional Office, Intelligence Committee, and Campaign staff," *see, e.g.*, Ex. A (Request Nos. 4, 5, 8, 9, 12–14, 33, 34), at 16-20; *see also* Exs. O & P

---

[3] Even if Nunes had not promised to preserve and produce any responsive documents possessed by his staff, courts have found that such documents are within the possession, custody, or control of a Member of Congress.  *See, e.g.*, *Jewish War Veterans of the U.S. of Am., Inc. v. Gates*, 506 F. Supp. 2d 30, 59-63 (D.D.C. 2007) (compelling Members to produce e-mails between or among staff); *In re Grand Jury Subpoena John Doe, No. 05GJ1318*, 584 F.3d 175, 187 (4th Cir. 2009) (compelling Member to produce documents of his chief of staff, deputy chief of staff, and legislative assistant over which he "had constructive possession" because he "could have called for them at any time").  That is consistent with the fact that Nunes employed his staff, *see In re Barnwell Enters. Ltd.*, 265 F. Supp. 3d 1, 16 (D.D.C. 2017) ("employers have control over their employees and can be required to produce documents in their employees' possession"), and controlled his office's records, *see* 115th, 116th, & 117th Congresses, House Rule VII ¶ 6(b), ("Records created, generated, or received by the congressional office of a Member . . . in the performance of official duties are exclusively the personal property of the individual Member . . . and such Member . . . has control over such records.").

(Defs.' Requests for Prod.), at 4 (defining those terms), and because the Post informed Nunes
during the meet and confer process that it is obvious from public records that many of his staffers
likely possess responsive documents, such as any of the following individuals:

- Congressional Office scheduler (Jennifer Morrow)—her role as "scheduler" signals
  she likely possesses, at minimum, "schedules" and other documents relating to
  Nunes's White House visits (Request No. 2) or his "meetings" and "public
  appearances" (Request Nos. 18, 19).

- Congressional Office assistant (Kathryn Hopper)—her request to be reimbursed for
  paying for Nunes's "taxi/parking/tolls" on the day of his March 21, 2017 White
  House visit suggests she likely possesses, at minimum, "travel expenses or receipts"
  and other documents relating to his White House visits (Request Nos. 2, 41).

- Congressional Office employee(s) (unknown)—Nunes publicly stated he "was in a
  cab with staff" and "dropped them off before" his March 21, 2017 White House visit.
  *See* Jake Tapper, *Who cleared Devin Nunes into the White House?* CNN (Mar. 28,
  2017), https://www.cnn.com/2017/03/27/politics/devin-nunes-white-house-donald-
  trump/index.html.  But Nunes has not identified the "staff" whose email account(s) or
  other files likely include, at minimum, emails or other documents relating to that visit
  (Request No. 2).  Nunes's counsel agreed during the meet-and-confer process to
  identify the individual(s), but subsequently failed to do so.

- Congressional Office employee (unknown)—Nunes stated, "I cannot recall how my
  visits to the Eisenhower Executive Office Building or the White House were

11

arranged," Ex. D (Suppl. Resp. to Interrog. No. 17), at 8-9, but has not identified any

person from his Congressional Office who assisted in arranging such visits, who

likely possesses, at minimum, "documents relating to" those visits (Request No. 2).

- Congressional Office chiefs of staff (Jillian Plank and Anthony Ratekin)—their roles

  as "chief of staff" signal they likely possess, at minimum, "communications" with

  Nunes or drafts of his public "statements" relating to the explosive aftermath of his

  March 21 and March 22, 2017 White House visits (Request Nos. 10, 15), and would

  be knowledgeable about the location of documents responsive to all other requests.

- Intelligence Committee assistants (Scott Glabe, George Pappas, Damon Nelson

  (deceased))—Nunes concedes that his Intelligence Committee staffers "were aware of

  allegations of the Obama administration spying on Trump associates," Ex. D (Resp.

  to Interrog. No. 15), at 3, suggesting they likely possess documents relating to any

  "communications," "meetings," or "statements" by Nunes or other individuals on that

  subject (Request Nos. 4, 5, 7, 8, 9, 10, 11, 12, 13, 14, 17, 38).

- Campaign manager (Jake Mizner)—his role as "campaign manager" suggests he

  likely possesses, at minimum, documents relating to "communications" posted on

  Nunes's campaign-funded website (www.devinnunes.com) about "lawsuits against

  The Washington Post" (Request Nos. 35, 36), *see* Ex. F, at 23, and any campaign

  "communications" about his March 21 or 22, 2017 White House visits (Request

  No. 16).

- Campaign employee, consultant, or other agent (unknown)—Nunes's campaign-

funded website (www.devinnunes.com) references this "lawsuit" (Request Nos. 35, 36), *see* Ex. F, at 23, but Nunes has not identified the person working on behalf of his Campaign who drafted or posted the content.  Nunes's counsel agreed during the meet-and-confer process to identify that person, but subsequently failed to do so.

By designating his spokesman as his sole document custodian, Nunes failed to satisfy his duty to search for documents "reasonably available to him from his employees, agents, or others subject to his control," *Weaver*, 107 F.R.D. at 717, or to "respond fully to document requests," *Kleen Prods.*, 2012 WL 4498465, at *15.  A search based on a single employee does not "sufficiently demonstrate that responsive documents do not exist or would not be found by a more in-depth search."  *Leopold v. N.S.A.*, 196 F. Supp. 3d 67, 73 (D.D.C. 2016) (finding search of a DOJ office's records in response to FOIA request inadequate when it included two senior employees who reviewed near-final documents but omitted responsive drafts of dozens of lower-level employees or responsive documents of hundreds of former employees).  That is especially true given Langer's role as Nunes's external liaison with the press and other third parties—which as discussed below, has resulted in production of press releases, other public documents, and media-facing correspondence between Langer and various journalists, but no evidence of internal deliberations or communications within Nunes's office.  *See, e.g.*, *Mann v. City of Chicago*, 2017 WL 3970592, at *4 (N.D. Ill. Sept. 8, 2017) (mayor's search for documents from two police liaisons in his office was unreasonable because "the Mayor and his upper level staff also might have responsive emails" and may "not include" the liaisons in their internal discussions).

**B.**   **Nunes's Production Omits Internal Communications and Other Documents, and His Assertions That No Documents Exist Are Implausible.**

Relatedly, Nunes's production in response to the Post's document requests is deficient because it omits any internal communications and other documents likely to exist.  Rather than

commit to producing all responsive documents, Nunes appears to have chosen certain documents to produce and objected to producing others, without specifying any grounds for doing so.

A party must "produce any documents responsive to" document requests when it fails to specify grounds for objections. *Inova Health Care Servs.*, 2021 WL 6503725, at *5. The party may not elect to produce "some, but not all, responsive documents," *Escamilla v. Nuyen*, 2015 WL 4245868, at *5, *10 (D.D.C. July 14, 2015), even if it considers the documents it chooses to be "sufficiently comprehensive," *Dage v. Leavitt*, 2005 WL 8167603, at *2 (D.D.C. Aug. 18, 2005). When a party asserts that no responsive documents exist, and that assertion is implausible or contradicted by the public record or other evidence, courts compel a diligent search. *See, e.g.*, *U.S. Commodity Futures Trading Comm'n v. Trade Exch. Network Ltd.*, 61 F. Supp. 3d 1, 8 (D.D.C. 2014) (responding party "stretches credulity past its breaking point to assert that [it] has no documents regarding a Consent Order that [the party] itself entered into—this Court simply cannot believe that without further explanation"); *Collett v. Socialist Peoples' Libyan*, 2005 WL 8167600, at *4 (D.D.C. Nov. 23, 2005) (assertion that no documents exist was contradicted by "ample publicly available evidence" showing responding parties "were not diligent in their inquiries" and "did not make a good faith effort to respond").

Here, Nunes's 164-document production consists of media-facing correspondence and other documents sanitized for public consumption. With the exception of a two-page "agenda" for March 21 and 22, 2017, the only documents that Nunes produced were public records, his spokesman's email correspondence with media outlets or journalists, highly publicized letters to government agencies, and advocacy pieces that appear to have been created for use in this litigation. Nunes did not produce any documents that reflect internal discussion between or among him and his Congressional Office, Intelligence Committee, or Campaign staff, or any

communications between him or his staff and anyone at the White House.  Nunes also did not

produce any internal drafts or other deliberative documents, such as notes, talking points, or

preparation materials.  Indeed, Nunes did not produce even a single document from his own

personal files, including from any of his own computers, email accounts, or other devices.

Nunes did not object to producing such documents or specify any grounds for such an objection,

but instead claimed that "there is no further information to provide."  Ex. G, at 3-4.

It is implausible that neither Nunes nor his Congressional Office, Intelligence Committee,

and Campaign staff possess *any* communications reflecting internal discussion, deliberation,

coordination, or commentary of Nunes's so-called "midnight run" or allegations of "Obama

administration surveillance" of which they undisputedly had knowledge.  It "stretches credulity

past its breaking point," *U.S. Commodity Futures Trading Comm'n*, 61 F. Supp. 3d at 8, to assert

that there are *no* records or coordination of Nunes's trips to the most secure facilities in the

world, including any coordination of Nunes's meeting with Michael Ellis on March 21, 2017, or

Nunes's meeting with the President of the United States on March 22, 2017.  *See* Exs. A & C

(Request Nos. 2, 4, 11, 37, 38, 41).  Likewise, it is improbable for Nunes to assert that there are

*no* communications or drafts regarding his public statements or press releases regarding the

events and allegations that ignited a political firestorm and national media coverage.[4]  *See* Ex. A

(Request Nos. 3, 4, 5, 6, 7, 8, 9, 10, 12, 13, 14, 15, 16, 17, 28, 29).  The absence of such

documents suggests that Nunes failed to conduct a diligent search in response to the Post's

requests.  *U.S. Commodity Futures Trading Comm'n*, 61 F. Supp. 3d at 8 (court "simply cannot

believe" no documents exist "without further explanation"); *see, e.g., Axis Ins. Co. v. Am.*

---

[4]  Indeed, Nunes elsewhere has acknowledged that he "worked on" statements and press releases
with members of his staff, including Langer, but no documents reflecting any of that "work"
have been produced.  Ex. B (Suppl. Resp. to Interrog. No. 2), at 5.

*Specialty Ins. & Risk Servs., Inc.*, 2021 WL 2910814, at *8 (N.D. Ind. July 12, 2021) ("apparent paucity of responsive communications" raised "legitimate concerns" regarding diligence of party's search); *Organo Gold Int'l, Inc. v. Aussie Rules Marine Servs., Ltd.*, 2019 WL 7371831, at *4 (S.D. Fla. Sept. 20, 2019) (party lacked "any explanation for conducting its initial search in such a way that omitted internal communications"); *Sarieddine v. D&A Distrib., LLC*, 2018 WL 5094937, at *4 (C.D. Cal. Apr. 6, 2018) (granting motion to compel when party contended opponent's production was "unreliable because it lacks internal communications").

Nunes's other discovery responses also are deficient.  In many responses, Nunes implausibly asserted that no documents exist, when that is contradicted by "ample publicly available evidence," *Collett*, 2005 WL 8167600, at *4; cited certain documents he considers "sufficiently comprehensive," without committing to produce all responsive documents, *Dage*, 2005 WL 8167603, at *2; or stated "generic, non-specific" objections, without specifying their grounds, *Klayman*, 2008 WL 11394169, at *3.  The following examples illustrate those pervasive deficiencies:

- ***Request for Production Nos. 37***—The Post requested documents from three weeks in March 2017 that reference the White House Worker and Visitor Entry System ("WAVES") database used to monitor entry and access to White House offices.  In an initial response, Nunes stated, "None," and supplemented his response only to add: "I have no idea if the WAVES system was used for my White House visit."  It is inconsistent for Nunes to claim first that no responsive documents exist, and then to claim that he has "no idea" if responsive documents exist.  Any claim that there are no responsive documents in Nunes's possession, custody, or control also appears inconsistent with the public record concerning

how White House visits are recorded.  *See, e.g.*, *Citizens for Resp. & Ethics in Washington v. U.S. Dep't of Homeland Sec.*, 527 F. Supp. 2d 76, 90 (D.D.C. 2007) (observing that "the authorized pass holder" supplies content for WAVES records, and "an email from the pass holder to the Secret Service is typically the triggering event that leads to the creation of the record" in the WAVES database).

- ***Request for Production Nos. 8, 9, 10***—The Post requested documents relating to Nunes's "statements" about Obama administration surveillance, including on March 22, 2017.[5]  In response, Nunes stated: "See Appendix A; Appendix E; Appendix F; Press releases cited in response to request no. 1."  Ex. A, at 17. Nunes did not produce any drafts of the public statement he gave on March 22, 2017, or public statements on any other date.  Nor did he produce correspondence within his offices about those statements, or correspondence about any of his public appearances on media networks, including Fox News and CNN.

- ***Request for Production Nos. 2, 41***—The Post requested "travel expenses" or "receipts" related to transportation Nunes used in Washington D.C. on March 21, 2017—the day of the so-called "midnight run."  In response, Nunes stated: "None.  There are no responsive documents because, as previously stated, I did not take an Uber to the White House."  Ex. C, at 10.  But Nunes publicly stated that on March 21, 2017, he "was in a cab with staff" on the way to the White House.  *See* Jake Tapper, *Who cleared Devin Nunes into the White House?* CNN

---

[5] C-SPAN (Mar. 22, 2017), https://www.c-span.org/video/?425829-1/devin-nunes-confirms-incidental-surveillance-trump-transition-team.

(Mar. 28, 2017), https://www.cnn.com/2017/03/27/politics/devin-nunes-white-house-donald-trump/index.html.  Moreover, publicly available House records[6] reflect that one of Nunes's staff assistants submitted a request for reimbursement for an expense related to Nunes's "taxi/parking/tolls" that day, as shown below:

| 04-13 | AP | E0500400 | CITIBANK GOV CARD SERVICE | 02/10/17 | 03/04/17 | CAR RENTAL | 436.92 |
| 04-18 | AP | E0500408 | CITIBANK GOV CARD SERVICE | 03/02/17 | 03/29/17 | TAXI/PARKING/TOLLS | 44.65 |
| 04-18 | AP | E0500410 | COMFORT SUITES SERVICES | 02/02/17 | 03/16/17 | TAXI/PARKING/TOLLS | 420.66 |
| 04-25 | AP | E0500554 | HOPPER KATHRYN E | 03/27/17 | 03/21/17 | TAXI/PARKING/TOLLS | 70.15 |
| 04-25 | AP | E0500653 | MORROW, JENNIFER | 03/20/17 | 03/21/17 | COMMERCIAL TRANSPORTATION | 501.40 |
| 04-25 | AP | E0500654 | MORROW, JENNIFER | 03/22/17 | 03/22/17 | LODGING | 464.18 |
| 04-25 | AP | E0500653 | MORROW, JENNIFER | 03/20/17 | 03/22/17 | MEALS | 259.02 |
| 04-25 | AP | E0500653 | MORROW, JENNIFER | 03/20/17 | 03/22/17 | TAXI/PARKING/TOLLS | 302.11 |

Nunes refused to consult with or collect documents from the staff assistant who submitted this request for reimbursement, Kathryn Hopper, even after the Post raised the issue.  Ex. K, at 6.

- ***Request for Production Nos. 35, 36***—The Post requested communications that "reference" his "lawsuits against The Washington Post" on behalf of his campaign or by any member of his Congressional Office or Campaign staff.  In response, Nunes objected, stating "attorney-client privilege; work product," or responded, "None."  Ex. A, at 28.  But Nunes's own campaign-funded website (www.devinnunes.com) references his lawsuits against the Post in a section titled "Media Attacks and Lawsuits":



[6] *Archive – Statement of Disbursements*, U.S. HOUSE OF REPRESENTATIVES, https://www.house.gov/the-house-explained/open-government/statement-of-disbursements/archive.

Ex. F (Devin Nunes Website), at 23.  During the parties' meet and confer, Nunes's counsel acknowledged that he was unaware of these statements.  He agreed to identify the Campaign staffer(s) who prepared this content for Nunes's campaign-funded website.  Ex. L, at 3.  However, he failed to do so.  Nunes did not collect or produce any documents or information from Campaign staff.

- **Request for Production Nos. 28, 29**—The Post requested documents relating to "ethics complaints" filed against Nunes relating to his March 2017 statements following the so-called "midnight run" and to his litigation against journalists. Nunes objected, stating: "Objection – relevance; not proportional to needs of case; attorney-client privilege," and included a hyperlink to one of his own press releases.  Ex. A, at 26.  Nunes did not specify any grounds for his objections. Documents relating to publicly available ethics complaints against Nunes in connection with the events at issue in this lawsuit are relevant because Nunes has alleged that the Post falsely portrayed him as "unethical" in the Article.  *See* Am. Compl. ¶¶ 9 ("unethical"), 19 ("lack of ethics").  Evidence of Nunes's compliance with House ethics rules is relevant to rebutting his own allegations.  In addition, documents related to the House ethics investigation of Nunes's conduct during the so-called midnight run, which prompted him weeks later to recuse himself from the Intelligence Committee's impeachment inquiry, would be probative of Nunes's state of mind, motive for the trip, and reputation, which are all at issue.

- **Request for Production No. 27**—The Post requested documents sufficient to identify "all sources of funding" Nunes is "using to pay costs, expenses, or fees

for litigation against The Washington Post." In response, Nunes stated:

"Objection – Relevance." Ex. A, at 25. Nunes did not specify any grounds for

his objections. But such documents are relevant for the multiple reasons set forth

above. First, Nunes alleged that the Post falsely portrayed him as "unethical" in

the Article, *see* Am. Compl. ¶¶ 9, 19, but Nunes has been accused of having

"improperly received legal services in violation of House gift rules,"[7] and

evidence that Nunes broke House ethics rules by receiving but not disclosing legal

services to litigate actions against the Post would rebut his own allegations. *See,*

*e.g.*, *Berger v. Seyfarth Shaw, LLP*, 2008 WL 4570687, at \*1 (N.D. Cal. Oct. 14,

2008) ("fee-payment arrangements are relevant to credibility and bias, and

discoverable"). Second, discovery will refute the "David vs. Goliath" narrative in

Nunes's litigation against the Post, *see* Am. Compl. ¶ 22(e) (referring to Post's

"institutional hostility, hatred, extreme bias, spite and ill-will"); Compl. ¶ 1,

*Nunes v. WP Co.*, No. 20-cv-1403 (D.D.C.) (alleging Jeff Bezos "purchased

WaPo in 2013 for the purpose of using WaPo's mighty pen to influence Federal

elections" and "Bezos and his printing press remain desperate to defame the

President of the United States and his allies in Congress"), which courts have

found a sufficient basis for such discovery, including in another case involving

Nunes. *Nunes v. Lizza*, 2021 WL 7186264, at \*6 (N.D. Iowa Oct. 26, 2021); *see*

*also Cont'l Cirs. LLC v. Intel Corp.*, 435 F. Supp. 3d 1014, 1019 (D. Ariz. 2020).

Third, discovery will probe Nunes's alleged damages of over \$200 million, and

---

[7] Letter from Campaign Legal Center to Office of Congressional Ethics 7 (Feb. 26, 2020),
https://campaignlegal.org/sites/default/files/2020-02/Letter%20from%20CLC%20to%20OCE%
20Board_2-26-20_Final_with%20exhibits.pdf.

test whether Nunes brought this case for political fundraising.  *See* Jake Bernstein,

*The Fundraising Pulpit*, N.Y. REVIEW OF BOOKS (Apr. 23, 2020),

https://www.nybooks.com/articles/2020/04/23/republican-fundraising-pulpit/ ("no

one else exploits the courts as part of their fundraising strategy like Nunes,"

noting that in December 2019, "as he was making headlines battling CNN in the

courts, the Nunes campaign raked in nearly $300,000 in contributions").

Nunes also has not produced specific documents he identified and committed to provide.

For example:

- ***Request for Production No. 25***—The Post requested documents sufficient to
  show the dates and amounts of monetary damages Nunes has sought for other
  recent claims of reputational harm.  On November 24, 2021, Nunes responded:
  "I will produce copies of the Complaints, which show the dates and amounts of
  monetary damages sought for claims of reputational harm that I have made in the
  past five years."  Ex. A, at 25.  Nunes failed to produce those documents.

- ***Request for Production No. 40***—The Post requested documents sufficient to
  show the terms of Nunes's current employment and compensation with the Trump
  Media & Technology Group, as related to Nunes's claimed damages.  On January
  20, 2022, Nunes responded that such documents "will be produced."  Ex. C, at 9.
  Nunes failed to produce those documents, although during a meet-and-confer call
  on June 9, 2022, Nunes's counsel again affirmed that Nunes would produce them.

The foregoing examples illustrate the unreasonableness of Nunes's search for documents

and the egregiousness of his omissions, which render implausible his assertions that no other

documents exist that are responsive to the Post's discovery requests.

### C.     Nunes's Production Omits Requested Metadata.

Nunes's production of emails and other electronic documents also is deficient because it

lacks metadata identifying who created the documents or when they were created or modified.  A

party's discovery requests "may specify the form or forms in which electronically stored

information is to be produced."  Fed. R. Civ. P. 34(b).  Courts require parties to produce any

requested metadata as part of their production of electronically stored information.  *D'Onofrio v.*

*SFX Sports Grp., Inc.*, 247 F.R.D. 43, 48 (D.D.C. 2008) (summarizing lesson from recent cases

"that in order to obtain metadata you may need, you should specifically ask for it to begin with"

(citation omitted)); *see, e.g.*, *Hagenbuch v. 3B6 Sistemi Elettronici Industriali S.R.L.*, 2006 WL

665005, at *3 (N.D. Ill. Mar. 8, 2006) (ordering production of "metadata" including "information

such as the creation and modification dates" so recipient can "piece together the chronology of

events and figure out, among other things, who received what information and when").

Here, the Post requested metadata from Nunes to help identify the sources of relevant

discovery and the provenance of electronic documents.  Exs. O & P, at 2-3 ("Document" defined

to include "all electronically stored information," which "shall be construed to include all

available metadata associated with any electronically stored information"); Ex. J, at 5.  Although

Nunes did not object to producing metadata, he never provided it.  Instead, he produced 109

native emails in .msg format which he collected from undisclosed accounts or other repositories

of his spokesman Jack Langer, and 55 Word or PDF documents for which there is no custodial

information or other original metadata (other than the date of production).  Many of those Word

or PDF documents appear to consist of self-serving argument or assertions compiled by Nunes or

Nunes's attorney—such as documents that lack an author, are dated on the day of production in

November 2021, and bear filenames like, "Attacks on Nunes related to WaPo Nov 9 2020 story.pdf," "General Russia collusion attacks on Nunes.pdf," or "Appendix C Threats.pdf."

Nunes's refusal to supply original metadata for electronic documents prevents the Post from learning "who received what information and when" for the few documents Nunes produced. *Hagenbuch*, 2006 WL 665005, at *3. Nunes's omission of requested metadata also mirrors Nunes's refusal to identify persons among his staff with responsive information or to identify repositories of responsive documents within his possession, custody, or control.

*     *     *

Nunes's failure to comply with the Federal Rules of Civil Procedure in conducting a diligent search for responsive documents and information is precluding the Post from obtaining meaningful discovery of documents in Nunes's possession, custody, or control. Given Nunes's designation of a single document custodian from his sizable staff, the substantial gaps in his document production, his evasion of any commitment to produce all responsive documents, and his refusal to produce basic metadata for the few documents he produced, the Post respectfully requests that the Court compel Nunes to comply with his discovery obligations. Compliance should include conducting a diligent search for documents responsive to the Post's requests by identifying appropriate Congressional Office, Intelligence Committee, and Campaign staff as document custodians; promptly producing any responsive documents in those custodians' possession, custody, or control, along with any original metadata showing who created each document and when it was created or modified; and identifying any custodians or locations of discoverable documents from which responsive documents have not been preserved.

## II.    Nunes Failed To Answer the Post's Interrogatories.

For similar reasons to those identified above, Nunes should be required to supplement his responses to the Post's interrogatories (Interrogatory Nos. 1-17). First, as with his responses to

23

the Post's document requests, Nunes admitted that the only information upon which he based his interrogatory responses was limited to his own personal recollection and a consultation with his spokesman, Jack Langer.  Ex. E, at 5 (Resp. to Interrog. No. 18).  Second, many of Nunes's interrogatory responses are evasive, contradictory, or otherwise inadequate under Federal Rule of Civil Procedure 33.

### A.    Nunes's Interrogatory Responses Are Deficient Because They Fail To Reflect Information Available from Staff or Records.

Nunes's failure to respond to interrogatories based on information outside his own recollection and that of anyone other than his spokesman, Jack Langer, is unreasonable.  That is because Nunes is required to "fully" answer each interrogatory, Fed. R. Civ. P. 33(b)(3), and each answer must be "true, explicit, responsive, complete and candid."  *Barnes v. District of Columbia*, 283 F.R.D. 8, 10 (D.D.C. 2012).  "In answering interrogatories, a party is charged with knowledge of what its agents know, or what is in records available to it, or even, for purposes of Rule 33, information others have given it on which it intends to rely in its suit."  8B Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2177 (3d ed.).

A party "cannot limit his answers to matters within his own knowledge and ignore information immediately available to him or under his control."  *Escamilla v. Nuyen*, 2015 WL 4245868, at *5 (D.D.C. July 14, 2015); *see Olmert v. Nelson*, 60 F.R.D. 369, 370 (D.D.C. 1973) ("party may not so limit his answers" to interrogatories by opting to "answer solely on the basis of his own knowledge and not acknowledge information" the party "has under his control"); *O'Rourke v. Audio Stats Educ. Servs., Inc.*, 1987 WL 11998, at *1 (D.D.C. May 26, 1987) (party may not respond "in a vague and generalized fashion based merely upon the recollections of" corporate secretary, but must "make some attempt to find answers"); *see also Maurer v. Jones*, 2019 WL 3890924, at *5 (W.D. Ky. Aug. 19, 2019) (party "may not claim ignorance as an

excuse to the requirements of discovery").  Nor may a party depend on its own recollection "supplemented with information based on what [the party] could recall being told" by another person.  *Angrignon v. KLI, Inc.*, 2009 WL 10667097, at *1 (S.D. Fla. Apr. 20, 2009).  Instead, a party should undertake a reasonable search for responsive information, which "includes an investigation and inquiry of employees, agents, and others, who conceivably, but in realistic terms, may have information which may lead to or furnish the necessary and appropriate response."  *F.D.I.C. v. Halpern*, 271 F.R.D. 191, 193-94 (D. Nev. 2010).

Here, Nunes admitted that he relied on his own memory and a consultation with his spokesman to respond to the Post's interrogatories, without even attempting to obtain relevant information from other Congressional Office, Intelligence Committee, or Campaign staffers knowledgeable about the topics at issue.  Ex. E, at 5 (Resp. to Interrog. No. 18: "The only person I communicated with in preparing the [responses to the Post's interrogatories], aside from my attorney, was Jack Langer.").  Yet in several responses, Nunes admitted that he "cannot recall" the answers, and decided not to make any attempt to obtain them.  For example, in response to Interrogatory No. 17, seeking information about his visit to the White House in the so-called "midnight run" episode, Nunes responded: "I cannot recall how my visits to the Eisenhower Executive Office Building or the White House were arranged"—a topic about which he could ask the Congressional Office or Intelligence Committee staffers who arranged them.  Ex. C, at 7.  In response to Interrogatory No. 2, seeking the identities of individuals who worked with Nunes to draft public statements and press releases in 2017, Nunes responded: "I cannot recall with whom I worked on specific statements and press releases five years ago, but most likely it was HPSCI communications director Jack Langer"—a hypothesis that he could confirm with Langer or any of his other Congressional Office or Intelligence Committee staffers.  Ex. A, at 5-7.  In his

supplemental response to Interrogatory No. 1, seeking information about his itinerary on the day

of the so-called "midnight run," Nunes asserted that he could not provide "specific times"

because "I do not have a minute-by-minute account of my activities that day, or any day"—but

his answer does not reflect any information that his Congressional Office scheduler or assistants

could have prepared.  Ex. B, at 3.  And in his supplemental response to Interrogatory No. 15,

seeking a description of the knowledge of relevant staffers, Nunes asserted that all of his

Intelligence Committee staffers would have "no knowledge of these areas aside from what [they]

read in the press"—a claim he cannot plausibly make after admitting that he only consulted with

one staffer, Jack Langer, to prepare his discovery responses.  Ex. D, at 3-6.

Nunes should not be allowed to "claim ignorance as an excuse" to answering the Post's

interrogatories, *Maurer*, 2019 WL 3890924, at *5, while admitting that his only investigation of

the facts consisted of trying to remember them and talking with his spokesman.  Nunes must

make a serious "attempt to find answers," *O'Rourke*, 1987 WL 11998, at *1, from the

Congressional Office, Intelligence Committee, and Campaign records and personnel "available

to him or under his control," *Escamilla*, 2015 WL 4245868, at *5.

### B.    Nunes's Interrogatory Responses Are Incomplete, Evasive, or Contradictory.

In addition to Nunes's interrogatory responses being limited to matters within his own

personal recollection and that of a spokesman, Nunes's responses also are inadequate on their

face because they contradict his other statements, recycle allegations, or dodge or object to the

questions posed.  Courts require supplementation when a party's interrogatory responses

"directly contradict" the party's other statements.  *Williams v. Johanns*, 2006 WL 3826967, at *5

(D.D.C. Dec. 28, 2006).  A party also cannot respond by "merely restating allegations" or giving

partial answers that are "incomplete or evasive."  *Covad Commc'ns Co. v. Revonet, Inc.*, 258

F.R.D. 17, 19 (D.D.C. 2009); *see Shvartser v. Lekser*, 321 F.R.D. 23, 24 (D.D.C. 2017) (granting

motion to compel when responses were "far from the full answers required by Rule 33").

The following responses illustrate examples of Nunes contradicting his own statements, restating allegations from his complaint, or otherwise avoiding providing full and complete answers to the Post's interrogatories:

- ***Interrogatory No. 16***—The Post requested that Nunes identify "all custodians who have relevant documents within your possession, custody or control" and information about "every repository ever used by that custodian to send, receive, or store relevant communications or documents," the "date range" and "subject matter" of documents in each repository, and "whether you have collected documents from the repository." In response, Nunes stated, "None," and further stated: "I have no relevant documents in my custody, possession, or control aside from the documents I have already provided. I collected the documents from my office and from publicly available sources, such as the Clerk of the House of Representatives." Ex. D, at 7. Nunes's response is "incomplete" and "evasive." *Covad Commc'ns*, 258 F.R.D. at 19. Nunes's statement that he collected documents "from my office" does not answer an interrogatory seeking the names of individuals who possessed documents, the locations where those documents were stored, and whether he has collected documents from any of those locations.

- ***Interrogatory No. 1***—The Post requested "a complete itinerary" of Nunes's "activities and whereabouts on March 21, 2017," including the "specific location and time" he departed for the White House, arrived at the White House, and left for destinations thereafter. In response, Nunes stated he departed from the U.S.

Capitol "in the late afternoon," arrived at the White House grounds "in the late afternoon," and left "approximately 90 minutes later" for a "reception at the National Building Museum."  Ex. A, at 5.  Nunes defended the ambiguity of his response by asserting that "[n]o specific times were provided because I do not have a minute-by-minute account of my activities that day, or any day for that matter."  Ex. B, at 2-3.  Again, Nunes's response is "incomplete," *Covad Commc'ns*, 258 F.R.D. at 19, including because he did not consult his scheduler at the time, Jennifer Morrow, or any records relating to his activities or whereabouts on the day of the so-called "midnight run," which he has placed at the center of his defamation claim.  Nunes should be required to supplement his response by consulting knowledgeable persons and documents within his possession, custody, or control that may shed light on the answer, such as schedules, call records, or emails of his staffers.

- ***Interrogatory No. 2***—The Post requested identification of "each person you believe to possess knowledge or information concerning the allegations."  In response, Nunes identified Post employees and Members of Congress, but asserted "no staff members" other than Jack Langer ever discussed or helped coordinate his March 21 and March 22, 2017 visits to the White House.  Ex. A, at 5-7; Ex. B, at 5.  But that is contradicted by Nunes's prior statement that he "was in a cab with staff" on March 21, 2017 and "dropped them off before" his White House visit.  *Supra* at p. 17.  Because Nunes's response "directly contradicts" his prior statement, his answer is incomplete.  *Williams*, 2006 WL 3826967, at *5.

- ***Interrogatory No. 17***—The Post requested that Nunes identify any communications relating to his March 21 or March 22, 2017 visits to the White House, including "all communications coordinating" the visits.  In response, Nunes asserted he has "no such records" and "cannot recall how my visits to the Eisenhower Executive Office Building or the White House were arranged." Ex. C, at 7; Ex. D, at 8-9.  Yet again, Nunes's response is incomplete because it fails to account for any communications by himself or any of his staff members regarding his trips to the White House, including communications that undoubtedly occurred if only to coordinate the logistics of his visits to the most secure facility in the world and to meet with the President of the United States.

- ***Interrogatory No. 6***—The Post requested facts underlying Nunes's $200 million damages claim, including identification of "the basis for the calculation" of each category of damages, "any documents that support or form the basis" of each calculation, and "any persons with knowledge" of such damages.  In response, Nunes cited his own "Rule 26(a)(1) Disclosures," "discovery responses," and six pages containing string citations to damages-related case law.  Ex. A, at 9; Ex. B, at 6-13.  Neither Nunes's initial disclosures, nor his discovery responses, nor his lengthy citations to case law contain any of the requested information regarding the factual basis for his claimed damages and any relevant witnesses or documents.  Because Nunes's response consists of "merely restating allegations," his answer is incomplete.  *Covad Commc'ns*, 258 F.R.D. at 19.

- ***Interrogatory No. 13***—The Post requested that Nunes identify "all sources of

funding you are using to pay costs, expenses, or fees for litigation against The Washington Post."  In response, Nunes stated, "Objection – Relevance," just as he did in response to the Post's request for documents relating to the same topic. Ex. A, at 13.  As with the Post's document request (Request No. 27), such information is relevant for multiple reasons.  As discussed above, *supra* at pp. 19-21: (1) Nunes alleged that the Article portrayed him as "unethical," and evidence that Nunes received without disclosing legal services to litigate defamation actions against the Post in violation of House ethics rules would rebut those allegations; (2) evidence that Nunes is receiving outside funding to litigate his defamation actions will refute the "David vs. Goliath" narrative in Nunes's allegations against the Post; and (3) discovery will probe Nunes's claim to $200 million in damages. Because Nunes's response consists entirely of a generic, boilerplate objection to relevance and fails to specify grounds for that objection, Nunes should be required to supplement his response with requested information. *Inova Health Care Servs.*, 2021 WL 6503725, at *1.

- ***Interrogatory No. 14***—The Post requested that Nunes identify all "sources of income over the past five years" and "the total amount of income derived from each source per year."  In response, Nunes merely stated: "See 2016-2020 Financial Disclosure Reports attached," referring to annual disclosures publicly available from the House of Representatives (https://disclosures-clerk.house.gov/ PublicDisclosure/FinancialDisclosure). Ex. A, at 13.  However, as the Post noted in a December 10, 2021 letter to Nunes's counsel, *see* Ex. J, at 5, Nunes's public disclosures do not purport to reflect his government salary or benefits, and only

provide "ranges" of other sources of income (e.g., "$15,001 - $50,000").  Because Nunes's response simply recycles public information without adding responsive, non-public information, Nunes should be required to supplement his response.

*     *     *

Nunes failed to comply with his obligation to "fully" answer interrogatories under Federal Rule of Civil Procedure 33, including by failing to base answers on information available to him outside his spokesman and lawyer, and by evading the Post's requests for the basic factual information needed to test his allegations, including his claimed entitlement to $200 million in damages.  The Post respectfully requests that the Court compel Nunes to comply with his discovery obligation to provide "responsive, complete, and candid" answers to the Post's interrogatories.  *Barnes*, 283 F.R.D. at 10.  Nunes's compliance should include identifying Congressional Office, Intelligence Committee, and Campaign staff available to consult for responsive information, and promptly supplementing his responses to include that information.

## III.  Nunes Failed To Provide Any Computation To Support Initial Disclosures Claiming $200 Million in Alleged Damages.

Nunes also should be required to supplement his initial disclosures to include the "computation of each category of damages claimed" required by Federal Rule of Civil Procedure 26(a)(1)(A)(iii).  Courts reject a "mere undifferentiated statement of damages" stated in "wholly general terms."  *Williams v. Johnson*, 278 F.R.D. 10, 13 (D.D.C. 2011); *Armenian Assembly of Am., Inc. v. Cafesjian*, 746 F. Supp. 2d 55, 71 (D.D.C. 2010).  "A defendant is entitled to specific and detailed information as to the amount of damages allegedly sustained by a plaintiff as a result of the defendant's purported behavior, how those amounts were determined, how the loss was attributable to the defendant, and the dates applicable to each purported loss."  *Nat'l Cmty. Reinvestment Coal. v. NovaStar Fin., Inc.*, 2009 WL 10719757, at *2 (D.D.C. July 13, 2009).

Here, Nunes's damages disclosure consists of nothing more than boilerplate and dollar figures totaling $200 million, separated into categories of "presumed damages," "actual injuries," "special damages," and "punitive damages." Ex. H. Nunes included no information regarding "how those amounts were determined." *Nat'l Cmty. Reinvestment*, 2009 WL 10719757, at *2. Nor did he provide such information in response to interrogatories (e.g. Interrog. No. 6, *see* Ex. A, at 9) in which the Post "independently requested a calculation of damages"—a compound failure courts find "especially troubling." *Am. Prop. Constr. Co. v. Sprenger Lang Found.*, 274 F.R.D. 1, 9 (D.D.C. 2011).

Nunes's outrageous damages claim appears to be little more than an improper attempt to harass his adversaries, without any good faith basis. Courts recognize that when a plaintiff seeks "tens or hundreds of millions of dollars in damages without any allegation to suggest that [his] alleged injuries support these amounts"—as Nunes has done here—that "suggests that [the] plaintiff is not motivated by the merits of his claims" and that the lawsuit is "intended to harass defendants." *Hiramanek v. Cal. Jud. Council*, 2016 WL 6427870, at *9 (N.D. Cal. Oct. 31, 2016) (finding plaintiff a vexatious litigant), *aff'd*, 754 F. App'x 580 (9th Cir. 2019); *see, e.g.*, *Phila. Sunday Press, Inc. v. Consumers United Cap. Corp.*, 1987 WL 10242, at *1-2 (D.D.C. Apr. 16, 1987) ($5 million damages claim was "incredible" and a "clear violation of Rule 11").

Although Nunes represented to the Court that he would "supplement his initial disclosures by April 29, 2022 to include a more specific computation," he failed to do so. *See* Ex. G, at 4. Other courts recently have sanctioned Nunes's counsel for failing to supplement threadbare damages disclosures. *See, e.g.*, *Amari v. Griffin*, No. 5:20-cv-50, ECF No. 61, at *6-7 (W.D. Va. May 9, 2022) (sanctioning same counsel for failing to supplement damages disclosure consisting of "nothing more than a lump sum statement"). The Post respectfully requests that the

32

Court require Nunes to supplement his initial disclosures and interrogatory responses to provide the information required by Federal Rule of Civil Procedure 26 relating to his claimed damages.

## **CONCLUSION**

For the reasons above, the Post respectfully requests that the Court grant its motion to compel.

## **STATEMENT PURSUANT TO LCvR 7(m)**

Defendants' counsel discussed the issues raised in this Motion with Plaintiff's counsel in a good-faith effort to determine whether there is any opposition to the relief sought and to narrow the areas of disagreement.  Plaintiff opposes the Motion.

Dated: June 10, 2022                         Respectfully Submitted,

WILLIAMS & CONNOLLY LLP

By: /s/ *Thomas G. Hentoff*

      Kevin T. Baine (D.C. Bar No. 238600)
      Thomas G. Hentoff (D.C. Bar No. 438394)
      Nicholas G. Gamse (D.C. Bar No. 1018297)
      Sean M. Douglass (D.C. Bar No. 1033069)
      680 Maine Avenue, SW
      Washington, DC 20024
      Telephone: (202) 434-5000
      Facsimile: (202) 434-5029

      *Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 10, 2022, I electronically filed the foregoing Defendants'

Motion to Compel Discovery from Plaintiff with the Clerk of the Court by using the CM/ECF

system, which will send a notice of electronic filing to registered CM/ECF participants.


*/s/ Thomas G. Hentoff*
*Counsel for Defendants*