IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DEVIN G. NUNES                                )
                                              )
            Plaintiff,                        )
                                              )
v.                                            )        Case No. 1:21-cv-00506-CJN
                                              )
                                              )
WP COMPANY, LLC                               )
d/b/a The Washington Post                     )
            *et al*                           )
                                              )
            Defendants.                       )
_____)

# PLAINTIFF'S MOTION TO COMPEL DISCOVERY

Plaintiff, Devin G. Nunes ("Plaintiff"), by counsel, pursuant to Rule 37 of the Federal Rules of Civil Procedure ("Rules") and Local Civil Rule ("LCvR") 7, respectfully moves the Court to compel discovery from Defendants, W.P. Company, LLC and Ellen Nakashima (the "Defendants").

## Certification

Counsel has discussed Plaintiff's anticipated motion to compel discovery with opposing counsel in a good-faith effort to determine whether there is any opposition to the relief sought and, if there is, to narrow the areas of disagreement.  In accordance with LCvR 7(m) and paragraph 11 of the Court's Standing Order, Counsel certifies that the required discussion occurred.  This motion is opposed.

## Statement of Points and Authorities

The express purpose of the Rules is to "secure the just, speedy, and inexpensive determination of every action and proceeding." *Fed. R. Civ. P. 1.*  The Rules authorize

broad discovery.   Rule 26(b) states that parties "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense."   For purposes of pretrial discovery, relevancy "has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978). Discovery Rules are to be broadly and liberally construed in order to fulfill discovery's purposes of providing both parties with information essential to the proper litigation of all relevant facts, to eliminate surprise, and to promote settlement. *St. Paul Reinsurance Co., Ltd. v. Commercial Financial Corp.*, 198 F.R.D. 508, 511 (N.D. Iowa 2000) ("In order to fulfill discovery's purposes of providing both parties with 'information essential to the proper litigation of all relevant facts, to eliminate surprise, and to promote settlement,' the discovery rules mandate a liberality in the scope of discoverable material … Thus, as long as the parties request information or documents relevant to the claims at issue in the case, and such requests are tendered in good faith and are not unduly burdensome, discovery shall proceed … The party resisting production bears the burden of establishing lack of relevancy or undue burden") (quotations and citations omitted).

Plaintiff has propounded two sets of interrogatories and requests for production of documents to Defendants and several third-parties subpoenas to employees of the Post, including Defendant Ellen Nakashima.   The Post has treated the subpoenas as a third request for production of documents, which may be an immaterial difference unless a reporter has documents which she/he has hidden from their employer.   Defendants' responses are attached as *Exhibits "A", "B" and "C"*.

There are unresolved disputes concerning Defendants' responses to the following discovery requests:

1.    **<u>Interrogatory Nos. 1, 2, 8 and 9</u>**

Interrogatory No. 1 goes to the heart of Plaintiff's libel action:  the specific source or sources, if any, of the false and defamatory statement that Plaintiff was given access at the White to intelligence files that "Nunes believed would buttress **<u>his</u>** baseless claims of the Obama administration spying on Trump Tower."  Interrogatory No. 2 likewise goes to the heart of Plaintiff's libel action:  the specific source or sources, if any, of the false and defamatory statement that Plaintiff was given access at the White to intelligence files that "Nunes believed would buttress **<u>Trump's</u>** baseless claims of the Obama administration spying on Trump Tower."

Defendants respond to both Interrogatories with a series of stock objections, including that the answer is protected by a reporter's privilege, making it impossible to know for sure what information is being withheld.  The objections are improper.  Subject to the stock objections, Defendants' answers to Interrogatory Nos. 1 and 8 state that the source(s) of the defamatory statement in the November 9, 2020 article was "Nakashima's general recollection of national security reporting  and her review of various reports, <u>including</u>"[1] six "reports" that Defendants identify and produce.  No human sources are identified.  Subject to the stock objections, Defendants' answers to Interrogatory Nos. 2 and 9 state that the source(s) of the defamatory statement in the December 8, 2020 "correction" was "public reports, <u>including</u>" the same six "reports" that Defendants

---

[1]    Ahead of depositions, Plaintiff is entitled to know exactly what Ms. Nakashima and any other contributors to the November 2020 article and the December 2020 "correction" reviewed.

identify in their answer to Interrogatory No. 1, plus five additional "reports".  Again, no human sources are identified, except for *Plaintiff's* statements on "March 20, 2017" and "March 22, 2017".

Defendants' answers are vague and evasive.

Not a single one of the "public reports" produced by Defendants shows (a) that Devin Nunes "believed" intelligence files would buttress his or President Trump's "baseless claims" of wiretapping, and/or (b) that Devin Nunes, acting of his "belief", went to the White House in the dead of night to view files that would buttress his or President Trump's "baseless claims of the Obama administration spying on Trump Tower."  Rather, the "public reports", most notably excerpts from a book published by Post reporter Greg Miller ("Miller"), all confirm that Devin Nunes went to the White House to look at intelligence files that would buttress his concerns about "incidental" collection of information about US citizens involved in the Trump transition, and his concerns about unmasking and criminal leaks. [*See* ECF No. 41 (Memorandum Opinion, pp. 2-3 ("Nunes also expressed his 'concern[] that other surveillance activities were used against President Trump and his associates,' and that he thought it was 'very possible' that Trump (or others at the White House) might have been swept up in surveillance targeting foreign nationals on U.S. soil) (footnotes omitted)].

Defendants should either admit that the statements about Plaintiff have no source and, thus are the products of Defendants' imagination, or they should identify the specific source(s) that support the statements.

2.      **Interrogatory Nos. 1, 2, 8 and 9**

In their answers to Interrogatory Nos. 1, 2, 8 and 9, "the Post responds that it will produce" (a) "any responsive, non-privileged documents referring to such public sources in the drafting and editing of the Article that are identified during the course of a reasonable search and review of the documents of pertinent custodians substantively involved in reporting, writing, and editing the Article", (b) "any responsive, non-privileged documents referring to such articles that are identified during the course of a reasonable search and review of the documents of pertinent custodians who were substantively involved in reporting, writing, and editing the Article", and (c) "non-privileged documents concerning drafting or discussion of the Article that are identified during the course of a reasonable search and review of the documents of pertinent custodians who were substantively involved in reporting, writing, and editing the Article."

During a meet and confer on June 9, 2022, Counsel for Defendants represented that _all_ the "responsive, non-privileged documents" referenced in the Defendants' interrogatory answers were included in a production on April 22, 2022.  It is impossible to verify whether all responsive documents have been produced.

3.      **Privilege Log**

In their answers to Interrogatory Nos. 1, 4, 8, 9, 10 and 11, Defendants invoked the attorney-client, work-product and/or reporter's privileges.  On April 22, 2022, Defendants produced a privilege log, a copy of which is attached as _Exhibit "D"_.[2]

---

[2]      Defendants designated the Privilege Log as "confidential", so Plaintiff will file it separately under seal.

The log does not identify specific documents withheld or fair identify the respective drafters and recipients of the documents, so that Plaintiff can assess the validity of the claimed privilege.  For instance, communications between and among reporters and editors and publishers would not be protected by the attorney-client privilege.

4.    **<u>Interrogatory No. 4</u>**

Plaintiff's Interrogatory No. 4 requests the sources of statements about the "midnight run" that is discussed in a March 26, 2017 article published by the Post – the same "midnight run" referred to in the November 9, 2020 article at issue.  The sources are identified as "congressional officials" and "members of Nunes' staff".  Defendants claim that the statements in the March 26, 2017 article were "based in part on public remarks by Representative Adam Schiff" at a news conference.  [https://www.c-span.org/video/?425953-101/representative-schiff-calls-intelligence-chairs-decision-cancel-open-hearing-serious-mistake&live=].    Defendants invoke "the Reporter's Privilege to protect the identities of any confidential and other unpublished sources for the referenced statements in the 03/26/2017 Article."

The information requested in Interrogatory No. 4 is relevant to the issue of actual malice.  Defendants' refusal to identify the sources – if indeed there are any – of the alleged "midnight run" hinders Plaintiff's ability to demonstrate that Defendants fabricated the entire narrative.

In their answer to Interrogatory No. 4, Defendants represent that they will produce "a transcript of [Schiff's] remarks identified above and non-privileged documents concerning Plaintiff's March 21, 2017 visit to the White House grounds that are

identified during the course of a reasonable search and review of the documents of pertinent custodians who were substantively involved in reporting the 03/26/2017 Article, including any non-privileged notes." In the answers to Interrogatory Nos. 5, 6, and 7, Defendants further agree to produce documents.

During a meet and confer on June 9, 2022, Counsel for Defendants represented that _all_ the "non-privileged" documents referenced in the Defendants' interrogatory answers were included productions on December 17, 2021 and April 22, 2022. Upon review of the April 22, 2022 production (2,050+ pages), there do not appear to be any "notes" or other documents concerning Plaintiff's March 21, 2017 visit to the White House grounds.

### 6.    **Interrogatory No. 10**

In Defendants' answer to Interrogatory No. 10, Defendants represent that there was "widespread reporting relating to Plaintiff's 'midnight run' and Plaintiff's attempt to provide cover for former President Trump's claims of the Obama administration spying on Trump Tower."

Plaintiff is entitled to know exactly what this "reporting" is. Defendants have identified and produced a handful of materials that they claim is part of the alleged "widespread reporting". Plaintiff is entitled to know if this is everything.

### 7.    **Interrogatory Nos. 12 and 13**

Plaintiff appeared and made statements at news conferences on May 21, 2017 and May 22, 2017. Defendants' answers to Interrogatory Nos. 12 and 13 are incomplete. If the Post had reporters present at the news conferences, the Post would have learned that Plaintiff did not go to the White House to view files to buttress any "baseless claims" of

spying on Trump Tower, and, thus, the Post would have known that its statements in November 2020 and December 2020 were false.

The Post should be ordered to identify any of its reporters who were present at the news conferences.

**8.** **Document Requests 4, 5, 8, 11, 12, 15, 17, 20, 21, 22 and 23**

Defendants' voluminous objections and responses to Plaintiff's Request for Production of Documents Nos. 4, 5, 8, 11, 12, 15, 17, 20, 21, 22 and 23 are evasive and incomplete.   It is impossible to tell if *any* or *all* responsive documents have been produced.

Specifically, Plaintiff requested copies of the following documents:

- any pitch made by Nakashima to the Post of any story relating to Plaintiff and the "midnight run";

- reporter's notes, correspondent's notes, audiotapes, videotapes, records of conversations, transcripts of interviews, memoranda, minutes, emails, text messages, direct messages, iMessages and other records created or prepared by the Post and/or Nakashima prior to publication of the Article that mention Plaintiff or that constitute or relate to Nakashima's investigation or reporting of the facts stated in the Article;

- any research undertaken by Nakashima in connection with the reporting and/or preparation of the Article, including, without limitation, copies of or hyperlinks to all documents reviewed by Nakashima prior to publication;

- documents that prove, show or evidence that the statements in the Article are substantially true;

- documents upon which the Post intends to rely to support the truthfulness of the two allegedly defamatory statements in the Article;

- records of telephone calls made by Nakashima to any person while reporting and prior to publication of the Article;

- drafts, versions and edits of the Article prior to its original publication on November 9, 2020;

- documents received by Defendants from any third-party (excluding only attorneys for Defendants), whether in response to a subpoena *duces tecum* or otherwise, that relate to the Article or to the allegations in Plaintiff's Amended Complaint;

- documents that prove, evidence, demonstrate or show that "[i]n March 2017, … Nunes … was given access at the White House to intelligence files that Nunes believed would buttress his baseless claims of the Obama administration spying on Trump Tower";

- documents that evidence or show why the Post corrected the misstatements in the original Article;

- documents that prove, evidence, demonstrate or show that in March 2017, Nunes sought access at the White House to intelligence files that Nunes believed would buttress Trump's baseless claims of the Obama administration spying on Trump Tower; **and**

- documents that prove, evidence, demonstrate or show that "[i]n March 2017, … Nunes … was given access at the White House to intelligence files that Nunes believed would buttress Trump's baseless claims of the Obama administration spying on Trump Tower".

During a meet and confer on June 9, 2022, Counsel for Defendants stated that Defendants refuse to produce the phone records because they are protected by the reporter's privilege. Counsel represented that *all* remaining documents were produced as part of the April 22, 2022 production. The April 22, 2022 production consists of over 2,050 pages. There is no way to tell which documents are responsive to which requests.

9.    **The Rule 45 Subpoenas**

Finally, Plaintiff issued Rule 45 subpoenas to Post reporters, Nakashima, Ignatius, Miller, Barrett, DeYoung and Rucker. The subpoenas seek documents that relate to the sources of the criminal leaks of classified information that Plaintiff was investigating in the spring of 2017.

The Post refuses to provide any documents in response to the Rule 45 subpoenas.

The identity of the sources, including the criminal leakers, is relevant to two key issues: 1) who manufactured the two false narratives in November 2020 and December 2020 that Plaintiff went to the White House to review intelligence files to buttress "baseless claims" (his own or President Trump's) of wiretapping Trump Tower?  2) did Defendants publish the original Article and "correction" with actual malice? Specifically, is there a source for Defendants' false statements in 2020?  Or, did Defendants fabricate the narratives?  When, how and from whom – if anyone – did Defendants learn that Plaintiff, an elected official, ridiculously "searched for evidence to support baseless claims" and that "Nunes is the type of official who would spend his time searching for evidence to support claims with no foundation in fact."

The criminal leakers had a clear motive to target Devin Nunes, and interfere with his oversight duties on the House Intelligence Committee, both in 2017 and in 2020.  To the extent that the Post colluded with or participated in a coordinated effort to defame Plaintiff, that is relevant to show actual malice. *See United States v. Sussmann*, Case 1:21-cr-00582-CRC (Document 98-1) (Filed 04/25/2022) (showing coordination and concerted action between Fusion GPS and the Washington Post and other media outlets to publish and promote the Russia collusion hoax).

The evidence is relevant and it cannot be obtained from any other source. *Blumenthal v. Drudge*, 186 F.R.D. 236, 245 (D. D.C. 1999) ("Because defendant's sources would be the only insight into defendant's frame of mind other than the defendant's own testimony, information from the sources would go to the 'heart of the matter' and be 'crucial to [plaintiffs'] case' in a public figure case, making the argument in favor of disclosure more compelling."); *Zerilli v. Smith*, 656 F.2d 705, 714 (D.C. Cir.

1981) ("A distinction can also be drawn between civil cases in which the reporter is a party, as in a libel action, and cases in which the reporter is not a party.  When the journalist is a party, and successful assertion of the privilege will effectively shield him from liability, the equities weigh somewhat more heavily in favor of disclosure ... Proof of actual malice will frequently depend on knowing the identity of the newspaper's informant, since a plaintiff will have to demonstrate that the informant was unreliable and that the journalist failed to take adequate steps to verify his story.  Protecting the identity of the source would effectively prevent recovery in many Times -type libel cases"); *Carey v. Hume*, 492 F.2d 631, 632, 636-639 (D.C. Cir. 1974) ("civil litigation has its entitlements on proper occasion to the pursuit of truth wherever it may be found ... Turning to the facts of the case before us, the information sought appears to go to the heart of appellee's libel action, certainly the most important factor in Garland.  It would be exceedingly difficult for appellee to introduce evidence beyond his own testimony to prove that he did not, at any time of day or night over an indefinite period of several weeks, remove boxfuls of documents from the UMW offices.  Even if he did prove that the statements were false, Sullivan also requires a showing of malice or reckless disregard of the truth.  That further step might be achieved by proof that appellant in fact had no reliable sources, that he misrepresented the reports of his sources, or that reliance upon those particular sources was reckless.  Knowledge of the identity of the alleged sources would logically be an initial element in the proof of any of such circumstances. Although it might be possible to submit the question of malice to the jury simply on the basis of the conflicting allegations of the parties, that procedure would seem to provide the plaintiff little prospect of success in view of his heavy burden of proof.

Consequently, we find that the identity of appellant's sources is critical to appellee's claim ... The courts must always be alert to the possibilities of limiting impingements upon press freedom to the minimum; and one way of doing so is to make compelled disclosure by a journalist a last resort after pursuit of other opportunities has failed, But neither must litigants be made to carry wide-ranging and onerous discovery burdens where the path is as ill-lighted as that emerging from appellant's deposition.").

Although they invoked the reporter's privilege, it is impossible to tell from the Defendants privilege log which documents being withheld pursuant to § 16-4702 of the D.C. Code.  Further, § 16-4703(a) expressly provides that a Court may compel disclosure of news or information otherwise protected from disclosure under § 16-4702(2)

> "if the court finds that the party seeking the news or information established by clear and convincing evidence that:
>
> (1)    The news or information is relevant to a significant legal issue before a judicial, legislative, administrative, or other body that has the power to issue a subpoena;
>
> (2)    The news or information could not, with due diligence, be obtained by any alternative means; and
>
> (3)    There is an overriding public interest in the disclosure."

At the very least, the Court should compel the disclosure of the "news and information" and require Defendants to redact the names of any "sources".

## <u>CONCLUSION AND REQUEST FOR RELIEF</u>

For the reasons stated above, Plaintiff respectfully requests the Court to grant his Motion to Compel.[3]

---

[3]    A proposed Order is attached as *Exhibit "E"*.

DATED:        June 16, 2022


                         DEVIN G. NUNES


                         By:___/s/ Steven S. Biss_____
                                 Steven S. Biss (VSB # 32972)
                                 300 West Main Street, Suite 102
                                 Charlottesville, Virginia 22903
                                 Telephone:  (804) 501-8272
                                 Facsimile:  (202) 318-4098
                                 Email:  stevenbiss@earthlink.net
                                 (*Admitted Pro Hac Vice*)

                                 Richard S. Basile
                                 (D.C. Bar No. 374069)
                                 6305 Ivy Lane, Suite 416
                                 Greenbelt, MD 20770
                                 Telephone:  301-441-4900
                                 Facsimile:  301-441-2404
                                 Email:  rearsb@gmail.com

                                 *Counsel for the Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 16, 2022 a copy of the foregoing was filed electronically using the Court's CM/ECF system, which will send notice of electronic filing to counsel for the Defendants and all interested parties receiving notices via CM/ECF.

By:   */s/ Steven S. Biss*
         Steven S. Biss (VSB # 32972)
         300 West Main Street, Suite 102
         Charlottesville, Virginia 22903
         Telephone:  (804) 501-8272
         Facsimile:  (202) 318-4098
         Email:  stevenbiss@earthlink.net
         (*Admitted Pro Hac Vice*)

         Richard S. Basile
         (D.C. Bar No. 374069)
         6305 Ivy Lane, Suite 416
         Greenbelt, MD 20770
         Telephone:  301-441-4900
         Facsimile:  301-441-2404
         Email:  rearsb@gmail.com

         *Counsel for the Plaintiff*