IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DEVIN G. NUNES ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:21-cv-00506-CJN |
| ) | |
| ) | |
| WP COMPANY, LLC ) | |
| d/b/a The Washington Post ) | |
| *et al* ) | |
| ) | |
| Defendants. ) | |
| ) | |

# PLAINTIFF'S RESPONSE AND OPPOSITION TO DEFENDANTS' MOTION TO COMPEL DISCOVERY

Plaintiff, Devin G. Nunes ("Plaintiff"), by counsel, pursuant to Local Civil Rule ("LCvR") 7, respectfully submits this Response and Opposition to the motion to compel discovery [*ECF No. 56*] filed by Defendants, W.P. Company, LLC and Ellen Nakashima (the "Defendants").

### I. Introduction

Plaintiff's answers to defendants' three (3) sets of interrogatories are complete. In response to alleged concerns raised by Defendants, Plaintiff in good faith supplemented certain interrogatory answers to the best of his ability. Plaintiff conducted a reasonable search for responsive material. There is no further information to provide. Defendants may not like Plaintiff's responses. Defendants may find them "implausible", but Plaintiff's responses to defendants' three (3) requests for production of documents are complete, with the limited exception of certain agreed undertakings related to special

1

damages, including production of Plaintiff's current agreement with Trump Media and Technology Group Corp. ("TMTG").[1]  Any further questions, including examination of Plaintiff concerning his interrogatory answers and documents, are properly the subject of a deposition.  Defendants have not been willing to schedule depositions, however.

Discovery has revealed that Defendants in fact knew from prior reporting in 2017 that the statements published on November 9, 2020 were false.  Defendants knew that Plaintiff publicly and repeated stated that there was no evidence that the Obama administration spied on Trump Tower.  Defendants also knew that the "corrected" story – published on December 8, 2020 – was also a lie.  Defendants knew that Plaintiff did not go to the White House on March 21 to review intelligence files that would buttress **_anyone's_** "baseless claim" of "the Obama administration spying on Trump Tower".  Defendants knew the purpose of Plaintiff's "midnight run".

The litigation process is – or should be – a search for the truth. *Riley v. Goodman*, 315 F.2d 232, 234 (3rd Cir. 1963) ("A trial is not a contest but a search for the truth so that justice may properly be administered.").  In order to tamp out the resounding evidence of actual malice and to prevent discovery of further knowledge of falsity and reckless disregard, Defendants have manufactured a "dispute" in an effort get Plaintiff in a "discovery bear hug".

---

[1] All information related to Plaintiff's employment with TMTG has been filed with the Securities and Exchange Commission, and is publicly available to Defendants.  Notwithstanding, Plaintiff's counsel agreed to produce a Counsel's Eyes Only copy of Plaintiff's employment agreement.  The agreement will be produced by June 27.

## II. Specific Responses To Issues Raised

1. Plaintiff undertook a reasonable search for responsive documents over which he had "possession, custody, or control." Plaintiff produced all documents or information that was in the possession or control of his congressional staff, including communications director, Jack Langer ("Langer"). On November 24, 2021, Plaintiff produced over 100 emails in native format relating to (a) the unmasking of American citizens, including General Flynn, and the criminal leaks by the Post and others, (b) President Trump's March 4, 2017 wiretapping tweet and Plaintiff's public statements that there was never a physical wiretap of Trump Tower nor a FISA warrant to tap Trump Tower, and (c) the false and fictious "midnight run". These emails identified any and all other staff members who had any involvement in the matters related to this case, including the fabricated and fictitious "midnight run". At Defendants' request, Plaintiff bates-stamped and produced all the emails in PDF. Plaintiff also collected and produced documents from the Clerk of the House of Representatives that identified his House Permanent Selection Committee on Intelligence ("HPSCI") and Congressional Staff. Langer is the only staff member that is or ever was in possession of any responsive documents. This is borne out clearly by the facts.

The so-called "midnight run" entailed a visit Plaintiff made **alone** to the Eisenhower Executive Office Building ("EEOB") on March 21, 2017 to view highly classified documents that Plaintiff read without taking away any copies. The information dealt with the extremely sensitive subject of the unmasking of American citizens, whose identities are essentially hidden from the Intelligence Community itself because they were not the target of surveillance operations—they were largely swept up incidentally in

the monitoring of other targets.  Because this information is highly classified, Plaintiff could **not** legally speak to **anyone** about the details of it, or email about it, or discuss it on the phone, except with people holding a TS/SCI security clearance (and no one on either Plaintiff's personal office staff or campaign staff held such a clearance).  And even with appropriately cleared people, the communications would have to take place in a Secure Compartmentalized Information Facility ("SCIF") or via a secure phone line.  Plaintiff also could not keep documents with information related to these unmaskings, except on secure computers or in a SCIF.

Contrary to Defendants' suspicion and speculation, except for Langer, there are no other custodians, including staffers and other employees at Plaintiff's congressional, HPSCI, and campaign offices who are or were in possession of any responsive documents.  Plaintiff cannot provide information and documents that do not exist.  Defendants offer nothing but disbelief and speculation.  They think there must be more.  There is not.

2.    Plaintiff did not attempt to collect documents from staff members with **no** involvement or relevant knowledge of the events involved in this action.  In a supplemental interrogatory answer, Plaintiff specifically notified Defendants that these staff members have no relevant knowledge "aside from what she [or he] may have read in the press". [*Plaintiff's Second Supplemental Answer to Interrogatory No. 15*].

3.    Plaintiff truthfully responded to 13 of the 49 document requests that he has no documents.  For instance, Plaintiff has no documents relating to his meeting and review of classified intelligence files at the EEOB on March 21, 2017 or his meeting with the President the next day.  The fact that Defendants' counsel "just can't believe it" is not

a matter that the Court can resolve. There are no documents. Defendants are free to cross-examine Plaintiff at his deposition about his responses to any document request.

4. Plaintiff has fully and completely answered all interrogatories, including nos. 1, 2, 3, 6, 11, 13, 14, 15, 16, and 17. Plaintiff's answer to interrogatory no. 1, for instance, fully and completely accounts for Plaintiff's whereabout on March 21, 2017 – the day of the so-called "midnight run". The answer responds to the best of Plaintiff's memory and information:

> "I departed the U.S. Capitol in the late afternoon en route to the Eisenhower Executive Office Building on the White House grounds. I arrived at the White House grounds in the late afternoon, departed approximately 90 minutes later, and went to a reception at the National Building Museum in Washington, D.C."

When Defendants requested additional detail about the White House Visit on March 21, Plaintiff provided a supplemental answer as follows:

> "No specific times were provided because I do not have a minute-by-minute account of my activities that day, or any day for that matter. The times I provided are the most accurate that I can reconstruct. The specific place I visited on the White House grounds was the SCIF in the Eisenhower Executive Office Building."

[*Plaintiff's First Supplemental Answer to Interrogatory No. 1*]. Similarly, Plaintiff's answer to interrogatory no. 16 identifies all known custodians of responsive documents relating to the "midnight run", including Langer and the Clerk of the House of Representatives.[2] Likewise, Plaintiff's answer and supplemental answer to interrogatory no. 17 is complete. Plaintiff identified all persons with whom he communicated, including Michael Ellis, Speaker Paul Ryan, President Trump, Republican HPSCI

---

[2] The "midnight run" story and related fake details, such as Plaintiff taking an "Uber" to the White House, was likely manufactured by HPSCI ranking member (at the time) Adam Schiff and his long-time chief of staff, Patrick Boland. Significantly, Defendants have made no effort to subpoena Schiff or Boland.

members, Representatives Elise Stefanik, William Hurd, Trey Gowdy, Chris Stewart, Brad Wenstrup, Mike Turner, Mike Conaway, Rick Crawford, Tom Rooney, Peter King, Frank LoBiondo, and Ileana Ros-Lehtinen, who were briefed about the unmaskings, and a "gaggle of reporters". [*Plaintiff's Supplemental Answer to Interrogatory No. 17*]. The answer is complete. There is no further information to provide.

5. Defendants' falsely accuse Plaintiff of "refusing" to answer interrogatories. To the contrary, Plaintiff answered every single one.

6. Defendants claim that only Plaintiff knows the identities of other "key agents", for example, a staffer who accompanied Plaintiff before his March 21, 2017 visit to the White House, and the person who drafted content about this lawsuit for a campaign-related website. Plaintiff has agreed to identify these individuals, and will supplement his Rule 26(a)(1) disclosures by July 5, 2022.

7. Defendants argue that Plaintiff publicly stated he was "in a cab with staff" and "dropped them off before" he went to his the White House on March 21, 2017. [*See* Jake Tapper, "***Who cleared Devin Nunes into the White House?***" CNN (Mar. 28, 2017), https://www.cnn.com/2017/03/27/politics/devin-nunes-white-house-donald-trump/index.html]. Defendants claim that Plaintiff has not identified the "staff" whose email account(s) or other files likely include, at a minimum, emails or other documents relating to the March 21 visit (Request No. 2). All "disbelief" aside, Plaintiff expressly stated that he "dropped them [staff] off" **before** he went to the White House. So why would anyone have emails or other documents about Plaintiff's trip to the White House if they didn't go with him?

6

8. Defendants speculate that Congressional Office chiefs of staff (Jillian Plank and Anthony Ratekin) – simply because of their job title – likely possess, at a minimum, "communications" with Plaintiff or drafts of his public "statements" relating to the "explosive aftermath" of his March 21 and March 22, 2017 White House visits (Request Nos. 10, 15), and would be knowledgeable about the location of documents responsive to all other requests. Defendants are mistaken. Public statements on HPSCI issues were not run through Plaintiff's chiefs of staff. Further, neither former chiefs of staff are still with either HPSCI or Plaintiff's Congressional staff, so none of them would even have access to the email accounts they were using in 2017.

9. In response to Defendants' interrogatory no. 15, Plaintiff stated that "[a]ll HPSCI staff members were aware of allegations of the Obama administration spying on Trump associates because the FISA warrant on Carter Page was investigated by HPSCI". Defendants extrapolate from this that certain HPSCI staffers [Scott Glabe, George Pappas and Damon Nelson (deceased)] likely possess documents relating to "communications," "meetings," or "statements" by Plaintiff or other individuals on the subject of the "midnight run". (Defendants' request for production of documents nos. 4, 5, 7, 8, 9, 10, 11, 12, 13, 14, 17, 38).

As Plaintiff stated in his supplemental answer to interrogatory no. 15, Plaintiff believes that HPSCI staff would have been generally aware of Plaintiff's visit to the White House through press reports, which does not in any way imply they possess documents or ever possessed documents concerning the "midnight run" or the subject of this action.

10. Defendants speculate that "campaign manager" Jake Mizner – simply by reason of his role as "campaign manager" – is likely, at a minimum, to possess documents relating to "communications" posted on Plaintiff's campaign-funded website (www.devinnunes.com) about "lawsuits against The Washington Post" and any campaign "communications" about Plaintiff's March 21 or 22 White House visits (Defendants' request no. 16).

Contrary to Defendants' counsel's "belief", Langer volunteered to help write/edit the section of the campaign website. Mr. Mizner had no involvement.

11. Defendants assert that Plaintiff did not produce a single document from his own personal files, including from any of his own computers, email accounts, or other devices. How could this be, Defendants wonder? Well, this is because Plaintiff did not keep documents in this fashion. Plaintiff didn't have a computer or document filing cabinet he used either at HPSCI, or in his personal office, or at the campaign office.

12. In spite of the fact that Plaintiff makes no claim for attorney's fees in this defamation action, Defendants want to know who is paying Plaintiff's legal fees. Defendants allege that someone filed an ethics complaint against Plaintiff, and accused him of having "improperly" received legal services in violation of House gift rules. Defendants claim that "evidence" that Plaintiff broke House ethics rules by receiving, but not disclosing, legal services to litigate actions against the Post would rebut his Plaintiff's allegation that he did not engage in "unethical" behavior. This is rank speculation. The ethics complaint, ginned up by someone with an axe to grind, is not "evidence" of anything. There is not even a scintilla of evidence that anyone other than Plaintiff is

paying counsel to hold the Defendants accountable for their defamation, including the original fabricated story and the "correction" published on December 8, 2020.

13. Defendants' motion to compel discovery is largely a wild fishing expedition without any good faith basis in fact.

14. Finally, Plaintiff has agreed to supplement his initial disclosures to include a more specific computation of each category of damages, and to identify and produce the documents or other evidentiary material on which each computation is based, including links to all articles, tweets and other public records that evidence the injury to reputation and mental anguish claimed by Plaintiff is this action. Plaintiff will provide supplemental disclosures by July 5, 2022.

## CONCLUSION AND REQUEST FOR RELIEF

For the reasons stated above, Plaintiff respectfully requests the Court to DENY the Defendants' motion to compel.

DATED: June 24, 2022

Signature of Counsel on Next Page

DEVIN G. NUNES

By: <u>*/s/ Steven S. Biss*</u>
Steven S. Biss (VSB # 32972)
300 West Main Street, Suite 102
Charlottesville, Virginia 22903
Telephone: (804) 501-8272
Facsimile: (202) 318-4098
Email: stevenbiss@earthlink.net
(*Admitted Pro Hac Vice*)

Richard S. Basile
(D.C. Bar No. 374069)
6305 Ivy Lane, Suite 416
Greenbelt, MD 20770
Telephone: 301-441-4900
Facsimile: 301-441-2404
Email: rearsb@gmail.com

*Counsel for the Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on June 24, 2022 a copy of the foregoing was filed electronically using the Court's CM/ECF system, which will send notice of electronic filing to counsel for the Defendants and all interested parties receiving notices via CM/ECF.

By: */s/ Steven S. Biss*
Steven S. Biss (VSB # 32972)
300 West Main Street, Suite 102
Charlottesville, Virginia 22903
Telephone: (804) 501-8272
Facsimile: (202) 318-4098
Email: stevenbiss@earthlink.net
(*Admitted Pro Hac Vice*)

Richard S. Basile
(D.C. Bar No. 374069)
6305 Ivy Lane, Suite 416
Greenbelt, MD 20770
Telephone: 301-441-4900
Facsimile: 301-441-2404
Email: rearsb@gmail.com

*Counsel for the Plaintiff*