# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DEVIN G. NUNES,

       Plaintiff,

v.

WP COMPANY LLC, d/b/a THE
WASHINGTON POST and ELLEN
NAKASHIMA,

       Defendants.

**FILED UNDER SEAL**

**CONTAINS INFORMATION
DESIGNATED AS HIGHLY
CONFIDENTIAL**

Case No. 1:21-cv-00506 (CJN)

## DEFENDANTS' MOTION FOR SANCTIONS

WILLIAMS & CONNOLLY LLP

Kevin T. Baine (D.C. Bar No. 238600)
Thomas G. Hentoff (D.C. Bar No. 438394)
Nicholas G. Gamse (D.C. Bar No. 1018297)
Sean M. Douglass (D.C. Bar No. 1033069)
Alexandra M. Gutierrez (D.C. Bar No. 1619149)
680 Maine Avenue, S.W.
Washington, DC 20024
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
thentoff@wc.com

*Counsel for Defendants*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 5

    A.    Nunes and His Congressional Staff Possessed Communications and Other Documents Relating to Nunes's Daily Activities in Congress. .................................................................................................. 5

    B.    Nunes Sued The Post Before Leaving Congress, But Failed To Issue a Litigation Hold. ................................................................................ 6

    C.    The Post Requested Relevant Communications by Nunes and His Staffers in 2021, Before Nunes Departed from Congress in 2022. ............... 8

    D.    Nunes Announced That He Would Resign from Congress in 2022, But Promised That His Departure Would Not Impact Preservation of and Continued Access to Documents. .................................... 9

    E.    In Response to The Post's Discovery Requests, Nunes Asserted That Apart from a Spokesman, No Individuals "Are or Were in Possession of Any Responsive Documents." ................................................ 9

    F.    Nunes ███████████████████████████████████████ ████████████ ............................................................................... 10

    G.    By Conducting Third-Party Discovery, The Post Learned That Nunes ██████ Documents Responsive to The Post's Pending Discovery Requests. ........................................................................ 12

    H.    The Court Issued Multiple Orders Compelling Nunes To Comply with The Post's Discovery Requests, and Nunes Failed To Do So. .............. 15

        1.    The Court's October 25, 2022 Order .................................................. 15

        2.    The Court's February 1, 2023 Order ................................................. 16

        3.    The Court's April 5, 2023 Order and Leave for The Post To Seek Sanctions ............................................................................. 18

LEGAL STANDARDS ...................................................................................... 19

ARGUMENT ..................................................................................................... 21

I.       SPOLIATION SANCTIONS ARE WARRANTED. ................................................. 21

A.      Nunes's Failure To Preserve Congressional Records Meets Rule 37(e)'s Threshold Requirements for Spoliation Sanctions. ........................... 21

      1.     Nunes Had a Duty To Preserve ESI on Devices Issued to Nunes and His Congressional Staffers by No Later Than November 2020 .............................................................................. 21

      2.     Nunes Failed To Take Reasonable Steps To Preserve ESI Because ██████████████████████ ████████████████████ Even After Assuring The Post that His Departure from Congress Would Not Affect Document Retention. ................. 23

      3.     Relevant Records Were ████████ as a Result ............................. 28

B.      Nunes Intentionally Deprived The Post of Responsive Communications from Nunes and His Staffers in This Litigation, Justifying Rule 37(e)(2) Sanctions. ............................................... 29

C.      Other Sanctions, Including an Award of Fees and Costs, Are Warranted To Cure Prejudice to The Post by Nunes's Misconduct Under Rule 37(e)(1). ..................................................................... 35

II.     AN AWARD OF FEES AND COSTS IS WARRANTED GIVEN THE POST'S SUCCESSFUL DISCOVERY MOTION, OPPOSITION TO NUNES'S MOTION, AND EFFORTS TO ENFORCE COURT ORDERS .......................................................................................... 37

A.      The Court Should Order Nunes To Pay Fees and Costs in Connection With its June 10, 2022 Motion To Compel Pursuant to Rule 37(a)(5)(C). ..................................................................... 38

B.      The Court Should Order Nunes To Pay Fees and Costs in Connection with Nunes's Noncompliance with Multiple Court Orders Pursuant to Rule 37(b)(2)(C). ........................................... 40

CONCLUSION .................................................................................................... 43

# TABLE OF AUTHORITIES

## CASES

*Beck v. Test Masters Educ. Servs., Inc.*, 2012 WL 10817176 (D.D.C. Sept. 25, 2012)...............38

*\*Beck v. Test Masters Educ. Servs., Inc.*, 289 F.R.D. 374 (D.D.C. 2013).......................29, 30, 34

*\*Borum v. Brentwood Vill., LLC*, 332 F.R.D. 38 (D.D.C. 2019).......................................... *passim*

*Dellums v. Powell*, 566 F.2d 231 (D.C. Cir. 1977)........................................................43

*DL v. District of Columbia*, 251 F.R.D. 38 (D.D.C. 2008)........................................................39

*\*Doe v. District of Columbia*, 2023 WL 3558038 (D.D.C. Feb. 14, 2023)........................ *passim*

*Doe v. District of Columbia*, 2023 WL 5284815 (D.D.C. Feb. 14, 2023)..............................36, 37

*Flynn v. Thibodeaux Masonry, Inc.*, 311 F. Supp. 2d 30 (D.D.C. 2004).......................................37

*\*Freeman v. Giuliani*, -- F. Supp. 3d --, 2023 WL 5600316 (D.D.C. Aug. 30, 2023).......... *passim*

*Freeman v. Giuliani*, 2023 WL 5282593 (D.D.C. June 23, 2023) .................................................27

*Gaina v. Northridge Hosp. Med. Ctr.*, 2018 WL 6258895 (C.D. Cal. Nov. 21, 2018) .................26

*George v. Allen Martin Ventures, LLC*, 2023 WL 2705776 (D.D.C. Mar. 30, 2023).................38

*Herman v. City of New York*, 334 F.R.D. 377 (E.D.N.Y. 2020).......................................................27

*Hice v. Lemon*, 2021 WL 6053812 (E.D.N.Y. Nov. 17, 2021) .................................................29

*Inova Health Care Servs. v. Omni Shoreham Corp.*, 2022 WL 4598578 (D.D.C. Sept. 30, 2022) *on reconsideration on other grounds*, 2023 WL 5206142 (D.D.C. Aug. 14, 2023) ........................................................................................................................39

*Keithley v. Home Store.com, Inc.*, 2008 WL 3833384 (N.D. Cal. Aug. 12, 2008).......................24

*Leidig v. Buzzfeed, Inc.*, 2017 WL 6512353 (S.D.N.Y. Dec. 19, 2017).......................................24

*Milkovich v. Lorain J. Co.*, 497 U.S. 1 (1990)................................................................34

*Montgomery v. Risen*, 197 F. Supp. 3d 219 (D.D.C. 2016), *aff'd*, 875 F.3d 709 (D.C. Cir. 2017) .....................................................................................................................34

*Moore v. Chertoff*, 255 F.R.D. 10 (D.D.C. 2008)................................................................30, 33

*Nunnally v. District of Columbia*, 243 F. Supp. 3d 55 (D.D.C. 2017) ........................................21

*Ottoson v. SMBC Leasing & Fin., Inc.*, 268 F. Supp. 3d 570 (S.D.N.Y. 2017) ...........................30

*Paisley Park Enters., Inc. v. Boxill*, 330 F.R.D. 226 (D. Minn. 2019) ...........................................28

*Parsi v. Daioleslam*, 778 F.3d 116 (D.C. Cir. 2015) .................................................................39, 40

*Poe v. Nw. Mut. Life Ins. Co.*, 2023 WL 4155378 (C.D. Cal. Apr. 24, 2023)..............................27

*Richard Green (Fine Paintings) v. McClendon*, 262 F.R.D. 284 (S.D.N.Y. 2009)......................27

*Sekisui Am. Corp. v. Hart*, 945 F. Supp. 2d 494 (S.D.N.Y. 2013) ................................................35

*United States v. Philip Morris USA Inc.*, 327 F. Supp. 2d 21 (D.D.C. 2004) ..............................37

*\*Vasser v. Shulkin*, 2017 WL 5634860 (D.D.C. Nov. 22, 2017)......................................29, 30, 35

*Wyndham Vacation Ownership, Inc. v. Slattery, Sobel & Decamp, LLP*, 2021 WL
    5275700 (M.D. Fla. Nov. 10, 2021) ........................................................................................34

*Zhi Chen v. District of Columbia*, 839 F. Supp. 2d 7 (D.D.C. 2011) ............................................28

*Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212 (S.D.N.Y. 2003).................................................21

## RULES

Fed. R. Civ. P. 37(a) ............................................................................................ *passim*

Fed. R. Civ. P. 37(b) ............................................................................................ *passim*

Fed. R. Civ. P. 37(e) ............................................................................................ *passim*

---

*\*Authorities upon which counsel chiefly rely are marked with asterisks.*

# INDEX OF EXHIBITS

**Exhibit 1**:   Email from S. Biss to N. Gamse (December 10, 2021)

**Exhibit 2**:   Excerpts from Transcript of Deposition of Jacob Langer (June 19, 2023) (filed under seal)

**Exhibit 3**:   Plaintiff's Supplemental Answers and Responses to Defendants' Second Discovery Requests (February 23, 2022)

**Exhibit 4**:   Excerpts from Transcript of Deposition of Caitlin M. Canter (May 10, 2023) (filed under seal)

**Exhibit 5**:   Excerpts from Transcript of Deposition of Jilian Plank Souza (June 19, 2023) (filed under seal)

**Exhibit 6**:   Excerpts from Transcript of Deposition of Jennifer Morrow (December 9, 2022) (filed under seal)

**Exhibit 7**:   Excerpts from Transcript of Deposition of Devin G. Nunes (June 19, 2023) (filed under seal)

**Exhibit 8**:   Defendants' First Set of Requests for Production of Documents (October 20, 2021)

**Exhibit 9**:   Letter from N. Gamse to S. Biss (March 22, 2022)

**Exhibit 10**:   Defendants' Summary of Discovery Dispute (April 29, 2022)

**Exhibit 11**:   Email from N. Gamse to S. Biss (June 6, 2023) (filed under seal)

**Exhibit 12**:   Email from S. Biss to N. Gamse (July 12, 2022)

**Exhibit 13**:   Text Messages between D. Nunes and C. Canter (February 5, 2021) (BF.Nunes.Canter.101822.000012–000013) (filed under seal)

**Exhibit 14**:   Email from ███████████ (March 22, 2017) (MORROW0000006–0000008) (filed under seal)

**Exhibit 15**:   Email from ███████████ (March 22, 2017) (EST_077P-R000000447_0001) (filed under seal)

**Exhibit 16**:   Email from ███████████████ (March 30, 2017) (EST_077P-R000000183_0001) (filed under seal)

**Exhibit 17**:  ███████ (March 21, 2017) (BF.Nunes.Canter.101822. 000014–000015) (filed under seal)

**Exhibit 18**:  J. Morrow Production of March 21 and 22, 2017 Agenda (MORROW0000001–0000004) (filed under seal)

**Exhibit 19**:  D. Nunes Production of March 21 and 22, 2017 Agenda (PX 0009–0010) (filed under seal)

**Exhibit 20**:  Plaintiff's Third Supplemental Answers and Responses to Defendants' Discovery Requests (November 8, 2022)

**Exhibit 21**:  Plaintiff's Fourth Supplemental Answers and Responses to Defendants' Discovery Requests (November 16, 2022)

**Exhibit 22**:  Plaintiff's Supplemental Answers and Responses to Defendants' Discovery Requests and Compliance with the Court's February 1, 2023 Order (February 23, 2023)

**Exhibit 23**:  Email to ███████████████ (March 21, 2017) (EST_077P-R000000439_0001) (filed under seal)

**Exhibit 24**:  Defendants' Summary of Discovery Dispute (March 13, 2023) (filed under seal)

**Exhibit 25**:  Plaintiff's Second Supplemental Answers and Responses to Defendants' Discovery Requests and Compliance with the Court's April 5, 2023 Order (April 16, 2023)

**Exhibit 26**:  Transcript of Motion Hearing Before the Honorable Carl J. Nichols, United States District Judge (January 25, 2023)

**Exhibit 27**:  Email from A. Gutierrez to S. Biss (May 4, 2023)

**Exhibit 28**:  Defendants' Second Set of Requests for Production of Documents (December 21, 2021)

**Exhibit 29**:  Excerpts from Transcript of Deposition of Michael Ellis (December 13, 2023) (filed under seal)

**Exhibit 30**:  Plaintiff's Objections, Answers and Responses to Defendants' Fourth Discovery Requests (June 20, 2022)

**Exhibit 31**:  Defendants' Summary of Discovery Dispute (November 23, 2022)

## INTRODUCTION

Discovery has shown that after Plaintiff Devin Nunes filed his defamation lawsuit against The Washington Post and Ellen Nakashima (collectively, "The Post") in November 2020, Nunes committed spoliation by comprehensively failing to take reasonable steps to preserve records that were requested by The Post and important to this case.  Not only did Nunes fail to preserve any of his own communications in November 2020, he a███████████████████████████ ██████████████████████████████████████████████, while discovery requests served by The Post in November and December 2021 were pending.  Thereafter, Nunes made a series of submissions in response to Post motions and Court Orders concealing the fact that he had ███████████████████████ responsive to The Post's requests.  The Post now moves for spoliation sanctions under Rule 37(e).  The Post also moves under Rules 37(a) and 37(b) for reimbursement of reasonable fees and costs associated with Nunes's prior violations of three Court Orders, issued in response to motions to compel, and with his discovery obligations, by failing to supplement his document production and to identify relevant events, individuals, and repositories.

As with his other discovery misconduct, Nunes's spoliation is not the result of innocent error.  At the outset of discovery, on October 1, 2021, Nunes represented to The Post and the Court that he would produce documents from Congressional staffers without the need for third-party discovery.  ECF No. 44 (Joint Rpt. of L.R. 16.3 Conf.) ¶ 16(b).  When The Post learned that Nunes would resign from Congress effective January 1, 2022, The Post asked for confirmation that his departure would not affect his preservation of and access to all relevant documents from his time in Congress, and Nunes provided that assurance in an email.  Ex. 1 (Dec. 10, 2021 Email from S.

Biss to N. Gamse).[1]  By this point, Nunes had received forty-one document requests from The Post, in addition to several interrogatories.

The Post's discovery requests sought communications sent or received by Nunes and his Congressional staffers relating to his so-called "midnight run" to the White House on March 21, 2017.  Nunes's interactions with the White House and the circumstances of the visit are relevant because Nunes alleged that The Post defamed him in a November 2020 article (the "Article") by reporting that he went to the White House to review intelligence files he "believed would buttress Trump's baseless claims of the Obama administration spying on Trump Tower."  The Post's discovery requests also sought documents relating to Nunes's allegations that he suffered threats and reputational harm as a result of the Article, and that such harm was concentrated in Virginia (where he initially filed this lawsuit) and not his home state of California.

It is now clear that Nunes's representations that he would produce documents from staffers and preserve his Congressional files were false.  After his resignation, Nunes failed to produce documents from Congressional staffers other than his spokesman, Jack Langer.  He also failed to produce a single one of his own communications.  The Post moved to compel discovery from Nunes, and issued subpoenas to Nunes's former staffers for documents and testimony.

The Post learned from Nunes's staffers that Nunes had never issued a litigation hold. Instead, Nunes ██████████████████████████████████████ ████████████████████████████, which Nunes produced to The Post in November 2021, before his resignation.  Nunes made no effort to preserve his own communications, communications by his staffers, or any other documents in his Congressional office.  As a result

---

[1] For purposes of simplicity in this motion, The Post will refer to representations  made through the parties' respective counsel as representations made by the parties themselves.

of this artificially narrow approach to document retention and preservation, Nunes never produced a single substantive internal communication between or among him or his forty-plus staffers, even though they testified ███████████████████████████████████████████.

The Post also learned that after Nunes resigned from Congress, and after he affirmatively confirmed to The Post that all responsive records would be preserved, he ███████████ █████████████████████████████████████████████████████████████████ ████████████████████████████. In doing so, Nunes guaranteed that internal communications requested by The Post would, in the testimony of his spokesman Jack Langer, be ██████████ Ex. 2 ("Langer Tr.") at 385:7–15.

Nunes's actions merit spoliation sanctions under Rule 37(e) because they reflect that he "failed to take reasonable steps to preserve" relevant communications that have been lost, prejudicing The Post, and "acted with the intent to deprive" The Post of the use of such documents. *Doe v. District of Columbia*, 2023 WL 3558038, at *6, *16 (D.D.C. Feb. 14, 2023) (citation omitted).  Rule 37(e) sanctions are necessary to deter such egregious misconduct and to preserve the integrity of the justice system, and should include (1) adverse inferences against Nunes at trial that the spoliated records would have contained evidence unfavorable to Nunes's arguments as to the alleged falsity of The Post's reporting and his own damages, (2) preclusion of Nunes from testifying about the contents of destroyed documents, and (3) an award of The Post's reasonable fees and costs associated with litigating Nunes's noncompliance with his preservation obligations.

Additional sanctions pursuant to Rules 37(a) and 37(b) are also necessary because Nunes disobeyed three Court Orders requiring him to produce documents and information to The Post, including a complete account of his activities on March 21, 2017, and information identifying repositories that contained Nunes's and his Congressional staffers' documents and

communications.  Nunes failed to produce a single additional document, or to identify his own devices or other devices issued to his staffers.  He also omitted key repositories, and omitted information about his activities before the late afternoon on March 21, 2017— ████████████ ████████████████████████████████, about which The Post only learned through third-party discovery (months *after* Nunes had falsely represented to the Court that he had disclosed a complete chronology of his activities).  The Post thus requests an award of reasonable fees and costs associated with submitting its largely successful June 10, 2022 motion to compel against Nunes, ECF No. 56, *see* Fed. R. Civ. P. 37(a)(5), and with its efforts to enforce the Court's October 25, 2022, February 1, 2023, and April 5, 2023 Orders compelling Nunes to produce discovery, *see* Fed. R. Civ. P. 37(b)(2).  Such awards are proper because Nunes is unable to justify his intransigence during discovery, which has caused The Post to expend considerable time and resources, including on third-party discovery.  Nunes should bear the costs of his misconduct.

For these reasons, the Court should impose sanctions on Nunes.  Pursuant to Rule 37(e), the Court should order an adverse inference instruction at trial, limit Nunes's testimony as to the contents of the spoliated records, permit The Post to argue that the spoliated records likely contained evidence unfavorable to Nunes, and award The Post reasonable fees and costs spent litigating this issue.  Pursuant to Rule 37(a), the Court should award The Post reasonable fees and costs spent moving to compel documents from Nunes.  And pursuant to Rule 37(b), the Court should award The Post its reasonable expenses spent in connection with Nunes's disobedience toward the Court's three Orders concerning his discovery failures.  These sanctions are all warranted to remedy Nunes's discovery misconduct and to maintain the integrity of this Court.[2]

---

[2] The Post notes that the litigation decisions and conduct at issue in this Motion occurred well before September 12, 2023, when a health situation arose requiring the appearance of new counsel for Nunes.  *See* ECF Nos. 75, 76 (notices of appearance).

**BACKGROUND**

A.     **Nunes and His Congressional Staff Possessed Communications and Other Documents Relating to Nunes's Daily Activities in Congress.**

The record shows that during his time in Congress, Nunes and his sizable staff generated a prodigious quantity of documents and communications on a daily basis, and were frequent and regular users of email and text messages for official business.  Before Nunes resigned in January 2022 as Congressman for California's 22nd Congressional District and Chairman of the House Permanent Select Committee on Intelligence ("Intelligence Committee"), he oversaw more than forty staffers.  *See* Ex. 3 (Pl.'s Supp. Resps. to Defs.' 2d Disc. Reqs.) (Resp. to Req. No. 15). Between March 2017 and his January 2022 departure from Congress, Nunes and his staffers ████████████████████████████████  As his former deputy chief of staff testified, Nunes ████████████████████████████████████████ ████████ Ex. 4 ("Canter Tr.") at 23:22–24:2.  Nunes ████████████████████████ ████████████████████████████████████████████ ████████████████████████  *Id*. 25:1–26:2.  Email was one of his staffers' ████████████████████ Ex. 5 ("Souza Tr.") at 34:9–11; *see* Langer Tr. at 72:3–7.  Staffers often received ████████ of emails in a day.  Souza Tr. at 32:6–21; Ex. 6 ("Morrow Tr.") at 46:12–13. ████████████████████████████ ████████████████████████████████  Langer Tr. at 80:6–83:16 ████ ████████████████████████████████████████████).

Nunes and his staffers also communicated ████████████████ ████████████.  Canter Tr. at 27:17–28:3.  According to Nunes's former chief of staff, ██ ████████████████████████████████████  Souza Tr. at 38:21–39:1.   Other staffers ████████████████████████████



██████████████ with Nunes.  Langer Tr. at 72:21–73:11.  Staffers ████████████████

████████████████████, depending on the day.  Souza Tr. at 32:6–21, 33:19–34:1.  Staffers

also communicated using ███████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████ *Id.* at 36:8–37:15.

█████████████████ Souza Tr. at 15:10–16, 39:10–42:9, 184:20–185:11, 228:7–10.  Staffers also used an

███████████ Canter Tr. at 31:16–32:6.

**B.    Nunes Sued The Post Before Leaving Congress, But Failed To Issue a Litigation Hold.**

Nunes brought this lawsuit on November 17, 2020, fourteen months before he resigned

from Congress.  ECF No. 1 (Compl.).  Shortly after discovery began, in September 2021, The Post

asked Nunes "to confirm that in responding to Defendants' discovery requests, he would collect

and produce documents or information from his congressional and campaign offices and staffers"

over which "he has actual or constructive possession, custody, or control."  ECF No. 44 , ¶ 16(b).

In an October 1, 2021 joint submission, Nunes represented to The Post and the Court: "Plaintiff

confirms that in response to party discovery he will produce any documents or information that

may be in the possession or control of his congressional staff, including Langer, without the need

for third-party discovery."  *Id.*

But Nunes never provided ███████████████████████████████████ in

connection with this case.  Ex. 7 ("Nunes Tr.") at 102:2–7.  Nunes now claims that instead he ███

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████ Nunes Tr. at 104:19–105:10.  However, Morrow confirmed that

███████████████████████████████████████████." Morrow Tr. at 123:4–11 ███

███████████████████████████████████████████████████████

████████████████████████████).  And even her copy of the calendar was never

produced by Nunes in discovery and was only turned over by Morrow after she was subpoenaed.

As for Langer, he confirmed that ███████████████████████████████████████

█████.  But under oath, he was ███████████████████████████████

███████████████████████████████████████████████████████

█████████████, *see* Langer Tr. at 342:2–346:9 ██████████████████████

███████████████████████████████████████████████████████

█████), and only produced external emails with others outside Nunes's staff, mainly journalists.

Other staffers were never asked to preserve any documents.  For example, Jilian Plank

Souza, who served as Nunes's chief of staff at the time he filed this lawsuit in 2020 through his

resignation in 2022, testified that ███████████████████████████████████████

█████████ Souza Tr. at 208:18–209:21.  She confirmed ███████████████████████

████████████████████████████.  *Id.*

C.   **The Post Requested Relevant Communications by Nunes and His Staffers in 2021, Before Nunes Departed from Congress in 2022.**

Nunes was on notice of the communications sought by The Post while he was still in office. In October and December 2021—before Nunes resigned from Congress in 2022—The Post requested that he produce several categories of relevant communications, including the following:

- Communications by Nunes or any of his staffers regarding President Trump's March 2017 claims that the Obama Administration spied on Trump Tower, *see* Ex. 8 (Defs.' 1st Discovery Reqs.) (Req. Nos. 5, 15), Nunes's March 21 and 22, 2017 visits to the White House to review documents and meet with President Trump, *see id.*, and Nunes's subsequent statements about what he learned about surveillance by the Obama Administration, *see id.* (Req. No. 2), which are relevant to the substantial truth of The Post's reporting about the circumstances of Nunes's visit and the context in which it was made;

- Communications by Nunes or any of his staffers regarding "threats" or other injuries that Nunes alleges he sustained as a result of the Article, *see id.* (Req. No. 22), which are relevant to rebut his damages allegations; and

- Records of calls to Nunes's Congressional office about Nunes's so-called "midnight run," *see id.* (Req. Nos. 22, 23), which are relevant to rebut his argument that any reputational harm was concentrated in Virginia and not in California (and that therefore, he was not required to comply with California's retraction statute).

In response, Nunes did not produce any emails, text messages, or other communications involving himself. Instead, in November 2021, Nunes produced certain emails from his spokesman Jack Langer—namely, emails Langer sent to journalists, press releases, or summaries of news articles—but did not produce any communications from the custodial files of any other

staffers.  The only other documents Nunes produced from his Congressional office included a two-page calendar of his activities for March 21 and 22, 2017, three widely reported letters from the Intelligence Committee to U.S. government agencies, and documents that reflect public information (*e.g.*, financial disclosures or staff lists) or that appear to have been created for use in this litigation (and were titled as "Appendices" to Nunes's interrogatory responses).

### D. Nunes Announced That He Would Resign from Congress in 2022, But Promised That His Departure Would Not Impact Preservation of and Continued Access to Documents.

On December 6, 2021, Nunes announced that he would resign from Congress effective January 1, 2022, to lead Trump Media and Technology Group ("TMTG").  Within days of his announcement, The Post asked Nunes to verify that his departure would have no effect on his ability to preserve and collect relevant documents for the case.  Specifically, The Post asked Nunes to confirm that he would "ensure the preservation of and continued access to all documents that may be relevant to his ongoing litigation with the Washington Post after he leaves office, including those documents held by his current or former Campaign Staff, Congressional Office Staff, or Intelligence Committee Staff."  Ex. 1.  Nunes represented that his resignation would have "no impact on his efforts to preserve relevant documents and information" and that "[a]ny and all relevant documents have been preserved."  *Id.*

Three months later, The Post asked Nunes to inform The Post of any change in circumstances that could result in the loss of potentially relevant documents from his time in Congress.  *See* Ex. 9 (Mar. 22, 2022 Letter from N. Gamse to S. Biss) at 3.  Nunes did not respond.

### E. In Response to The Post's Discovery Requests, Nunes Asserted That Apart from a Spokesman, No Individuals "Are or Were in Possession of Any Responsive Documents."

As discovery progressed in the spring of 2022, The Post repeatedly confronted Nunes regarding his failure to produce documents responsive to The Post's requests.  In an interrogatory

response, Nunes stated, "I collected the documents from my office and from publicly available sources," and "I have no relevant documents in my custody, possession, or control aside from the documents I have already provided." Ex. 3 (Feb. 23, 2022 Resp. to Interrog. No. 16). In April 2022, The Post raised its concerns regarding Nunes's production of documents to the Court, and Nunes responded by admitting that he "did not attempt to collect documents from staff members" other than his spokesman Jack Langer because he believed that they had no "relevant knowledge of the events involved in this action." Ex. 10 (Apr. 29, 2022 Defs.' Sec. 11 Submission) at 4.

The Post filed its first motion to compel on June 10, 2022. *See* ECF No. 56. In response to The Post's motion, Nunes argued that no responsive documents had ever existed. ECF No. 59 (June 24, 2022 Opp. to Mot. To Compel) at 4. Nunes represented to the Court: "Contrary to Defendants' suspicion and speculation, except for Langer, there are no other custodians, including staffers and other employees at Plaintiff's congressional, committee, and campaign offices who are *or were* in possession of any responsive documents." *Id.* (emphasis added).

**F.    Nunes** ███████████████████████████
███████████████████████████████████████████

Unbeknownst to The Post, while Nunes was arguing before the Court in April 2022 that no individuals other than Langer were "in possession of any responsive documents," Ex. 10 at 4, Nunes knew that his Congressional records were in the process of being destroyed. Although Nunes had stated to the Court in October 2021 that he would collect documents from his staffers, and confirmed with The Post in December 2021 that his departure from Congress would have "no impact on his efforts to preserve relevant documents," Ex. 1, in the following months, Nunes in fact made no effort to preserve such documents, and ████████████████████████████
████████████████████████████████████████████
████████████████████████████████

According to Nunes's former chief of staff, ███████████████████████ ███████████████████████████████████████████ ███████████████ Souza Tr. at 125:22–128:16.  Thus, after he resigned, Nunes's staff worked to determine ████████████████████████████████ *Id.* at 121:11–12.  Nunes ███████████████████, and his former chief of staff testified that ██████████████████████████████████████ *Id.* at 123:17– 18.  But ultimately, Nunes himself █████████████████████████████ to his successor, and what would be ████████ *Id.* at 125:20–131:5.  Nunes has not denied that he ██████████████, and ignored a request to produce it.  *See* Ex. 11 (June 6, 2023 Email from N. Gamse to S. Biss).  But Nunes's chief of staff recalled what it conveyed: that the only item from Nunes's office that would be transferred to Nunes's successor—and thus, preserved— was ███████████████████████████████████████ ██████████████████████.  Souza Tr. at 128:7–129:19.

As a result, all Congressional records on the House-issued devices possessed by Nunes and his staff were "████████ Langer Tr. at 385:6–16, 413:6–414:12, save for ██████████ the calendar, and subset of emails Nunes had produced from his spokesman's files in November 2021, Souza Tr. at 128:7–129:19.  As Nunes's former chief of staff testified: "█████████████████ ████████████████ *Id.* at 127:14–128:6.  That included documents on every House-issued computer and cell phone issued to Nunes and his staff, █████████████████████ ███████████████████████████████████████████ ██████████████████████.  *Id.* at 126:22–128:6; *see also id.* at 121:8–10 ("█ ████████████████████████████"); Langer Tr. at 383:22–386:5 ("█ ███████████████████████████████████████████



); Morrow Tr. at 33:17–25

*See, e.g.*, Morrow Tr. at 120:18–121:5

Nunes understood that the records accumulated during his work in Congress were being destroyed by House staff.  As he testified, ███████████████████ Nunes Tr. at 167:15–16.

**G.    By Conducting Third-Party Discovery, The Post Learned That Nunes ███████████ Documents Responsive to The Post's Pending Discovery Requests.**

Only through third-party discovery did The Post learn that Nunes destroyed Congressional records that included internal communications and communications with the White House that were responsive to The Post's discovery requests.

The Post, awaiting resolution of its June 10, 2022 motion to compel and unaware of the ongoing destruction of Nunes's Congressional records, requested that Nunes make his former staffers available for depositions.  Ex. 12 (July 12, 2022 Email from N. Gamse to S. Biss).  Nunes declined, *see id.*, even though he had previously represented to the Court that "he has actual or constructive possession, custody, or control" over the information of "staffers," and that "in response to party discovery he will produce any . . . information that may be in the possession or control of his congressional staff . . . without the need for third-party discovery."  ECF No. 44, ¶ 16(b).  In response, The Post sent subpoenas for documents and deposition testimony to three of Nunes's former staffers: scheduler Jennifer Morrow, deputy chief of staff Caitlin Canter, and chief of staff Jilian Plank Souza.  The Post also sent a document subpoena to the National Archives and Records Administration ("NARA") that requested, among other things, communications between Nunes's staffers and White House staff in March 2017.

As discussed above, deposition testimony from Nunes's staffers revealed that ███████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ █████████████████████████████████████████.  Third-party discovery also revealed that contrary to Nunes's representations, documents responsive to The Post's discovery requests had existed when discovery in this case began, but since have been destroyed.  By issuing third-party subpoenas, The Post was able to recover a few examples of such documents that Nunes's staffers had saved to their personal devices.  But original versions and other documents that once existed on House-issued devices possessed by Nunes and his staffers and were responsive to The Post's discovery requests have been lost.

For example, with regard to the above-referenced discovery requests by The Post related to the truth of the circumstances of Nunes's March 2017 White House visit, *see* Ex. 8 (Req. Nos. 2, 5, 15), The Post learned the following:

- Nunes exchanged several text messages with his staff in February 2021—months after filing this lawsuit—about his March 21, 2017 trip to the White House.  *See* Ex. 13. Although Nunes frequently texted with his staffers about his daily activities, any other responsive text messages, including from March 2017, have been lost.

- Nunes's deputy chief of staff, scheduler, and Intelligence Committee staff director all emailed in March 2017 with White House officials about Nunes's statements and his interactions with President Trump.  *See, e.g.*, Ex. 14 (Mar. 22, 2017 email re Nunes's visit ███████████"); Ex. 15 (Mar. 22, 2017 email re ██████████████); Ex. 16 (Mar. 30, 2017 email re ███████████████).  Any other responsive

emails among Nunes's staffers about his statements or interactions with the White House during this time have been lost.

- Nunes's deputy chief of staff ████████████████████████████████
  ██████. *See* Ex. 17. Nunes had incorrectly represented in his discovery responses that ████████████████ "because, as previously stated, I did not take an Uber to the White House." Ex. 3 at 10. Any receipts or similar documents relating to Nunes's return trip or his activities that day have been lost.

- Nunes's scheduler retained a version of Nunes's calendar for March 21 and 22, 2017, which was different and more detailed than the one that Nunes produced. *Compare* Ex. 18 (J. Morrow Production of March 21 and 22, 2017 Agenda) *to* Ex. 19 (D. Nunes Production of March 21 and 22, 2017 Agenda). Nunes's staffers frequently ████



████, *see* Canter Tr. at 13:10–17, and ████████████████████████ ████████, Souza Tr. at 131:4.

With respect to The Post's requests for production of documents concerning Nunes's alleged damages and the site of any alleged reputational harm, *see* Ex. 8 (Req. Nos. 22, 23), The Post also learned that Nunes's staff had ████████████████████████████████████ ████████████████████████████ Souza Tr. at 207:18–21, and ████████████████████████ *id.* at 41:7–11, 230:7–10. ████████████████████████████. *Id.* at 231:9–13.

**H.**     **The Court Issued Multiple Orders Compelling Nunes To Comply with The Post's Discovery Requests, and Nunes Failed To Do So.**

As The Post pursued third-party discovery, the Court issued a series of three orders requiring Nunes to produce documents within his control and disclose basic information about his repositories.  Nunes failed to comply with each of these orders.

**1.**     **The Court's October 25, 2022 Order**

On October 25, 2022, the Court issued an Order granting The Post's motion to compel in nearly every regard.  *See* ECF No. 65 (the "October 25, 2022 Order").  In the October 25, 2022 Order, the Court required Nunes to consult with Congressional staffers about multiple interrogatory responses; to provide an accounting for "every repository ever used to send, receive, or store relevant communications or documents" by "each individual with relevant knowledge or information on Plaintiff's staff or otherwise within his control"; and to conduct a "reasonably diligent search" of his own files and his staffers' files for responsive documents.  *Id.*

After the Court issued its October 25, 2022 Order, Nunes submitted to The Post a pair of two-page "Supplements" on November 8 and November 16, 2022, each containing vague answers and contradicting the information that The Post had obtained through third-party discovery.  *See* Ex. 20 (Pl.'s Nov. 8, 2022 Suppl.); Ex. 21 (Pl.'s Nov. 16, 2022 Suppl.).  For example, Nunes asserted that he personally had "no such repository" that would have been used to send, receive, or store communications or documents relevant to this case.  Ex. 20, ¶ 2; Ex. 21, ¶ 2.  But his staffers testified that ████████████████████████████████████████ ████████████████████████████████████.  Souza Tr. at 30:17–31:21; Canter Tr. at 25:1–26:2.  Nunes also did not provide any specific information about his staffers' repositories, failing to identify any individual shared drives, devices, or specific email accounts. *See* Ex. 20, ¶ 2; Ex. 21, ¶ 2.  Moreover, Nunes asserted that he traveled alone in a cab to the White

House on March 21, 2017—even though third-party discovery revealed that he had texted with his former deputy chief of staff during this litigation about traveling in a car with her and others on March 21, 2017. *See* Ex. 13.

To address Nunes's failure to comply with the Court's October 25, 2022 Order, The Post filed a motion to enforce compliance with the October 25 Order and for sanctions on December 13, 2022. *See* ECF No. 66.

### 2.      The Court's February 1, 2023 Order

The Court conducted a hearing on The Post's motion to enforce on January 25, 2023. On February 1, 2023, the Court required Nunes to provide (1) "a complete account of each of his activities and whereabouts on March 21, 2017"; (2) to identify "every individual on Plaintiff's staff who communicated with anyone regarding any aspect of Plaintiff's March 21 and 22 visits to the White House"; (3) to identify "every individual who worked on Plaintiff's campaign website post about 'lawsuits against the Washington Post'"; (4) to identify "every individual who has or may have knowledge about" a series of topics relating to the timing, purpose, and circumstances of Nunes's March 21 and 22 trips to the White House; (5) to identify "every repository used by" the individuals Nunes identifies and "every repository he personally used, from 2017 to present, to send, receive, and store communications and/or documents"; (6) to "produce all non-privileged documents responsive to the Defendants' Requests for Production Nos. 1 through 59 that have not yet been produced" and "original metadata (if any) for all documents"; and (7) to submit "a signed declaration describing in detail the steps Plaintiff took to comply with each paragraph of this Order and certifying that he made all reasonable efforts to ensure compliance." ECF No. 71 (the "February 1, 2023 Order"). The Court held in abeyance The Post's request for sanctions. *Id.* at 3.

Nunes responded to the February 1, 2023 Order only by submitting to The Post another deficient "Supplement" without any accompanying documents. Despite the Court's order to

identify "every repository he personally used," Nunes failed to identify any of his own devices used to send, receive, and store communications and documents.  Nunes merely stated: "I no longer have access to my House office phone or records since I left Congress and/or my 2017 personal phone records due to the passage of time.  I did not send or receive any non-privileged emails." Ex. 22 (Feb. 22, 2023 Suppl.) at 15.

Despite the Court's order to identify "every repository used by" his staffers, Nunes's Supplement also omitted any reference to repositories in his Congressional office, such as a █████

████████████████████████████████.  Nunes stated that he "lack[s] access to" the email accounts and devices of his staffers due to "Plaintiff's resignation from Congress and discontinuance of email and phone."  *Id.*  Nunes further stated: "Prior to discontinuance of the above House emails, I instructed Langer and Morrow that all emails and information related to this action be preserved."  *Id.*  But as Langer and Morrow both testified, ████████████

████████████████████████████████████████

████████████████████████████████████████

████  Morrow Tr. at 123:4–11; Langer Tr. at 342:2–346:9.

And although the Court required him to provide "a complete account of each of his activities and whereabouts" on March 21, 2017, Nunes began his account at 4:00 p.m. that afternoon, Ex. 22 at 4, thus omitting any events that happened earlier that day, such as a █████

████████████████████████████████████████

████████████████████████, *see* Ex. 23 (Mar. 21, 2017 Email to █████████████████

████).

To address Nunes's failure to comply with the Court's February 1, 2023 Order, The Post informed the Court of its concerns about Nunes's most recent "Supplement" on March 13, 2023. *See* Ex. 24 (Defs.' Mar. 13, 2023 Sec. 11 Submission) at 1.

### 3. The Court's April 5, 2023 Order and Leave for The Post To Seek Sanctions

The Court conducted a status conference on April 5, 2023.  After the conference, the Court issued a third Order requiring Nunes to "supplement his response to Paragraph 5 of the Court's February 1, 2023 Order by identifying every repository used by the individuals named in his previous response—Plaintiff, Damon Nelson, Jennifer Morrow, Caitlin Canter, Jack Langer, Jilian Plank, and Nicky Henderson—from 2017 to present to send, receive, and store ANY communications and/or documents, WITHOUT limitation as to whether the repositories may contain communications and/or documents relevant to this suit."  *See* Apr. 5, 2023 Min. Order (the "April 5, 2023 Order").  The Court identified as examples of such repositories any "laptop," "shared drive," "phone," "hard drive," and storage facility for "hard copy files," and reiterated that its Order was not "limited to documents relevant to this suit."   ECF No. 73 ("Apr. 5, 2023 Conf. Tr.") at 14:13–15:12, 16:1–7.

The Court also granted leave for The Post to file a sanctions motion "for whatever relief it believes appropriate for spoliation, in light of the possibility that documents weren't preserved." *Id.* at 19:3–11.  The Court stated that it would resolve any request for "sanctions" in "connection with any spoliation motion that may be filed."  *Id.* at 19:12–20.

Nunes submitted to The Post another "Supplement" on April 16, 2023, *see* Ex. 25 (Apr. 16, 2023 Suppl.), but Nunes *still* did not identify any of the devices he used during his time in Congress.  Nunes also ██████████████████████████████████████████████ ███, which The Post did not learn until his deposition months later in June, *see* Nunes Tr. at

218:10–14, despite his January 2023 assurance to the Court that "there is nothing more out there." Ex. 26 ("Jan. 25, 2023 Hr'g Tr.") at 54:11.  Nunes also did not disclose his use of any social media accounts, including those with messaging features, despite ███████████████████████, *see* Langer Tr. at 28:1–3 ███████████████████████), and Nunes' own sworn deposition testimony in another defamation lawsuit that he not only used such platforms but even produced non-public "direct messages" from them.  *See NuStar Farms, LLC, v. Lizza*, No. 5:19-cv-04064-CJW-MAR, ECF No. 121-12, at 100:2–6 (N.D. Iowa Nov. 1, 2022) (Nunes testifying: "I know he direct messaged me on Twitter, because I have that—I provided that—to your subpoena request."). Although Nunes's counsel agreed on an April 19, 2023 telephone call with The Post's counsel to address such deficiencies, *see* Ex. 27 (May 4, 2023 Email from A. Gutierrez to S. Biss), Nunes still has not done so.

On June 21, 2023, The Post deposed Nunes.  During his deposition, Nunes confirmed ███ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████.  Nunes Tr. at 167:17–168:3.  Fact discovery closed on June 30, 2023, and because the parties have not identified any experts to disclose, the parties' next deadline under the Court's April 27, 2023 Minute Order is to file summary judgment motions on or before October 25, 2023.

## LEGAL STANDARDS

"Rule 37(e) of the Federal Rules of Civil Procedure governs a court's inquiry in deciding whether to impose sanctions for the failure to preserve ESI."  *Borum v. Brentwood Vill., LLC*, 332 F.R.D. 38, 43 (D.D.C. 2019).  "When analyzing a motion for sanctions under Rule 37(e)(1), courts consider whether (1) electronically stored information (ESI) 'should have been preserved in the anticipation or conduct of litigation'; (2) 'a party failed to take reasonable steps to preserve' the

ESI; (3) ESI 'was lost as a result'; and (4) the ESI 'could not be restored or replaced by additional discovery.'" *Doe*, 2023 WL 3558038, at *12 (quoting Fed. R. Civ. P. 37(e), advisory committee's note to 2015 amendment).  If these requirements are met, and there is evidence that the spoliating party "acted with the intent to deprive another party of the information's use in the litigation," courts may "(A) presume that the lost information was unfavorable to the party; (B) instruct the jury that it may or must presume the information was unfavorable to the party; or (C) dismiss the action or enter a default judgment." Fed. R. Civ. P. 37(e)(2).  Absent evidence of intent, the Court may impose other "proportional sanctions upon the finding of prejudice." *Doe*, 2023 WL 3558038, at *12 (quoting *Borum*, 332 F.R.D. at 46); Fed. R. Civ. P. 37(e)(1).  "Rule 37(e) leaves judges with discretion to determine how best to assess prejudice in particular cases and where to allocate the burden of proving prejudice." *Id.* at *14 (internal quotation marks omitted).

Rule 37(a) of the Federal Rules of Civil Procedure provides for a movant to be reimbursed reasonable expenses for successful motions to compel discovery.  With regard to discovery motions that are granted or granted in part, courts may require payment of the movant's "reasonable expenses" or may "apportion the reasonable expenses for the motion." Fed. R. Civ. P. 37(a)(5)(A), (C).

Rule 37(b) of the Federal Rules of Civil Procedure provides for a movant to be reimbursed reasonable expenses for motions to enforce court orders against a disobedient party.  If a party "fails to obey an order to provide or permit discovery," then "the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(A), (C).

## ARGUMENT

### I.    Spoliation Sanctions Are Warranted.

#### A.    Nunes's Failure To Preserve Congressional Records Meets Rule 37(e)'s Threshold Requirements for Spoliation Sanctions.

Nunes failed to preserve electronically stored information ("ESI") from his and his Congressional staffers' House-issued devices, including by failing to issue a litigation hold and by expressly authorizing the destruction of documents responsive to numerous pending discovery requests.  Spoliation sanctions are appropriate when (1) "[ESI] should have been preserved in the anticipation or conduct of litigation"; (2) "a party failed to take reasonable steps to preserve the ESI"; and (3) "ESI was lost as a result" and "could not be restored or replaced by additional discovery."  *Doe*, 2023 WL 3558038, at *12 (citation omitted).  Nunes's misconduct meets each of those criteria.

#### 1.    Nunes Had a Duty To Preserve ESI on Devices Issued to Nunes and His Congressional Staffers by No Later Than November 2020.

By the time Nunes filed this lawsuit in November 2020 alleging defamation regarding statements about events occurring in March 2017, he had a duty to preserve any emails, text messages, and other ESI dating back to March 2017, both on his own devices and on devices issued by the House to his Congressional staffers.  A party "must preserve potentially relevant evidence that might be useful to an adversary" when it "anticipates litigation," and "[a]t the very least, the duty begins no later than the date the lawsuit is filed."  *Borum*, 332 F.R.D. at 45; *see Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003).  "Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents."  *Nunnally v. District of Columbia*, 243 F. Supp. 3d 55, 73 (D.D.C. 2017) (citation omitted).

Here, Nunes had a duty to preserve at least as early as November 17, 2020, when he filed this lawsuit.  That duty extended to his own and his staffers' emails, text messages, and other documents on House-issued devices regarding the March 2017 events and the November 2020 Article at issue in his Complaint.

The record makes clear that Nunes possessed substantial evidence that was not preserved. Among other things, Nunes possessed emails to and from his staffers about ███████████ and ███████████ Canter Tr. at 25:1–26:2, and ███████████ ███████████ *id.* at 27:17–28:3, about subjects such as his March 21, 2017 trip to the White House, *see* Ex. 13, and ███████████, *see* Langer Tr. at 75:5–76:5, 124:20–131:22.  Nunes also possessed ███████████ ███████████, *see, e.g.*, Ex. 15 (Mar. 22, 2017 email thread ███████████ ███████████), ███████████ ███████████, *see* Langer Tr. at 175:3–178:8, 239:4–17, 275:10–20, and ███████████ ███████████, *see* Souza Tr. at 230:12–14.  Nunes also still had access to any documents saved to House-issued computers and a ███████████ ███████████ ███████████, *see* Souza Tr. at 15:10–16, 39:10–42:4, 133:13–15, 184:20–185:11, 228:7–10, ███████████, *id.* 229:3–230:14.  All of the foregoing documents would have been responsive to The Post's first and second sets of requests for production of documents served on Nunes prior to his resignation, *see supra* at Background §§ C, G (citing document requests), and should have been preserved along with other responsive ESI in Nunes's possession when he filed his lawsuit in November 2020.

Nunes's duty to preserve these documents was both obvious and explicit by the time he resigned from Congress in January 2022. By that point, Nunes had represented to the Court that he would produce documents from his House office and staff. ECF No. 44, ¶ 16(b). Nunes had also represented to The Post his resignation would have "no impact on his efforts to preserve relevant documents and information" and that "[a]ny and all relevant documents have been preserved." Ex. 1.

Additionally, prior to his January 2022 resignation, Nunes already had received The Post's first and second sets of document requests. He was therefore on notice that The Post had requested documents and communications from him and his "Congressional Office Staff" that related to his March 21 and 22, 2017 White House visits and to "any allegations of the Obama administration spying" on President Trump or his campaign." Ex. 8 (Req. No. 15). Nunes also was on notice that The Post had sought all communications between his "Congressional Office Staff" and the White House on those same subjects. Ex. 28 (Defs.' 2d Discovery Reqs.) (Req. No. 38).

> 2.   **Nunes Failed To Take Reasonable Steps To Preserve ESI Because** ███████ ███████████████████████████████████████████ **Even After Assuring The Post that His Departure from Congress Would Not Affect Document Retention.**

Nunes's failure to preserve his Congressional records was unreasonable in multiple respects, including because Nunes: (1) ████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████ (3) failed to undertake any affirmative document preservation efforts; (4) failed to ensure that the preservation process was supervised by counsel; and (5) ███████████████████████████████ ██████████████████████, even after receiving The Post's discovery requests and assuring The Post that his resignation would not affect his preservation of records. Reasonable steps would

have included issuing a litigation hold to staffers likely to possess potentially relevant documents and information, and taking "affirmative steps" preserve records and "to monitor compliance so that all sources of discoverable information are identified and searched." *Doe*, 2023 WL 3558038, at *13 (citation omitted).  Nunes's conduct did not come close to meeting this standard.

First, Nunes's failure to issue a written litigation hold was unreasonable.  Nunes and his staffers confirmed ███████████████████████████████████████████████

███████████████████████████████████████████ *See supra* at Background § B.  But it is "well recognized that an oral litigation hold is insufficient to reasonably protect against the spoliation of evidence." *Borum*, 332 F.R.D. at 46.  Courts find a failure to issue a formal written litigation hold to reflect a "lackadaisical attitude" toward discovery. *Keithley v. Home Store.com, Inc.*, 2008 WL 3833384, at *6 (N.D. Cal. Aug. 12, 2008).  As the plaintiff, Nunes's failure to do so is "particularly unreasonable." *Leidig v. Buzzfeed, Inc.*, 2017 WL 6512353, at *12 (S.D.N.Y. Dec. 19, 2017).

Second, even Nunes's oral instructions were unreasonably narrow.  Nunes was obligated to instruct all individuals likely to have "information that is relevant to the claims or defenses of any party" or "relevant to the subject matter involved in the action" to preserve all "potentially relevant" evidence. *Doe*, 2023 WL 3558038, at *13 (citations omitted).  But by his own account, Nunes only ███████████████████████████████████████████████████

███████████████████████████████████████ Nunes Tr. at 108:12–17.[3]

---

[3] Notably, Nunes did not produce the unabridged four-page version of his March 21 and 22, 2017 calendars that The Post later obtained directly from Jennifer Morrow, suggesting that any instructions Nunes gave Morrow did not cover all versions of that document.  Additionally, Nunes's production did not include Morrow's emails ███████████████████████████████ *see, e.g.*, Ex. 15, which further demonstrates that any instructions to Morrow were unduly narrow (or that he failed to produce responsive documents he collected).

Nunes's preservation efforts excluded obvious custodians, documents, and repositories. These included, most fundamentally, his own personal communications and repositories, such as his own cell phone used to communicate with multiple witnesses about the events of March 21, 2017, including Michael Ellis and Caitlin Canter, which Nunes totally failed to preserve.  *See, e.g.*, Ex. 29 ("Ellis Tr.") at 78:16–19 (White House staffer Michael Ellis, who met Nunes at the White House on March 21, 2017, testifying that he spoke with Nunes via cell phone); Ex. 13 (███████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████).

Nunes's instructions also failed to cover most of the staffers likely to possess relevant information.  *See Doe*, 2023 WL 3558038, at *14 (finding that party "failed to fulfill its obligations by a long shot" when it made only "partial distribution" of a litigation hold).  For example, Nunes's instructions did not cover his chief of staff, Jilian Plank Souza, even though she was ███████████

████████████████████████████████████████████████████, and likely possessed information concerning the March 2017 events at issue and Nunes's reputation thereafter.  Souza Tr. at 55:9, 183:16.  Nunes's instructions also did not cover anyone on his Intelligence Committee staff, even though multiple Intelligence Committee staffers ███████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████.  *See, e.g.*, Ex. 15 (Mar. 22, 2017 email

████████████████████████████████████████████████████████████████

███████).  Nunes also failed to issue a litigation hold to staffers who attended a National Republican Congressional Committee dinner that was on Nunes's March 21, 2017 calendar, even though they had information regarding Nunes's activities that evening.  *See* Ex. 18.  Nunes did not even issue a general litigation hold to his staff, instructing them not to delete potentially relevant

documents from the office ███████ such as expense receipts, constituent communications, or records related to his multiple lawsuits against The Post.

Third, Nunes acted unreasonably by failing to take any affirmative steps to preserve potentially relevant documents and communications. For example, Nunes "could have, but chose not to," make an active effort to preserve these materials by as "downloading" them to an "external storage device" or "engaging an expert to preserve" them. *Freeman v. Giuliani*, -- F. Supp. 3d --, 2023 WL 5600316, at *14 (D.D.C. Aug. 30, 2023). Nunes's preservation efforts were instead limited to providing vague, █████████████. He did not even take measures to prevent deletion of clearly relevant messages from his own cell phone. *See* Jan. 25, 2023 Hr'g Tr. at 33:5–6. Other litigants have done more, and courts have still found their efforts wanting. *See, e.g.*, *Freeman*, 2023 WL 5600316, at *13, (explaining that "turning off auto-delete" setting on cell phone not enough to satisfy reasonableness requirement); *Gaina v. Northridge Hosp. Med. Ctr.*, 2018 WL 6258895, at *5 (C.D. Cal. Nov. 21, 2018) (deeming preservation efforts unreasonable where some ESI was backed up to a computer "fortuitously" rather than "intentionally").

Fourth, it was unreasonable for Nunes to fail to "take affirmative steps to monitor compliance" of preservation and search efforts with regard to even their key witness in this action. *Doe*, 2023 WL 3558038, at *13 (citation omitted). Nunes repeatedly has insisted that his spokesman Jack Langer was the only member of his staff to have "knowledge of any facts related to [Nunes's] allegations in this action," Ex. 3 (Feb. 23, 2022 Resp. to Interrog. No. 16), but Nunes



███████ at 342:2–346:9. ███████

███████ s. *Id.* He remembered that ███████

███████

████████████████████████████████████████████████    ██████████████████    to

conduct such an "imprecise 'manual search'" is patently unreasonable.  *Freeman v. Giuliani*, 2023

WL 5282593, at *1 (D.D.C. June 23, 2023) (citation omitted).  It is particularly unreasonable when

done without any supervision or guidance from counsel.  *See Richard Green (Fine Paintings) v.*

*McClendon*, 262 F.R.D. 284, 290 (S.D.N.Y. 2009) (explaining that "'active supervision of

counsel' is of particular importance when electronically-stored information is involved" (quoting

*Zubulake*, 229 F.R.D. at 433)); *Herman v. City of New York*, 334 F.R.D. 377, 386 (E.D.N.Y. 2020)

("It is not appropriate to take a client's self-collection of documents, assume it is complete, and

not take steps to determine whether significant gaps exist."); *Poe v. Nw. Mut. Life Ins. Co.*, 2023

WL 4155378, at *1 (C.D. Cal. Apr. 24, 2023) (concluding that a party's "searches of [his] own

'electronic accounts such as [his] email and electronic calendar'" were "not reasonable").

Fourth, it was unreasonable for Nunes to ██████████████████████    with information

relevant to this case, particularly after The Post expressed concerns about document preservation

and after Nunes confirmed that he would preserve any responsive documents.  Nunes, as the

plaintiff in this action, acted unreasonably by failing to preserve information on his devices,

including records of communications on his cell phone with key witnesses such as Michael Ellis

and Nunes's former deputy chief of staff Caitlin Canter.  It was also unreasonable for Nunes to

████████████████████████████████████████████████████████████████

██████████████████████████    and other ESI he possessed in his Congressional office during

this litigation.  Nunes ██████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████    .  *See* Souza Tr. at 121:8–122:19, 128:10–16.

Such ███████████████ during ongoing litigation is "troubling." *Paisley Park Enters., Inc. v. Boxill*, 330 F.R.D. 226, 233 (D. Minn. 2019).  It is especially troubling here, when Nunes had received discovery requests from The Post for documents, had been alerted to The Post's concerns about the possibility that documents may not be preserved in connection with his resignation from Congress, and yet represented to The Post that his departure would not affect his ability to preserve any potentially relevant documents, including his own.  Nunes's behavior was "completely incongruous to the expected norms that govern a party's duty to preserve evidence during litigation." *Borum*, 332 F.R.D. at 46.

**3.    Relevant Records Were ███████████ as a Result.**



███████████████████████ ESI responsive to The Post's discovery requests was "irremediably lost." *Id.* at 46.  That ESI included Nunes's and his staffers' communications and other documents on House-issued computers, telephones, and other devices.[4]

As Nunes and his staffers testified, Nunes's Congressional records ███████████ ███████████████████████.  *See* Nunes Tr. at 166:15–167:16 ███████████████████████; Langer Tr. at 384:15–17 ███████████████████████ ███████████); Souza Tr. at 126:10–127:5 ███████████████

---

[4] Nunes asserted that he no longer has access to "2017 personal phone records due to the passage of time," Ex. 22 at 15, but failed to disclose when precisely those records were deleted.  If Nunes lost such access after November 2020, he "neglected to maintain any viable copy" of his cellular data and "allowed the [data] to be overwritten." *Zhi Chen v. District of Columbia*, 839 F. Supp. 2d 7, 13 (D.D.C. 2011).  At his deposition, Nunes claimed ███████████████████████ ███████████████████████ Nunes Tr. at 217:20–221:6.  But he failed to do so, either in response to the Court prior Orders or after his deposition.

████████████████████████████████████████████████████████████████████████

██████████ Morrow Tr. at 33:22–34:6 ████████████████████████████

████████████████████████████████████████████████████████ Other than the

documents Nunes produced before his departure—including his calendar for March 21 and 22,

2017, and a handful of emails from his spokesman's files—and the small number of documents

that The Post was able to obtain in third-party discovery, any other responsive documents within

Nunes's Congressional office from March 2017 were, as Nunes's spokesman put it, ████████

Langer Tr. at 385:7–15; *see also id.* at 413:6–414:12 (explaining that ████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████

## B.     Nunes Intentionally Deprived The Post of Responsive Communications from Nunes and His Staffers in This Litigation, Justifying Rule 37(e)(2) Sanctions.

Severe sanctions for Nunes's discovery conduct are warranted under Federal Rule of Civil

Procedure 37(e)(2) because the evidence reflects that Nunes ████████████████████ with

the intent to deprive The Post of relevant communications in this litigation.

Upon a finding that a party "acted with the intent to deprive another party of the

information's use in the litigation," courts may "instruct the jury that it may or must presume the

information was unfavorable to the party."  Fed. R. Civ. P. 37(e)(2)(B).  Such intent can be shown

by a party's "conscious disregard" of preservation obligations by failing "to make any serious

effort" to preserve or recover ESI.  *Beck v. Test Masters Educ. Servs., Inc.*, 289 F.R.D. 374, 378

(D.D.C. 2013) (citation omitted); *see also Freeman,* 2023 WL 5600316, at *18, (intent requirement

met where party showed "blatant disregard for satisfying his preservation obligations"); *Vasser v.

Shulkin*, 2017 WL 5634860, at *5–6 (D.D.C. Nov. 22, 2017) (sanctioning party who failed to

preserve relevant documents despite repeated requests); *Hice v. Lemon*, 2021 WL 6053812, at *7

(E.D.N.Y. Nov. 17, 2021) (holding that a "party's conscious dereliction of a known duty to preserve electronic data," whether passive or active, "is both necessary and sufficient to find that the party 'acted with the intent to deprive another party of the information's use' under Rule 37(e)(2)" (citation omitted)); *Ottoson v. SMBC Leasing & Fin., Inc.*, 268 F. Supp. 3d 570, 582–83 (S.D.N.Y. 2017) (noting conscious failure "to take any reasonable steps to preserve" relevant records can satisfy intent requirement of Rule 37(e)(2)).

Here, Nunes failed "to make any serious effort" to preserve or produce his Congressional or personal records, *Beck*, 289 F.R.D. at 378, and instead ███████████████, despite the fact that they were the subject of pending discovery requests and that he had represented to The Post that he would preserve them, *see, e.g.*, *Vasser*, 2017 WL 5634860, at *6 (ordering sanctions when spoliating party "not only knew or should have known that these documents were relevant, it knew [its opponent] had requested them" but still "failed to preserve them").  The Post asked Nunes twice to confirm that all potentially relevant Congressional records were being preserved in connection with his resignation.  Ex. 1; Ex. 9.  Nunes replied: "Any and all relevant documents have been preserved."  Ex. 1.  But in the meantime, Nunes was authorizing his staffers to wind down his office and dispose of his documents, aware that House staffers would ███████ ██████████  Nunes Tr. at 167:16.  Nunes even ██████████████████████████ ██████████████████████████████.  Souza Tr. at 128:10–16.  If condoned, Nunes's approach to discovery would "effectively rewrit[e] both Rule 34 and this court's orders to justify his production of only those documents he was inclined to produce" while destroying everything else.  *Moore v. Chertoff*, 255 F.R.D. 10, 35 (D.D.C. 2008).

After failing to preserve documents in connection with his January 2022 resignation when he promised to do so, Nunes attempted to cover his tracks.  For more than a year after his

resignation, Nunes represented to the Court in misleading fashion that no additional relevant documents existed, or indeed ever had existed.  For example:

- On June 24, 2022, Nunes asserted: "Contrary to Defendants' suspicion and speculation, except for Langer, there are no other custodians, including staffers and other employees at Plaintiff's congressional, committee, and campaign offices who are *or were* in possession of any responsive documents."   ECF No. 59, at 4 (emphasis added).

- On December 19, 2022, Nunes asserted: "Plaintiff has no additional documents to produce.  Plaintiff cannot look for something he knows does not exist."  ECF No. 67, at 10.

- On January 25, 2023, Nunes asserted: "there is nothing more out there."  Jan. 25, 2023 Hr'g Tr. at 54:11.

As discussed above, Nunes and his staffers had a host of other responsive documents he claimed did not exist, evidence of which began to appear during third-party discovery and reveal that his representations to The Post and the Court about the nonexistence of various documents were demonstrably false.  For example:

- Nunes represented that he had no further documents to produce regarding his whereabouts on March 21 and 22, 2017 beyond a two-page agenda that he provided. Ex. 30 (Pl.'s Resps. Defs.' 4th Disc. Reqs.) (Resp. to Req. No. 50).  But when The Post subpoenaed his scheduler, she produced a far more detailed version she had saved to a personal device that revealed (for the first time) ███████████████████ ████████████████████████████████████████████████████████████████ ████████████████, along with several emails related to the schedule.  The fact that

Nunes failed to collect or produce these documents, or disclose Canter or Morrow as knowledgeable witnesses, belies any claim that he exercised reasonable diligence with regard to his preservation obligations or document collection.

- Nunes represented to the Court that he "did not use any repository to communicate with anyone regarding his visits to the White House or any events relevant to this action." Ex. 31 (Defs.' Nov. 23, 2022 Sec. 11 Submission) at 5. But White House staffer Michael Ellis, who met Nunes at the White House on March 21, 2017, testified that he spoke with Nunes via cell phone. Ellis Tr. at 78:16–19. And when The Post subpoenaed Nunes's deputy chief of staff Caitlin Canter, she produced text messages with Nunes *during this litigation* about the events of March 21, 2017. *See* Ex. 13. Nunes claimed he deleted these messages on the ground that they "just didn't seem relevant to this case." Jan. 25, 2023 Hr'g Tr. at 33:8–9.

- Even after the Court issued its February 1, 2023 Order requiring him to identify "every repository he personally used" since 2017 to "store communications," Nunes certified that he no longer had access to his "House office phone or records since [he] left Congress and/or [his] 2017 personal phone records due to the passage of time." Ex. 22 at 15. But at his June 21, 2023 deposition, Nunes speculated that ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████. *See* Nunes Tr. at 218:10–14.

- Nunes represented that there were "no network drives" that his staffers "us[ed] to communicate with one another." Apr. 5, 2023 Conf. Tr. at 13:8–15. But Nunes's former chief of staff, Jilian Plank Souza, testified that ████████████████████



Souza Tr. at 39:10–42:4.  Souza also testified that ██████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████. *Id.* at 133:15; 230:5–10.

- Nunes represented that he did not use any House-issued devices beyond his cell phone. Ex. 25 at 2.  But Nunes's former chief of staff Jilian Plank Souza recalled that ████████████████████████████████████████████

  ████████.  Souza Tr. at 30:18–31:21.

- Nunes represented that there were "no responsive" Uber or other receipts from his March 21, 2017 trip to the White House "because, as previously stated, I did not take an Uber to the White House." Ex. 3 at 10.  But discovery produced in response to The Post's subpoena to deputy chief of staff Caitlin Canter shows that this is demonstrably false; she literally had the ████████████████████████

  ████████████████████████████████████████████████████

  ████  *See* Ex. 17; Canter Tr. at 61:5, 64:23–25 ████████████████

Courts find such patterns of misrepresentations and "substantial and prejudicial obduracy" to "constitute bad faith" in the context of Rule 37.  *Moore*, 255 F.R.D. at 35 (citation omitted) (noting that sanctioned party had "effectively rewritten both Rule 34 and this court's orders to justify his production of only those documents he was inclined to produce").  This is especially true where the litigant is "sophisticated" like Nunes, who litigated frequently in state and federal courts and who has held process-oriented positions as a member of Congress and as chief executive

of a social media company.[5]  *Freeman,* 2023 WL5600316, at *18 (concluding that the "only reasonable explanation" for a sophisticated litigant's "blatant disregard for satisfying his preservation obligations—despite fully understanding them—is that he intentionally and willfully ignored them").  In this case, Nunes's "repeated misrepresentations" regarding the nonexistence of potentially relevant documents reflects "flagrant bad faith" that merits sanctions under Rule 37(e)(2), particularly because it has become clear that he never intended to conduct "a proper document retention and collection process in the first place."  *Wyndham Vacation Ownership, Inc. v. Slattery, Sobel & Decamp, LLP,* 2021 WL 5275700, at *4-5 (M.D. Fla. Nov. 10, 2021).

Such sanctions should include an adverse inference at trial (if the case gets to that point).  *Beck*, 289 F.R.D. at 380.  The Post thus requests that the Court instruct the jury that Nunes failed to produce Congressional records within his control, and that the jury may infer that those Congressional records would have contained evidence unfavorable to Nunes, and in particular to: (1) Nunes's assertion of falsity with respect to the statement that he went to the White House to review intelligence files that he "believed would buttress Trump's baseless claims of the Obama administration spying on Trump Tower";[6] (2) Nunes's assertion that he suffered non-reputational

---

[5] Nunes has filed at least ten lawsuits in the past four years, in both state and federal courts.  *See, e.g.*, *Nunes v. Twitter*, C49-1715, Compl. (Henrico Cnty. Cir. Ct. Mar. 18, 2019); *Nunes v. Lizza*, 5:19-cv-04064, Compl., ECF No. 1 (N.D. Iowa Sept. 30, 2019); *Nunes v. Cable News Network, Inc.*, 1:20-cv-03976, Compl., ECF No. 1 (S.D.N.Y. May 22, 2020); *Nunes v. NBCUniversal Media, LLC*, 1:22-cv-01633, Compl., ECF No. 1 (S.D.N.Y. Aug. 3, 2021); *Nunes v. Guardian*, 2023 CA 003668 NC, Compl., Dkt. 2 (Sarasota Cnty. Cir. Ct. Apr. 3, 2023).

[6] Because reporting that Nunes "believed" that his review of certain intelligence files "would buttress Trump's baseless claims" does "not contain a provably false factual connotation," such reporting is entitled to "full constitutional protection" as a matter of law.  *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 19–21 (1990); *see also Montgomery v. Risen*, 197 F. Supp. 3d 219, 248 (D.D.C. 2016) (determining that "assertion that [plaintiff] was motivated out of greed or ambition is a subjective judgment that is not verifiable"), *aff'd*, 875 F.3d 709 (D.C. Cir. 2017).  The Post intends to move for summary judgment on this basis, but nonetheless requests an adverse inference in support of its substantial truth argument in the event that the Court disagrees.

injury as a result of the Article, such as "threats"; and (3) Nunes's assertion that he suffered any purported reputational injury outside of his home state of California.  Such an adverse instruction is appropriate because Nunes "not only knew or should have known that these documents were relevant, [he] knew the [Post] had requested them (and has done so at every stage of this litigation), yet [he] failed to preserve them."  *Vasser*, 2017 WL 5634860, at *6.

### C.   Other Sanctions, Including an Award of Fees and Costs, Are Warranted To Cure Prejudice to The Post by Nunes's Misconduct Under Rule 37(e)(1).

Additional sanctions under Rule 37(e)(1), including imposing limits on Nunes's testimony at trial and awarding The Post fees and costs associated with this sanctions motion, are also appropriate because Nunes's failure to preserve his personal and Congressional records has prejudiced The Post.  *Borum*, 332 F.R.D. at 46.  If the Court agrees that Nunes acted with the "intent to deprive" The Post of discovery under Rule 37(e)(2), such prejudice may be presumed.  *See, e.g.*, *Sekisui Am. Corp. v. Hart*, 945 F. Supp. 2d 494, 508 (S.D.N.Y. 2013) ("When evidence is destroyed intentionally, such destruction is sufficient evidence from which to conclude that the missing evidence was unfavorable to that party.").  Otherwise, to "evaluate prejudice from the loss of ESI, courts consider the information's importance in the litigation."  *Doe*, 2023 WL 3558038, at *14 (internal quotation marks omitted).

Here, the documents that Nunes ensured would be destroyed were internal communications between him and his staff, which would have shed light on the substantial truth of The Post's reporting, as well as any purported damages and reputational injury that Nunes alleged (or lack thereof).  "Without access to circumstantial evidence of [Nunes's] state of mind—in the form of his messages and email communications with associates or other contemporaneous records of his thoughts" when he made his March 2017 White House visits—The Post is "severely hampered" in its ability to establish that Nunes believed that the intelligence files at issue would lend

credibility to President Trump's allegations that the Obama administration spied on Trump Tower. *Freeman*, 2023 WL 5600316, at *16–17.  Nunes's destruction of personal and Congressional records has thus prejudiced The Post's defense. *Doe*, 2023 WL 3558038, at *15.

In addition, The Post has been prejudiced "monetarily" by the need to conduct expensive motions practice and third-party discovery to investigate and redress the consequences of Nunes's spoliation. *Id.* The Post "spent time conferring with opposing counsel and . . . deposed several witnesses regarding" the circumstances of Nunes's spoliation. *Id.* The Post "also, of course, incurred expense in the filing of the sanctions motion," *id.*, which followed a June 10, 2022 motion to compel, ECF No. 56, a December 13, 2022 motion to enforce compliance, ECF No. 66, and a March 13, 2023 pre-motion letter submission to the Court, Ex. 24, all as a result of Nunes's continued noncompliance with Court Orders.

To cure this prejudice and in addition to its Rule 37(e)(2) request for the Court to issue an adverse inference instruction to the jury, The Post requests that the Court impose Rule 37(e)(1) sanctions related to the parties' own trial presentations that this Court has recently provided for similarly egregious conduct. *See Doe v. District of Columbia*, 2023 WL 5284815, at *1 (D.D.C. Feb. 14, 2023).  First, the Court should prohibit Nunes from testifying at trial about the contents of any person or Congressional records he spoliated or arguing that these records would have supported his allegations regarding the falsity of the Article, his alleged damages, or his alleged reputational harm being concentrated outside of California. *Id.* at *1, ¶¶ 1–2.  Second, the Court should allow The Post to argue at trial that the spoliated records likely contained evidence unfavorable to Nunes's arguments on those subjects. *Id.* at *1, ¶ 3.[7]

---

[7] In the event Court declines to issue an adverse inference instruction pursuant to Rule 37(e)(2), The Post requests in the alternative that the Court order a narrower jury instruction pursuant to Rule 37(e)(1) that Nunes "failed to preserve" records under his control, "despite having an obligation

The Court also should award The Post "reasonable attorney's fees and costs expended . . . in litigating the spoliation issue, including time spent . . . filing the instant motion for sanctions." *Id.* at *1, ¶ 5.  Courts in this District have imposed heavy monetary sanctions in order to deter spoliation.  *Cf. United States v. Philip Morris USA Inc.*, 327 F. Supp. 2d 21, 26 (D.D.C. 2004) (imposing "monetary sanction of $2,995,000" to the court registry where the court had "no way of knowing what, if any, value those destroyed emails had" but found it "essential that such [spoliation] be deterred, that the . . . legal community understand that such conduct will not be tolerated, and that the amount of the monetary sanction fully reflect the reckless disregard and gross indifference displayed by [the spoliating parties] toward their discovery and document preservation obligations").

## II.     An Award of Fees and Costs Is Warranted Given The Post's Successful Discovery Motion, Opposition to Nunes's Motion, and Efforts To Enforce Court Orders.

The Post also requests an award of fees and costs in connection with Nunes's initial failure to produce documents and his subsequent failure to comply with the Court's discovery orders. Pursuant to Rule 37(a)(5)(C), The Post seeks fees and costs associated with its June 10, 2022 motion to compel.  The Post also moves for fees and costs pursuant to Rule 37(b)(2)(C), renewing its request for fees and expenses related to its December 13, 2022 motion to enforce Nunes's compliance with the October 25, 2022 Order, which the Court previously held in abeyance, and initiating a request for fees and costs incurred as a result of Nunes's failure to comply with the Court's February 1, 2023 Order and April 5, 2023 Minute Order, *see* Fed. R. Civ. P. 37(b)(2)(C). Such an award is necessary to deter misconduct, remind Nunes of "the seriousness of his . . . neglect," and "vindicat[e] the integrity of the court."  *Flynn v. Thibodeaux Masonry, Inc.*, 311 F.

---

to do so, and that the jury may consider that fact, along with all the other evidence in the case," when weighing the evidence.  *Doe*, 2023 WL 5284815, at *1, ¶ 4.

Supp. 2d 30, 36 (D.D.C. 2004); *see also* Fed. R. Civ. P. 37(e) advisory committee's note to 1970 amendment (observing that award of expenses is "the most important available sanction to deter abusive resort to the judiciary").

**A.      The Court Should Order Nunes To Pay Fees and Costs in Connection With its June 10, 2022 Motion To Compel Pursuant to Rule 37(a)(5)(C).**

The Court should award fees and costs associated with The Post's June 10, 2022 motion to compel, ECF No. 56, under Rule 37(a)(5)(C).  As The Post explained in its motion, Nunes failed to conduct a reasonable search of his documents, responded that no documents existed despite evidence to the contrary, and provided incomplete and evasive answers to interrogatories, among other things.  ECF No. 56, at 1–2.  An award of fees and costs is warranted because the Court granted The Post's motion almost in its entirety, ordering supplementation with regard to thirty-nine requests for production of documents and two interrogatories and denying relief only as to two requests for production of documents and one interrogatory related to Nunes's funding of his lawsuits against new organizations.  *See* Oct. 25, 2022 Order ¶¶ 1–5.  The Court held The Post's request for fees in abeyance, *see* Feb. 1, 2023 Order at 2, and The Post submits that it is now time to resolve that pending request.

Rule 37(a)(5)(C) provides that a "court may 'apportion the reasonable expenses' incurred in relation to" a motion that was granted in part "among the parties and persons 'in a just manner.'" *George v. Allen Martin Ventures, LLC*, 2023 WL 2705776, at *10 (D.D.C. Mar. 30, 2023) (citations omitted); *see Beck v. Test Masters Educ. Servs., Inc*., 2012 WL 10817176, at *11 (D.D.C. Sept. 25, 2012) ("When a motion is granted in part and denied in part, the Court should apportion expenses, including attorney's fees, accordingly.").  "Courts apportion reasonable expenses by looking at each individual claim for relief, and determining whether the actions of the non-prevailing party were 'substantially justified,' meaning that there is a 'genuine dispute' or that

'reasonable people could differ' as to the appropriateness of the motion to compel." *Inova Health Care Servs. v. Omni Shoreham Corp.*, 2022 WL 4598578, at *15 (D.D.C. Sept. 30, 2022) (citations omitted) *on reconsideration on other grounds*, 2023 WL 5206142 (D.D.C. Aug. 14, 2023).

Here, with only "minor and narrow exceptions, . . . the Court substantially grant[ed] [The Post's] motion in its entirety." *DL v. District of Columbia*, 251 F.R.D. 38, 49 (D.D.C. 2008).  Over ninety percent of The Post's briefing was dedicated to its winning issues.  Less than ten percent of the briefing concerned The Post's requests for litigation funding information, which the Court denied with leave to renew in the event "the desired information becomes relevant" to Nunes's proposed computation of damages*.  See* Oct. 25, 2022 Order at 3.  Because The Post achieved near-total success on its motion, and the only requests with respect to which the Court denied the motion were denied with leave to renew in the future, The Post should be awarded at least ninety percent of the costs associated with bringing that motion.  *See Inova*, 2022 WL 4598578, at *15 (awarding fees in proportion to amount of briefing dedicated to winning issues).

The "overwhelming" success by The Post showed that Nunes's failure to comply with the discovery requests at issue was "not substantially justified" and that reasonable people could not "differ as to the appropriateness" of the bulk of The Post's motion.  *Id.*; *see also Parsi v. Daioleslam*, 778 F.3d 116, 127 (D.C. Cir. 2015) ("Reasonable people cannot differ about whether a party is entitled to withhold relevant documents without articulating any claim of privilege.").  Nunes was unable to provide a valid justification for this type of behavior, and his intransigence required the Court to issue a second and third Order addressing the same misconduct.

Because The Post largely succeeded in its June 10, 2022 motion to compel, the Court should order Nunes to reimburse The Post at least ninety percent of its reasonable costs and fees incurred in connection with that filing.

**B.**     **The Court Should Order Nunes To Pay Fees and Costs in Connection with Nunes's Noncompliance with Multiple Court Orders Pursuant to Rule 37(b)(2)(C).**

The Court also should award fees and costs associated with Nunes's disobedience of the October 25, 2022 Order, the February 1, 2023 Order, and the April 5, 2023 Order. Rule 37(b)(2)(C) requires a "disobedient party" to "pay the reasonable expenses, including attorney's fees, caused by the failure' to obey a discovery order, unless the party's disobedience was substantially justified or the circumstances would otherwise render an expense award unjust." *Parsi*, 778 F.3d at 128 (quoting Fed. R. Civ. P. 37(b)(2)(C)). A party is substantially justified in disobeying a discovery order only if a genuine dispute "or if reasonable people could differ" as to the propriety of the conduct. *Id.* at 127 (internal quotation marks omitted).

First, The Post renews its request that the Court previously held in abeyance for an award of fees and costs in connection with its December 13, 2022 motion to enforce the October 25, 2022 Order. *See* Feb. 1, 2023 Order at 3. For all the reasons set forth in The Post's previous briefing, *see* ECF Nos. 66, 69, The Post submits that such an award remains appropriate.

Second, The Post requests fees and costs in connection with Nunes's failure to comply with the February 1, 2023 Order. Nunes disobeyed that Order in multiple ways. For example:

- Nunes was ordered to search his own files and his Congressional office, and "produce all non-privileged documents" responsive to The Post's document requests. Feb. 1, 2023 Order ¶ 6. But he did not supplement his production with a single document. To date, Nunes has not produced any of his own communications to The Post.

- Nunes was required to identify every repository that "he personally used, from 2017 to present, to send, receive, and store communications and/or documents." Feb. 1,

2023 Order ¶ 5.  But he did not identify his phone carrier or any physical location where he may have stored documents.  He did not identify a single device that he used during this time period.  Nunes also failed to identify any of his staffers' devices, ██████████████████████████████████████████

███████████████████████████████████████████

██████.  Souza Tr. at 137:2–138:19.

- Nunes was ordered to provide a "complete account of each of his activities and whereabouts on March 21, 2017," Feb. 1, 2023 Order ¶ 1, but in his February 22, 2023 "Supplement" in response to the Court's Order, he instead limited his account to events that occurred after 4:00 p.m. that afternoon.  By beginning his account late in the afternoon, Nunes omitted key facts that The Post only learned after it had already sought and received relief from this Court—█████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████.  *See* Ex. 23.  Nunes to date has not disclosed any information regarding █████████████

███████████████████████████████████████████

with former President Trump.

Nunes's noncompliance reflects a conscious disregard for the Court's February 1, 2023 Order, and necessitated the filing of yet another submission to the Court regarding information that The Post should have received long ago.

Third, The Post seeks fees and costs in connection with Nunes's noncompliance with the April 5, 2023 Order.  In that Order, the Court for the third time directed Nunes to identify every

repository that he and certain staffers used "from 2017 to present to send, receive, and store ANY communications and/or documents, WITHOUT limitation as to whether the repositories may contain communications and/or documents relevant to this suit."  The Court issued its third Order after informing Nunes that "phone[s]," "laptop[s]," "shared drive[s]," "hard drive[s]," and locations for storing "hard copy files" all qualified as examples of responsive repositories.  Apr. 5, 2023 Conf. Tr. at 14:13–15:12.  But to this day, Nunes has failed to identify any specific device that he used to exchange communications or store documents.  Instead, Nunes only provided a cell phone number, the main phone number to his former Congressional office, and email addresses he used at his Campaign and at his current company, TMTG.  *See* Ex. 25.

Examples of repositories that Nunes omitted are evident from Nunes's own testimony, including the following:

- At his June 21, 2023 deposition in this case, Nunes acknowledged that ███████ ██████████████████████████████████████████████ █████████████████████████████.  *See* Nunes Tr. at 218:20–21 ████████████████████████████████████████████

- At his September 9, 2022 deposition in another defamation case, Nunes testified that he receives "direct" or private messages on social media.  *See NuStar Farms, LLC, v. Lizza*, No. 5:19-cv-04064-CJW-MAR, ECF No. 121-12, at 100:2–100:6 (N.D. Iowa Nov. 1, 2022) ("I know he direct messaged me on Twitter, because I have that—I provided that—to your subpoena request.").  But Nunes has not disclosed his Twitter account or any of his other social media accounts, even though he himself is chief executive of a social media company and ███████████ ██████████████████████████ Langer Tr. at 28:1–3 ███████████████

██████████████████████████████████████

████  After the Court's April 5, 2023 Order, The Post asked Nunes to disclose these social media accounts as repositories twice, but Nunes never did so.  Ex. 27.

As with the Court's previous Orders, Nunes has chosen to respond to the Court's April 5, 2023 Order with further misrepresentation and obfuscation.  Such persistent "conscious disregard" of Court Orders is unjustifiable, and reimbursing The Post for seeking to enforce those Orders is reasonable.  *Dellums v. Powell*, 566 F.2d 231, 235 (D.C. Cir. 1977).

## CONCLUSION

For the reasons above, The Post requests that the Court grant its motion.

## STATEMENT PURSUANT TO LCvR 7(m)

The Court granted Defendants leave to file this Motion on April 5, 2023.  In addition, on October 9, 2023, Defendants' counsel confirmed with Plaintiff's counsel that Plaintiff opposes the Motion.

Dated: October 11, 2023            Respectfully Submitted,

                                   WILLIAMS & CONNOLLY LLP

                                   By: /s/ *Thomas G. Hentoff*

                                       Kevin T. Baine (D.C. Bar No. 238600)
                                       Thomas G. Hentoff (D.C. Bar No. 438394)
                                       Nicholas G. Gamse (D.C. Bar No. 1018297)
                                       Sean M. Douglass (D.C. Bar No. 1033069)
                                       Alexandra M. Gutierrez (D.C. Bar No. 1619149)
                                       680 Maine Avenue, S.W.
                                       Washington, DC 20024
                                       Telephone: (202) 434-5000
                                       Facsimile: (202) 434-5029

                                       *Counsel for Defendants*

43