# EXHIBIT 22

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DEVIN G. NUNES                              )
                                            )
      Plaintiff,                          )
                                            )
v.                                          )          Case No. 1:21-cv-00506-CJN
                                            )
                                            )
WP COMPANY, LLC                             )
d/b/a The Washington Post                   )
      *et al*                           )
                                            )
      Defendants.                         )
                                            )

## PLAINTIFF'S SUPPLEMENTAL ANSWERS AND RESPONSES TO DEFENDANTS' DISCOVERY REQUESTS AND COMPLIANCE WITH THE COURT'S 02/01/2023 ORDER

      Plaintiff, Devin G. Nunes ("Plaintiff"), by counsel, pursuant to Rules 26(e), 33 and 34 of the Federal Rules of Civil Procedure, the Federal Rules of Evidence ("FRE"), Local Civil Rule ("LCvR") 30.4, and the Court's Order entered February 1, 2023, hereby serves the following Supplemental Answers and Responses to defendants, WP Company, LLC d/b/a The Washington Post ("WaPo") and Ellen Nakashima ("Nakashima") ("Defendants"), interrogatories and request for production of documents:

Continued on Next Page

1. Provide a complete account of each of his activities and whereabouts on March 21, 2017, which shall include, in chronological order, (A) each specific location Plaintiff visited that day; (B) the specific time Plaintiff arrived at each location; (C) the specific time Plaintiff departed each location; and (D) the person or persons who were present at each location.

**ANSWER**:        By mid-March of 2017, as Chairman of the House Permanent Select Committee on Intelligence (the "House Intelligence Committee"), I had spent several months investigating a series of unprecedented, extremely damaging, criminal leaks of classified information that had been appearing in the media (in particular the *Washington Post*) since Donald Trump won the Presidential Election in November 2016.  I found the following leaks to be the most alarming:

- A February 1, 2017 *Associated Press* story purporting to reveal classified details of a phone call between President Trump and Mexican President Enrique Nieto.
  [https://www.yahoo.com/news/trump-mexico-care-bad-hombres-us-might-231304076--politics.html].

- A February 2, 2017 *Washington Post* story, written by Greg Miller and Philip Rucker, purporting to reveal classified details of a phone call between President Trump and Australian Prime Minister Malcolm Turnbull.
  [https://www.washingtonpost.com/world/national-security/no-gday-mate-on-call-with-australian-pm-trump-badgers-and-brags/2017/02/01/88a3bfb0-e8bf-11e6-80c2-30e57e57e05d_story.html].

- A January 12, 2017 *Washington Post* story, written by David Ignatius, and a February 9, 2017 *Washington Post* article, written by Ellen Nakashima, Greg Miller and Adam Entous, purporting to reveal classified details of a phone call between incoming National Security Advisor ("NSA") Lieutenant General (Ret.) Michael T. Flynn ("General Flynn") and Russian Ambassador Sergei Kislyak.
  [https://www.washingtonpost.com/opinions/why-did-obama-dawdle-on-russias-hacking/2017/01/12/75f878a0-d90c-11e6-9a36-1d296534b31e_story.html;

https://www.washingtonpost.com/world/national-security/national-security-adviser-flynn-discussed-sanctions-with-russian-ambassador-despite-denials-officials-say/2017/02/09/f85b29d6-ee11-11e6-b4ff-ac2cf509efe5_story.html].

I was particularly concerned by the *Washington Post's* Flynn leaks, which I believed to be the most damaging of all the leaks – leaks that, incredibly, had been confirmed to the *Washington Post* by nine separate sources.  After making numerous inquiries, I strongly suspected that the Flynn leaks resulted from the unmasking of General Flynn's name in incidental intelligence collection reports followed by the dissemination of that information throughout the Intelligence Community.  Through my investigation, I wanted answers to the following questions:

- Who were the criminal leakers?

- Was General Flynn's conversation, in fact, unmasked, disseminated, and then intentionally leaked by the *Washington Post* in violation of Federal law?

- Were intelligence or government officials unmasking names in intelligence reports for the specific purpose of spying on their political opponents and/or leaking classified information?

- Did the Intelligence Community need to adopt tighter, more accountable procedures for unmasking names?

[*See also* http://www.devinnunes.com/ – "Unmaskings"].[1]

In the course of my inquiries into these matters, I consulted with Michael Ellis ("Ellis").  Ellis had been General Counsel of the House Intelligence Committee before he transferred to the White House to serve as special assistant to the President, senior associate counsel to the President, and deputy NSC legal advisor.  A former Navy serviceman and an expert in both military and intelligence issues, Ellis is an exceptionally

---

[1]     The "Unmaskings" webpage of my bio is incorporated herein by reference.

bright and experienced attorney, whom I trusted implicitly.   Throughout January, February and March 2017, Ellis and I discussed, either in person or over a classified line, leaks that were being facilitated by the misuse of the unmasking process.  At my request, Ellis began compiling documents that were relevant to our official House Intelligence Committee investigation into the unmaskings.  These were Executive Branch documents that I would have to view at a Sensitive Compartmentalized Information Facility ("SCIF") at the Eisenhower Executive Office Building ("EEOB") on the White House grounds.

I decided that March 21, 2017 would be a suitable date to review the relevant documents at the SCIF.  I had a break in my schedule that day before the NRCC annual spring dinner that I would be attending at the National Building Museum with a group of constituents visiting from California.  Since the National Building Museum is on the way to the White House, I planned to drop off my constituents at the National Building Museum, visit Ellis at the White House (which is about 5-10 minutes away), then return to the National Building Museum for the NRCC dinner.  Although there was a reception before the dinner, I decided to skip the reception to make time to visit the SCIF.  I knew the House would not hold votes during the reception, so I was confident my visit to the SCIF would not be interrupted by votes.   After deciding this timing would work, I informed Ellis over the phone a day or two ahead of time that I would come to the SCIF on March 21, and he agreed to have the documents ready.

On March 21, 2017, the NRCC reception began around 4:00 p.m.  To the best of my recollection, my constituents met at the Capitol Hill Club (300 1st Street SE), which is close to the Capitol.  We had planned to take a car from the Capitol Hill Club to the

National Building Museum.  I did not arrange the car.  I had planned to drop them off slightly before 4:00 p.m. and be at the White House by 4:00 p.m., but I recall I was running late, probably due to the timing of the previous set of votes in the House.  We ended up leaving Capitol Hill between 4:45 and 5:00 p.m. for the 5-10 minute ride to the National Building Museum.  I cannot recall who was with me for the car ride from Capitol Hill to the National Building Museum.[2]  I believe it was one or two constituents and one or two of my staff members.  Damon Nelson, my House Intelligence Committee Staff Director, may have been in the car, though I'm not sure.  I did not tell the other passengers in the car the purpose of my visit to White House.

After dropping everyone off at the National Building Museum, I was left alone in the car with whomever was driving.  We then drove 5-10 minutes to the White House grounds.  I exited the car by myself (on 17th Street).  I walked to the south entrance checkpoint to check in, and did so around 5:30 p.m.  I went through the entry point, which was the typical place where I had entered the White House on previous visits (unrelated to the matter for which I was meeting Ellis).  From there, I walked up the sidewalk to the EEOB.  As I was walking, I came across the Israeli Ambassador and stopped for 1-2 minutes to exchange pleasantries with him.  I may have stopped to shake hands and speak with other foreign dignitaries as well.  My visit to the White House during the day (the sun was out) and my interaction with the Israeli Ambassador and

---

[2]       In answering this Interrogatory, I consulted with Ryan Turner ("Turner"), who does not remember being in a car with me or anyone else on March 21, 2017.  Additionally, my counsel consulted with counsel for Caitlin Canter (formerly Caitlin Shannon).  Ms. Canter remembers being in a car with Turner, Damon Nelson (possibly) and me on March 21 during the day headed to the NRCC reception, and being dropped off at the reception.  Ms. Canter remembers that I was on the phone and that I stated I was headed to the White House.

others was a matter of public record, as I explained on air to CNN's Wolf Blitzer on March 27, 2017. [https://www.cnn.com/videos/politics/2017/03/27/devin-nunes-entire-interview-wolf-blitzer-tsr.cnn – Video at 3:45].[3]

Michael Ellis, by himself, met me at the entrance to the EEOB. He then escorted me into the SCIF, which as I recall was close to the building's entrance. Ellis handed me the documents he had prepared, which were in a binder. He then left me alone and I reviewed the documents for approximately 30-45 minutes. After I finished, I had another short conversation with Ellis for 5-10 minutes. I believe I told him I found the documents very disturbing, since they indicated that government officials were conducting inappropriate unmaskings and disseminations of information related to their political opponents, which would be a form of spying. I had not known reports like these were being generated because they were not being provided to Congress. I then left the White House grounds by myself, I believe on the north side towards Pennsylvania Avenue. To the best of my recollection, I hailed a taxi on the street, rode 5-10 minutes back to the National Building Museum, and probably paid the driver in cash.

I walked into the National Building Museum sometime around 7:00 p.m. as dinner was being served. There were around 2,000 guests at the dinner, and I had 4-5 tables in my name for about 30-40 constituents, staffers, and other guests I had invited. [*See* BF.Nunes.WP.DNCC.3516-3519, 3504, 3509]. I recall that Damon Nelson was there, as was Bob Smittcamp, my campaign chairman, who'd flown in from California with a large group of constituents for the dinner. In particular, I recall that constituents Bill Mattos, Ryan Turner and Jacquie and Rich Dyt were there. I did not eat dinner

---

[3]     I expressly stated to Wolf Blitzer that I did not believe that the Obama administration spied on or wiretapped Trump Tower. [Video at 13:50].

because I spent my time walking around the tables and chatting with guests.  I sat down later to listen to the event's speakers and watch the videos they displayed.  President Trump spoke, but I did not speak with him that evening.

I left the NRCC event around 9:00 p.m.  Originally, I had planned to go to an after-party and then to Café Berlin on Capitol Hill with then-Congressman (R-NC) George Holding and some of my constituents.  Rep. Holding thought the after-party would be too crowded, however, so we agreed to skip it and go directly to Café Berlin.  I can't recall how we got the car or who drove from the National Building Museum to Café Berlin.  I remember Mr. and Mrs. Dyt were in the car with me, but I can't specifically recall anyone else.  We drove straight to Café Berlin and met Rep. Holding there.  It was already past 9:00 p.m., so the restaurant wasn't crowded.  Rep. Holding sat at the table with me, along with Mr. and Mrs. Dyt and Ryan Turner, who are all old friends of mine.  There may have been one or two other people there, but I'm not sure.  We ate hors d'oeuvres and drank a few beers over the course of the next few hours.  We left the restaurant around 11:00 p.m., and I walked about 10 minutes with Mr. and Mrs. Dyt and Mr. Turner to the Capitol, since I had earlier offered to take them for a Capitol tour that evening.  Throughout my tenure in Congress, I did night tours of the Capitol with constituents at least a few times per month, so this was not in any way unusual.

The tour was a fairly brief walk through the Capitol from the Senate side to my office in the Longworth Building.  I believe we got to my office between 11:30 p.m. and midnight.  We drank some wine there, and I believe my guests left to go to their hotels around 1:30 a.m.  At that point I went to sleep in my office, which was where I stayed

when I was in Washington.  It was not unusual for me to stay up late with constituents or friends visiting from California in this fashion.

The Dyts took some photographs that evening, which they sent to my counsel:



[Jacqui and Rich Dyt, NRCC Spring Dinner, Washington, D.C., March 21, 2017]



[Devin Nunes, Jacqui and Rich Dyt, Café Berlin, Washington, D.C., March 21, 2017]



[Rich Dyt, Devin Nunes and Jacqui Dyt, Longworth Building,
After Midnight March 22, 2017]

The "midnight run" story is a total fabrication, fed to the *Washington Post* by Adam Schiff and his staff, and republished out of a desire to inflict injury on my reputation as an elected official.  Ellen Nakashima and her cohorts knew in March 2017 that I did not go to the White House at midnight or even at night.  There is no evidence that I jumped in and out of cars or ordered an Uber at midnight.  My communications director, Jack Langer ("Langer"), told Nakashima the story was a fabrication.  The Defendants ignored the truth and chose to propagate the false narrative that my visit to the White House on March 21, 2017, occurred under cover of night in order to convey the false impression to *Washington Post* readers and others that there was something shady, nefarious, baseless, ridiculous and untoward about the outing.

The next morning, March 22, 2017, I woke up and went to the House gym.  Then I met with Speaker Paul Ryan, briefed him on the documents I had read the previous day, and told him I thought the documents showed how the criminal leaks were being orchestrated.  I also requested from the White House the opportunity to give a similar briefing to President Trump.  I cannot remember how that meeting was arranged, but my guess is that I called the White House operator, spoke to someone there, and then the White House arranged the meeting through my scheduler Jennifer Morrow.  At or about the time Defendants published the statements at issue, I instructed Ms. Morrow to preserve all documents in her possession relating to the events of March 21, 2017, and March 22, 2017.  She did so.

At some point in the morning of March 22, 2017, I asked Mr. Langer to post a press availability announcing that I would be talking to the press outside the House Intelligence Committee SCIF that day.  I asked all Republican HPSCI members to meet me in the SCIF, where I briefed them on the documents I had reviewed and told them I would be informing the media I had seen evidence that improper unmaskings may be occurring.  Then I went outside the SCIF and spoke to reporters there.  Following that press conference, I went directly to the White House and spent about 30 minutes briefing President Trump.  After our meeting, I went outside to speak to the White House press pool gathered there.  Immediately afterward, I returned to the Capitol for votes.  I do not recall speaking to anyone else that day about my visit to the EEOB on March 21, 2017 or the documents I had reviewed.

During the press conferences on March 22, 2017, I was crystal clear that the purpose of my visit to the White House on March 21, 2017 was ***not*** to review intelligence

files to buttress the President's (or anyone's) "baseless claims of the Obama administration spying on Trump Tower". Anyone attending the press conferences or watching them on C-Span knew that I visited the White House to review documents related to the incidental collection of information on United States citizens involved in the Trump transition, the unmasking of those United States citizens, and criminal leaks of classified information related thereto. [https://www.c-span.org/video/?425829-1/devin-nunes-confirms-incidental-surveillance-trump-transition-team; https://www.c-span.org/video/?425836-1/president-concerned-transition-team-surveillance].

In fact, at the afternoon press conference at the White House on March 22 after my meeting with President Trump, I expressly stated that the Obama Administration did not tap President Trump's phones or spy on Trump Tower: "No, no, no, that did not happen. I've said this for many, many weeks, including a couple of days after [the President's March 4, 2021 tweet] in front of the press. That never happened." I was crystal clear "on day two" that there was no evidence of wiretapping of Trump Tower. [Video at 4:20, 6:52].

---

> 2. Identify every individual on Plaintiff's staff who communicated with anyone regarding any aspect of Plaintiff's March 21 and 22 visits to the White House.

**ANSWER**: The following members of my staff communicated with me or others regarding aspects of my March 21 and/or 22 visits to the White House:

- Damon Nelson (see Morrow 5-8);

- Jennifer Morrow (see Morrow 1-9);

- Caitlin Canter (see BF.Nunes.Canter.101822.000013);

- Jack Langer (multiple communications with press & "Unmaskings" webpage, http://www.devinnunes.com/);

- Jilian Plank/Nicky Henderson ("Unmaskings" webpage, http://www.devinnunes.com/).

---

3.   Identify every individual who worked on Plaintiff's campaign website post about "lawsuits against The Washington Post," including any and all individuals who reviewed the website post and/or proposed edits to it.

**<u>ANSWER</u>**:        Jack  Langer;  Jilian  Plank;  Nicky  Henderson;  *see BFNunesWP000001-411.*

---

4.   Identify every individual who has or may have knowledge about the following topics:

a.   the approximate time at which Plaintiff departed for the White House on March 21, 2017;

b.   the approximate time at which Plaintiff arrived at the White House on March 21, 2017;

c.   the approximate time at which Plaintiff left the White House on March 21, 2017;

d.   Plaintiff's activities and whereabouts after leaving the White House on March 21, 2017;

e.   the purpose of Plaintiff's visit to the White House on March 21, 2017;

f.   the purpose of Plaintiff's visit to the White House on March 22, 2017; and

g.   the nature of the documents and/or materials that Plaintiff reviewed at the White House on March 21, 2017.

**ANSWER**:            Responding to this Interrogatory and each of its subparts, Plaintiff states as follows:

      a.    Plaintiff and possibly Damon Nelson (if he was still in the car);

      b.    Plaintiff, Michael Ellis, NARA as records custodian;

      c.    Plaintiff, Michael Ellis;

      d.    Plaintiff, staffers who may have seen Plaintiff at the NRCC dinner, various constituents, including Ryan Turner and the Dyts, and George Holding, who were with Plaintiff after the dinner;

      e.    Plaintiff, Michael Ellis, Paul Ryan, Republican HPSCI members briefed on March 22, 2017, Defendants, Greg Miller, reporters and others who attended the March 22, 2017 press conferences, President Trump, Wolf Blitzer;

      f.    Plaintiff, Paul Ryan, Republican HPSCI members briefed on March 22, 2017, Defendants, Greg Miller, reporters and others who attended the March 22, 2017 (afternoon) press conference, President Trump;

      g.    Plaintiff, Michael Ellis, FBI, CIA, NSA, Paul Ryan, Republican HPSCI members briefed on March 22, 2017, President Trump.

5. For each individual identified in response to paragraphs (2)–(3) above, and any individual identified in response to paragraph (4) above who worked on either Plaintiff's staff or Plaintiff's campaign, identify every repository used by that individual, from 2017 to present, to send, receive, and store communications and/or documents. Plaintiff shall also identify every repository he personally used, from 2017 to present, to send, receive, and store communications and/or documents.

**ANSWER**:            Responding to this Interrogatory and each of its subparts,

Plaintiff states as follows:

- Plaintiff – 202-225-2523; 559-288-1919; DGN@devinnunes.net.

- Damon Nelson (Deceased) – Damon.Nelson@mail.house.gov.

- Jennifer Morrow – 912-268-4088; 202-431-0175;
  Jennifer.Morrow@mail.house.gov;
  jennifermorrow2006@yahoo.com.

- Caitlin Canter – 559-977-9278;
  Caitlin.Shannon@mail.house.gov;
  caitlin@devinnunes.net.

- Jack Langer – 202-380-2234; 571-345-4423;
  Jack.Langer@mail.house.gov;
  Lackjanger99@gmail.com.

- Jilian Plank – 559-916-3754; 202-225-2523;
  Jilian.Plank@mail.house.gov;
  jilian@devinnunes.net.

- Nicky Henderson – 559-739-8903; nicky@devinnunes.net.

---

6. For each repository identified in response to paragraph (5) above, produce all non-privileged documents responsive to the Defendants' Requests for Production Nos. 1 through 59 that have not yet been produced.  Plaintiff shall also produce original metadata (if any) for all documents, including for all previously produced documents. If Plaintiff lacks access to a specific repository, he shall notify Defendants and explain why he lacks access.

---

**ANSWER**:            For each repository identified in response to paragraph (5) above, all non-privileged documents responsive to Defendants' Requests for Production Nos. 1 through 59 and all original metadata (if any) associated with all documents have

14

been produced.  When Defendants published the false and defamatory statements at issue in this case in 2020, I instructed Jack Langer and Jennifer Morrow, the only two staffers who would ever have had any responsive documents, to preserve all documents.  They did so.  All documents have been produced.

I lack access to the following repositories for the following reasons:

- I no longer have access to my House office phone or records since I left Congress and/or my 2017 personal phone records due to the passage of time.  I did not send or receive any non-privileged emails.

- Damon.Nelson@mail.house.gov (death of Mr. Nelson in 2018 and discontinuance of email and phone)

- Jennifer.Morrow@mail.house.gov; 202-431-0175 (Plaintiff's resignation from Congress and discontinuance of email and phone)

- Caitlin.Shannon@mail.house.gov (Plaintiff's resignation from Congress and discontinuance of email)

- Jack.Langer@mail.house.gov; 202-380-2234 (Plaintiff's resignation from Congress and discontinuance of email and phone)

- Jilian.Plank@mail.house.gov; 202-225-2523 (Plaintiff's resignation from Congress and discontinuance of email and phone)

Prior to discontinuance of the above House emails, I instructed Langer and Morrow that all emails and information related to this action be preserved.  Elliot Berke, counsel for the Campaign, Plank and Canter (Shannon), employed a third party vendor to search the campaign committee members' (devinnunes.net) emails and phones for responsive documents.  All documents responsive to Defendants' subpoenas were produced by all staff and campaign members.

7.   Submit a signed declaration describing in detail the steps Plaintiff took to comply with each paragraph of this Order and certifying that he made all reasonable efforts to ensure compliance; and it is further

**ANSWER**:          I took the following steps to comply with each paragraph of the Court's Order:  I reviewed each paragraph of the Court's Order.  I re-constructed the timeline of events, including my whereabouts on March 21, 2017 and March 22, 2017, based on consultation with material witnesses and examination of all available documents, including my itinerary, videos of press conferences and public statements available on the Internet.  I or my counsel contacted former staffers to verify facts, verify document repositories and to confirm that any and all responsive documents in their possession and control had been preserved and produced.   I personally contacted Anthony Ratekin, Johnny Amaral, Scott Glabe and George Pappas to determine whether they had any documents responsive to Defendants' requests for production of documents. They did not.  I also confirmed with Mr. Ratekin and Mr. Amaral that they reviewed my website bio.  They did, but provided no edits.  I also personally asked Scott Glabe and Kash Patel, as my House counsel at the time, whether they had any knowledge of the nature of the documents I reviewed on March 21, 2017.  They did not.  Neither did George Pappas.   My counsel conducted an independent examination of Jennifer Morrow's yahoo email account using the following search terms: "Devin Nunes", "Washington Post", "Nakashima", "WaPo", "lawsuit", "Michael Ellis", "White House", "midnight run", "spying", "wiretapping", "Trump Tower", "March 21", "WAVES", "Eisenhower", "NRCC", "National Building Museum", "itinerary".   There were no responsive documents.

16

### V-E-R-I-F-I-C-A-T-I-O-N and C-E-R-T-I-F-I-C-A-T-I-O-N

I have reviewed the attached Interrogatory answers served February 22, 2023, and I swear or affirm that the information listed in my answers and responses is truthful and accurate to the best of my knowledge and belief based upon documents and information in my possession and control, all of which has been produced, based upon personal observations, memory, and experiences, and based upon documents believed to be in the possession, custody and control of others.

I further certify that I have made all reasonable efforts to ensure compliance with the Court's Order entered on February 1, 2022.

In accordance with 28 U.S.C. § 1746, I declare, certify, verify, and state under penalty of perjury that the foregoing is true and correct.

Executed in Sarasota, Florida, on February 22, 2023.

/s/ *Devin Nunes*

DEVIN G. NUNES

17

DATED:        February 22, 2023


                    DEVIN G. NUNES


                    By:___/s/ *Steven S. Biss*_____
                           Steven S. Biss (VSB # 32972)
                           300 West Main Street, Suite 102
                           Charlottesville, Virginia 22903
                           Telephone:  (804) 501-8272
                           Facsimile:  (202) 318-4098
                           Email:  stevenbiss@earthlink.net
                           (*Admitted Pro Hac Vice*)

                           Richard S. Basile
                           (D.C. Bar No. 374069)
                           6305 Ivy Lane, Suite 416
                           Greenbelt, MD 20770
                           Telephone:  301-441-4900
                           Facsimile:  301-441-2404
                           Email:  rearsb@gmail.com

                           *Counsel for the Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 22, 2023 a copy of the foregoing was served electronically in PDF upon counsel for the Defendants.

By:   */s/ Steven S. Biss*
        Steven S. Biss (VSB # 32972)
        300 West Main Street, Suite 102
        Charlottesville, Virginia 22903
        Telephone:  (804) 501-8272
        Facsimile:  (202) 318-4098
        Email:  stevenbiss@earthlink.net
        (*Admitted Pro Hac Vice*)

        Richard S. Basile
        (D.C. Bar No. 374069)
        6305 Ivy Lane, Suite 416
        Greenbelt, MD 20770
        Telephone:  301-441-4900
        Facsimile:  301-441-2404
        Email:  rearsb@gmail.com

        *Counsel for the Plaintiff*