**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DEVIN G. NUNES,

              Plaintiff,

v.

WP COMPANY LLC, d/b/a THE
WASHINGTON POST and ELLEN
NAKASHIMA,

              Defendants.

**FILED UNDER SEAL**

**CONTAINS INFORMATION
DESIGNATED AS HIGHLY
CONFIDENTIAL**

**ORAL ARGUMENT REQUESTED**

Case No. 1:21-cv-00506 (CJN)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

WILLIAMS & CONNOLLY LLP

Kevin T. Baine (D.C. Bar No. 238600)
Thomas G. Hentoff (D.C. Bar No. 438394)
Nicholas G. Gamse (D.C. Bar No. 1018297)
Sean M. Douglass (D.C. Bar No. 1033069)
Alexandra M. Gutierrez (D.C. Bar No. 1619149)
680 Maine Avenue, S.W.
Washington, DC 20024
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
thentoff@wc.com

*Counsel for Defendants*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................iii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 4

    A.    The Passages at Issue in the Article and the Corrected Article. ...................... 4

    B.    March and April 2017............................................................................................ 5

          1.    Before March 21, 2017. ...................................................................... 5

          2.    March 21, 2017. ................................................................................... 7

          3.    March 22, 2017. ................................................................................... 9

          4.    After March 22, 2017........................................................................ 12

    C.    November and December 2020. ........................................................................ 16

          1.    The November 9, 2020 Article. ........................................................ 16

          2.    The Lawsuit, Retraction Demand, and December 7, 2020
              Corrected Article.............................................................................. 20

    D.    Procedural History. ........................................................................................... 21

SUMMARY JUDGMENT STANDARD.............................................................................. 23

ARGUMENT ...................................................................................................................... 24

I.    THERE IS NO GENUINE ISSUE OF MATERIAL FACT AS TO
    ACTUAL MALICE. ........................................................................................................ 24

    A.    The Law of Actual Malice. ............................................................................... 25

    B.    The Two Challenged Statements in the Article and the One
        Challenged Statement in the Corrected Article. ............................................ 26

          1.    "[Nunes's] baseless claims."............................................................. 28

          2.    "[R]eportedly late at night, earning the episode the
              nickname 'the midnight run.'"........................................................ 33

3.     "Nunes believed [the intelligence files] would buttress Trump's baseless claims of the Obama administration spying on Trump Tower." .................................................. 35

II.     THE CHALLENGED STATEMENTS ARE NOT MATERIALLY FALSE AND DEFAMATORY ................................................ 37

     A.     The Law of Material Falsity and Defamatory Meaning. ............................ 37

     B.     The Challenged Statements in the Article. .................................... 38

     C.     The Challenged Statement in the Corrected Article. .................................... 42

III.     THE CORRECTED ARTICLE'S STATEMENT ABOUT NUNES'S BELIEF IS NOT A VERIFIABLE STATEMENT OF FACT AND THUS IS NONACTIONABLE OPINION. ................................. 43

     A.     The Law of Opinion. ........................................................ 43

     B.     The Post's Statement about Nunes's Belief Is Nonactionable Opinion. .................................... 44

CONCLUSION ........................................................................... 45

# TABLE OF AUTHORITIES[*]

## CASES

*Abbas v. Foreign Pol'y Grp., LLC*, 975 F. Supp. 2d 1 (D.D.C. 2013) ..........................................38

*\*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..................................................23

*\*Blankenship v. NBCUniversal, LLC*, 60 F.4th 744 (4th Cir. 2023) .......................................32, 34

*\*Bose Corp. v. Consumers Union*, 466 U.S. 485 (1984) .................................................29

*Buendorf v. NPR, Inc.*, 822 F. Supp. 6 (D.D.C. 1993) ...................................................31

*Burns v. Rice*, 813 N.E.2d 25 (Ohio Ct. App. 2004) ...................................................31

*\*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ......................................................23

*Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087 (4th Cir. 1993)............................................41, 44

*Colorado v. New Mexico*, 467 U.S. 310 (1984)....................................................26

*Copeland-Jackson v. Oslin*, 555 F. Supp. 2d 213 (D.D.C. 2008).....................................37

*Deripaska v. Assoc. Press*, 282 F. Supp. 3d 133 (D.D.C. 2017) ...................................24

*\*Fairbanks v. Roller*, 314 F. Supp. 3d 85 (D.D.C. 2018)..............................................29

*Farah v. Esquire Mag.*, 736 F.3d 528 (D.C. Cir. 2013) ...............................................44

*Filippo v. Lee Publ'ns, Inc.*, 485 F. Supp. 2d 969 (N.D. Ind. 2007) ........................................45

*Fridman v. Orbis Bus. Intel. Ltd.*, 229 A.3d 494 (D.C. 2020).......................................26

*Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580 (D.C. 2000)....................................38

*\*Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657 (1989) .........................................27

*Harvey v. CNN, Inc.* 48 F.4th 257 (4th Cir. 2022).......................................................33

*\*Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222 (7th Cir. 1993) ..............................................40, 41

*Hoffman v. Wash. Post Co.*, 433 F. Supp. 600 (D.D.C. 1977) .................................28, 34

*Hourani v. Psybersolutions LLC*, 164 F. Supp. 3d 128 (D.D.C. 2016)..........................................5

---

[*] *Authorities upon which counsel chiefly rely are marked with asterisks.*

*Jankovic v. Int'l Crisis Group*, 822 F.3d 576 (D.C. Cir. 2016) ...............................23, 25, 26, 30

*Kahl v. Bureau of Nat'l Affs., Inc.*, 856 F.3d 106 (D.C. Cir. 2017) ..................................... *passim*

*Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287 (D.C. Cir. 1988) ...................27, 37, 43

*Logan v. District of Columbia*, 447 F. Supp. 1328 (D.D.C. 1978)........................................28, 35

*Lohrenz v. Donnelly*, 350 F.3d 1272 (D.C. Cir. 2003) ...................................................26

*Masson v. New Yorker Mag., Inc.*, 501 U.S. 496 (1991) ......................................25, 37

*McFarlane v. Esquire Mag.*, 74 F.3d 1296 (D.C. Cir. 1996) ...............................................27, 33

*McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501 (D.C. Cir. 1996) ........................26, 34

*Montgomery v. Risen*, 197 F. Supp. 3d 219 (D.D.C. 2016).......................................44, 45

*Montgomery v. Risen*, 875 F.3d 709 (D.C. Cir. 2017)........................................23, 37

*Nader v. de Toledano*, 408 A. 2d 31 (D.C. 1979)........................................................31, 32

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) .........................................23, 25

*Newton v. NBC*, 930 F.2d 662 (9th Cir. 1990).......................................................35

*Rosen v. Am. Isr. Pub. Affs. Comm., Inc.*, 41 A.3d 1250 (D.C. 2012).........................................43

*Rosenblatt v. Baer*, 383 U.S. 75 (1966) ...............................................................24

*Secord v. Cockburn*, 747 F. Supp. 779 (D.D.C. 1990) ...........................................28

*Shipkovitz v. Wash. Post Co.*, 408 F. App'x 376 (D.C. Cir. 2010).................................................37

*Smith v. Clinton*, 886 F.3d 122 (D.C. Cir. 2018) ......................................................37, 38, 41, 43

*St. Amant v. Thompson*, 390 U.S. 727 (1968)..........................................................25

*Tah v. Glob. Witness Publ'g, Inc.*, 991 F.3d 231 (D.C. Cir. 2021).......................................26, 27

*Tavoulareas v. Piro*, 817 F.2d 762 (D.C. Cir. 1987) .....................................................25, 35

*Thompson v. Armstrong*, 134 A.3d 305 (D.C. 2016) ................................................25

*Time, Inc. v. Pape*, 401 U.S. 279 (1971)...............................................................30

*Turner v. Wells*, 198 F. Supp. 3d 1355 (S.D. Fla. 2016) ......................................................44, 45

*Wash. Post v. Robinson*, 935 F.2d 282 (D.C. Cir. 1991) ..............................................5

*Washington Post Co. v. Keogh*, 365 F.2d 965 (D.C. Cir. 1966)....................................................23

*Waskow v. Assoc. Press*, 462 F.2d 1173 (D.C. Cir. 1972)..............................................25, 28, 30

*Wentz v. Project Veritas*, 2019 WL 1716024 (M.D. Fla. Apr. 16, 2019)....................................40

*Weyrich v. New Republic, Inc.*, 235 F.3d 617 (D.C. Cir. 2001) ....................................................42

*Xereas v. Heiss*, 933 F. Supp. 2d 1 (D.D.C. 2013) ........................................................................43

## RULES

Fed. R. Civ. P. 56(a) ........................................................................................................................23

## OTHER AUTHORITIES

1 Robert D. Sack, *Sack on Defamation* § 2.4.1 (5th ed. 2017)........................................................38

*Baseless*, Cambridge Dictionary, https://bit.ly/3MssDnq............................................................41

*Buttress*, Cambridge Dictionary, https://bit.ly/3Mrs9Ow............................................................41

*Restatement (Second) of Torts* § 581A, comment f (1977) ............................................................43

W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 111 (5th ed. 1984)...................38

# INDEX OF EXHIBITS[*]

## I.  Thomas G. Hentoff Declaration

**Exhibit 1**:  Ellen Nakashima, "White House official and former GOP political operative Michael Ellis named as NSA general counsel," Washington Post (Online) (November 9, 2020) (POST_1-21-cv-506_0000001)

**Exhibit 2**:  Ellen Nakashima, "Trump loyalist named to NSA post," Washington Post (Print) (November 10, 2020) (POST_1-21-cv-506_00000003)

**Exhibit 3**:  Email from S. Biss to E. Nakashima (November 17, 2020) (POST_1-21-cv-506_00001636)

**Exhibit 4**:  Ellen Nakashima, "White House official and former GOP political operative Michael Ellis named as NSA general counsel," Washington Post (Online Correction) (December 8, 2020) (POST_1-21-cv-506_00000004)

**Exhibit 5**:  Washington Post (Print Correction) (December 8, 2020) (POST_1-21-cv-506_00000006)

**Exhibit 6**:  Excerpt from Transcript of Deposition of Devin Nunes (August 10, 2021)

**Exhibit 7**:  Devin Nunes, Press Conference (Transcript) (March 22, 2017) (POST_1-21-cv-506_00000142)

**Exhibit 7a**:  Devin Nunes, Press Conference (Video) (March 22, 2017)

**Exhibit 8**:  The Situation Room, CNN (Transcript) (March 27, 2017)

**Exhibit 8a**:  The Situation Room, CNN (Video) (March 27, 2017)

**Exhibit 9**:  The Lead with Jake Tapper (Transcript) (March 22, 2017) (Greg Miller Deposition Exhibit 46)

**Exhibit 9a**:  The Lead with Jake Tapper (Video) (March 22, 2017)

**Exhibit 10**:  Hannity, Fox News (Transcript) (March 23, 2017) (POST_1-21-cv-506_00002327)

**Exhibit 10a**:  Hannity, Fox News (Video) (March 23, 2017) (Devin Nunes Deposition Exhibit 87)

---

[*] "Ex. [number]" refers to exhibits to the Declaration of Thomas G. Hentoff.  "[Witness name] Ex. [letter]" refers to exhibits to witness declarations.

**Exhibit 11**: Devin Nunes, Press Conference (Transcript) (March 22, 2017) (POST_1-21-cv-506_00000142)

**Exhibit 11a**: Devin Nunes, Press Conference (Video) (March 22, 2017) (Devin Nunes Deposition Exhibit 88)

**Exhibit 12**: Michael Scherer, "President Trump's Interview With TIME on Truth and Falsehoods," Time (March 23, 2017) (POST_1-21-cv-506_00002315)

**Exhibit 13**: Carol E. Lee and Paul Sonne, "U.S. Sanctions Russia Over Election Hacking; Moscow Threatens to Retaliate," Wall Street Journal (December 29, 2016)

**Exhibit 14**: Michael S. Schmidt, Mark Mazzetti and Matt Apuzzo, "Trump Campaign Aides Had Repeated Contacts With Russian Intelligence," New York Times (February 14, 2017)

**Exhibit 15**: President Donald Trump (@realDonaldTrump) Tweets (March 4, 2017) (Devin Nunes Deposition Exhibit 81)

**Exhibit 16**: John Whitesides and James Oliphant, "Former U.S. intelligence chief rejects Trump wiretap accusation," Reuters (March 5, 2017)

**Exhibit 17**: Madeline Conway, "Spicer: Trump 'doesn't really think' Obama wiretapped him personally," Politico (March 13, 2017)

**Exhibit 18**: Ted Mann, "Trump Faces Furor Over Unsubstantiated Claim Obama Wiretapped Him," Wall Street Journal (March 4, 2017)

**Exhibit 19**: Joint Statement from Senate Intel Committee Leaders on Wiretapping Evidence at Trump Tower (March 16, 2017)

**Exhibit 20**: Tucker Carlson Tonight, Fox News (Transcript) (March 15, 2017)

**Exhibit 20a**: Tucker Carlson Tonight, Fox News (Video) (March 15, 2017)

**Exhibit 21**: Devin Nunes, Press Conference (Video) (March 7, 2017)

**Exhibit 22**: Devin Nunes and Adam Schiff, Press Conference (Video) (March 15, 2017)

**Exhibit 23**: House Permanent Select Committee on Intelligence's Hearing on the Russian Active Measures Investigation (Transcript Excerpt) (March 20, 2017 ) (POST_1-21-cv-506_00000052)

**Exhibit 24**: Matthew Rosenberg, Emmarie Huetteman and Michael S. Schmidt, "Comey Confirms F.B.I. Inquiry on Russia; Sees No Evidence of Wiretapping," New York Times (March 20, 2017)

**Exhibit 25**:  Email from ████████████████████████████████ (March 21, 2017) (077P-R000000439_0001) (filed under seal)

**Exhibit 26**:  Excerpt from Transcript of Deposition of Caitlin Canter (May 10, 2023) (filed under seal)

**Exhibit 27**:  Plaintiff's Supplemental Answers and Responses to Defendants' Discovery Requests and Compliance With the Court's February 1, 2023 Order (February 22, 2023) (Devin Nunes Deposition Exhibit 82)

**Exhibit 28**:  ████████████████████████████████████ (077P-R000000046_0001) (filed under seal)

**Exhibit 29**:  Excerpt from Transcript of Deposition of Michael Ellis (December 13, 2022)

**Exhibit 30**:  Excerpt from Transcript of Deposition of Devin Nunes (June 21, 2023)

**Exhibit 31**:  Excerpt from Transcript of Deposition of Jilian Plank Souza (May 12, 2023) (filed under seal)

**Exhibit 32**:  The Five, Fox News (Image Capture) (March 22, 2017) (Devin Nunes Deposition Exhibit 89)

**Exhibit 33**:  Matthew Rosenberg, Adam Goldman and Emmarie Huetteman, "Monitoring May Have 'Incidentally' Picked Up Trump Aides, House Member Says," New York Times (March 22, 2017)

**Exhibit 34**:  Emmarie Huetteman, "G.O.P. Panel Chairman Apologizes for Withholding Trump Data From Democrats," New York Times (March 23, 2017)

**Exhibit 35**:  Austin Wright and Nolan D. McCaskill, "Nunes apologizes for going directly to White House with monitoring claims," Politico (March 23, 2017)

**Exhibit 36**:  Reuters Staff, "Nunes apologized to Democrats after surveillance comments: aide," Reuters (March 23, 2017)

**Exhibit 37**:  Press Briefing by White House Press Secretary Sean Spicer (Transcript) (March 23, 2017)

**Exhibit 38**:  Jake Tapper, "Who cleared Devin Nunes into the White House?," CNN (March 27, 2017) (Caitlin Canter Exhibit 27).

**Exhibit 39**:  David S. Cloud, "Devin Nunes plot thickens as his spokesman concedes he met source for surveillance claim at White House," Los Angeles Times (March 27, 2017) (Jack Langer Deposition Exhibit 65)

**Exhibit 40**:   Excerpt from Transcript of Deposition of Jack Langer (June 19, 2023) (filed under seal)

**Exhibit 41**:   "Paul Ryan on Russia probe, health care bill 'growing pain,'" CBS News (March 30, 2017)

**Exhibit 42**:   Tim Mak, "Devin Nunes Vanished the Night Before He Made Trump Surveillance Claims," Daily Beast (March 24, 2017) (Jack Langer Deposition Exhibit 61)

**Exhibit 43**:   Julia Borger, "Lawmaker's 'peculiar midnight run' endangers Trump-Russia inquiry," Guardian (March 26, 2017) (POST_1-21-cv-506_00002347)

**Exhibit 44**:   Eric Levitz, "Nunes Had Secret White House Meeting Before Claiming Trump Team Was Surveilled," New York Magazine (March 27, 2017)

**Exhibit 45**:   Michael Warren, "More Confusion After Nunes Reveals His White House-based Source," Weekly Standard (March 28, 2017)

**Exhibit 46**:   Ned Price, "Devin Nunes wants to run an intel operation for the White House — against our intelligence agencies," NBC News (May 25, 2018)

**Exhibit 47**:   David A. Graham, "The Ever-Deepening Mystery of Devin Nunes," The Atlantic (March 27, 2017)

**Exhibit 48**:   Greg Miller and Karen DeYoung, "Three White House officials tied to files shared with House intelligence chairman" Washington Post (March 30, 2017) (Ellen Nakashima Deposition Exhibit 24)

**Exhibit 49**:   Matthew Rosenberg, Maggie Haberman, and Adam Goldman, "2 White House Officials Helped Give Nunes Intelligence Reports," New York Times (March 30, 2017) (Ellen Nakashima Deposition Exhibit 25)

**Exhibit 50**:   Eli Lake, "Devin Nunes and the Tragedy of the Russia Inquiry," Bloomberg (March 30, 2017) (Devin Nunes Deposition Exhibit 91)

**Exhibit 51**:   Today Show, NBC (Transcript) (March 28, 2017)

**Exhibit 52**:   Rebecca Savransky, "McCain: Nunes's actions 'very disturbing,'" The Hill (March 23, 2017)

**Exhibit 53**:   Statement Issued by Rep. Devin Nunes Regarding the Russia Investigation (April 6, 2017)

**Exhibit 54**:   Chris Megerian and Joseph Tanfani, "Rep. Devin Nunes plays defense for

Trump by going on hard offense against Justice Department," *Los Angeles Times* (January 5, 2018)

**Exhibit 55**:     Natasha Bertrand, "How the Intelligence Committee Broke," *The Atlantic* (April 4, 2018) (POST_1-21-cv-506_00002450)

**Exhibit 56**:     Jason Zengerle, "How Devin Nunes Turned the Intelligence Committee Inside Out," *New York Times* (April 24, 2018) (Jack Langer Deposition Exhibit 77)

**Exhibit 57**:     Jeff Stein, "Nunes Memo Reveals Congressman's Penchant for Conspiracy Theories," *Newsweek* (February 11, 2018) (POST_1-21-cv-506_00002342)

**Exhibit 58**:     Excerpt from Transcript of Deposition of Ellen Nakashima (June 30, 2023)

**Exhibit 59**:     Greg Miller and Karoun Demirjian, "Chairman and partisan: The dual roles of Devin Nunes raise questions about House investigation," *Washington Post* (March 26, 2017) (Ellen Nakashima Deposition Exhibit 13)

**Exhibit 60**:     Chris Cillizza, "Devin Nunes confirms it: The evidence of Trump Tower being wiretapped just doesn't seem to exist," *Washington Post* (March 15, 2017) (Ellen Nakashima Deposition Exhibit 12)

**Exhibit 61**:     Philip Bump, "The Nunes-White House question, assessed minute-by-minute," *Washington Post* (March 30, 2017) (Ellen Nakashima Deposition Exhibit 38)

**Exhibit 62**:     Amy Zegart, "Devin Nunes's Fake Oversight," *The Atlantic* (February 20, 2018)

**Exhibit 63**:     Devin Nunes Website Biography (Jack Langer Deposition Exhibit 76)

**Exhibit 64**:     Announcement Regarding the Vacancy of the Office of the 22nd Congressional District of California, Clerk of the United States House of Representatives

**Exhibit 65**:     Press Release, Trump Media & Technology Group (December 6, 2021)

**Exhibit 66**:     ███████ (March 21, 2017) (BF.Nunes.Canter.101822.0000014) (Caitlin Canter Deposition Exhibit 19) (filed under seal)

**Exhibit 67**:     National Building Museum, Google Maps (Image Capture) (Caitlin Canter Deposition Exhibit 20)


**II.    Peter Finn Declaration**

**Exhibit A**:     Email from ███████████ (December 7, 2020) (POST_1-21-cv-506_00000522) (filed under seal)

**Exhibit B**:  Email from ███████████████████ (March 20, 2017) (POST_1-21-cv-506_00001549) (filed under seal)

## III.   Greg Miller Declaration

**Exhibit A**:  Email from ███████████████████ (March 22, 2017) (POST_1-21-cv-506_00001527) (filed under seal)

**Exhibit B**:  Email from ███████████████████ (March 24, 2017) (POST_1-21-cv-506_00001523) (filed under seal)

**Exhibit C**:  Email from ███████████████████ (March 27, 2017) (POST_1-21-cv-506_00001513) (filed under seal)

**Exhibit D**:  Greg Miller, "The Apprentice" (Excerpt) (POST_1-21-cv-506_00000149)

## IV.   Ellen Nakashima Declaration

**Exhibit A**:  Ellen Nakashima, Washington Post (Ellen Nakashima Deposition Exhibit 1)

**Exhibit B**:  Ellen Nakashima, Karoun Demirjian, and Devlin Barrett, "FBI Director Comey confirms probe of possible coordination between Kremlin and Trump campaign," Washington Post (March 20, 2017)

**Exhibit C**:  Adam Entous, Ellen Nakashima, and Greg Miller, "Sessions met with Russian envoy twice last year, encounters he later did not disclose," Washington Post (March 1, 2017)

**Exhibit D**:  Philip Rucker, Ellen Nakashima, and Robert Costa, "Trump, citing no evidence, accuses Obama of 'Nixon/Watergate' plot to wiretap Trump Tower," Washington Post (March 4, 2017)

**Exhibit E**:  Karoun Demirjian and Ellen Nakashima, "Intelligence Chair Nunes apologizes for disclosing surveillance information to the White House," Washington Post (March 23, 2017)

**Exhibit F**:  Greg Miller and Karoun Demirjian, "Chairman and partisan: The dual roles of Devin Nunes raise questions about House investigation," Washington Post (March 26, 2017) (Ellen Nakashima Deposition Exhibit 13)

**Exhibit G**:  Ellen Nakashima, Notes (March 24, 2017) (POST_1-21-cv-506_00002131) (filed under seal)

**Exhibit H**:  Ellen Nakashima, Browser History (November 9, 2020) (POST_1-21-cv-506_00002059) (filed under seal)

**Exhibit I**:   Email from ███████████████████ (November 9, 2020 ) (POST_1-21-cv-506_00000521) (filed under seal)

**Exhibit J**:   Email from ███████████████ (November 9, 2020) (POST_1-21-cv-506_00001730) (filed under seal)

**Exhibit K**:   Email from ██████████████ (November 9, 2020) (POST_1-21-cv-506_00001691) (filed under seal)

**Exhibit L**:   Greg Miller and Karen DeYoung, "Three White House officials tied to files shared with House intelligence chairman" Washington Post (March 30, 2017) (Ellen Nakashima Deposition Exhibit 24)

**Exhibit M**:   █████████████████████ (POST_1-21-cv-506_00002145) (filed under seal)

**Exhibit N**:   Email from █████████████ (November 9, 2020 ) (POST_1-21-cv-506_00001533) (filed under seal)

**Exhibit O**:   Matthew Rosenberg, Maggie Haberman, and Adam Goldman, "2 White House Officials Helped Give Nunes Intelligence Reports," New York Times (March 30, 2017) (Ellen Nakashima Deposition Exhibit 25)

**Exhibit P**:   Deb Riechmann, "Impeachment inquiry focuses on 2 White House lawyers," Associated Press (November 1, 2019) (Ellen Nakashima Deposition Exhibit 27)

**Exhibit Q**:   Tom Cleary, "Michael Ellis: 5 Fast Facts You Need To Know," Heavy.com (March 31, 2017) (Ellen Nakashima Deposition Exhibit 26)

**Exhibit R**:   Matt Naham, "Trump Installs Lawyer Who Worked for Rep. Nunes and Don McGahn in Key NSC Role," Law & Crime (March 3, 2020) (Ellen Nakashima Deposition Exhibit 28)

**Exhibit S**:   Ryan Goodman, "The Gravity of Michael Ellis' Promotion to Senior Director for Intelligence at the White House," Just Security (March 4, 2020) (Ellen Nakashima Deposition Exhibit 29)

**Exhibit T**:   House Permanent Select Committee on Intelligence's Hearing on the Russian Active Measures Investigation (Transcript Excerpt) (March 20, 2017 ) (POST_1-21-cv-506_00000052)

**Exhibit U**:   Devin Nunes, Press Conference (Transcript) (March 22, 2017) (POST_1-21-cv-506_00000142)

**Exhibit V**:     Philip Bump, "The Nunes-White House question, assessed minute-by-minute," Washington Post (March 30, 2017) (Ellen Nakashima Deposition Exhibit 38)

**Exhibit W**:     "Devin Nunes: A Running Timeline of His Surveillance Claims and White House Ties," Wired (April 12, 2017) (Ellen Nakashima Deposition Exhibit 30)

**Exhibit X**:     Email from ████████████████████ (December 7, 2020 ) (POST_1-21-cv-506_00000521) (Ellen Nakashima Deposition Exhibit 14) (filed under seal)

**Exhibit Y**:     Email from ██████████████ (December 7, 2020) (POST_1-21-cv-506_00001531) (filed under seal)

## INTRODUCTION

On November 9, 2020, Washington Post national security reporter Ellen Nakashima spent a few hours reporting and writing a 600-word breaking news story about the imminent appointment of White House official and former Republican political operative Michael Ellis to the position of general counsel of the National Security Agency ("NSA") and opposition to the appointment within the agency.  The appointment was newsworthy because two days earlier news organizations had announced Joe Biden's victory over incumbent Donald Trump in the 2020 presidential election; the NSA is "the U.S. government's largest and most technically advanced spy agency"; and as general counsel Ellis, with considerably less experience than past NSA general counsels, would "no longer be a presidential appointee, but a senior civil servant with civil service protections" in the next administration.  Ex. 1; Ex. 2; Nakashima Decl. ¶ 20.

As part of the Article's discussion of Ellis's background, Nakashima included a brief mention of Ellis's involvement in a March 2017 episode involving then-chair of the House Permanent Select Committee on Intelligence Devin Nunes that had come to be known as "the midnight run."  In doing so, Nakashima made a factual error.  She wrote that "Nunes . . . was given access at the White House to intelligence files that Nunes believed would buttress his baseless claims of the Obama administration spying on Trump Tower," Ex. 1, when she should have referred to the claims as "*Trump's* baseless claims."   Nakashima also included an explanation that the "midnight run" nickname came from it reportedly occurring late at night.  *Id.*

Once Nunes brought the error to the attention of Nakashima and The Post (collectively, "The Post") and asserted that the review of the files had not occurred at night, Ex. 3, The Post published a correction that attributed the baseless spying claims to Trump, stated Nunes believed that the files would buttress those claims, and added that the precise timing of the visit was unclear

and Nunes said it occurred during daylight hours.  Ex. 4; Ex. 5.  Despite the timely correction, Nunes—at the time one of the most powerful people in the federal government—pursued a defamation lawsuit against The Post, consistent with his stated policy: "if you defame or slander me, I take you to court."  Ex. 6 at 79:10-12 (*Nunes v. Lizza* deposition transcript).

In its Opinion denying The Post's Rule 12(b)(6) motion to dismiss, the Court explained that "the question" of 12(b)(6) dismissal "is a close one," but "at this stage in the proceedings, where the Court is limited to the allegations in the Amended Complaint and the reasonable inferences that can be drawn from them, the Court cannot determine what in fact led to the incorrect statements in the article."  Aug. 11, 2021 Op. ("12(b)(6) Op."), ECF No. 41, at 1, 12. The Court emphasized that "[l]ater in this case, Nunes will have to establish by clear and convincing evidence" that The Post "published its statements with actual malice."  *Id.* at 12.

We are now at the later, summary judgment, stage of the case.  Nunes has had a full opportunity to conduct discovery, and summary judgment should be granted for The Post on a number of alternative grounds.

First, Nunes cannot establish, by clear and convincing evidence, that The Post made any false statement about him with actual malice—that is, knowing it to be false or with serious doubts about its truth—either in the original Article ("the Article") or when The Post corrected and updated the Article ("the Corrected Article").  As the D.C. Circuit has held, an "honest" error like The Post's "does not amount to actual malice even if the publisher was negligent."  *Kahl v. Bureau of Nat'l Affs., Inc.*, 856 F.3d 106, 117 (D.C. Cir. 2017) (Kavanaugh, J.).

Second, the challenged statements were neither materially false nor defamatory.  The Article stated that in March 2017 Nunes was given access at the White House, reportedly late at night, to intelligence files that he believed would support his baseless spying claims.  Any "gist"

2

or "sting" from that statement was not materially false when compared to the indisputable record of Nunes's conduct at the time.  That conduct included (1) claiming that the intelligence files showed possible Obama administration surveillance of Trump or his associates while pretending that the White House was unaware of the files, Ex. 7 at 3; Ex. 7a; (2) making repeated false statements to the public to conceal the fact that White House officials had secretly given Nunes access to the files in the first place, Ex. 8 at 16; Ex. 8a; and (3) at least once making the baseless claim that Trump had appeared in those intelligence files, Ex. 9; Ex. 9a.

The Corrected Article said that Nunes, who it reported had stated that he did not believe there had been any wiretapping of Trump Tower, had received access to intelligence files that he believed would buttress Trump's baseless claims of spying on Trump Tower (it also said that the precise timing of the visit was unclear and that Nunes said it took place during daylight).  Here too, any "gist" or "sting" was not materially false when compared to the record of events in March 2017, which included: (1) Nunes in fact using the intelligence files he reviewed at the White House to publicly and repeatedly lend credence to Trump's wiretapping claims by equating those claims with what Nunes called other possible Obama administration surveillance of Trump or his associates, Ex. 7; (2) Nunes stating on national television that a reason for his highly publicized briefing of President Trump about the intelligence files was that Trump had "been taking a lot of heat in the news media," Ex. 10; Ex. 10a; (3) Nunes telling White House reporters that "it is possible" that Trump's wiretapping claims were correct, Ex. 11 at 4:07-4:12; and (4) Trump stating shortly after the briefing that "Nunes said, so that means I'm right," Ex. 12.

Third, summary judgment should be granted as to the Corrected Article because its statement about how Nunes "believed" the intelligence files could be used is nonactionable opinion as it is an unverifiable statement about someone's belief or motivation.

The First Amendment requires that journalists who report on high public officials like Nunes have the opportunity to resolve defamation lawsuits early to avoid the chilling effect of burdensome and expensive litigation, including trial. This is especially so when such public officials have professed, and acted on, a "policy" of suing over every alleged "slander."[1] As the D.C. Circuit has emphasized: "To preserve First Amendment freedoms and give reporters, commentators, bloggers, and tweeters (among others) the breathing room they need to pursue the truth, the Supreme Court has directed courts to expeditiously weed out unmeritorious defamation suits." *Kahl*, 856 F.3d at 109. Summary judgment should be granted.[2]

## BACKGROUND

### A.    The Passages at Issue in the Article and the Corrected Article.

For ease of reference, we first set forth (1) the passage at issue in the online November 9, 2020 Article, and (2) the Correction and the corrected passage in the online December 7, 2020 Corrected Article, showing with a markup how the Corrected Article changed the passage.[3]

**November 9, 2020 Article (excerpt) (Ex. 1):**

> In March 2017, [Ellis] gained publicity for his involvement in a questionable episode involving Nunes, who was given access at the White House to intelligence files that Nunes believed would buttress his baseless claims of the Obama administration spying on Trump Tower.
>
> News reports stated that Ellis was among the White House officials who helped Nunes see the documents—reportedly late at night, earning the episode the nickname "the midnight run."

---

[1] Since 2019, Nunes has pursued at least seven other defamation lawsuits against news organizations, including a previous lawsuit against The Post in which a 12(b)(6) dismissal was affirmed on appeal. Hentoff Decl. ¶ 4; *Nunes v. WP Co.*, 2022 WL 997826 (D.C. Cir. Apr. 1, 2022). Defending against these lawsuits necessarily imposes substantial costs on the news media.

[2] The Post has separately filed a motion for sanctions, ECF No. 78, which is pending. That motion does not seek any relief relating to summary judgment.

[3] The print version of the Article, Ex. 2, and the print Correction, Ex. 5, were similar, except the print version did not mention the timing of Nunes's visit and thus neither did the print Correction.

4

**December 7, 2020 Correction and Corrected Article (excerpt) (Ex. 4):**

> *Correction: As originally published, this article inaccurately attributed claims that the Obama administration spied on Trump Tower to Rep. Devin Nunes (R-Calif.), rather than to President Trump. Nunes has stated that he did not believe there had been any wiretapping of Trump Tower. This article has also been updated to note that Nunes says an incident known as the "midnight run" took place during daylight hours.*

*   *   *

> In March 2017, [Ellis] gained publicity for his involvement in a questionable episode involving Nunes, who was given access at the White House to intelligence files that Nunes believed would buttress ~~his~~ Trump's baseless claims of the Obama administration spying on Trump Tower.

> News reports stated that Ellis was among the White House officials who helped Nunes see the documents — reportedly late at night, earning the episode the nickname "the midnight run." The precise timing of the visit is unclear, and Nunes says it took place during daylight hours.

## B.   March and April 2017.

### 1.   Before March 21, 2017.

Before March 2017, U.S. government surveillance played a role in two controversies that had arisen in connection with the new Trump presidency: alleged Russian interference with the 2016 presidential campaign, *see, e.g.*, Ex. 13,[4] and revelations of previously undisclosed contacts between Trump campaign or transition officials and the Russian government, *see, e.g.*, Ex. 14.

On the morning of Saturday, March 4, 2017, President Trump posted four tweets claiming that he had just learned that he personally had been a victim of improper government surveillance:

---

[4] The Court may take judicial notice of "news articles . . . not for their truth but merely for the fact that they were published." *Hourani v. Psybersolutions LLC*, 164 F. Supp. 3d 128, 132 n.1 (D.D.C. 2016), *aff'd*, 690 F. App'x 1 (D.C. Cir. 2017); *Wash. Post v. Robinson*, 935 F.2d 282, 291 (D.C. Cir. 1991) (taking judicial notice of newspaper articles that publicized certain events).



Ex. 15.  The tweets included Trump's claims that he "[j]ust found out that Obama had my 'wires tapped' in Trump Tower just before the victory" and "President Obama was tapping my phones in October, just prior to Election!"  *Id.*

These claims were denied by Obama and former National Intelligence Director James Clapper.  Ex. 16.  Trump faced criticism for making wiretapping claims without a basis in fact or subsequently providing evidence.  Exs. 17, 18.  The bipartisan leaders of the Senate Intelligence Committee stated, "we see no indications that Trump Tower was the subject of surveillance by any element of the United States government either before or after Election Day 2016."  Ex. 19.

Facing criticism, Trump publicly welcomed any reports of Obama administration surveillance that could be described as analogous to wiretapping.  For example, in a March 15, 2017 interview on Fox News, Trump told Tucker Carlson: "And don't forget, when I say, wiretapped, those words were in quotes . . . because wiretapping is pretty old-fashioned stuff but that really covers surveillance and many other things.  And nobody ever talks about the fact that was in quotes but that's a very important thing.  But wiretapped, it covers a lot of different things."  Ex. 20; Ex. 20a.  Trump then added: "I think you're going to find some very interesting items

coming to the forefront over the next two weeks." *Id.*

As Chair of the House Intelligence Committee, Nunes commented on Trump's wiretapping claims. Although Nunes said there was no evidence that Trump Tower had literally been wiretapped, he repeatedly added to that remark statements that Trump's expressed concern about Obama administration surveillance of him was nevertheless valid. For example:

● March 7, 2017: "[I]f I'm understanding the point of [the tweets]— . . . was he or any of his associates targeted," then "I think it's a valid question." Ex. 21 at 5:27-45.

● March 15, 2017: "President Obama wouldn't physically go over and wiretap Trump Tower. . . . But if you're not going to take the tweets literally, and if there's a concern that the president has about other . . . surveillance activities looking at him or his associates, either appropriately or inappropriately, we want to find that out." Ex. 22 at 7:35-8:06.

● March 20, 2017: "Let me be clear: we know there was not a wiretap on Trump Tower. However, it's still possible that other surveillance activities were used against President Trump and his associates." Ex. 23.

On March 20, 2017, FBI Director James Comey testified before Nunes at the Intelligence Committee's March 20 hearing that:

> I have no information that supports those tweets and we have looked carefully inside the FBI. The Department of Justice has asked me to share with you that the answer is the same for the Department of Justice and all its components. The Department has no information that supports those tweets.

*Id.* at 17. Comey also revealed that the FBI was investigating Russian interference in the 2016 election, including whether anyone affiliated with the Trump campaign had aided it. Ex. 24.

### 2.    March 21, 2017.

████████████████████████████████████████████████████████

███████████████████████████████████. Ex. 25. At the end of the work day, Nunes

joined staffers and constituents ████████████ from the Capitol to an after-work reception at the Building Museum.  Ex. 26 (Deposition of Deputy Chief of Staff Caitlin Canter ("Canter Dep."))

at 59:20-65:4. ████████████████████████████████████████████████████████

████████████  Canter Dep. at 67:11-67:14.  Nunes dropped off his passengers ███████████, and rerouted it to take him to the White House grounds.  Ex. 27 at 5.



████████████████████  Ex. 28.  Nunes met with Michael Ellis, who at the time was a White House lawyer and National Security Council ("NSC") staffer and had recently been Nunes's staffer on the Intelligence Committee.  Ex. 29 (Deposition of Special Assistant to the President Michael Ellis ("Ellis Dep.")) at 8:4-8:17, 9:10-9:13.  Ellis testified that the first time he discussed setting up the meeting to show Nunes the intelligence files was March 20 or March 21, with White House Counsel Don McGahn and White House NSC Legal Advisor John Eisenberg.  Ellis testified that he first discussed the meeting with Nunes on March 21 and he called Nunes to come to the White House that day.  Ellis Dep. at 73:19-75:8, 78:3-79:9.  He testified that he told Nunes "there was some information we thought was important for him to see, and that he needed to see it in person at the White House."  *Id.* at 78:15-79:2.  Nunes testified that the meeting was his idea and he set up the meeting days earlier in a call with Ellis.  Ex. 27 at 4.

    Before meeting with Nunes, Ellis met with White House Counsel McGahn and NSC Legal Advisor Eisenberg.  Ellis Dep. at 73:19-75:8.  Ellis was given a set of intelligence reports to show Nunes.  *Id.* at 92:14-93:6.  Those reports reflected instances in which members of the Obama administration had reviewed foreign intelligence surveillance that had incidentally collected information about members of Trump's transition team and unmasked information about them.

Ellis Dep. at 93:14-94:2, 106:12-106:18.[5]

Ellis did not escort Nunes off the White House grounds, and White House records obtained in discovery do not reflect when Nunes left the White House complex.  Nunes testified that he arrived at the Building Museum reception by 7 p.m.  Ex. 30 (Deposition of Devin Nunes ("Nunes Dep.")) at 45:5-45:6; Ex. 27 at 6.  His Chief of Staff who attended the event testified that ████████████████████████████████████████  Ex. 31 (Deposition of Chief of Staff Jilian Plank Souza ("Souza Dep.")) at 152:6-8.  After the event, Nunes entertained constituents at the Capitol into the early morning of Wednesday, March 22.  Ex. 27 at 7–8.

### 3.    March 22, 2017.

Nunes immediately publicized his review of the files.  He called a press conference early that day at the Capitol.  Ex. 7.  Stating that he had recently encouraged anyone with information about "surveillance on President-Elect Trump or his team to come forward," Nunes announced that undisclosed "sources who . . . thought that we should know it" had shown him information about potential incidental collection and unmasking by the Obama administration of "President-Elect Trump or his transition team."  *Id.* at 3, 6.  Nunes said the information "bothers me enough" that he briefed the Speaker of the House about it and would shortly brief the President.  *Id.* at 6.

Nunes again coupled his denial that wiretapping occurred with the claim that something similarly concerning may have happened: "while there was not a physical wiretap of Trump

---

[5] Under U.S. law, authorized government surveillance of foreign citizens may incidentally collect information about American citizens—either because the American was involved in the surveilled communication or it mentioned the American.  To protect privacy, such information is supposed to be "minimized" so that officials viewing intelligence reports do now know the identity of the Americans.  When required for reasons like the need to fully understand the gathered intelligence, officials may approve the "unmasking" of the information about the Americans.  *See* Incidental Collection in a Targeted Intelligence Program," https://bit.ly/3tWBmIs; When Is It Permissible To Identify an American in an Intelligence Report?, https://bit.ly/47eh6Ap.

Tower, I was concerned that other surveillance activities were used against President Trump and his associates." *Id.* at 1. Asked whether President Trump's "personal communications were collected," Nunes responded: "It's possible." *Id.* at 2.

Even though Nunes had been at the White House complex the previous evening reviewing intelligence files handed to him by a White House lawyer, Nunes suggested that he had received the information from an intelligence whistleblower and was heading to the White House to inform "the administration" of what he learned. Nunes made the false statement that "[t]he administration, I don't think, is aware of this. I want to make sure I go over there and tell them what I know." *Id.* at 3. He repeated that "I'm going to go to the White House and at least let them know what . . . I've seen . . . because . . . they need to see it. If they don't have it, they need to see it." *Id.* at 5. Again, Nunes knew "the administration" had the information because a White House lawyer had showed it to him, in the White House complex.

Nunes briefed President Trump in the Oval Office that afternoon and stepped outside to hold a second press conference. He said, "I briefed the president on the concerns that I had about incidental collection and how it relates to president-elect Trump and his transition team." Ex. 11 at 1. As reflected in the video of Nunes's remarks, Nunes was asked if this information "suggests the president was correct in what he tweeted?" Nunes replied: "It is possible." Ex. 11a at 4:07–4:12. Nunes followed up by suggesting that Trump had in fact been surveilled, stating that while "President Obama tapp[ing Trump's] phones" "did not happen," as for whether "*President Obama order[ed] any kind of surveillance of the . . . president-elect*," he said, "*we don't know who sent the taskings*." Ex. 11 at 2 (emphasis added).

Shortly thereafter, Trump was asked by reporters at the White House whether he felt "vindicated by Chairman Nunes's" briefing. He responded, "I somewhat do. I must tell you I

somewhat do.  I very much appreciated the fact that they found what they found.  But I somewhat do."  Ex. 10; Ex. 10a at 0:23-0:36.  In an interview with Time Magazine later that day, Trump elaborated: "Devin Nunes had a news conference, did you hear about this, *where they have a lot of information on tapping*.  When I said wiretapping, it was in quotes.  Because a wiretapping is, you know today it is different than wire tapping.  It is just a good description.  But wiretapping was in quotes.  What I'm talking about is surveillance. . . . House intelligence chairman Devin Nunes told reporters, wow.  *Nunes said, so that means I'm right*.  Nunes said the surveillance appears to have been . . . incidental collection."  Ex. 12 at 5 (emphasis added).

That afternoon, the Fox News program "The Five" broadcast Nunes's "it is possible" answer and highlighted it with the chyron: "REP NUNES: IT IS POSSIBLE PRES TRUMP'S TWEETS WERE CORRECT," Ex. 32:



Also that afternoon, Nunes appeared on CNN, where he told Jake Tapper: "President Trump, to some degree, is right that he did end up in some [of the] intelligence reports" that Nunes reviewed.  Ex. 9.  But that statement had no basis.  Ellis, who gave Nunes the files and sat with him as he reviewed the materials, testified that the files "were disseminated reports with US person information anonymized, but none of them, based on the context, appear to be Trump himself."  Ex. 29 at 106:19-107:15.

11

A March 22, 2017 New York Times article summed up how Nunes's public appearances that day had changed the public conversation about Trump's wiretapping tweets: "For weeks, President Trump has insisted that President Barack Obama tapped his phones even as the F.B.I. director and members of Mr. Trump's own party said there was no evidence for his charge.  But on Wednesday, Mr. Trump got an assist from a powerful House Republican who said the president or his closest associates may have been "'incidentally' swept up in foreign surveillance by American spy agencies."  Ex. 33.

### 4.      After March 22, 2017.

Nunes appeared on Fox News on March 23, where, after Sean Hannity played for Nunes the video of Trump saying Nunes's briefing had made him feel vindicated, Hannity asked:

> HANNITY: The president then said that he felt vindicated over his claims that he felt he was—well, he said wiretapping, but surveillance, wiretapping—in my view, we're just really parsing words. But he was picked up at least in an incidental way. Can you give us more detail about it?

> NUNES: Well, it's tough for me to get into it, right, because I've only read the report, so I don't know all the intelligence that went into it. But to me, I mean, it's clear that I would be concerned if I was the president. And that's why I wanted him to know, and *I felt like I had a duty and obligation to tell him because, as you know, he's been taking a lot of heat in the news media*.

Ex. 10 (emphasis added).

Nunes immediately faced criticism from Democrats on the House Intelligence Committee for briefing the press and the White House about the intelligence files before briefing fellow Committee members, leading to public reports that Nunes had apologized to them for his handling of the information.  Ex. 34; Ex. 35; Ex. 36.

In the ensuing days, reporters and officials also began to question Nunes's suggestion that the source of the intelligence files was a whistleblower.  On March 23, Sean Spicer expressed doubt about speculation that the White House itself may have fed Nunes the information: "I don't

know what he actually briefed the president on, but I don't know why he would come up to brief the president on something that we gave him . . . .  That doesn't really seem to make a ton of sense.  I'm not aware of it, but it doesn't really pass the smell test."  Ex. 37.

On March 26, The Post published a feature on Nunes that reported ranking member Adam Schiff's suspicion of "a White House hand in what he called Nunes's 'dead-of-night' excursion to view classified documents."  Nakashima Ex. F.  The article recounted how, within hours of Nunes's announcement, "President Trump was declaring that he had been vindicated for his tweets alleging that Trump Tower had been wiretapped by his predecessor, Barack Obama. . . . That sequence was largely engineered by a conservative lawmaker from California's Central Valley who has emerged as one of Trump's most tenacious allies on Capitol Hill."  *Id*.

On March 27, CNN revealed that Nunes had reviewed the intelligence files at the White House.  Ex. 38.  That day, Nunes's spokesman Jack Langer falsely told the Los Angeles Times that although Nunes met the source at the White House, "the source of Nunes's information was not a White House staff member."  Ex. 39.  Langer testified that ███████████████████████ ████████████████████████████  Ex. 40 (Deposition of Jack Langer ("Langer Dep.")) at 249:19-250:5.  Similarly, on March 30, Speaker of the House Paul Ryan told CBS News that Nunes had told him (falsely) that the source was "a whistleblower-type person."  Ex. 41.

Also on March 27, just days before news reporting would uncover that White House staffers had prepared the intelligence files for Nunes and handed them to him, Nunes appeared on CNN, where he made additional false statements to conceal this fact.  Nunes:

● falsely said he did not meet with "The President or his aides," when he in fact met with White House lawyer Ellis;

● falsely said "people in the West Wing had no idea I was there," when Ellis in fact

supplied the files to Nunes after meeting with White House Counsel McGahn; and

●   falsely denied that "someone in the administration was coordinating the release of
this information to [Nunes]," when White House lawyer Ellis had not only coordinated the release
but had supplied the information to Nunes and sat with him while he reviewed it.  Ex. 8 at 15-16.

While making these false statements, Nunes also said that the visit occurred during
daylight hours.  Ex. 8 at 14.  News organizations, however, reported that it had occurred at night.
*See, e.g.*, Ex. 42 (March 24, 2017 Daily Beast article) ("Devin Nunes Vanished the Night Before
He Made Trump Surveillance Claims"; quoting Democratic Representative Mike Quigley about
"this middle of the night excursion"); Ex. 43 (March 26, 2017 Guardian article) ("Such behaviour
reportedly includes an unexplained disappearance from an Uber ride with a staffer on Tuesday
night"); Ex. 44 (March 27, 2017 New York article) ("Devin Nunes was riding in an Uber with a
staffer Tuesday night, when he received a communication on his phone."); Ex. 45 (March 28,
2017 Weekly Standard article) ("Regardless of who helped him access the documents Tuesday
night and how, Nunes was back at the White House the next afternoon to brief the president on
what he had seen."); Ex. 46 (March 27, 2017 Atlantic article) ("With his late-night escapades and
questionable explanation for his visit, he has fed speculation that he is working in concert with
the White House and attempting to help the president"); Ex. 47 (NBC, May 25, 2018 NBC article)
("Nunes ditched his staff and took a late night Uber to the White House complex.").

On March 30, The Post and the New York Times each revealed that White House officials
had shown Nunes the intelligence files after all.  Ex. 48, Ex. 49.  The Times reported that although
"[i]n his public comments," Nunes "has described his sources as whistle-blowers trying to expose
wrongdoing at great risk to themselves," that "does not appear to be the case."  Ex. 49.

These reports led to commentary that Nunes had damaged his reputation for truthfulness

and independence.  For example, a Bloomberg columnist wrote: "This week, [Nunes] told me that his source for the information was an intelligence official, not a White House staffer.  It turns out he misled me . . . .  This is a body blow for Nunes, who presented his findings last week as if they were surprising to the White House."  Ex. 50.

Nunes also received public criticism for breaking with Intelligence Committee tradition by failing to brief his Committee members about the intelligence files before briefing the President, who the day before had been revealed as at least a possible subject of the just-announced FBI investigation.  He was criticized by both Democrats and Republicans, including Senator Lindsey Graham, who said "The problem that he's created is he's gone off on a lark by himself, sort of an Inspector Clouseau investigation here," and Senator John McCain, who said Nunes's actions were "very disturbing," and that he should recuse himself from the Russia investigation.  Ex. 51; Ex. 52.  On April 6, 2017, Nunes announced that he was temporarily stepping away from leading the Intelligence Committee's Russia investigation.  Ex. 53.

Over time, Nunes's once-secret March 21, 2017 visit to the White House to view intelligence files came to be referred to "the midnight run" as a shorthand.  *See, e.g.*, Ex. 54 (L.A. Times, Jan. 5, 2018) ("It became known as 'the midnight run,' a dark-of-night dash to the White House compound last March 21 by Rep. Devin Nunes to view classified reports two weeks after President Trump's incendiary claim that President Obama was 'tapping my phones' before the 2016 election."); Ex. 55 (Atlantic, April 4, 2018) ("Nunes's late-night excursion to the White House last spring[,] referred to as 'the Midnight Run'"); Ex. 56 (N.Y. Times, April 24, 2018) (describing the "late-night visit to Pennsylvania Avenue," and observing that "since Nunes's midnight run, the committee has been crippled by partisan fighting"); Ex. 43 (Guardian, March 26, 2017) ("Lawmaker's 'peculiar midnight run' endangers Trump-Russia inquiry"); Ex. 57

(Newsweek, Feb. 11, 2018) (describing the "now-famous 'midnight run' to the White House").

    **C.**    **November and December 2020.**

        **1.**    **The November 9, 2020 Article.**

More than three and a half years later, on November 9, 2020, Washington Post national security reporter Ellen Nakashima received a scoop from her Post colleague Greg Miller: Michael Ellis, then a White House senior director for intelligence who had graduated from law school only nine years earlier, was to be named general counsel of the National Security Agency amid internal opposition to the nomination.  Nakashima Decl. ¶ 19.

Nakashima is an experienced, award-winning reporter who has worked at The Post since 1995 and on The Post's national security desk since 2009.  *Id.* ¶¶ 8-9.  Between March 2017 and November 2020 Nakashima wrote hundreds of articles for The Post on intelligence and national security issues.  *Id.* ¶ 16.  Nakashima's beat was national security issues involving the Executive Branch, and she did not regularly cover either Congress or Nunes.  *Id.* ¶ 9.  Her reporting on Nunes in March 2017 was limited to one article where she shared a byline, Nakashima Ex. E, and another where she had a contributor credit, *id.* Ex. F.  When Nakashima set to work on the scoop about Michael Ellis, details she had been exposed to more than three and a half years earlier were not in her mind.  Nakashima Decl. ¶ 34.

Over a few hours on November 9, 2020, Nakashima received approval from her editor to pursue the story, researched it, wrote it, and published a 600-word article.  Nakashima Decl. ¶¶ 19, 31.  The breaking news about Ellis and the reaction within the NSA were the focus of Nakashima's reporting, time, and attention.  *Id.* ¶ 24.  She identified sources who might have information about the appointment, spoke with them, and used their information to inform her reporting.  *Id.*  It is common in reporting breaking news to provide background information to help readers place the news in context.  *Id.* ¶ 26.  Nakashima decided to give readers such

background information about two past public controversies in which Ellis had been involved: moving the transcript of President Trump's 2019 phone call with Ukrainian President Zelenskyy to a highly classified server amid events that ultimately led to Trump's first impeachment, and Ellis's involvement in Nunes's "midnight run" episode in 2017.  Ex. 1.

Because for this background discussion Nakashima was only summarizing previous news reports, there was no need to reach out to sources, and she instead reviewed prior news coverage to find a concise way to convey information about the two incidents.  Nakashima Decl. ¶ 26.  For the Nunes incident, Nakashima conducted internet searches, reviewed a few articles, and then wrote two sentences.  *Id.*

Nakashima relied primarily on two articles to help her fashion a concise background description of the incident.  Nakashima Decl. ¶ 33; Ex. 58 (Deposition of Ellen Nakashima ("Nakashima Dep.")) at 29:8–29:12, 53:16–54:5.  In describing Nunes's White House visit and its aftermath, a March 30, 2017 New York Times article, titled "2 White House Officials Helped Give Nunes Intelligence Reports," reported that "the view among Democrats and even some Republicans was that Mr. Nunes was given access to the intelligence reports to divert attention from the investigations into Russian meddling, and to bolster Mr. Trump's debunked claims of having been wiretapped" and "[o]n both counts, Mr. Nunes appears to have succeeded," including because "the administration has portrayed his information as vindicating the president's wiretapping claims."  Nakashima Ex. O.

A March 30, 2017 Washington Post article authored by Greg Miller and Karen DeYoung, titled "Three White House officials tied to files shared with House intelligence chairman," reported that "[t]he White House role in the matter contradicts assertions by the committee's chairman, Rep. Devin Nunes (R-Calif.), and adds to mounting concerns that the Trump

administration is collaborating with the leader of the House Intelligence Committee's investigation of Russian meddling in the 2016 election."  Nakashima Ex. L.  The article further explained that "[t]he materials unearthed by Nunes have been used to defend President Trump's baseless claims on Twitter that he had been wiretapped at Trump Tower under a surveillance operation ordered by then-President Barack Obama.  FBI Director James B. Comey and others have said that claim is false."  *Id.*

In her quick review of these passages, Nakashima misunderstood them to say that as Nunes had "bolster[ed]" and "defend[ed] Trump's wiretapping claims," they were Nunes's claims as well.  Nakashima Decl. ¶ 34; Nakashima Dep. 214:17–215:11.  She did not notice her error. Nakashima Decl. ¶ 34.

Based on her memory of coverage of the Nunes incident, she added that the visit had become known as "the midnight run" and explained that was because it reportedly occurred late at night.  *Id.* ¶ 38; Nakashima Tr. 70:6–70:13.

None of the articles Nakashima reviewed on November 9, 2020 included any mention of Nunes saying there had been no wiretapping of Trump Tower.  None of the articles said the White House visit had taken place during daylight hours; instead, two said it had taken place at night. Nakashima Ex. O (describing visit as occurring at "night" and "after dark"); Nakashima Ex. Q (describing visit as occurring at "night").  And Nakashima did not remember ever hearing about Nunes saying his White House visit took place during daylight hours.  Nakashima Decl. ¶ 40.  In March 2017, Nunes spokesman Langer had only generally stated to Nakashima that reporting on Nunes's March 21 trip to review documents was inaccurate, without specifying any details, including about the time it occurred, *Id.* ¶ 14; Nakashima Ex. G; Langer Dep. at 217:9-218:1 ("█

████████████████████████████████████."), and Nakashima in any event did not have this

conversation in her mind in November 2020, Nakashima Decl. ¶ 34.

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████.  *E.g.*, Finn Ex. B.  Three and a half years and

hundreds of articles later, she did not remember this information as she wrote the two sentences.

Nakashima Decl. ¶ 35.  Nor could she have found those emails if she wanted since the Post email

system prevented her from accessing emails from 2017.  *Id.* ¶ 41.[6]

National security editor Peter Finn reviewed and approved the Article.  He did not notice

any factual error and although he had also sent and received some emails including Nunes's denial

of wiretapping in March 2017, he did not remember them three and a half years later and similarly

did not have access to or remember those emails when reviewing the Article.  Finn Decl. ¶ 26.

No one else had responsibility for the substantive content of the Article.  Finn Decl. ¶ 15.

Nakashima received the byline because she reported and wrote the story.  Miller received a

contributor credit for passing on the tip.  He did not review the Article.  Miller Decl. ¶¶ 19-20.

In finalizing the Article, Nakashima inserted a hyperlink to the March 30, 2017 Post article

she had relied on (and which did not include a reference to Nunes saying there had not been

wiretapping).  Nakashima Decl. ¶ 28, Ex. L.  The online Article was published on the evening of

November 9 and a print version of the story was published on November 10.  The only substantive

---

[6] As the Court noted, 12(b)(6) Op. at 3 & nn. 6, 8, 11, the Complaint's allegations of actual malice included that two Post articles, published on March 15 and 26, 2017, respectively, mentioned Nunes's statement that Trump Tower had not been wiretapped.  Am. Compl. ¶ 22(a) n.5 (citing Greg Miller and Karoun Demirjian article, Ex. 59; and Chris Cillizza article, Ex. 60).  These were among the isolated documents Nakashima saw or may have seen at the time but did not remember in November 2020.  Nakashima Decl. ¶ 35; Nakashima Dep. at 112:1-2.  Although Nakashima was listed as a contributor to the March 26, 2017 article, her role was limited to seeking comment from Nunes spokesman Langer about Nunes's trip to review documents, not about Trump's wiretapping claims.  Nakashima Decl. ¶ 14; Nakashima Ex. G.

difference between the two is that the print version did not include the sentence concerning the

timing of Nunes's White House visit.  *Compare* Ex. 1 *with* Ex. 2.

   2.   **The Lawsuit, Retraction Demand, and December 7, 2020 Corrected Article.**

On November 17, 2020, Nunes filed this lawsuit and immediately thereafter demanded a

retraction (including a copy of his filed Complaint with his demand).  Ex. 3.



. Nakashima Decl. ¶ 45; Finn Decl. ¶ 19; Barr Decl.

¶ 11.

Finn Decl. ¶ 20; Miller Ex. D.

Nunes had in fact made substantial efforts in his treatment of the intelligence files to buttress

Trump's baseless claims of wiretapping by stating, repeatedly, that the intelligence files he

reviewed validated Trump's claims about surveillance of him or his associates, resulting in Trump

enthusiastically telling the public that Nunes had vindicated Trump.  Nakashima Decl. ¶ 48; Finn

Decl. ¶ 20; Barr Decl. ¶ 14.

███████████████ a March 30, 2017 article by The Post's Philip Bump, which was not among the articles that Nakashima had reviewed when preparing the original Article. Nakashima Decl. ¶ 47; Barr Decl. ¶ 16.  Bump's article had reported that Nunes's White House visit had taken place in the "afternoon or evening" and that "[t]he precise timing on this isn't clear; in later interviews, Nunes says that it was still daylight."  Nakashima Ex. V.

The online Correction and the Corrected Article reflected ████████████████. The Correction included the statement that "[t]his article has also been updated to note that Nunes says an incident known as 'midnight run' took place during daylight hours."  Ex. 4.  The corrected passage added the sentence: "The precise timing of the visit is unclear, and Nunes says it took place during daylight hours."  *Id.*

Accordingly, the Corrected Article, published to The Post's website on December 7, 2020, corrected the attribution of the wiretapping claims to Trump, revised the sentence to reflect that Nunes received files he believed would buttress Trump's claims, and stated that the precise timing of the visit was unclear and Nunes said it occurred during daylight hours.  Ex. 4.  The Post also included an editor's note describing the correction, and explaining that "Nunes has stated that he did not believe there had been any wiretapping of Trump Tower."  *Id.*  A similar correction was published in The Post's print edition on December 8, 2020, without the reference to the timing of Nunes's visit because discussion of that fact had not appeared in the original print Article.  Ex. 5.

**D.     Procedural History.**

Nunes sued The Post in the Eastern District of Virginia prior to sending the retraction demand, in a two-count complaint alleging defamation and negligence.  Two months after The Post published the Corrected Article, Nunes filed an amended complaint ("Complaint").  ECF No.  22.  It added a claim about the corrected statement that "Nunes believed [the intelligence files] would buttress Trump's baseless claims," ECF No. 22, ¶ 17(b), but did not add a claim over

21

the editor's note that "[t]his article has been updated to note that Nunes says an incident known as the 'midnight run' took place during daylight hours" or the corrected statement that while the incident earned the nickname the "midnight run" because it was reportedly late at night, "[t]he precise timing of the visit is unclear, and Nunes says it took place during daylight hours."  Ex. 4.

The Post moved to dismiss.  After transfer to this District, this Court denied the motion as to the defamation claim and granted it as to the negligence claim.  12(b)(6) Op. at 1.  As to actual malice, the Court observed that Nunes would later have to surmount the "clear and convincing evidence" standard at summary judgment.  *Id.* at 12-13.  The Court held as to substantial truth and defamatory meaning that at the Rule 12(b)(6) stage "[a] reasonable juror could . . . conclude that" the Article "was materially false because it stated that Nunes had made such a baseless claim (when he had not)," and capable of a defamatory meaning because "a reasonable juror could conclude that an elected official is ridiculous or unfit for office if he searched for evidence to support baseless claims" and that he did so "'late at night,' suggesting something untoward about the outing."  *Id.* at 8-9.  The Court added that "'baseless' is the type of word that transforms the 'gist' of the article by insinuating that Nunes is the type of official who would spend his time searching for evidence to support claims with no foundation in fact."  *Id.* at 9.

Nunes later moved to supplement the Complaint to add claims over a December 2021 Washington Post column and background allegations about The Post's past national security reporting, which the Court denied in a February 2, 2002 Order.  Feb. 2, 2022 Order at 3-4, ECF No. 51.  In that Order, the Court noted that it had earlier denied The Post's motion to dismiss "in large part because the two contested articles . . . could be read as stating that Nunes himself had made or believed baseless claims that the Obama administration had wiretapped Trump Tower." The parties then engaged in discovery, which is now closed.

## SUMMARY JUDGMENT STANDARD

Summary judgment should be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Montgomery v. Risen*, 875 F.3d 709, 713 (D.C. Cir. 2017). "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Because the plaintiff bears the burden of proof on all claims, the defendant is entitled to summary judgment where the plaintiff "fails to make a showing sufficient to establish the existence of an element essential to [his] case, . . . since a complete failure of proof . . . necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

"To preserve First Amendment freedoms and give reporters, commentators, bloggers, and tweeters (among others) the breathing room they need to pursue the truth, the Supreme Court has directed courts to expeditiously weed out unmeritorious defamation suits." *Kahl*, 856 F.3d at 109. In particular, "[w]hen determining if a genuine factual issue as to actual malice exists in a libel suit brought by a public figure, a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability" under the *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964) standard. *Anderson*, 477 U.S. at 254. Thus, the question at summary judgment is whether Nunes has sufficient evidence to "support a reasonable jury finding that he has shown actual malice by clear and convincing evidence." *Jankovic v. Int'l Crisis Group*, 822 F.3d 576, 590 (D.C. Cir. 2016) (quotation marks and alterations omitted) (affirming summary judgment); *see Kahl*, 856 F.3d at 116 ("That heightened summary judgment standard helps 'prevent persons from being discouraged in the full and free exercise of their First Amendment rights.'" (quoting *Washington Post Co. v. Keogh*, 365 F.2d 965, 968 (D.C. Cir. 1966))). He cannot.

23

## **ARGUMENT**

To prevail on a defamation claim, a plaintiff must prove a number of elements, including that the defendant published (1) a provably false statement of fact about the plaintiff, which is (2) defamatory, (3) materially false, and (4) published with the requisite degree of fault, which in this case is actual malice.  *See Deripaska v. Assoc. Press*, 282 F. Supp. 3d 133, 140-41 (D.D.C. 2017).  If the plaintiff cannot show that there is genuine dispute as to material fact as to every element as to which the defendant moves, summary judgment should be granted for defendants.

Summary judgment should be granted here for the following separate and independent reasons.  First, Nunes, a public figure and public official, cannot establish by clear and convincing evidence that The Post made any allegedly false statement about him with actual malice.  Second, the record shows without any genuine dispute of material fact that the challenged statements about Nunes's conduct in connection with his March 21, 2017 White House visit are not materially false, because the "gist" or "sting" of the challenged statements is substantially the same as that of his actual conduct.  In addition, the challenged statements are not defamatory.  Third, the one statement in the Corrected Article that Nunes challenges—that he "believed" intelligence files he received would buttress Trump's wiretapping claims—cannot support a defamation claim because a statement about someone's belief or motivation is a type of nonactionable opinion.

## I.    **There Is No Genuine Issue of Material Fact as to Actual Malice.**

As the Court has noted, "Nunes does not dispute that he is a public figure" subject to the actual malice test.  12(b)(6) Op. at 9 n.11; *see also* Pl.'s March 5, 2021 Opp. to Mot. to Dismiss at 22 ("plaintiffs like Nunes—public figures"), ECF No. 36.  Nunes, who was a leading member of Congress as chair of the House Intelligence Committee, is also subject to the actual malice test as a public official. *See Rosenblatt v. Baer*, 383 U.S. 75, 85 (1966) ("government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of

24

government affairs"); *Thompson v. Armstrong*, 134 A.3d 305, 308, 312 (D.C. 2016).

Nunes's defamation claims fail under this test. Nunes cannot carry his burden of showing that a properly instructed jury could find by clear and convincing evidence that The Post made any allegedly false statement about him with actual malice.

### A.      The Law of Actual Malice.

Actual malice requires proof that Defendants published false statements about Plaintiff "with knowledge that [they] were false or with reckless disregard of whether [they were] false or not." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964). "[I]t is not enough to show that defendant should have known better." *Jankovic*, 822 F.3d at 589; *see Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 510 (1991) ("Mere negligence does not suffice."). Instead, the "'proof must show that 'the defendant *in fact* entertained serious doubts as to the truth of his publication.'" *Kahl*, 856 F.3d at 116 (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)).

Where, as here, an organization is a defendant, the relevant state of mind is that of "the persons in the . . . organization having responsibility for the publication." *N.Y. Times*, 376 U.S. at 287; *see also Waskow v. Assoc. Press*, 462 F.2d 1173, 1175 n.4 (D.C. Cir. 1972) (per curiam) ("[T]he fact that a news organization possesses information (such as items in a clipping file) which indicates the falseness of a news item does not establish that the organization acted with knowledge of the falseness"). As to the Article, those persons were Nakashima and her editor, Peter Finn. Nakashima Decl. ¶ 4; Finn Decl. ¶ 15. Greg Miller, who received a contributor credit, did not write any part of the Article, or review it before publication. Miller Decl. ¶ 19. As to the Corrected Article, ████████████████████████████████████████ ████████████████████████ Barr Decl. ¶ 10; Nakashima Decl. ¶ 44; Finn Decl. ¶ 18.

The "clear and convincing" evidence standard is "significantly more onerous than the usual preponderance of the evidence standard," *Kahl*, 856 F.3d at 116 (quoting *Tavoulareas v.*

*Piro*, 817 F.2d 762, 776 (D.C. Cir. 1987) (en banc)), requiring that "the ultimate factfinder [have] an abiding conviction that the truth of [the] factual contentions [is] 'highly probable,'" *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984).

Actual malice is thus a "famously daunting" standard, *Tah v. Glob. Witness Publ'g, Inc.*, 991 F.3d 231, 240 (D.C. Cir.), *cert. denied*, 142 S. Ct. 427, 211 L. Ed. 2d 252 (2021), which "very few public figures can meet," *Fridman v. Orbis Bus. Intel. Ltd.*, 229 A.3d 494, 509 (D.C. 2020). It "is not easily met, even at summary judgment," which is why courts frequently grant summary judgment for defendants.  *Jankovic*, 822 F.3d at 590; *see Lohrenz v. Donnelly*, 350 F.3d 1272, 1283-84 (D.C. Cir. 2003) (plaintiff failed to meet "heavy burden" at summary judgment); *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1515-16 (D.C. Cir. 1996) (affirming summary judgment); *Kahl*, 856 F.3d at 117-18 (directing grant of summary judgment).

### B.  The Two Challenged Statements in the Article and the One Challenged Statement in the Corrected Article.

Nunes cannot show by clear and convincing evidence that The Post acted with actual malice in making any of the three challenged statements: (1) Nakashima's mistake in the Article about who had made baseless claims; (2) her explanation in the Article that "the midnight run" was so named because it reportedly happened late at night; and (3) the Corrected Article's statement that Nunes believed the intelligence files would help buttress Trump's baseless claims.

The Court's Rule 12(b)(6) Opinion rejected most of Plaintiff's allegations of actual malice—including that The Post purportedly "made up facts," "abandoned all journalistic standards and integrity," relied on unreliable sources, and acted out of "institutional hostility, hatred, . . . bias, spite and ill-will" toward Nunes.  12(b)(6) Op. at 10 (quoting Compl. ¶¶ 22a, 22d, 22e).  The Court properly deemed these conclusory allegations insufficient as a matter of law, noting, among other things, that "'a public figure plaintiff must prove more than an extreme

departure from professional standards and[] a newspaper's motive in publishing a story cannot provide a sufficient basis for actual malice.'" *Id.* at 10-11 (quoting *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 665 (1989)); *see also, e.g., Tah*, 991 F.3d at 241 (emphasizing that "preconceived notions" or "suspicion[s]" usually do "little to show actual malice") (quotation omitted); *McFarlane v. Esquire Mag.*, 74 F.3d 1296, 1307 (D.C. Cir. 1996) ("The fact that a commentary is one sided and sets forth categorical accusations has no tendency to prove that the publisher believed it to be false.").

These same allegations still fail—not only as a matter of law but also because they have no factual basis. The Post did not "make up" any facts about Nunes's White House visit or rely on an "unreliable source." Instead, Nakashima consulted public sources—past news coverage of the episode. Nakashima Decl. ¶ 43; *see Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1297 (D.C. Cir. 1988) ("[G]ood faith reliance on previously published reports in reputable sources . . . precludes a finding of actual malice as a matter of law"). When later considering whether and how to correct the Article, ███████████████████████████████████████████████ Nakashima Decl. ¶ 45; Barr Decl. ¶ 11; Finn Decl. ¶ 19. Nunes has no expert witness on journalistic standards who could testify that making a factual error in a background paragraph in a breaking news story is a departure from journalistic standards, let alone an extreme departure.

Instead, Nakashima engaged in her usual practice of conducting research to support statements in the Article. Nakashima Decl. ¶¶ 22, 32. No one—not Nakashima, Finn, or the ████████████████████████████████████████████—sought to tell a lie to harm Nunes out of bias or ill will. *Id.* ¶ 55; Barr Decl. ¶ 26; Finn Decl. ¶ 29. And it is incredible to suggest that even if anyone at The Post sought to harm Nunes with a lie—which no one at The Post would do—that they would lie about a news story that had received wide public

news coverage in the past and could therefore be readily disproved.  In addition, as this Court noted, although the fact of a correction does not foreclose the possibility of actual malice, it "'is significant and tends to negate any inference of actual malice.'"  12(b)(6) Op. at 12 (quoting *Logan v. District of Columbia*, 447 F. Supp. 1328, 1332 (D.D.C. 1978)); *see also Hoffman v. Wash. Post Co.*, 433 F. Supp. 600, 605 (D.D.C. 1977), *aff'd*, 578 F.2d 442 (D.C. Cir. 1978).

The Court held that the allegation of actual malice that it could not dismiss on the Rule 12(b)(6) record was what it termed the plausible inference that The Post could have been aware that Nunes had denied that Trump Tower had been wiretapped because the Complaint identified two Post articles from March 2017 that reported Nunes's denial, on one of which Nakashima had a contributor credit.  12(b)(6) Op. at 12.  On the summary judgment record, that allegation cannot survive because Nunes cannot demonstrate by clear and convincing evidence that Nakashima or Finn had such knowledge more than three and a half years later when she briefly wrote and he briefly reviewed the two background sentences in a breaking news article.  "Against the affidavits of [The Post's] employees to the effect that they were unaware of the [alleged] error, there is nothing in the record from which it can be inferred that the story was distributed or published with knowledge that it was false."  *Waskow*, 462 F.2d at 1175.  Nor can Nunes demonstrate that The Post acted with actual malice in any other respect in connection with the Article or the Corrected Article published on December 7, 2020.

### 1. "[Nunes's] baseless claims."

While reporting a breaking news story about a national security issue of substantial interest, Nakashima made a mistake when inserting background information.  Ex. 1; Ex. 2.  She and The Post subsequently corrected that mistake.  Ex. 4; Ex. 5.  As a matter of law, merely making a mistake is not evidence of actual malice.  *See Secord v. Cockburn*, 747 F. Supp. 779, 792 (D.D.C. 1990) ("[T]he mere fact that subsequent events determine the falsity of a . . .

statement would be tantamount to conflating . . . actual malice and falsity.").

Indeed, the actual malice standard was devised precisely to *protect* publishers from liability for good-faith mistakes. As the Supreme Court explained in *Bose Corp. v. Consumers Union*, 466 U.S. 485 (1984): "Realistically, some error is inevitable; and the difficulties of separating fact from fiction convinced the Court in *New York Times* . . . and similar cases to limit liability" under the actual malice standard "in order to eliminate the risk of undue self-censorship and the suppression of truthful material." *Id.* at 512-13 (alteration omitted); *see also, e.g.*, *Fairbanks v. Roller*, 314 F. Supp. 3d 85, 92 (D.D.C. 2018) ("Because free debate inevitably leads to some mistaken statements and punishment of these statements would chill the freedom of speech, reckless disregard requires a "high degree of awareness of . . . probable falsity."). Nunes cannot show by clear and convincing evidence that Nakashima acted with actual malice in making the mistake, or that Finn acted with actual malice in not noticing it.

While reporting about the Ellis NSA appointment, Nakashima was looking for a concise way to convey background information about the March 2017 Nunes White House visit in which Ellis was involved. Nakashima Decl. ¶ 33. She conducted internet searches to read past news coverage of the incident. *Id.* ¶ 25. She primarily relied on two March 30, 2017 news articles, by the New York Times and The Post, which had broken the news that Nunes's repeated denials of White House orchestration of his review of intelligence files turned out to have been false. *Id.* ¶ 33. Those articles reported that Nunes had successfully "bolstered" Trump's "debunked" wiretapping claims, and successfully "defended" Trump wiretapping claims that were "baseless." *Id.* Ex. L; Ex. O. In working to synthesize what she read to fit it into a sentence, she misconstrued the articles to say that because Nunes was bolstering and defending these baseless wiretapping claims—and doing so successfully—they were Nunes's claims. *Id.* ¶ 34. She did not notice this

29

mistake at the time, *id.*, and her editor Peter Finn, did not notice an error when reviewing the Article, Finn Decl. ¶ 10.  Notably, *none* of the articles Nakashima reviewed said Nunes had denied wiretapping of Trump Tower.  Nakashima Decl. ¶ 37, Exs. L, O-S.

Under controlling law, a good-faith misreading of source material with ambiguities is not evidence of actual malice.  *See Time, Inc. v. Pape*, 401 U.S. 279, 290-92 (1971); *Jankovic*, 822 F.3d at 594 (affirming summary judgment); *Kahl*, 856 F.3d at 118 (directing grant of summary judgment when publisher misinterpreted hearing excerpt and erroneously attributed the prosecutor's statement to the judge); *Waskow*, 462 F.2d at 1176 (affirming summary judgment dismissal where alleged error was the product of a "good faith misinterpretation").  For example, in *Jankovic*, the author of an international NGO's report misread a government frozen asset list as saying that the plaintiff's assets had been frozen for giving support to a sanctioned individual. 822 F.3d at 594.  Affirming summary judgment, the D.C. Circuit held that "[a]n honest misinterpretation does not amount to actual malice even if the publisher was negligent in failing to read the document carefully."  Similarly, in *Pape*, the Supreme Court reversed denial of a motion for judgment as a matter of law where a Time researcher had mistakenly omitted the word "alleged" in summarizing a report, explaining that "[g]iven the ambiguities of the [report] as a whole, and the testimony of the Time author and researcher, Time's conduct reflected at most an error of judgment," not actual malice.  *Pape*, 401 U.S. at 292.  Likewise, here, Nakashima's unrebutted testimony is that she misread the source material and Finn's unrebutted testimony is reviewing the article he did not catch it as an error.  Nakashima Decl. ¶ 34; Finn Decl. ¶ 10.

Nunes will contend that Nakashima and Finn must have acted with knowledge of falsity because emails and articles produced by The Post in discovery show that each sent or received email or other documents on a few days in March 2017 that contained Nunes's wiretapping denial.

*E.g.*, Finn Ex. B.  Similarly, as the Court noted, the Complaint alleged that two Washington Post articles from March 2017 included Nunes's denial of wiretapping.  12(b)(6) Op. at 12.

This is where the difference between the plausible-inference test at the Rule 12(b)(6) stage and the requirement to provide clear and convincing evidence of actual malice at the summary judgment stage is dispositive.  More than three and a half years had elapsed since Nakashima's and Finn's exposure to reporting on Nunes's statements in March 2017.  Nakashima had written hundreds of other articles in that time.  Nakashima Decl. ¶ 16.

On November 9, 2020, with Nakashima focusing her attention on the breaking news aspects of her reporting, Nakashima Decl. ¶ 24, and Finn spending less time than that reviewing that sentence, Ex. 11, neither of them recalled that in March 2017 they had seen or passed along reporting of Nunes's denial, Nakashima Decl. ¶ 41; Finn Decl. ¶ 27.  Moreover, because of Post email policies, neither had access in November 2020 to the 2017 emails that The Post produced in discovery.  Nakashima Decl. ¶ 41; Finn Decl. ¶ 26.

Courts in D.C. and across the country grant or affirm summary judgment where, as here, journalists had been exposed to information in the past, but testified that they had not recalled that information at the time of publication.  *See, e.g.*, *Buendorf v. NPR, Inc.*, 822 F. Supp. 6, 8 (D.D.C. 1993) (granting summary judgment where NPR host made a false statement about the sexual orientation of the plaintiff secret service agent as a result of misremembering two famous presidential assassination attempts); *Burns v. Rice*, 813 N.E.2d 25, 35-36 (Ohio Ct. App. 2004) (affirming summary judgment where the author of an erroneous report testified that he may have read a press release from a year earlier that would have contradicted his reporting  but that he did not recall its details when writing his report).

For example, in *Nader v. de Toledano*, the D.C. Court of Appeals affirmed summary

judgment dismissal of defamation claims Ralph Nader brought against a publisher who reported that he had "falsified and distorted evidence," where the publisher based his review of an article on his memory of prior "press coverage" of a government report that had said Nader made certain allegations in "good faith."  The publisher testified that at the time of the article at issue, he "did not remember any reference in the [prior] news item relating to, and thus had no knowledge of," the good faith finding.  408 A.2d 31, 57 (D.C. 1979).[7]

Similarly, the Fourth Circuit recently affirmed summary judgment in a case in which journalists from numerous news organizations, including ABC, Fox, NBC, and The Post, were accused of defaming the plaintiff by erroneously reporting that he was a convicted felon even after they knew and in some cases had reported he was only a misdemeanant.  *Blankenship v. NBCUniversal, LLC*, 60 F.4th 744, 750 (4th Cir. 2023), *cert. denied*, 2023 WL 6558383 (U.S. Oct. 10, 2023).  For example, the plaintiff presented evidence that a Fox host had received the correct fact in a briefing packet, and heard it on air, only weeks prior to publishing the false statement; that a Post reporter had correctly reported that the plaintiff was a misdemeanant three months prior; that an ABC journalist had authored or co-authored three articles which correctly reported that fact the same year, and had received numerous emails to that effect; and that an MSNBC host had acknowledged the misdemeanor conviction in email two and a half years earlier.  But in every case, the Fourth Circuit agreed that the evidence of the journalists' lack of memory could not establish actual malice.  *Id.* at 758-63 (explaining, for example, that "Doocy's remark and the briefing packet might well permit a finding that a reasonable person in Cavuto's position *should have known* Blankenship was convicted of a misdemeanor, but actual malice

---

[7] By contrast, while the court denied summary judgment as to a separate reporter, that was because the journalist admitted during deposition that "he was aware" that the report had stated Nader acted in good faith *when writing the article*.  *Nader*, 408 A.2d at 51-54.

requires 'much more' than mere negligence.").

And any other factual conclusion would make little sense: anyone who falsely stated that the baseless claims of spying were Nunes's *while* knowing that public reporting had said Nunes had disbelieved the wiretapping would know that any false statement like that would be readily rebutted, resulting only in embarrassment to the speaker.  Nunes cannot satisfy the clear and convincing evidence test.

> ### 2.    "[R]eportedly late at night, earning the episode the nickname 'the midnight run.'"

For similar reasons, Nunes has no evidence, let alone clear and convincing evidence, that The Post acted with actual malice when Nakashima explained in the online version of the Article that the incident had earned the nickname "the midnight run" because Ellis had helped Nunes see the intelligence files "reportedly late at night."  Ex. 1.

First, it is indisputable that the episode was in fact widely known as "the midnight run" and that numerous accounts reported that it had occurred at night or late at night.  *See* pp. 16-17, *supra*.  Nakashima had a general recollection that the reason for the nickname is that it had occurred late at night and, in sharing that explanation with readers, she expressly couched it with the word "reportedly," which she meant to signal that she was not definitively reporting when the review of intelligence files occurred.  Nakashima Decl. ¶ 39.  Nakashima's intent to flag the non-definitive quality of the information independently undermines any actual malice claim.  *See, e.g.*, *Harvey v. CNN, Inc.* 48 F.4th 257, 274 (4th Cir. 2022) (affirming dismissal; noting that defendant's "characteriz[ing] the statements made . . . as 'claims'" "may actually rebut" a claim of actual malice ) (citing *McFarlane*, 74 F.3d at 1304).

Second, Nakashima had no contradictory information in her mind on November 9, 2020 when she wrote the sentence.  Nakashima Decl. ¶ 32.  None of the articles she reviewed said that

Nunes's review of files occurred during the day; to the contrary, two said it had occurred at night. *Id.* ¶ 40; Exs. O, Q.  Nakashima thus had no reason to disbelieve her statement and in fact believed it.  *Id.* ¶ 40.  Nunes will argue that in March 2017 he gave a CNN interview in which he said the document review occurred during daylight hours, and a March 2017 Washington Post article by Philip Bump said the same thing.  Ex. 8; Ex. 61.  But there is no evidence that Nakashima saw that interview or read that article or would have remembered them three and a half years later if she had.  Nakashima Dep. 142:9-10, 272:4-6.[8]  *See, e.g.*, *Blankenship*, 60 F.4th at 758-63 (allegations of far more recent knowledge of contrary facts not enough to support actual malice).

And even if Nunes were to argue that Nakashima should have done more checking, such a criticism is not relevant to her subjective state of mind at the time of publication and thus is insufficient to create a material issue of act as to actual malice.  *See, e.g.*, *McFarlane*, 91 F.3d at 1509 (actual malice inquiry focuses on "the publisher's state of mind," not "whether the publisher satisfied an objective standard of care."); *Hoffman*, 433 F. Supp. at 605 (even where author had relied on only his own "vague recollections" when writing about the plaintiff's "valueless protein supplements," that conduct fell "far short of raising a genuine issue" of actual malice).

The same is all true for editor Finn, who read the article and did not understand the reference to the timing of Nunes's document review to be inaccurate.  Finn Decl. ¶ 12.

Third, The Post's inclusion in the Correction of an update of the review's timing—including Nunes's position that it occurred during daylight—fully corrected any statement conveying the message that the review had occurred late at night, as reflected by Plaintiff's not

---

[8] In her only contribution to a different March 2017 article, Nakashima sought comment from Nunes spokesman Langer about Nunes's White House visit.  Nakashima Decl. ¶ 14.  She testified that she has no memory of Langer denying that the incident took place at night, Nakashima Dep. 293:6-295:3, and her contemporaneous notes ████████████████████████ ████████████████████████, Nakashima Decl. ¶ 14, Nakashima Ex. G.

making a new claim about the updated reporting of the timing of the review.  *See, e.g.*, *Logan*,

447 F. Supp. at 1332 (correction tending to negate actual malice).

> ### 3. "Nunes believed [the intelligence files] would buttress Trump's baseless claims of the Obama administration spying on Trump Tower."

Undisputed evidence shows that the ███████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████ was true and thus did not act with actual malice.  █████████████

████████████████████████████████████████████████████████████████

Nakashima Decl. ¶ 44; Finn Decl. ¶ 18; Barr Decl. ¶ 10.

The Court held at the Rule 12(b)(6) stage that a reasonable inference of actual malice

could be derived from the language "'*Nunes believed [intelligence files] would buttress Trump's*

*claims*'" because "a reasonable juror could conclude [it] meant that Nunes did believe the baseless

claims."  12(b)(6) Op. at 12.  But now, where the evidentiary burden is on Plaintiff to establish

The Post's actual malice, by clear and convincing evidence, he cannot do so.

First, ██████████████████████████ both the Correction at the top of the Corrected

Article and the corrected statement.  Nakashima Decl. ¶ 49 .  Read together, they show that The

Post did not intend to convey the message that Nunes believed Trump's baseless claims.  The

Correction at the top said the opposite: "Nunes has stated that he did *not* believe there had been

any wiretapping of Trump Tower."  Ex. 4 (emphasis added).  *See Tavoulareas*, 817 F.2d at 779–

80 ("[A] court is to consider both the words themselves and the entire context in which the

statement occurs."); 12(b)(6) Op. at 7.  Thus, the statement later in the Article that "Nunes

believed [the files] would buttress Trump's baseless claims of . . . spying on Trump Tower" was

meant by The Post to convey just that, not that Nunes believed the baseless claims.  Nakashima

Decl. ¶ 49; Finn Decl. ¶ 23; Barr Decl. ¶ 19.  *See Newton v. NBC*, 930 F.2d 662, 680-81 (9th Cir.

1990) (the "deliberately subjective" actual malice test does not permit liability to be imposed "for what was not intended to be said").

Second, there is no evidence that ██████████ had any, let alone any serious, subjective doubts about the accuracy of the corrected sentence because they based it on their review of contemporaneous March 2017 news coverage of Nunes's White House visits that said the same thing as the corrected sentence, including coverage of Nunes's own public statements. Nakashima Decl. ¶ 54; Finn Decl. ¶ 25; Barr Decl. ¶ 23. ██████████ indeed included in its review the past news coverage that Nakashima had initially misread as well as other coverage showing that Nunes had in fact used information about the intelligence files he viewed at the White House to suggest that Trump's concerns about surveillance were valid.  Nakashima Decl. ¶ 48.

For example, ██████████████ the March 30, 2017 New York Times article stating that "the view among Democrats and even some Republicans was that Mr. Nunes was given access to the intelligence reports . . . to bolster Mr. Trump's debunked claims of having been wiretapped" and "appears to have succeeded." Ex. 49.  And the March 30, 2017 Washington Post article ████ ████████ stated, "[t]he materials unearthed by Nunes have been used to defend President Trump's baseless claims on Twitter that he had been wiretapped at Trump Tower."  Ex. 48.  Other news coverage ██████████████ further supported the reporting that Nunes had used the material to support Trump's claims.  Nakashima Exs. V, W.  This included the chapter of Greg Miller's book *The Apprentice* that Finn reviewed and its report that Nunes "said that Trump's surveillance claim was wrong in the most literal reading of his tweet, but implied that he had discovered new information substantiating the president's concerns."  Miller Dec. Ex. B.

The Post team thus believed it was accurate to say Nunes believed the intelligence files could be used to buttress Trump's baseless claims.  The news coverage ██████████—including

36

published articles by colleagues and other respected news sources, and reporting of Nunes's own words—said that Nunes had used the materials in this manner, and had done so successfully. Team members testified that they believed the articles were accurate.  Nakashima Decl. ¶ 54; Finn Decl. ¶ 25; Barr Decl. ¶ 23.  ███████ reputable news sources demonstrates that a defendant has not acted with actual malice.  *See*, *e.g.*, *Liberty Lobby*, 838 F.2d at 1297.  And there is no evidence to the contrary.

## II.     The Challenged Statements Are Not Materially False and Defamatory.

The summary judgment record shows that Plaintiff is unable to raise a genuine issue of material fact to support that any of the challenged statements are materially false.  Nor, as a matter of law, is any of them defamatory.

### A.     The Law of Material Falsity and Defamatory Meaning.

**Material Falsity:** "The truth of the publication is a complete defense in a libel action." *Copeland-Jackson v. Oslin*, 555 F. Supp. 2d 213, 217 (D.D.C. 2008).  "Minor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the libelous charge be justified." *Masson*, 501 U.S. at 517 (quotations omitted); *Liberty Lobby*, 838 F.2d at 1296.  A statement is materially false only if it has "a different effect on the mind of the reader from that which the pleaded truth would have produced."  *Shipkovitz v. Wash. Post Co.*, 408 F. App'x 376, 377-78 (D.C. Cir. 2010) (per curiam) (quoting *Masson*, 501 U.S. at 517).  Courts regularly grant summary judgment for inability to demonstrate material falsity.  *See, e.g.*, *Montgomery*, 875 F.3d at 714.

**Defamatory Meaning:** Even if challenged statements about a plaintiff are materially false, a plaintiff must also be able to show that they are defamatory.  "An allegedly defamatory remark must be more than unpleasant or offensive; the language must make the plaintiff appear odious, infamous, or ridiculous."  *Smith v. Clinton*, 886 F.3d 122, 128 (D.C. Cir. 2018) (per curiam) (quotation marks omitted).  "There is common agreement that a communication that is

merely unflattering, annoying, irksome, or embarrassing . . . is not actionable."  1 Robert D. Sack, *Sack on Defamation* § 2.4.1 (5th ed. 2017).  Rather, defamation "*necessarily . . . involves the idea of disgrace.*"  *Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 594 (D.C. 2000) (quoting W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 111, at 773 (5th ed. 1984)).  Whether the challenged statements are defamatory is a legal question to be resolved by the court in the first instance.  *Smith*, 886 F.3d at 128.   "The plaintiff has the burden of proving the defamatory nature of [the challenged] publication, and the publication must be considered as a whole, in the sense in which it would be understood by the readers to whom it was addressed."  *Abbas v. Foreign Pol'y Grp., LLC*, 975 F. Supp. 2d 1, 14 (D.D.C. 2013) (cleaned up), *aff'd*, 783 F.3d 1328 (D.C. Cir. 2015).  Courts routinely grant summary judgment in defamation cases where the challenged statements fall short.  *See, e.g.*, *Guilford Transp. Indus.*, 760 A.2d at 597.

### B.     The Challenged Statements in the Article.

Nunes cannot show on the summary judgment record that the statement that he made baseless claims of spying on Trump Tower satisfied the requirement that it be materially false.  Nor can he show that it is materially false to say that the March 2017 White House document review was known as the "midnight run" because it occurred "reportedly late at night."  This is because the indisputable facts of Nunes's conduct in connection with that review carry a "gist" or "sting" the same as or worse than the challenged statements.

On March 21, 2017, White House lawyer Michael Ellis called Nunes to come to the White House, where Ellis showed Nunes intelligence files about incidental collection and unmasking by the Obama administration that concerned the Trump transition team.  Ellis Dep. at 73:19-75:8, 78:3-79:9.  Instead of briefing fellow members of his own Intelligence Committee the next day, Nunes called two press conferences to publicize his review of the files; said his findings indicated that it is possible that Trump's wiretapping claims could be correct; and gave the President a

briefing that Trump immediately characterized as "Nunes said, so that means I'm right," Ex.12, while Nunes agreed: "President Trump, to some degree, is right," Ex. 9.

Nunes also made the baseless claim that "President Trump . . . did end up in some [of the] intelligence reports" he reviewed, *id.*, even though Ellis, who sat with Nunes as he reviewed them, testified that they "were disseminated reports with US person information anonymized, but none of them, based on the context, appear to be Trump himself."  Ellis Dep. at 106:19-107:15.

Nunes over the next week made a series of false statements to the public to conceal that White House officials  had been his source.  *See supra* Section Background B.4.  These included Nunes's false statement on the morning of March 22, hours after he had been sitting in a secure office in the *White House complex* reviewing the intelligence files that had been handed to him by a *White House lawyer*: "The administration, I don't think, is aware of this."  Ex. 7 at 3.

Before the press uncovered his ruse on March 30, Nunes made numerous other false statements. ██████████████████████████████████ that "the source of Nunes's information was not a White House staff member," which was then printed in the Los Angeles Times on March 27, 2017, misleading the public.  Ex. 39.  That same day, he falsely stated on live television that he did not meet with "The President or his aides," that "people in the West Wing had no idea I was there."  And he falsely denied that "someone in the administration was coordinating the release of the information" to him.  Ex. 8 at 15–16.

These false statements mattered because they created a false narrative that Nunes had uncovered important intelligence information that provided some measure of support for the President's baseless wiretapping claims, lending credence to them given his role as the Chair of the Intelligence Committee.  In fact, the White House gave him that information.  It was a political charade rather than intelligence oversight.

As examples of the public condemnation of Nunes for his deceit, one journalist wrote that Nunes "misled me. . . .  This is a body blow for Nunes, who presented his findings last week as if they were surprising to the White House."  Ex. 50.  In the aftermath, other journalists wrote that the "unusual episode did more to embarrass the Tulare Republican than help Trump."  Ex. 54.  A political scientist criticized that the ruse was a prominent example of "fake oversight," and destroyed bipartisanship in the intelligence committee.  Ex. 62.

The Seventh Circuit's decision in *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222 (7th Cir. 1993), is instructive.  The plaintiff sued for defamation because a book had inaccurately reported that he "left his children alone at night when he was supposed to be watching them; that he lost a job or jobs because of drinking; and that he spent money on a car that he should have used to buy shoes for his children."  *Id.* at 1226.  The plaintiff, however, "*was* a heavy drinker, a bad husband, a bad father, an erratic employee. . . .  Whether he . . . was fired for drinking rather than for having liquor on his person while working, or preferred to spend money on his car than on his children's shoes, are details that, while not trivial, would not if corrected have altered the picture that the true facts paint."  *Id.* (emphasis in the original).  Accordingly, the court held, "no reasonable jury" could find the book's depiction was not substantially true.  *Id.*; *see also, e.g.*, *Wentz v. Project Veritas*, 2019 WL 1716024, at *5 (M.D. Fla. Apr. 16, 2019) (accusation that plaintiff is a liar is substantially true where he admitted that he had lied to someone).  !

The same is true here.  First, in connection with his controversial March 21, 2017 White House visit to review intelligence files, Nunes did not make his own baseless claims of wiretapping Trump Tower, but he did make false claims about who gave him intelligence files to conceal that he was helping to conceal the White House's involvement in publicizing the files, in a way that benefitted the President's wiretapping narrative.  Second, while Nunes may not have

40

reviewed the documents late at night, possibly suggesting "something untoward" about the visit 12(b)(6) Op. at 8-9, he did make numerous false statements specifically to *conceal* the visit, which at least equally suggests "something untoward." Third, it is indisputably true that the episode was nicknamed "the midnight run," and the statement does not carry a materially greater sting by saying it was reported to have been late at night. Thus, like the plaintiff in *Haynes*, Nunes could not create a genuine issue of material fact as to material falsity.

The Post moved to dismiss on the ground that the challenged statements do not rise to the level of defamation and recognizes that the Court rejected this argument in its Rule 12(b)(6) Opinion. However, the statements must now be revaluated in light of the substantially true facts, because "[t]he falsity of a statement and the defamatory 'sting' of the publication must coincide— that is where the alleged defamatory 'sting' arises from substantially true facts, the plaintiff may not rely on minor or irrelevant inaccuracies to state a claim for libel." *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993). Here, even if incorrect, the statement that a staunch Congressional defender of President Trump reviewed documents at the White House, reportedly late at night, in order to buttress his baseless claims of wiretapping of Trump Tower cannot sustain a defamation claim because the statement does not make Rep. Nunes appear materially more "odious, infamous, or ridiculous" than his actual conduct. *See Smith*, 886 F.3d at 128.

The common dictionary definition of "baseless" is "not based on facts," rather than being *incapable* of being supported. *Baseless*, Cambridge Dictionary, https://bit.ly/3MssDnq. Accordingly, it does not make the President's defender appear to be ridiculous or unfit to arrive at the White House to look for information that could "buttress"—defined as "to give support to or strengthen something," *Buttress*, Cambridge Dictionary, https://bit.ly/3Mrs9Ow—the claims. And even if stating that the file review occurred late at night could reasonably suggest that

something "untoward" happened, a suggestion of a single instance of an "untoward" meeting is not enough to cause Nunes to appear ridiculous or unfit. *See Weyrich v. New Republic, Inc.*, 235 F.3d 617, 627 (D.C. Cir. 2001) (holding that isolated anecdotes concerning reprobation of appellant did not suggest anything "untoward" about him).

### C.     The Challenged Statement in the Corrected Article.

Nor is there evidence for Plaintiff to create a genuine issue of material fact as to the alleged material falsity of the Corrected Article's statement that Nunes believed the files he reviewed would buttress Trump's baseless claims on wiretapping.

Nunes, in his own words, supported Trump's baseless wiretapping claims by repeatedly making public statements supporting Trump's concerns over surveillance by equating Trump's wiretapping claims with Nunes's own stated concerns about potential electronic surveillance by the Obama administration of Trump or his associates. *See supra* Section Background B.1; Miller Decl. ¶¶ 15-16.  Nunes used his asserted concerns over the intelligence files he reviewed to do this—including by calling two unscheduled press conferences to promote his surveillance concerns arising from his review of the files and appearing on television interview programs where he admitted his self-publicized briefing of Trump was because the President had been "taking heat." Ex. 10.  Nunes also said that "it is possible" Trump's wiretapping tweets were correct.   Ex. 11 at 4:07–4:12.   Affirming that Nunes's statements "buttressed" Trump's wiretapping claims, Trump immediately told the public that he felt "vindicated" and Nunes's review of the files meant that "Nunes said, . . . that means I'm right," Ex. 12.  And on the same day, Nunes agreed that "President Trump, to some degree, is right."  Ex. 9.

Nunes cannot show a material inaccuracy since it is indisputable that Nunes did in fact use the intelligence files to buttress Trump's baseless wiretapping claims.  And if the contrary argument is that Nunes used analogous information to support Trump's wiretapping claims only

indirectly, that is not materially different from the shorthand "buttress."  Accordingly, as a matter

of law, Nunes is unable to establish material falsity.  *See Liberty Lobby*, 838 F.2d at 1296 ("'It is

not necessary to establish the literal truth of the precise statement made.  Slight inaccuracies of

expression are immaterial provided that the defamatory charge is true in substance.'") (quoting

*Restatement (Second) of Torts* § 581A, comment f (1977)).

      Nor can Nunes's claim over the corrected sentence satisfy the defamation element.

Because the Correction at the top of the article said that "Nunes has stated that he did not believe

there had been any wiretapping of Trump Tower," Ex. 4, the Corrected Article in context did not

say that Nunes believed Trump's baseless spying claims.  And to state that a defender of the

President visited the White House—in daylight hours, according to him—to view intelligence

files that he believed would buttress Trump's baseless claims does not suggest that he engaged in

disgraceful conduct or is unfit for his position as a Congressman.  *See Smith*, 886 F.3d at 128.

### III.  The Corrected Article's Statement About Nunes's Belief Is Not a Verifiable Statement of Fact and Thus Is Nonactionable Opinion.

      The only statement in the Corrected Article that the Amended Complaint challenges is

that Nunes "was given access at the White House to intelligence files that Nunes believed would

buttress Trump's baseless claims of the Obama administration spying on Trump Tower."  Ex. 4.

For an additional reason, this statement cannot support a defamation claim: it is nonactionable

opinion because a statement about a plaintiff's belief or motivation is not verifiably true or false.

#### A.  The Law of Opinion.

      Only a statement of fact that is capable of being proved false can be potentially actionable

in a defamation case.  *See Rosen v. Am. Isr. Pub. Affs. Comm., Inc.*, 41 A.3d 1250, 1256 (D.C.

2012).  Statements that cannot be proved false qualify as a type of nonactionable opinion.  *See*

*Xereas v. Heiss*, 933 F. Supp. 2d 1, 18 (D.D.C. 2013).  One example is statements that are "too

subjective . . . to be proved false." *Chapin*, 993 F.2d at 1093 (term "hefty" applied to price mark-ups not capable of being proven true or false).

One category of "subjective judgment[s] that [are] not verifiable" and thus "non-actionable statement[s] of opinion" is statements about the "possible feelings or motivations behind [a plaintiff's] actions." *Montgomery v. Risen*, 197 F. Supp. 3d 219, 248-49 (D.D.C. 2016), *aff'd*, 875 F.3d 709 (D.C. Cir. 2017) (citing cases); *Farah v. Esquire Mag.*, 736 F.3d 528, 539-40 (D.C. Cir. 2013) (statement that plaintiff authors were "not motivated by genuine belief, but rather by a desire to hold their readers 'captive' and to 'sell books'" was protected opinion). Courts dismiss such claims as a matter of law. *See, e.g.*, *Montgomery*, 197 F. Supp. 3d at 248-49.

Courts hold statements about a plaintiff's belief or motivation to be nonactionable even when they are made as part of a fact-finding report. Thus, in *Turner v. Wells*, 198 F. Supp. 3d 1355 (S.D. Fla. 2016), *aff'd*, 879 F.3d 1254 (11th Cir. 2018), a law firm's investigative report noted that the plaintiff, an NFL coach, had given a player a male blow-up doll as a "taunt." 198 F. Supp. 3d at 1368. The coach claimed defamation, alleging that, while he had indeed given the doll, he had meant it as a "gift," not a taunt. *Id.* The court dismissed the claim as a matter of law, holding that the report's conclusion as to plaintiff's intent in giving the doll was a subjective assessment of plaintiff's motivation and therefore nonactionable. *Id.* at 1370.

## B.   The Post's Statement about Nunes's Belief Is Nonactionable Opinion.

The only challenged statement about Nunes in the Corrected Article is one about his belief. It is therefore nonactionable. The Post corrected the factual statement in the original Article that Nunes *made* baseless claims about wiretapping. This leaves the statement in the Corrected Article that Nunes "was given access at the White House to intelligence files that Nunes *believed* would buttress Trump's baseless claims of the Obama administration spying on Trump Tower." Ex. 4 (emphasis added). Because that statement is about only Nunes's belief, and not

44

his actions, it is incapable of being proven true or false and cannot support a defamation action. *See, e.g.*, *Turner*, 198 F. Supp. at 1370 (affirming dismissal, holding that a statement about a plaintiff's motive is nonactionable opinion because it "is not subject to empirical proof"); *Filippo v. Lee Publ'ns, Inc.*, 485 F. Supp. 2d 969, 980 (N.D. Ind. 2007) (granting summary judgment, noting that "[c]ourts have repeatedly held that statements about another person's . . . beliefs . . . constitute protected opinions"); *Montgomery*, 197 F. Supp. 3d at 248-49.

## CONCLUSION

For the reasons stated, the Court should grant summary judgment in favor of The Post.


Dated: November 8, 2023                    Respectfully Submitted,

                                           WILLIAMS & CONNOLLY LLP


                                           By: /s/ *Thomas G. Hentoff*

                                               Kevin T. Baine (D.C. Bar No. 238600)
                                               Thomas G. Hentoff (D.C. Bar No. 438394)
                                               Nicholas G. Gamse (D.C. Bar No. 1018297)
                                               Sean M. Douglass (D.C. Bar No. 1033069)
                                               Alexandra M. Gutierrez (D.C. Bar No. 1619149)
                                               680 Maine Avenue, S.W.
                                               Washington, DC 20024
                                               Telephone: (202) 434-5000
                                               Facsimile: (202) 434-5029

                                               *Counsel for Defendants*