## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DEVIN G. NUNES,

              Plaintiff,

v.

WP COMPANY LLC, d/b/a THE
WASHINGTON POST and ELLEN
NAKASHIMA,

              Defendants.

**FILED UNDER SEAL**

**CONTAINS INFORMATION
DESIGNATED AS HIGHLY
CONFIDENTIAL**

Case No. 1:21-cv-00506 (CJN)

## DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 7(h), Defendants WP

Company LLC d/b/a The Washington Post and Ellen Nakashima, submit the following Statement

of Undisputed Material Facts in support of their Motion for Summary Judgment:

**Facts Applicable to All Grounds for Summary Judgment[1]**

1.      WP Company LLC d/b/a The Washington Post ("The Post") publishes online and

print editions of the newspaper *The Washington Post*.  Am. Compl. ¶ 3, 10; Ex. 1 (Online Article);

Ex. 2 (Print Article).[2]

2.      Devin Nunes is a former member of the United States House of Representatives,

---

[1] The Post has included section headings labeled "Facts Applicable to All Grounds for Summary Judgment," "Lack of Material Falsity and Defamatory Meaning," and "Lack of Actual Malice" for the Court's convenience in analyzing the Post's arguments and material facts as to which the Post contends there is no genuine issue.  The Post has not included a separate heading for "Nonactionable Opinion" because the related argument is being made as a matter of law based on the pleadings, which incorporate the Article at issue.

[2] "Ex. [number]" refers to exhibits to the Declaration of Thomas G. Hentoff.  "[Witness name] Ex. [letter]" refers to exhibits to witness declarations.

who represented a California House District from 2003 to 2022was the chairman of the House Permanent Select Committee on Intelligence ("Intelligence Committee") in 2017.  Am. Compl. ¶ 9; Ex. 63; Ex. 65.

**Lack of Material Falsity and Defamatory Meaning**

3.     On the morning of March 4, 2017, then-President Donald Trump made four posts to the social media website Twitter, stating, among other things, that he had "[j]ust found out" that former President Barack Obama had Trump's "'wires tapped' in Trump Tower" prior to the 2016 presidential election, but Trump did not cite any supporting evidence.  Ex. 15.

4.     On March 7, 2017, Nunes stated: "[I]f I'm understanding the point of [the tweets]— . . . was he or any of his associates targeted," then "I think it's a valid question."  Ex. 21 at 5:27-45.

5.     On March 15, 2017, Nunes stated: "President Obama wouldn't physically go over and wiretap Trump Tower. . . . But if you're not going to take the tweets literally, and if there's a concern that the president has about other . . .  surveillance activities looking at him or his associates, either appropriately or inappropriately, we want to find that out."  Ex. 22 at 7:35-8:06.

6.     On March 20, 2017, Nunes stated: "Let me be clear: we know there was not a wiretap on Trump Tower.  However, it's still possible that other surveillance activities were used against President Trump and his associates."  Ex. 23.

7.     Later on March 21, 2017, Nunes joined a group, including his Deputy Chief of Staff Caitlin Canter and at least one constituent, in an Uber ride from the U.S. Capitol to an area near the National Building Museum, where a National Republican Congressional Committee dinner was scheduled to take place that night.  Ex. 26 (Deposition of Caitlin Canter ("Canter Dep.")) at 59:20-65:4; Ex. 27; Ex. 66 ( ); Ex. 67.

8.      Nunes received a call from Michael Ellis, a Special Assistant to the President and former Nunes staffer, who told Nunes "that there was some information that we thought was important for him to see, and that he needed to see it in person at the White House."  Ex. 29 (Deposition of Michael Ellis ("Ellis Dep.")) at 73:19-75:8, 78:3-79:9.

9.      All of the passengers except for Nunes exited the Uber.  Canter Dep. at 59:20-65:4; Ex. 27 at 4-5; Ex. 66.

10.     Nunes traveled in the Uber to the White House grounds, arriving around 5:30 pm. Ellis Dep. at 83:2-17; Ex. 27 at 4-5; Ex. 28; Ex. 66.

11.     Nunes met with Ellis on the White House grounds.  Ellis Dep. at 41:16-41:19, 83:2-22; Ex. 27 at 6.

12.     Ellis allowed Nunes to review intelligence reports that "related to unmasking requests by White House officials in 2016 and early 2017 that appeared to have some nexus to members of the Trump transition or other folks associated with the Trump campaign."  Ellis Dep. at 106:12-18.

13.     "None of the reports" that Ellis showed to Nunes "appear[ed] to be about Trump himself."  Ellis Dep. at 107:4-15.

14.     After leaving the White House grounds, Nunes traveled to the National Building Museum, arriving after the National Republican Congressional Committee dinner had started. Ex. 26 at 6 ("I walked into the National Building Museum sometime around 7:00 p.m. as dinner was being served."); Ex. 31 (Deposition of Jilian Plank Souza ("Souza Dep.")) at 152:6-8 (Nunes's former chief of staff: ██████████████████████████████████████████████████ ██████████ ").

15.     On March 22, 2017, Nunes held a press conference at the Capitol, during which Nunes stated that "while there was not a physical wiretap of Trump Tower, I was concerned that other surveillance activities were used against President Trump and his associates," that Nunes "recently confirmed on numerous occasions the intelligence community incidentally collected information about U.S. citizens involved in the Trump transition," and that Nunes "confirmed that names of Trump transition team members were unmasked."  Ex. 7 at 1; Ex. 7a at 1:15-59.

16.     At the March 22, 2017 press conference at the Capitol, when a reporter asked if Trump's "personal communications were collected," Nunes answered in part, "It's possible."  Ex. 7 at 2; Ex. 7a at 4:33-47.

17.     At the March 22, 2017 press conference at the Capitol, Nunes announced his intent to go to the White House that day to inform "the administration" of what he learned, stating: "The administration, I don't think, is aware of this.  I want to make sure I go over there and tell them what I know." Ex. 7 at 3; Ex. 7a at 7:07-16.  He repeated that "I'm going to go to the White House and at least let them know what . . . I've seen . . . because . . . they need to see it.  If they don't have it, they need to see it."  Ex. 7 at 5.

18.     On the afternoon of March 22, 2017, Nunes went to the Oval Office to brief Trump on the intelligence reports that Nunes had reviewed on March 21, 2017.  Ex. 11 at 1; Ex. 11a at 0:23-38.

19.     After meeting with Trump, Nunes held a second press conference that day on the White House grounds.  Ex. 11 at 1; Ex. 11a.

20.     At this second press conference, Fox News reporter John Roberts asked Nunes if the information he reviewed in the intelligence reports "suggests the president was correct in what he tweeted?"  Nunes replied, "It is possible."  Ex. 11a at 4:07-12.  Nunes followed up by stating

that while "President Obama tapp[ing Trump's] phones" "did not happen," as for whether "President Obama order[ed] any kind of surveillance of the . . . president-elect," he said, "we don't know who sent the taskings." Ex. 11 at 2.

21.    The same day, Nunes appeared on CNN and told reporter Jake Tapper, "President Trump, to some degree, is right that he did up end up in some [of the] intelligence reports" that Nunes had reviewed.  Ex. 9; Ex. 9a at 12:42-52.

22.    Trump was asked by a reporter if he felt "vindicated" by Nunes's briefing, and Trump responded, "I somewhat do.  I must tell you I somewhat do."  Ex. 10; Ex. 10a at 0:23-:36.

23.    On March 23, 2017, Nunes appeared on Fox News and had the following exchange with Fox News host Sean Hannity:

> HANNITY: The president then said that he felt vindicated over his claims that he felt he was—well, he said wiretapping, but surveillance, wiretapping—in my view, we're just really parsing words. But he was picked up at least in an incidental way. Can you give us more detail about it?
>
> NUNES: Well, it's tough for me to get into it, right, because I've only read the report, so I don't know all the intelligence that went into it. But to me, I mean, it's clear that I would be concerned if I was the president. And that's why I wanted him to know, and I felt like I had a duty and obligation to tell him because, as you know, he's been taking a lot of heat in the news media.

Ex. 10; Ex. 10a at 1:20-55.

24.    On March 27, 2017, Langer told the Los Angeles Times that "the source of Nunes's information was not a White House staff member."  Ex. 39.  Nunes had told Langer that Nunes's source "was not a White House staffer."  Langer Dep. at 249:19-250:5.

25.    On March 27, 2017, CNN's Wolf Blitzer asked Nunes, "Did you meet with the president or any of his aides while you were there that night?"  Nunes replied, "No.  No.  In fact, I'm quite sure that people in the West Wing had no idea that I was there."   Ex. 8 at 15-16; Ex. 8a

at 5:30-40.  Blitzer asked Nunes, "By holding the meeting on the White House grounds, it makes it appear that someone in the administration was coordinating the release of this information to you.  Is that not the case?"  Nunes replied, "No, it's not the case."  Ex. 8 at 16; Ex. 8a at 6:35-46.

26.    After March 22, 2017, multiple news outlets reported that Nunes visited the White House at night.  Ex. 42 (March 24, 2017 Daily Beast article) ("Devin Nunes Vanished the Night Before He Made Trump Surveillance Claims"; quoting Democratic Representative Mike Quigley about "this middle of the night excursion"); Ex. 43 (March 26, 2017 Guardian article) ("Such behaviour reportedly includes an unexplained disappearance from an Uber ride with a staffer on Tuesday night"); Ex. 44 (March 27, 2017 New York article) ("Devin Nunes was riding in an Uber with a staffer Tuesday night, when he received a communication on his phone."); Ex. 45 (March 28, 2017 Weekly Standard article) ("Regardless of who helped him access the documents Tuesday night and how, Nunes was back at the White House the next afternoon to brief the president on what he had seen."); Ex. 46 (March 27, 2017 Atlantic article) ("With his late-night escapades and questionable explanation for his visit, he has fed speculation that he is working in concert with the White House and attempting to help the president"); Ex. 47 (NBC, May 25, 2018 NBC article) ("Nunes ditched his staff and took a late night Uber to the White House complex.").

27.    After March 22, 2017, news outlets and commentators referred to Nunes's visit to the White House on March 21, 2017 as the "midnight run."  Ex. 54 (L.A. Times, Jan. 5, 2018) ("It became known as 'the midnight run,' a dark-of-night dash to the White House compound last March 21 by Rep. Devin Nunes to view classified reports two weeks after President Trump's incendiary claim that President Obama was 'tapping my phones' before the 2016 election."); Ex. 55 (Atlantic, April 4, 2018) ("Nunes's late-night excursion to the White House last spring[,]" "referred to as 'the Midnight Run'"); Ex. 56 (N.Y. Times, April 24, 2018) (describing the "late-

night visit to Pennsylvania Avenue," and observing that "since Nunes's midnight run, the committee has been crippled by partisan fighting"); Ex. 43 (Guardian, March 26, 2017) ("Lawmaker's 'peculiar midnight run' endangers Trump-Russia inquiry"); Ex. 57 (Newsweek, Feb. 11, 2018) (describing the "now-famous 'midnight run' to the White House").

**Lack of Actual Malice**

28.     Ellen Nakashima is a reporter who has worked for The Post since 1995.  Am. Compl. ¶ 11; Nakashima Decl. ¶ 8.

29.     Nakashima wrote hundreds of articles for The Post on national security issues between March 2017 and November 2020.  Nakashima Decl. ¶ 16.

30.     On November 9, 2020, The Post published on its website an approximately 600-word article headlined, "White House official and former GOP political operative Michael Ellis named as NSA general counsel" (the "Article").  Ex. 1.

31.     Ellen Nakashima authored the Article.  Nakashima Decl. ¶ 4; Ex. 1.

32.     Post reporter Greg Miller received a contributor credit because he received a tip regarding Ellis's appointment, but had no role in writing or editing the Article.  Ex. 1; Miller Decl. ¶¶ 19-20.

33.     Nakashima researched and reported the Article during the afternoon of November 9, 2020.  Nakashima Decl. ¶¶ 19, 31; Ex. 58 (Deposition of Ellen Nakashima ("Nakashima Dep.")) at 38:1-7.

34.     While she researched and reported the Article on the afternoon of November 9, 2020, the breaking news about Ellis and the reaction to his appointment within the NSA was the focus of Nakashima's reporting, time, and attention.  Nakashima Decl. ¶ 24; Nakashima Dep. at 38:8-16.

35.     The online version of Article included two background sentences concerning Ellis's meeting with Nunes on March 21, 2017, and the resulting controversy:

> In March 2017, he gained publicity for his involvement in a questionable episode involving Nunes, who was given access at the White House to intelligence files that Nunes believed would buttress his baseless claims of the Obama administration spying on Trump Tower.
>
> News reports stated that Ellis was among the White House officials who helped Nunes see the documents — reportedly late at night, earning the episode the nickname "the midnight run."

Ex. 1.

36.     On November 10, 2020, the Post published a print version of the Article.  Ex. 2.

37.     The print version of the Article included only the sentence, "In March 2017, he gained publicity for his involvement in a questionable episode involving Nunes, who was given access at the White House to intelligence files that Nunes believed would buttress his baseless claims of the Obama administration spying on Trump Tower."  *Id.*

38.     Nakashima relied on the extent of her memory of the events of March 2017 and her review of publicly available sources to write the two background sentences in the Article quoted *supra* ¶ 36.  Nakashima Decl. ¶ X; Nakashima Dep. at 52:3-5, 69:8-70:13.

39.     Of the sources that Nakashima reviewed when drafting the statement regarding Nunes's "baseless claims of the Obama administration spying on Trump Tower," she primarily relied upon a March 30, 2017 Post article and a March 30, 2017 New York Times article (collectively, the "March 30, 2017 articles").  Nakashima Decl. ¶ 33; Nakashima Dep. at 29:8-12, 53:16–54:5

40.     The March 30, 2017 articles each reported that Nunes's review of intelligence files on March 21, 2017, had been used to support Trump's unsubstantiated claims of Obama administration spying on Trump Tower.  Nakashima Decl. ¶ 33; Nakashima Ex. L ("The materials

unearthed by Nunes have been used to defend President Trump's baseless claims on Twitter that he had been wiretapped at Trump Tower under a surveillance operation ordered by then-President Barack Obama."); Nakashima Ex. O ("[T]he view among Democrats and even some Republicans was that Mr. Nunes was given access to the intelligence reports to divert attention from the investigations into Russian meddling, and to bolster Mr. Trump's debunked claims of having been wiretapped.").

41.     When Nakashima reviewed the March 30, 2017 articles, she misread them to state that Nunes—as opposed to Trump—had made claims of Obama administration spying on Trump Tower.  Nakashima Decl. ¶ 34; Nakashima Dep. at 214:17-215:11.

42.     When Nakashima misread the March 30, 2017 articles, she did not remember that Nunes had denied that the Obama administration had wiretapped Trump Tower.  Nakashima Decl. ¶¶ 34, 35; Nakashima Dep. at 154:10-18.

43.     None of the publicly available sources that Nakashima reviewed referenced Nunes's statements denying that the Obama administration had wiretapped Trump Tower. Nakashima Decl. ¶ 37; Nakashima Exs. L, O, P, Q, R, S.

44.     Nakashima relied on her memory for the statement that Nunes's March 21, 2017 White House visit occurred "reportedly late at night, earning the episode the nickname 'the midnight run.'"  Nakashima Decl. ¶ 38; Nakashima Dep. at 69:8-70:13.

45.     None of the publicly available sources that Nakashima reviewed as part of her research in November 9, 2020, referenced Nunes's statement that his March 21, 2017 visit occurred during daylight hours.  Nakashima Decl. ¶ 40; Nakashima Exs. L, O, P, Q, R, S.

46.     Two of the publicly available sources that Nakashima reviewed as part of her research in November 9, 2020, reported that Nunes's March 21, 2017 White House visit occurred

at night.  Nakashima Decl. ¶ 40; Nakashima Ex. O (describing visit as occurring at "night" and "after dark"); Nakashima Ex. Q (describing visit as occurring at "night").

47.     At the time of the Article's publication, Nakashima did not doubt the truth of the background statements concerning Nunes in the Article.  Nakashima Decl. ¶ 43.

48.     On March 26, 2017, the Post had published an article headlined, "Chairman and partisan: The dual roles of Devin Nunes raise questions about House investigation," on which reporters Greg Miller and Karen DeYoung shared a byline and on which Nakashima received a contributor credit.  Nakashima Ex. F (the "March 26, 2017 Post Article").

49.     Nakashima had received a contributor credit on the March 26, 2017 Post Article because she called Nunes's spokesman Jack Langer to confirm an account of Nunes's activities on March 21, 2017, ████████████████████████



Nakashima Ex. G.

50.     Nakashima's contemporaneous notes reflect that Langer responded: "████████
██████████████████████████████████████████████
████████████████████████████  *Id.*; *see also* Ex. 40 (Deposition of Jack Langer ("Langer Dep.")) at 217:9-218:1 ("████████████████████████████").

51.     Nakashima did not contribute any additional reporting to the March 26, 2017 Post Article beyond seeking the comment from Langer, and did not remember the March 26, 2017 Post Article on November 9, 2020.  Nakashima Decl. ¶¶ 14, 35.

52.     Post national security editor Peter Finn edited and approved the Article.  Finn Decl. ¶¶ 2, 9.

53.     ██████████████████████████████████████████ *supra* ¶ 36.  Finn Decl. ¶¶ 10-11.

54.     At the time of the Article's publication, Finn did not doubt the truth of the truth of the background sentences in the Article quoted *supra* ¶ 36.  Finn Decl. ¶ 12.

55.     At the time of the Article's publication, neither Nakashima nor Finn had access to emails prior to November 2019, due to The Post's email retention policy.  Nakashima Decl. ¶ 41; Finn Decl. ¶ 26.

56.     On November 17, 2020, Nunes's counsel sent a letter to Nakashima and others at The Post stating that Nunes had filed this lawsuit against her and The Post and demanding retraction or correction of the Article.  Ex. 3.

57.     ██████████████████████████████████████████
██████████████████████████████████████████
Barr Decl. ¶ 10; Finn Decl. ¶ 18; Nakashima Decl. ¶ 44.

58.     ██████████████████████████████████████████
██████████████████████████████████████████
████████████     Barr Decl. ¶¶ 11, 15; Finn Decl. ¶ 19; Nakashima Decl. ¶¶ 45, 46.

59.     ██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
Barr Decl. ¶ 12; Finn Decl. ¶ 21; Nakashima Decl. ¶ 46.

60.     Nunes disputed the timing of his March 21, 2017 visit to the White House and had said that the visit occurred during daylight hours.  Barr Decl. ¶ 13; Finn Decl. ¶ 21; Nakashima Decl. ¶ 47.

61.     had made efforts in his treatment of the intelligence files to buttress Trump's baseless claims of the Obama administration spying on Trump Tower.  Barr Decl. ¶ 14; Finn Decl. ¶ 21; Nakashima Decl. ¶ 48.

62.    On December 7, 2020, the Post updated the online version of the Article to include a correction statement at the top of the Article and to revise the text below to reflect that Nunes was "given access at the White House to intelligence files that Nunes believed would buttress Trump's baseless claims of the Obama administration spying on Trump Tower," and that "The precise timing of the visit is unclear, and Nunes says it took place during daylight hours."  Ex. 4.

63.    On December 8, 2020, The Post ran a print correction on page A2, stating that the Article "incorrectly attributed claims that the Obama administration spied on Trump Tower to Rep. Devin Nunes (R-Calif.), rather than to President Trump.  Nunes has said that he did not believe there had been any wiretapping of Trump Tower."  Ex. 5.

64.     Barr Decl. ¶ 19; Finn Decl. ¶ 22; Nakashima Decl. ¶ 50.

Dated: November 8, 2023           Respectfully Submitted,

                 WILLIAMS & CONNOLLY LLP

        By: /s/ *Thomas G. Hentoff*
            Kevin T. Baine (D.C. Bar No. 238600)
            Thomas G. Hentoff (D.C. Bar No. 438394)
            Nicholas G. Gamse (D.C. Bar No. 1018297)
            Sean M. Douglass (D.C. Bar No. 1033069)
            Alexandra M. Gutierrez (D.C. Bar No. 1619149)
            680 Maine Avenue, S.W.
            Washington, DC 20024
            Telephone: (202) 434-5000
            Facsimile: (202) 434-5029

            *Counsel for Defendants*