# Ex. 29

CONFIDENTIAL

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF COLUMBIA

3                       - - - - -

4

   DEVIN G. NUNES,                    )

5                                     )

         Plaintiff,                   )   Civil Action No.

6                                     )   1:21-cv-00506 (CJN)

         vs.                          )

7                                     )

   WP COMPANY, LLC, d/b/a THE         )

8   WASHINGTON POST and ELLEN         )

   NAKASHIMA,                         )

9                                     )

         Defendants.                  )

10

11        VIDEO RECORDED DEPOSITION OF MICHAEL ELLIS

12           Tuesday, December 13, 2022, 10:00 a.m.

13

14                     CLARE LOCKE

15                   10 Prince Street

16                 Alexandria, Virginia

17

18

19

20

21   Reported By: Marjorie Peters, FAPR, RMR, CRR, RSA

22   Job Number: PA 5618796

CONFIDENTIAL

Page 2

1          VIDEO RECORDED DEPOSITION OF MICHAEL ELLIS,

2     a witness herein, called by the Defendant for

3     examination, taken pursuant to the Subpoena, by and

4     before Marjorie Peters, a Registered Merit Reporter,

5     Certified Realtime Reporter and Notary Public in and

6     for the Commonwealth of Virginia, at CLARE LOCKE, 10

7     Prince Street, Alexandria, Virginia, on Tuesday,

8     December 13, 2022, at 10:00 a.m.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

CONFIDENTIAL

1          MR. DOUGLASS:  My name is Sean

2    Douglass.  I'm from Williams & Connolly.  We

3    represent The Washington Post and Ellen Nakashima.

4    And I'm here with my colleague, Tom Hentoff.

5          MR. BISS:  I'm Steve Biss.  I

6    represent Devin Nunes.

7          MS. LOCKE:  Good morning.  My name

8    is Elizabeth Locke.  I'm here with Kat Humphrey from

9    the law firm of Clare Locke LLP.  We represent

10   third-party deponent, Michael Ellis.

11          MICHAEL ELLIS,

12   having been called as a witness, on behalf of the

13   Plaintiff, being duly sworn, testified as follows:

14          EXAMINATION

15   BY MR. DOUGLASS:

16       Q.    Good morning, Mr. Ellis.

17       A.    Good morning.

18       Q.    Thank you.  We really appreciate your

19   time here today.

20       A.    Of course.

21       Q.    We're going to ask you some questions

22   today about the 2017 period forward.

CONFIDENTIAL

Page 8

1          A.      Okay.

2          Q.      Taking you back just to the beginning of

3    2017, what was your position then?

4          A.      At the start of 2017, I was general

5    counsel for the House Permanent Select Committee on

6    Intelligence.

7                  In February of 2017, I took a new

8    position at the White House, with the White House

9    Counsel's Office, and I was also serving in a role

10   with the National Security Council Legal Affairs

11   Directorate.

12         Q.      What was your departure date from the

13   House Intelligence Committee?

14         A.      Early February.

15         Q.      Do you know what your start date was at

16   the White House?

17         A.      Oh, also early February.

18         Q.      Okay.

19         A.      There may have been a weekend in

20   between, but not much more.

21         Q.      Focusing on the period when you were the

22   general counsel of the House Intelligence Committee,

Page 9

1    what was your role as general counsel?

2         A.    I was the lead lawyer for the

3    Committee's majority staff.  I had, I think, two

4    other attorneys that reported to me.  And in that

5    role, I was responsible for advising the members of

6    the Committee on pending legislation within the

7    Committee's area of jurisdiction, as well as

8    assisting in the Committee's oversight of the

9    Intelligence Community.

10        Q.    Who was the chairman of the Committee at

11   that time?

12        A.    In early 2017, the chairman was Devin

13   Nunes.

14        Q.    Who was the ranking member at that time?

15        A.    Adam Schiff.

16        Q.    Who hired you for that position as

17   general counsel?

18        A.    Oh, I was hired at the Committee by Mike

19   Rogers, when he was the chairman, in 2013.  I was

20   hired initially as a counsel for the Committee, and

21   was promoted to general counsel at some point in

22   2016.  I forget exactly which month.

Page 10

1        Q.      Had you had any relationship with Devin

2    Nunes before you were hired as general counsel of

3    the House Intelligence Committee?

4        A.      Sorry.  I don't exactly understand the

5    "hired as general counsel," because I was hired to

6    the Committee as counsel, not as general counsel.

7    So could you explain which exactly you mean?

8        Q.      Sure.  Sure.

9                Before 2017, did you have any

10   relationship with Mr. Nunes?

11       A.      Yes.  He became chairman of the

12   Committee in 2015, and in the course of my duties, I

13   regularly advised him.

14       Q.      How regularly would you meet with

15   Mr. Nunes?

16       A.      You know, as with most things in

17   Congress, it all depends on the in-session or

18   out-of-session calendar.  You know, when he was in

19   D.C., when Congress was in session, it was almost

20   daily.  Obviously, during recess periods, it was

21   less frequent, when he was in California in his home

22   district.

Page 40

1    available only to the chairman and ranking member of

2    the Committee, the Speaker and the Minority Leader

3    in the House, and one staffer for each of those

4    members.

5              Same on the Senate side, too.

6              And at the HPSCI, that one staffer

7    for the chairman and ranking member was the staff

8    director.

9        Q.    Was that Damon Nelson in January 2017?

10       A.    For the majority, yes.

11       Q.    Did you ever go to those meetings of the

12   Gang of Eight as a sub-in for Damon Nelson or --

13       A.    No, substitutes were not allowed.

14       Q.    Mark one more press release, please.

15   This will be Exhibit 10.

16   (Exhibit 10, White House website staff announcement,

17   3.7.2017, was marked for identification.)

18       Q.    I'm only going -- I know this is a

19   nine-page document titled President Donald J. Trump

20   Announces Key Additions to the Office of the White

21   House Counsel.  I'm not going to ask you about this

22   whole document, just going to --

Page 41

1      A.     Nice to see the names of so many old

2   colleagues.

3      Q.     Right.

4             Now, it looks like your name appears

5   on page 5, and that's where I wanted to start.

6      A.     Okay.

7      Q.     So this announcement was made on

8   March 7, 2017; do you see that?

9      A.     I do.

10     Q.     So at this point, you had been in your

11  position at the White House for three or four weeks?

12     A.     Sounds about right.

13     Q.     Now, you were appointed to the position

14  of deputy National Security Council legal advisor;

15  correct?

16     A.     Yeah.  The full title is there.  Special

17  Assistant to the President, Senior Associate Counsel

18  to the President, and Deputy National Security

19  Council Legal Advisor.

20             I used to joke I was living proof of

21  the old Washington adage that you're -- the length

22  of your title is inversely proportional to the

Page 42

```
 1   importance of your job, right?  The President's
 2   title is just President.  I had, you know, about 28
 3   words there.
 4        Q.    Well, focusing just on the six words in
 5   your NSC role, can you describe that role generally?
 6        A.    Sure.
 7              So the NSC Legal Affairs Directorate
 8   is responsible for providing legal advice to the
 9   national security advisor, as well as to the
10   President on national security matters.
11              It also coordinates the views of
12   interagency lawyers on questions related to national
13   security and provides advice to the staff of the
14   National Security Council on both the functions and
15   operations of the Council staff, as well as on
16   substantive issues that they encounter in their
17   work.
18              The office is headed by the National
19   Security Council legal advisor, my boss.
20              And I was the -- I had the title of
21   deputy, but I was the only other member of the
22   office who was dual-hatted with the Council's office
```

Page 72

1      Q.     Did you speak with anyone at Congressman

2    Nunes's Congressional office or Intelligence

3    Committee staff during that time period you just

4    described?

5      A.     I think I probably spoke to Scott Glabe,

6    who we spoke about earlier.

7                    For one thing, Scott had succeeded

8    me as general counsel, so there were, I recall, a

9    couple, like, you know, where is that file, you

10   know, where -- where did you leave that, kind of

11   continuity questions.

12                   Scott's also a long-time personal

13   friend and, you know, I think we probably spoke in

14   that respect as well.

15     Q.     We're talking about Scott Glabe; right?

16     A.     That's right.

17     Q.     Did you have any discussions with Scott

18   Glabe before March 21, 2017, about President Trump's

19   assertion of wiretapping?

20     A.     I don't recall.

21     Q.     As of March 20, 2017, had you had any

22   discussion with anyone about meeting Devin Nunes the

Page 73

1   next day, on March 21, 2017?

2                    MS. LOCKE:   I'm going to object to

3   the extent it asks -- if you want to ask a

4   bifurcated question rather than anyone in the whole

5   wide world, I think my objections would be

6   different.

7                    But to the extent that your question

8   is about anyone, including anyone at the White

9   House, I'm going to object again on those privileges

10  that I already outlined.

11       Q.    Before March 21, 2017, had you had

12  discussion with anyone outside the White House about

13  meeting with Devin Nunes on March 21, 2017?

14       A.    No, I don't think so.

15       Q.    Before March 21, 2017, who at the White

16  House did you discuss meeting with Devin Nunes on

17  March 21, 2017, regarding -- I'm sorry, that was a

18  muddled question.   Strike that.

19                    Before March 21, 2017, who at the

20  White House did you discuss the meeting on March 21,

21  2017, with Devin Nunes?

22                    MS. LOCKE:   I'm going to object

CONFIDENTIAL

Page 74

1    again.

2                    You can answer with whom you spoke,

3    but not about the content of those conversations.

4                    So I think if it's something, for

5    example, that would appear on a privilege log, like

6    communication he -- from this person to that person,

7    you can testify to it, but only who, not what.

8                    THE WITNESS:  Even tying it to the

9    specific topic?

10                   MS. LOCKE:  Yes, because it would be

11   something that's relevant and would go on a

12   privilege log, I'm comfortable with that.

13                   THE WITNESS:  Okay.

14                   And sorry, just make sure I

15   understand.  The question relates to prior to

16   March 21st?

17                   MR. DOUGLASS:  Yes.

18                   THE WITNESS:  I honestly don't

19   remember the chronology, if the conversations were

20   March 20th or March 21st.

21   BY MR. DOUGLASS:

22       Q.    Who did you speak with on either day

Page 75

1    about that meeting taking place?

2                    MS. LOCKE:  Same objection.  Same

3    instruction.

4         A.    John Eisenberg.  Don McGhan.  I think

5    that's probably it.

6                    Oh.  Sorry.  I would have at some

7    point also had to spoken to our admin assistant, Deb

8    Severn, about the access to the building.

9         Q.    What did you discuss with John Eisenberg

10   about that meeting?

11                   MS. LOCKE:  Same objection, and I'm

12   going to instruct the witness not to answer.

13        Q.    What did you discuss with Don McGhan

14   about that meeting?

15                   MS. LOCKE:  Same instruction.  Same

16   objection.

17        Q.    You mentioned you talked with Deb Severn

18   about arranging access to the building; correct?

19        A.    Yes.

20        Q.    How did you communicate with Ms. Severn?

21        A.    I probably just walked over to her desk

22   and spoke to her.

Page 78

1    over and talked with Deb Severn; correct?

2         A.      (Nods head up and down.)

3         Q.      Who else at the White House was aware

4    ahead of time that Mr. Nunes was coming to the White

5    House on March 21, 2017?

6         A.      I don't know.

7         Q.      When were you first aware that Mr. Nunes

8    would be coming to the White House?

9         A.      I don't recall if it was March 20th or

10   March 21st.

11        Q.      When did you first discuss with

12   Mr. Nunes the possibility of him coming to the White

13   House that day?

14        A.      March 21st.

15        Q.      Do you recall that conversation?

16        A.      I recall that I called him on his cell

17   phone, and I remember that I had to step out into

18   the hallway to access my cell phone to pull his

19   phone number, and make the phone call.

20               I recall it was a very -- a pretty

21   short conversation, that I told him that there was

22   some information that we thought was important for

CONFIDENTIAL

Page 79

1    him to see, and that he needed to see it in person

2    at the White House.

3                    And I think we then probably just

4    discussed the mechanics of, you know, getting him

5    there.  He wanted to come over right away, and he

6    did.

7         Q.     Did he tell you why he wanted to come

8    over right away?

9         A.     Well, I told him it was important.

10        Q.     What else did you tell him about its

11   importance?

12        A.     I don't recall if I told him anything

13   else.  You know, we would have been on an open line,

14   so I couldn't have talked about substance.  I just

15   don't remember if there's anything else.

16        Q.     How did you know his cell phone number

17   at the time?

18        A.     I had it stored in my phone from my

19   tenure on his staff.

20        Q.     So you mentioned that you called him on

21   his cell phone.

22                    Who made the decision that you

Page 83

1    remember when exactly that switch was.

2         Q.     When did Mr. Nunes arrive at the White

3    House grounds that day?

4         A.     I think it was around 5:30.

5         Q.     Who met him to escort him in?

6         A.     I did.

7         Q.     How do you remember it was around 5:30?

8         A.     My wife and I would usually talk every

9    day around, like, 5:45.  I mean, it's a silly little

10   thing, but it's around our son's dinnertime.  He was

11   a baby at the time.  And we'd always, like,

12   FaceTime.  Everyone in the NSC staff would always

13   see me out in the hall on, like, FaceTime with the

14   little guy because I obviously wasn't making it home

15   at 5:45 for, you know, four years or so.

16              So I remember it was, you know --

17   had to delay the call that night.

18        Q.     Did he arrive in a car?

19        A.     I don't know.  I mean, he didn't -- you

20   know, I met him on the inside of the White House

21   security perimeter.  So how he got to the outside of

22   the perimeter, I don't know.

Page 84

1          Q.      Did someone call you when he reached the
2     outside of the White House perimeter?
3          A.      Yes.   But I don't remember if it was the
4     guard at the gate or if he called me, but there
5     probably was a phone call to say, hey, he's here.
6     You know, your guest is here.   Come escort him.
7          Q.      Did Mr. Nunes call you after the
8     telephone call you described when he decided to come
9     over to the White House but before he arrived?
10         A.      I don't recall.   If there was anything,
11    it was only of the nature of, again, logistics.
12         Q.      Did you exchange any text messages with
13    Mr. Nunes at the time about that meeting?
14         A.      Again, I don't recall.   If I did, it
15    would have just been of a logistical nature.
16         Q.      Who met Mr. Nunes to escort him in?
17         A.      I think I did.
18         Q.      You met him at the interior perimeter of
19    the White House --
20         A.      Yes.
21         Q.      -- to escort him in?
22                 Was anyone with him at the time?

Page 92

1              MS. LOCKE:  I'm going to object to

2    the extent that the content of that answer reveals

3    privileged communications and/or classified

4    information.

5        Q.    Are you going to follow your lawyer's

6    advice?

7        A.    Yes.

8        Q.    Where did you get the documents from?

9              MS. LOCKE:  Again, same objection.

10   I'm going to object to the extent it calls for

11   privileged communications or classified information.

12       A.    Physically, at the time of the meeting,

13   they were in my office.

14       Q.    Who printed the documents?

15       A.    I'm not sure I can answer that.

16       Q.    When did you first receive those

17   documents?  I'm just asking for a date.

18       A.    Mm-hmm.  March 19th.

19       Q.    March 19, 2017?

20       A.    Yes.

21       Q.    How did you receive those documents?

22              MS. LOCKE:  Same objection.

Page 93

1        A.      Well, in physical hard copy.

2        Q.      By courier?

3        A.      No.

4        Q.      Were the documents printed within your

5    office?

6        A.      No.

7        Q.      What were the documents?

8                MS. LOCKE:  I'm going to object to

9    the extent that it calls for privileged or

10   classified information.

11               If you're able to describe the

12   documents without revealing classified information,

13   you can answer the question.

14       A.      I think I can describe it, at least a

15   high level.  The documents were a log of unmasking

16   requests made in late 2016 and early 2017 from White

17   House officials -- sorry, requests made by White

18   House officials, and a very brief description of the

19   requests along the lines of, you know, what date it

20   was made, by whom, whether it was approved or

21   denied, as well as a copy -- sorry, and which

22   intelligence report the unmasking request related to

Page 94

1    as well as copies of all of the intelligence reports

2    listed in the log.

3         Q.    Was the log a spreadsheet?

4              MS. LOCKE:  I'm going to object to

5    the extent that it calls for you to reveal

6    classified information.

7         A.    I don't know how it was electronically

8    stored.  It appeared as a table.

9         Q.    How many pages are we talking about?

10             MS. LOCKE:  Same objection.

11        A.    I don't remember.  You know, the --

12   yeah, I just don't remember how many pages.

13        Q.    Can you ballpark whether it was more

14   than 100 pages?

15        A.    The log itself was not that many pages.

16             When combined with the underlying

17   intelligence reports, it was -- you know, there was

18   a fair amount of paper.  You know, probably a few

19   hundred pages.

20             Intelligence reports vary in length.

21   Some are, you know, one or two pages.  Some are

22   quite lengthy.  Sometimes there's a lot of, you

Page 95

1    might call metadata associated with them, a list of

2    recipients of the report, which can go on for pages.

3                    So it depended.

4         Q.    Ballpark, how many different

5    intelligence reports are you referring to?

6                    MS. LOCKE:  Same objection.

7         A.    A few dozen.

8         Q.    And about how many pages was just the

9    log?

10        A.    Again, I --

11                   MS. LOCKE:  Same objection.

12                   THE WITNESS:  Oh, yeah.  Sorry.

13        A.    Again, I don't recall.

14        Q.    How many pages of documents did you

15   provide to Mr. Nunes to review on that day?

16        A.    Again, I don't recall an exact number.

17   Probably a few hundred.  The log and the underlying

18   reports that were listed in the log.

19        Q.    Did Mr. Nunes review every page?

20        A.    I don't think so because, again, a lot

21   of the pages were sort of metadata, not substantive,

22   right, so you would flip through to find the -- you

Page 105

1   minimization procedures like the ones that you

2   described?

3       A.    No.

4       Q.    Is there anything about Mr. Nunes's use

5   of the word "raw" here that you think is inaccurate?

6               MS. LOCKE:  I want to object to the

7   extent it calls for classified information.

8       A.    Well, I don't really know exactly what

9   he means because he says, what appears to be raw, or

10  but I shouldn't say raw.  So I don't really know

11  what he means.

12      Q.    Would it be accurate to characterize the

13  intelligence reports that he saw as raw?

14              MS. LOCKE:  Same objection.

15      A.    No.  They were disseminated reports.

16      Q.    What is the basis for Mr. Nunes's

17  statement that intelligence reports show that the

18  President-elect himself was monitored and

19  disseminated out in intelligence?

20              MS. LOCKE:  Same objection.  To the

21  extent it calls for you to reveal classified

22  information, I'm going to instruct you not to

Page 106

1   answer.

2          A.      Yeah.  I don't think I can answer that.

3          Q.      What's the basis for his statement that

4   the intelligence reports show that the

5   President-elect's team were monitored and

6   disseminated out in intelligence?

7                  MS. LOCKE:  Same objection.  Same

8   instruction.

9          A.      I don't think I can answer.

10         Q.      Why did you say earlier that the entire

11  statement was accurate?

12         A.      In the broad strokes that -- you know,

13  that he had seen intelligence reports that were

14  disseminated intelligence that related to unmasking

15  requests by White House officials in 2016 and early

16  2017 that appeared to have some nexus to members of

17  the Trump transition or other folks associated with

18  the Trump campaign.

19         Q.      You mentioned "nexus to members of the

20  Trump transition or other folks associated with the

21  Trump campaign"; correct?

22         A.      If those were the words I just said,

Page 107

1    then, yes.

2         Q.     You didn't mention President Trump?

3         A.     I did not.

4         Q.     Is that because the intelligence reports

5    did not have a nexus to President Trump himself?

6                    MS. LOCKE:  Same objection to the

7    extent it asks you to reveal classified information,

8    and then I will instruct you not to answer to the

9    extent it -- the answer would reveal classified

10   information.

11        A.     I think I can at least say that none of

12   the reports -- again, it was -- these were

13   disseminated reports with the US person information

14   anonymized, but none of them, based on the context,

15   appear to be Trump himself.

16        Q.     So upon reflection, would you say that

17   the statement that "I've seen intelligence reports

18   that clearly show that the President-elect was

19   monitored and disseminated out in intelligence"

20   would be an inaccurate statement?

21        A.     As I said, it was accurate in broad

22   strokes.  There are, you know, some parts of this

Page 110

1    But again, broad strokes accurate, but, you know, I

2    take this as an off-the-cuff remark and not a -- a

3    finely lawyered statement.

4         Q.    When did Mr. Nunes leave the White House

5    grounds?

6         A.    I don't know exactly.

7         Q.    When did you leave Mr. Nunes?

8         A.    I recall he left the NSC Legal offices

9    after our meeting.  Again, I think I said the

10   meeting was 30 to 60 minutes.  So whenever that

11   ended, he left.  I don't know where he went after

12   that.

13        Q.    Where was the last place that you saw

14   him?

15        A.    In the hallway outside of our offices.

16        Q.    So Mr. Nunes could walk out alone?

17        A.    Yes.  It always amazed me that we

18   actually didn't require escorts at the White House,

19   unless you were a foreign national.

20        Q.    Who accompanied Mr. Nunes when he left?

21        A.    I don't recall.  He may have just walked

22   out by himself or he may have walked somewhere else

Page 111

1    in the complex.  I don't know.

2         Q.    Where he did go after his meeting with

3    you?

4         A.    I don't know.

5         Q.    What did he say to you about what he was

6    doing that evening?

7         A.    I don't remember if we discussed it.

8         Q.    Were you aware that there was an event

9    that evening at which President Trump was giving

10   remarks at the National Building Museum?

11        A.    I think I later saw in press reporting

12   that the NRCC's annual gala was that night.

13        Q.    You didn't go to the gala?

14        A.    No.

15        Q.    Were you invited to go to the gala?

16        A.    No.  I think I was still at work.

17        Q.    Did you see Mr. Nunes call anyone before

18   you two parted ways?

19        A.    I don't remember.

20        Q.    Did you see Mr. Nunes pick up his phone

21   from the locker outside NSC Legal when you parted

22   ways?

Page 112

1          A.     I don't have a particular memory, but

2     I'm sure he took his phones with him.  I don't

3     recall the next day having to, like, get his phones

4     back to him, so...

5          Q.     You referred to his "phones."

6                      So how many phones did he have at

7     the time?

8          A.     Oh, as I said, I don't really recall if

9     there was one phone, more than one phone, but just,

10    you know, the electronic devices, if any, he brought

11    with him, he would have taken back upon leaving.

12                      I assume if he had forgotten them,

13    we would have probably needed to help get them back

14    to him.

15         Q.     Did you have multiple cell phone numbers

16    for Mr. Nunes?

17         A.     I don't remember.

18         Q.     Who did you speak with on Mr. Nunes's

19    staff about Mr. Nunes's March 21, 2017, trip to the

20    White House after it happened?

21         A.     I think at some point I spoke to Damon

22    or Scott.  I don't remember which one of them, or

CONFIDENTIAL

Page 199

1              CERTIFICATE OF COURT REPORTER

2

3         I, Marjorie Peters, Fellow of the Academy of

4    Reporting, Registered Merit Reporter, Certified

5    Realtime Reporter, Notary Public the Commonwealth of

6    Virginia, before whom the foregoing deposition was

7    taken, do hereby certify that the foregoing

8    transcript is a true and correct record of the

9    testimony given; that said testimony was taken by me

10     stenographically and thereafter reduced to

11     typewriting under my direction and that I am neither

12     counsel for, related to, nor employed by any of the

13     parties to this case and have no interest, financial

14     or otherwise, in its outcome.

15          I further certify that signature was not

16     waived by the witness.

17          IN WITNESS WHEREOF, I have hereunto set my

18     hand this 19th day of December, 2022.

19

20

21

     Marjorie Peters, FAPR, RMR, CRR

22     My Commission expires on August 31, 2024.