**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DEVIN G. NUNES, | <span style="color:red">**FILED UNDER SEAL**</span> |
| Plaintiff, | <span style="color:red">**CONTAINS INFORMATION DESIGNATED AS HIGHLY CONFIDENTIAL**</span> |
| v. | |
| WP COMPANY LLC, d/b/a THE WASHINGTON POST and ELLEN NAKASHIMA, | Case No. 1:21-cv-00506 (CJN) |
| Defendants. | |

<u>**DECLARATION OF ELLEN NAKASHIMA**</u>

I, Ellen Nakashima, declare:

1.      I am a national security reporter for The Washington Post ("The Post") and a defendant in this case.  This declaration is based on my personal knowledge except where otherwise indicated and on documents kept by The Post in the ordinary course of business that I have reviewed.  If called as a witness, I could and would testify competently to these facts under oath.

2.      On Monday, November 9, 2020, The Post published an online version of an article titled "White House official and former GOP political operative Michael Ellis named as NSA general counsel" (the "Article").  Hentoff Decl. Ex. 1 (Online Article).  The Post published a print version of the Article the next day, on Tuesday, November 10, 2020.  Hentoff Decl. Ex. 2 (Print Article).  On November 17, 2020, counsel for Plaintiff Devin G. Nunes ("Nunes") filed a lawsuit against me and The Post and demanded retraction of statements that referenced him in

the Article.  Hentoff Decl. Ex. 3 (Retraction Demand).  In his lawsuit, he alleged that the
following statements were false and defamatory.

> a. "In March 2017, [Ellis] gained publicity for his involvement in a questionable
> episode involving Nunes, who was given access at the White House to
> intelligence files that Nunes believed would buttress his baseless claims of the
> Obama administration spying on Trump Tower."
>
> b. "News reports stated that Ellis was among the White House officials who
> helped Nunes see the documents — reportedly late at night, earning the
> episode the nickname 'the midnight run.'"

3.     The Post published an online correction to the Article on Tuesday, December 7,
2020, and published a print edition correction on Wednesday, December 8, 2020.  Hentoff Decl.
Ex. 4 (Online Correction); Hentoff Decl. Ex. 5 (Print Correction).  Nunes later amended his
complaint and alleged that the following sentence in the Corrected Article was defamatory.

> a. "In March 2017, he gained publicity for his involvement in a questionable
> episode involving Nunes, who was given access at the White House to
> intelligence files that Nunes believed would buttress Trump's baseless claims
> of the Obama administration spying on Trump Tower."

4.     I wrote the Article and was involved along with Post editors in approving the
correction and the changes to the Corrected Article.

**PROFESSIONAL BACKGROUND**

5.     I am a national security reporter for The Post, where I cover U.S.-China strategy
and policy, cybersecurity, and intelligence issues.  In November 2020, my reporting primarily
focused on the United States' attempts to counter foreign election interference and cyberattacks.

6.      I graduated from the University of California, Berkeley, in 1984, where I received a B.A. in the humanities.  I received a master's degree in International Journalism from City University in London in 1989.

7.      I have been employed full time as a journalist since 1990, when I started as a reporter at the Patriot Ledger in Quincy, Massachusetts.

8.      I strive for excellence and accuracy in my reporting.  Since joining The Post in 1995, my journalism has received numerous honors and awards.  For example, I was one of the team members who received the Pulitzer Prize for National Reporting in 2018 for reporting on Russia's efforts to influence the outcome of the 2016 presidential election and on contacts between aides to President Trump and Russian officials.  I was also one of the team members who received the Pulitzer Prize for Public Service in 2014 for revealing the hidden scope of government surveillance and its policy implications.  I received the Gerald Loeb Award in 2014 for my reporting on the National Security Agency's global surveillance programs.  My other honors and awards are listed in my Post biography, which is publicly available.  *See* Ex. A (Nakashima Biography).

9.      I joined The Post's national security desk in 2009.  As a national security reporter, I primarily focus on developments involving the executive branch.  My beat does not involve and has never involved closely monitoring Congress.  I am not nor have I ever been responsible for regularly attending meetings of the House Permanent Select Committee on Intelligence ("Intelligence Committee" or "HPSCI") or tracking the daily activities of its members.  To the extent I have reported on the activities of the Intelligence Committee or its former chair Nunes, it has been on an ad hoc basis or in connection with other national security stories on my beat.

**MARCH 2017 REPORTING**

10.     In March 2017, I focused my reporting on the executive branch's response to allegations of Russian interference in the 2016 presidential election.  For example, I shared a byline on the March 20, 2017 article, "FBI Director Comey confirms probe of possible coordination between Kremlin and Trump campaign," Ex. B, and on the March 1, 2017 article, "Sessions met with Russian envoy twice last year, encounters he later did not disclose," Ex. C.  I also reported on developments related to Wikileaks, the San Francisco Police Department's exit from the FBI anti-terrorism task force, and indictments of Russian spies.

11.     In March 2017, I also reported on President Trump's claims that the Obama administration had wiretapped Trump Tower.  On March 4, 2017, I shared a byline on the article, "Trump, citing no evidence, accuses Obama of 'Nixon/Watergate' plot to wiretap Trump Tower," which reported that President Trump made a series of Twitter posts accusing "former president Barack Obama of orchestrating a 'Nixon/Watergate' plot to tap the phones at his Trump Tower headquarters last fall in the run-up to the election."  Ex. D.  In one tweet, President Trump wrote, "Terrible!  Just found out that Obama had my 'wires tapped' in Trump Tower just before the victory.  Nothing found.  This is McCarthyism!"  Hentoff Decl. Ex. 10 (@realDonaldTrump March 4, 2017 Tweets).

12.     I was involved in some reporting on Nunes in March 2017.  That reporting was always part of a team effort, meaning that other Post journalists were involved in reporting and writing the articles, and I was involved either as a contributor or a co-author.  A co-author of an article has significant involvement in the writing of an article, and thus receives a byline credit at the top of the story.  A contributor is anyone who worked to provide information to a story, and so receives a contributor credit at the bottom of the story.  A contributor may be responsible for

4

contributing only a single fact to an article, and is generally not involved in the drafting and editing of an article.

13.     On March 23, 2017, I co-reported an article headlined, "Intelligence Chair Nunes apologizes for disclosing surveillance information to the White House."  Ex. E.  This article reported that Nunes had apologized to his Intelligence Committee colleagues after he "came under heavy fire from Democrats on Wednesday after going first to the press, then to the White House, and then to the press again before consulting with committee colleagues about what he said was fresh intelligence about the president and his campaign aides."  In reporting on the response to Nunes's March 2017 actions, this article quoted a Democratic committee official as stating, "This looks like the president got in hot water over his wiretapping claim, and the White House had to find a way to give him an off-ramp."  This article did not report the information that Nunes had disputed Trump's claims of wiretapping.

14.     I also was one of three reporters who received a contributor credit to a March 26, 2017 story headlined, "Chairman and partisan: The dual roles of Devin Nunes raise questions about House investigation."  Ex. F.  This story reported that the March 2017 sequence of events was "largely engineered" by Nunes, "who has emerged as one of Trump's most tenacious allies on Capitol Hill."  *Id.*  My only contribution to this story was seeking comment from Nunes's spokesman Jack Langer regarding Nunes's March 21, 2017 White House visit.  My notes reflect that Langer did not provide comment on the timing of Nunes's visit or the claim that the Obama administration had wiretapped Trump Tower, and that he provided only a general denial of an account that "Nunes was on his way to an event on Tuesday night in D.C. with his staff director when he got a phone call," swapped cars to go to a new location, and "got the documents regarding the incidental collection."  Ex. G (March 24, 2017 Notes).  I was not involved in the

reporting or writing of this article's statement that "Nunes has been at odds with Trump in a few cases, most notably when Nunes said that Trump was simply 'wrong' about the claim that Obama had ordered a wiretap of Trump Tower to listen to the Republican presidential candidate." I was not otherwise involved in the reporting or drafting of any other aspect of the March 26, 2017 article. I did not interview any sources for this article, aside from Langer.

15.     Because I was not the lead reporter covering developments related to Nunes's March 21 and 22, 2017 trips to the White House, I was not giving consistent attention to his statements regarding these trips. I did not follow every public statement that Nunes made that month, in press conferences or in media appearances. I also did not give consistent attention to his statements denying the wiretapping of Trump Tower. Although emails from this time period that I have reviewed during this litigation indicate that I was aware of Nunes's denial of the wiretapping of Trump Tower, I never reported on this denial or otherwise engaged with this fact in a meaningful way.

16.     During this time and in the years that followed, I was heavily occupied with my varied duties as a Washington Post national security reporter. In March 2017 in particular, I wrote or contributed to at least 39 articles for The Post. That month, I also worked on a 7,000-word feature story about how the Obama administration struggled with how and whether to sanction Russia for its interference in the 2016 election, conducting lengthy interviews in support of this original reporting. In 2017, as a whole, I wrote or contributed to at least 266 articles, reporting on Russia's interference in U.S. affairs, Russia's use of disinformation, and the development of cyberweaponry. Of the ten stories in The Post's winning Pulitzer-Prize submission covering the year of 2017, my byline was on six of them. In 2018, I wrote or contributed to at least 231 articles, and reported on North Korea's nuclear program, Chinese

hacking efforts, and National Security Agency ("NSA") personnel issues.  In 2019, I wrote or contributed to at least 209 articles, and reported on the NSA's collection of Americans' phone records and the development of new information warfare tactics by U.S. Cyber Command.

**NOVEMBER 9, 2020 ARTICLE**

17.     In 2020, I wrote or contributed to at least 236 articles, including both "spot news" or "breaking news" pieces and in-depth articles reflecting longer-term investigation.  November 2020 was a particularly busy time for me and my national security colleagues at The Post given the presidential election on Tuesday, November 3, 2020, and developing news both before and after the election regarding election-related interference, cyberattacks, and misinformation.

18.     Having refreshed my recollection by reviewing Post documents that have been produced in discovery in this case, I am able to piece together to a degree my reporting, researching, writing, and thinking both on November 9, 2020 and the month that followed when I participated in considering and approving a correction and revision to the Article.

19.     At some point on Monday, November 9, 2020—the day the Article was published—I learned from my colleague Greg Miller that Michael Ellis would be appointed General Counsel of the National Security Agency.  ██████████████████████████

████████████████████████████████████████  At 1:44 p.m., I began conducting internet research on Michael Ellis.  Ex. H (November 9, 2020 Browser History).  I also contacted various sources to confirm details of Ellis's appointment sometime after receiving the tip.  I confirmed Ellis's appointment sometime before 3:46 p.m.

20.     ████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████.  Ex. I (November 9, 2020 Email from E. Nakashima to P. Finn).

This development had not yet been reported by any other news outlet.  I believed the story was newsworthy in part because the NSA was "the U.S. government's largest and most technically advanced spy agency."  I also believed the story was newsworthy because Ellis, who had considerably less experience than past NSA general counsels, was being moved from a role where he served at the pleasure of the president to a senior civil servant position with "civil service protections," and that this appointment was being made two days after Democratic presidential candidate Joe Biden had been declared the winner of the 2020 election.  Hentoff Decl. Ex. 1.

21.    In my email,  . Ex. I.

"midnight run" because I recalled that political figures, journalists, and commentators used this nickname for the March 2017 controversy involving both Nunes and Ellis.

22.    I did not have or pursue a preconceived narrative when writing the Article to characterize Nunes or anyone else in any particular way.  As in all my articles, I tried to be impartial and accurate based on my reporting, my research, and my background knowledge.

23.    Finn approved the idea at 4:04 p.m. that day. . *See id.*  Because the Article was breaking news, I understood that my deadline for completing and submitting a draft would be as soon as possible that same evening, and worked on drafting the Article in a quick and efficient manner so as to get this new information out to the public.

24.     My focus in the Article was to report the news of Ellis's selection as General

Counsel of the NSA.  My reporting was based on on-the-record comments by former NSA

General Counsel Glenn Gerstell about the NSA and its legal office, off-the-record comments

provided to me during at least half a dozen interviews with confidential sources, and publicly

available information regarding Ellis's career.

25.     Having reviewed a copy of some of my internet search history while I was

working on the Article on November 9, 2020, I know that I located that publicly available

information through Google searches for ███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

███████████████████████████████  Ex. H.  As I drafted

the Article, I accurately referred to it as █████████████████████████████████

████████████  Ex. J (███████████████████████████████).

26.     I wrote a complete draft of the Article by 5:35 p.m. on November 9, 2020.  Ex. K

(November 9, 2020 Email from █████████████████).  In that draft, ████████

████████████████████████████████████████

██████████████  Providing such background information in news articles is a common practice

to help readers understand the importance of the story and place it in context.  As opposed to the

breaking news aspect of a news article, which involves reporting new information, the

background aspect of a news article involves conveying previously reported information to

readers.  In providing that background information here, I relied on my memory of two prior

times Ellis had been in the news, as well as my review of articles reporting on those episodes,

which I retrieved after conducting internet searches.

27.     I included the following two background statements about Ellis that reference Nunes and that are challenged in this lawsuit: (1) "In March 2017, he [Ellis] gained publicity for his involvement in a questionable episode involving Nunes, who was given access at the White House to intelligence files that Nunes believed would buttress his baseless claims of the Obama administration spying on Trump Tower"; and (2) "News reports stated that Ellis was among the White House officials who helped Nunes see the documents—reportedly late at night, earning the episode the nickname 'the midnight run.'" *See id.*

28.     I included a hyperlink after the second statement to a March 30, 2017 Post article by Greg Miller and Karen DeYoung, which stated, among other things, that Nunes reviewed the "intelligence files" I referenced "during a surreptitious visit to the White House grounds," and that those files "have been used to defend President Trump's baseless claims on Twitter that he had been wiretapped at Trump Tower under a surveillance operation ordered by then-President Barack Obama."  Ex. L.  We Post reporters are instructed to regularly include hyperlinks in our articles to provide readers with sources for a given statement and to direct them to other articles that may provide them with more context for the statement.

29.     Finn edited the Article at some point prior to its publication.  ██████████████ ████████████████████████████████████████  *Compare, e.g.*, Ex. M (draft of Article) *with* Hentoff Decl. Ex. 1 (Article as published).

30.     I was the only author of the Article, as reflected in the Article's byline.  The Article listed Greg Miller as the only contributor.  That contributor credit was based solely on Miller's initial tip to me that the White House planned to appoint Ellis to the role of NSA General Counsel.

31.     The Post published the online version of the Article by 5:54 p.m. on November 9,

2020.  Ex. N.  The later timestamp of 7:55 p.m. on the Article, *see* Hentoff Decl. Ex. 1, reflected

minor updates after publication that did not affect the content of either of the two background

statements, *see* Ex. N (providing link to published Article at 5:54 p.m.).  Although I cannot

identify what these specific changes were, I know from my experience at The Post that an article

may be updated after first publication to include additional web elements, such as illustrations

and captions.

32.     When I wrote those two statements referring to Nunes, I believed them to be

accurate and uncontroversial background statements, and had no doubts as to their truth.  In

writing the statements, I relied on my general recollection of national security reporting and a

review of news reports that I reviewed that day, as reflected by contemporaneous Internet

browser history on my work computer.  *See* Ex. H.

33.     For the first background statement that Nunes "was given access at the White

House to intelligence files that Nunes believed would buttress his baseless claims of the Obama

administration spying on Trump Tower," I relied primarily on two news reports to help me draft

a concise summary of the March 2017 events involving Michael Ellis:

      a.     A March 30, 2017 Post article co-authored by Greg Miller, which stated

that "[t]he materials unearthed by Nunes have been used to defend

President Trump's baseless claims on Twitter that he had been wiretapped

at Trump Tower under a surveillance operation ordered by then-President

Barack Obama," and that "[t]he White House role in the matter contradicts

assertions by the committee's chairman, Rep. Devin Nunes (R-Calif.), and

adds to mounting concerns that the Trump administration is collaborating

with the leader of the House Intelligence Committee's investigation of

Russian meddling in the 2016 election."  Ex. L.

b.   A March 30, 2017 New York Times article, which stated that "the view

among Democrats and even some Republicans was that Mr. Nunes was

given access to the intelligence reports to divert attention from the

investigations into Russian meddling, and to bolster Mr. Trump's

debunked claims of having been wiretapped," and "[o]n both counts, Mr.

Nunes appears to have succeeded: The House inquiry into Russian

meddling that he is leading has descended into a sideshow since he

disclosed the information, and the administration has portrayed his

information as vindicating the president's wiretapping claims," Ex. O.

I relied on these articles because I believe The Post and New York Times to be reliable

publications, and trust their reporting to be factually accurate.  In particular, I know my longtime

colleague Greg Miller to be meticulous, balanced, and accurate in his reporting.  In addition, I

believed these articles to be true in part because they tracked my general recollection that Nunes

had stood by Trump when Trump accused the Obama administration of wiretapping Trump

Tower, and that Ellis had been involved in this controversy.

34.   Because the March 30, 2017 Post and March 30, 2017 New York Times articles

framed the Ellis-Nunes controversy in a way that I thought readers would find easy to

understand, I tried to synthesize their statements that (1) "Nunes was given access to the

intelligence reports to . . . bolster Mr. Trump's debunked claims" and Nunes "appears to have

succeeded," and (2) "the materials unearthed by Nunes have been used to defend President

Trump's baseless claims."  Ex. L; Ex. O.  I put these ideas into my own words by writing that

"Nunes . . . was given access at the White House to intelligence files that Nunes believed would buttress his baseless claims of the Obama administration spying on Trump Tower."  Hentoff Decl. Ex. 1.  In doing so, I misread the articles to say that because Nunes had "bolster[ed]" and "defend[ed]" Trump's wiretapping claims, Nunes had also made the claims that the Obama administration had spied on Trump Tower.  As a result of this misunderstanding, I introduced an error that conflated Devin Nunes and Donald Trump, by referring to "his"—that is, Nunes's— "baseless claims of the Obama administration spying on Trump Tower."  I did not catch this error of understanding when writing the Article in November 2020, because I did not recall that Nunes had stated in March 2017 that he did not believe there had been any wiretapping of Trump Tower.  That information from more than three and a half years earlier was not in my mind.  The "baseless claims" I mistakenly attributed to Nunes in November 2020 should have been attributed to President Trump, who had tweeted in March 2017 that Trump Tower had been wiretapped.

35.     I have reviewed Nunes's Amended Complaint, ECF No. 22.  I am thus aware that Nunes alleges that "WaPo and Nakashima's own prior reporting demonstrates that they knew Plaintiff never claimed that the Obama administration had spied on or wire-tapped Trump Tower," referencing the March 26, 2017 story headlined, "Chairman and partisan: The dual roles of Devin Nunes raise questions about House investigation" and a March 15, 2017 story headlined "Devin Nunes confirms it: The evidence of Trump Tower being wiretapped just doesn't seem to exist" in support.  Am. Compl. ¶ 22(a) n.5.  As I stated, when I prepared the two background sentences on November 9, 2020, I did not remember the limited number of email or articles mentioning Nunes's statement about wiretapping that I saw or may have seen in March 2017.  That includes these two articles mentioned in the Amended Complaint.

36.     In writing the background statements, I also reviewed four other news reports, according to my browser history.  Although I do not recall relying heavily on the following articles, I have reviewed them during this litigation, and they are consistent with the above-referenced March 30, 2017 articles from The Post and the New York Times and support aspects of my background statements referencing Nunes:

a.      A November 1, 2019 AP article, which stated that the material Nunes reviewed "was to bolster Trump's claim that he was wiretapped during the 2016 campaign on the orders of President Barack Obama's administration."  Ex. P.

b.      A March 30, 2017 Heavy.com article, which stated that "Nunes has told reporters he received a call from a source at the White House the night of March 21 and rushed to meet with the source and review the documents." Ex. Q.

c.      A March 3, 2020 Law & Crime article, which quoted reports that Michael Ellis "invited Nunes to the White House to see 'evidence' of Obama admin 'unmaskings' so to distract from the early pressure of the Russia investigation" and that Ellis thus appeared "to have sought to use intelligence to advance the political goals of the Trump administration." Ex. R.

d.      A March 4, 2020 Just Security article, which stated that "[i]n March 2017, Ellis became caught up in the White House scandal of sharing intelligence information with Nunes in an apparent effort to discredit the Russia

investigation" and that "Ellis had used intelligence for political purposes."

Ex. S.

I had no reason to doubt the accuracy of these sources.

37.    None of the news reports I reviewed while drafting the Article alerted me to my mistaken attribution of the "baseless claims" to Nunes as opposed to Trump, because none contained any statements Nunes made in March 2017 that he did not believe there had been any wiretapping at Trump Tower.

38.    For the second background statement that Nunes accessed the intelligence files "reportedly late at night, earning the episode the nickname 'the midnight run,'" I relied on my memory of coverage and commentary about the episode. I did not have a specific article in mind when I wrote that phrase.  Indeed, when I first pitched the story to my editor Peter Finn, I used the nickname "midnight run" to describe the incident.  Because that nickname stuck out in my mind, I believed that readers might also remember it, and so used it in the second background statement as shorthand.

39.    For readers who were not familiar with the "midnight run" moniker, I included the contextual information that the episode occurred "reportedly late at night" to explain the nickname.  My intent in doing so was to describe the commentary around that trip.  I wrote "reportedly late at night" because I remembered that news outlets and commentators had reported or suggested that the events happened "late at night," and that was why the trip was called the "midnight run."  By writing that the trip occurred "reportedly late at night," I was not attempting to convey that the timing of the trip was an established fact.  As a general matter, when I use the qualifier "reportedly" in an article, I mean for it to signal that information has not been confirmed and may not necessarily be accurate.

15

40.     None of the articles that I reviewed stated that Nunes's visit to the White House to review intelligence files occurred during daylight hours.  Two of the articles, by the New York Times and Heavy.com, stated that the visit occurred at "night," with the New York Times article additionally stating that the visit "began after dark."  *See* Ex. O; Ex. Q.  This was consistent with my general memory at the time I wrote the Article that Nunes's White House trip was nicknamed the "midnight run" and contemporaneous news coverage reported that the trip occurred late at night, even though I did not doubt my memory on this point.

41.     At the time I wrote the Article in November 2020, I did not have access to any emails from 2017 on my work computer at The Post.  Pursuant to the email settings on my work computer at The Post, which are managed by The Post's IT Department, I was only able to access emails over the past year (*i.e.*, since November 2019) on my work computer at The Post.  I understand that my emails from March 2017 were recovered for this litigation, and that I had sent and received some emails during this time period that included Nunes's statement that the Obama administration had not wiretapped Trump Tower or referenced Nunes's March 21, 2017 visit to the White House.  Although I reviewed these March 2017 emails during this litigation, I did not have memory of these emails at the time I wrote the Article more than three and a half years later, in November 2020.

### DECEMBER 8, 2020 CORRECTED ARTICLE

42.     On November 17, 2020, I learned that Nunes had filed a lawsuit against me and The Post in which he alleged that background statements about him in the Article were defamatory, and that Nunes simultaneously had sent a letter in which he demanded that The Post retract the statements.  In that letter, Nunes stated among other things that he did not make "any claim that the Obama administration spied on Trump Tower" and did not believe intelligence

files "would buttress a claim Plaintiff made."  In that letter, Nunes also stated that "[t]he 'midnight run' 'episode' never happened."  Hentoff Decl. Ex. 3.

43.     I was surprised to receive Nunes's retraction demand and notice that he had filed a lawsuit against me based on the Article, particularly because the Article's brief discussion of Nunes was all based on publicly available material describing events that had occurred more than three years prior.  Before receiving Nunes's retraction demand and notice of his lawsuit, I had not received any request for correction or retraction of any statement in the Article, and had no doubts regarding the accuracy of any statements in the Article.

44.     After receiving Nunes's retraction demand and notice of his lawsuit, I ███████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████

45.     As those discussions were ongoing, ████████████████████████████

█████████████████████████████████████████████

46.     ████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

█████████████████████████████████████████:

      a.     Nunes's March 20, 2017 statement during a hearing of the House Permanent Select Committee on Intelligence that "we know there was not a physical wiretap of Trump Tower.  However, it's still possible that other surveillance activities were used against President Trump and his associates."  Ex. T.

b.    Nunes's March 22, 2017 statement during a news conference that "while there was not a physical wiretap of Trump Tower, I was concerned that other surveillance activities were used against President Trump and his associates.  So first, I recently confirmed that on numerous occasions the intelligence community incidentally collected information about U.S. citizens involved in the Trump transition."  Ex. U.

47.    

████████████  Even though the trip was known by the nickname the "midnight run," *see* Ex. K (quoting former national security official using the term "Midnight Run" in reference to Ellis),

██████████████████████████████████████████

███████████████████████  Hentoff Decl. Ex. 3.  Additionally, the following publicly available sources from that time period, ██████████████████

██████████████████████  reported that the trip occurred in the "afternoon" or "evening," as opposed to nighttime:

a.    A March 30, 2017 Post article by Philip Bump, which placed the timing of the visit during the "afternoon" or "evening" and stated that "the precise timing on this isn't clear; in later interviews, Nunes says that it was still daylight." Ex. V.

b.    An April 12, 2017 Wired article, which stated that Nunes's visit occurred during the "evening."  Ex. W.

48.    ████████████████████████████

██████████████████  the statement that Nunes went to the White House to review

"intelligence files that Nunes believed would buttress" "baseless claims of the Obama administration spying on Trump Tower":

    a.    A March 30, 2017 Post Article by Greg Miller and Karen DeYoung, which stated that Nunes's review of intelligence files at the White House added "to mounting concerns that the Trump administration is collaborating with the leader of the House Intelligence Committee's investigation of Russian meddling in the 2016 election" and which I reviewed in the course of reporting the Article.  Ex. L.

    b.    A March 30, 2017 New York Times Article, which stated that "the top Democrat on the House Intelligence Committee, said he needed clarification on whether White House officials had pursued 'a circuitous route' to feed Mr. Nunes the materials so he could then hand them to Mr. Trump" and which I reviewed in the course of reporting the Article and that "Nunes appears to have succeeded" in "bolster[ing] Mr. Trump's debunked claims" because the "House inquiry into Russian meddling that he is leading has descended into a sideshow since he disclosed the information, and the administration has portrayed his information as vindicating the president's wiretapping claims."  Ex. O.

    c.    A March 30, 2017 Post article by Philip Bump, which stated that Nunes "suddenly told the press that he'd seen intelligence suggesting that some Trump associates had been caught up in government surveillance – which, we were left to assume, might mean that Trump's March 4 tweets about having been wiretapped by former president Barack Obama had some

validity" and which noted that "Trump told reporters that he felt

'somewhat' vindicated by what Nunes had told him."  Ex. V.

      d.    An April 12, 2017 Wired article, which referred to the "Nunes

surveillance claims" as "plenty problematic" and stated: "Appearing on

*Hannity* on Fox News, Nunes explains his rationale for briefing Trump on

sensitive information: 'I felt I had a duty and obligation to tell him,

because, as you know, he's taking a lot of heat in the news media.'"  Ex.

W.

49.    ███████████████████████████████████  The correction

stated, "As originally published, this article inaccurately attributed claims that the Obama

administration spied on Trump Tower to Rep. Devin Nunes (R-Calif.), rather than to President

Trump. Nunes has stated that he did not believe there had been any wiretapping of Trump

Tower. This article has also been updated to note that Nunes says an incident known as the

'midnight run' took place during daylight hours."  Hentoff Decl. Ex. 4.



50.    ████████████████████████████████

██████████████████████████████████████

████████████████████████████████

██████████████████████████  Because the correction expressly said

that "Nunes has stated that he did not believe there had been any wiretapping of Trump Tower,"

I believe that the corrected sentence ████████████████████████

51.    ████████████████████████████████████████

██████████████████████  Ex. X (December 7, 2020 Email

████████████████████).  ███████████████████████████

████████ *see* Ex. Y (December 7, 2020 Email from P. Finn to E. Nakashima).  The Post corrected the online version of the Article on Tuesday, December 7, 2020, and published a print edition correction on Wednesday, December 8, 2020.  Hentoff Decl. Ex. 4; Hentoff Decl. Ex. 5.

52.    In addition to posting the correction at the top of the online Article, The Post revised the online Article to state, "In March 2017, he gained publicity for his involvement in a questionable episode involving Nunes, who was given access at the White House to intelligence files that Nunes believed would buttress Trump's baseless claims of the Obama administration spying on Trump Tower," a statement that Nunes alleges is still defamatory.

53.    The online Article was also revised to include the statement, "The precise timing of the visit is unclear, and Nunes says it took place during daylight hours."  This statement was supported by our review of the March 30, 2017 Post article by Philip Bump, which stated that "the precise timing on this isn't clear; in later interviews, Nunes says that it was still daylight." Ex. V.

54.    At the time of the correction, and to this day, I have had no doubts regarding the accuracy of any statements in the corrected Article.  I believe that the facts conveyed in the corrected Article are accurate in every respect.

55.    I regret making the mistake in the Article that The Post corrected.  I had and have no desire to inflict harm upon Nunes.  At no point during my work on the Article or the correction did I intend to convey inaccurate information about Nunes, nor was I ever asked to do so.  As a national security reporter, my reputation depends on me being accurate, objective, and meticulous.  Like any good reporter, I do my best to avoid making mistakes in my reporting.  I would have had nothing to gain from conveying inaccurate information about Nunes or anyone else.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Date: 11/8/23

Ellen Nakashima