UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DEVIN G. NUNES,

      *Plaintiff*,

  v.

WP COMPANY LLC, et al.,

      *Defendant*.

Civil Action No. 1:21-cv-00506 (CJN)

**MEMORANDUM OPINION**

    Former Congressman Devin Nunes claims that The Washington Post and one its reporters, Ellen Nakashima, defamed him in a November 2020 article and a later correction to that article. The Court previously granted in part Defendants' Motion to Dismiss, *see* ECF No. 41, and following discovery, Defendants now move for summary judgment on the remaining claims. *See* ECF No. 81-1. For the reasons discussed below, the Court grants Defendants' Motion.

    **I.**    **Factual Background**

    Some of the events relevant to this dispute occurred in March 2017, while others (including the publication of the allegedly defamatory article and correction) occurred more than three years later, in late 2020. The Court starts with 2017.

    On March 4, 2017, then-President Trump issued a series of tweets claiming that, during the 2016 presidential campaign, the phones in Trump Tower had been wiretapped. *See* Mot. for Summ. J., ECF No. 81-2 at 20. Those tweets triggered denials by senators, national security officials, and former President Obama. *See, e.g.,* Exhibit 19, Statement of Senate Select Committee on Intelligence Chairman and Vice Chairman, ECF No. 82-24 at 2 ("Based on the

1

information available to us, we see no indications that Trump Tower was the subject of surveillance by any element of the United States government either before or after Election Day 2016."); *see also* ECF No. 82-21 at 3 ("'There was no such wiretap activity mounted against the president-elect at the time, or as a candidate or against his campaign,' [said] former Director of National Intelligence James Clapper."). As Nunes puts it, the tweets garnered national media attention and were met "with skepticism by many individuals in the intelligence community." *See* Pl. Memo in Opp. To Summ. J., ECF No. 84-1 at 10.

At the time, Nunes was serving as a congressman for the 22nd District in California and as Chairman of the House Permanent Select Committee on Intelligence ("HSPCI"). *See* Pl. Memo in Opp. To Summ. J., ECF No. 84-1 at 9. According to Nunes, he was responsible for "leading the investigation by HPSCI into the Intelligence Community's Russia collusion investigation." *Id*. During this period, Nunes publicly expressed skepticism about then-President Trump's claims of wiretapping, but did make public statements suggesting that other surveillance activities had been directed at the campaign. For example, during a March 20, 2017 HSPCI hearing he said, "Let me be clear . . . [w]e know there was not a wiretap on Trump Tower. However, it's still possible that other surveillance activities were used against President Trump and his associates." *See* Exhibit 23, ECF No. 82-29 at 4.

On March 21, 2017, Nunes was contacted by HSPCI's former general counsel, Michael Ellis, who by then was serving as Deputy National Security Council Legal Advisor at the White House. *See* Ellis Dep., ECF No 82-35 at 9. Ellis invited Nunes to visit the White House to review documents relevant to the unmasking of Americans' names in intelligence reports. *See id*. at 15–16. Nunes ultimately arrived at the White House complex around 5:30 p.m. and met with Ellis in a secure location to review files that had been prepared for Nunes's review. *See id.* at 17. The

files purported to show the unmasking of Trump transition team members in incidental intelligence collection reports by the Obama administration.  *See* Pl.'s Supp. Answers and Resps. to Disc. Req., ECF No. 82-33 at 3.

The following day, Nunes held a press conference in which he stated that "while there was not a physical wiretap of Trump Tower . . . other surveillance activities were used against President Trump and his associates."  Exhibit 7, ECF No. 82-7 at 2.  Nunes stated that he had learned of those other surveillance activities from unspecified "sources . . . who thought that we should know it" and that he intended to inform "the administration" of what he had learned.  *Id.* at 4.  He stated, however, "that there wasn't a physical wiretap of Trump Tower."  *Id.* at 5.[1]

Several news outlets covered Nunes's statements (and President Trump's earlier claims) immediately thereafter.  Among other things, certain articles questioned Nunes's suggestion that he had learned about the other surveillance activities from a whistleblower.  For example, on March 26, the Post published an article in which it noted Representative Adam Schiff's claim that there had been "a White House hand in what [Schiff] called Nunes's 'dead-of-night' excursion to view classified documents."  *See* Nakashima Decl. Ex. F, ECF No. 82-79 at 4.

On March 30, 2017, the Post published an article entitled "Three White House officials tied to files shared with House intelligence chairman."  *See* Nakashima Decl. Ex. L, ECF No. 82-85 at 2.  The article's byline stated that it was written by Greg Miller and Karen DeYoung but had received contributions from Ellen Nakashima.  *See* Pl. Memo in Opp. To Summ. J., ECF No. 84-1 at 12.  The article reported that at "least three senior White House officials, including the top lawyer for the National Security Council, were involved in the handling of intelligence files that

---

[1] That transcript actually reads "that there wasn't a fiscal wiretap of Trump Tower," *see* ECF No. 82-7 at 5, but the Court assumes "fiscal" was a scrivener's error.

3

were shared with the chairman of the House Intelligence Committee." *See* Nakashima Decl. Ex. L, ECF No. 82-85 at 2.  And the article stated that "Nunes reviewed the material during a surreptitious visit to the White House grounds" that "showed that Trump campaign officials were mentioned or inadvertently monitored by U.S. spy agencies targeting foreign individuals." *Id*. at 2–3.  Nakashima's contribution was soliciting a statement from Nunes's communications director, which included "a denial of the entirety of the allegations that Mr. Miller and Ms. DeYoung were making, including allegations about the alleged midnight run, its timing, and circumstances." *See* Pl. Memo in Opp. To Summ. J., ECF No. 84-1 at 12.  The New York Times published a similar piece the same day; it stated (among other things) that "the view among Democrats and even some Republicans was that Mr. Nunes was given access to the intelligence reports to divert attention from the investigations into Russian meddling, and to bolster Mr. Trump's debunked claims of having been wiretapped." ECF No. 82-55 at 4, Matthew Rosenberg, Maggie Haberman, and Adam Goldman, *2 White House Officials Helped Give Nunes Intelligence Reports*, New York Times (March 30, 2017).

The Post also published articles during this period containing statements by Nunes rejecting President Trump's wiretapping claims.  For example, on March 15, 2017, the Post published an article noting that Nunes had said "at a press conference that 'clearly the president was wrong' if he meant literally that President Obama had wiretapped him."  Aaron Blake, *Republicans are threatening to expose Trump as the emperor with no clothes*, Washington Post, Mar. 15, 2017 available at https://www.washingtonpost.com/news/the-fix/wp/2017/03/14/republicans-are-threatening-to-expose-trump-as-the-emperor-with-no-clothes/.  That same day, the Post published an article titled "Devin Nunes confirms it:  The evidence of Trump Tower being wiretapped just doesn't seem to exist." *See* ECF No. 82-66 at 2.

4

That article quoted Nunes as saying, "I don't think there was an actual tap of Trump Tower." *Id*. Other news sources published similar articles during this period. For example, the New York Times reported that, "Mr. Nunes also told reporters on Wednesday that he had no evidence to support Mr. Trump's claim that he was directly or personally wiretapped." *See* ECF No. 82-39 at 2, Matthew Rosenberg, Adam Goldman, and Emmarie Huetteman, *Monitoring May Have 'Incidentally' Picked Up Trump Aides, House Member Says*, New York Times, Mar. 22, 2017.

Fast forward more than three years. On November 9, 2020, Nakashima received a "scoop" from another Post reporter that Ellis was going to be appointed general counsel of the NSA. That afternoon, Nakashima conducted research on the internet and contacted various sources for background on Ellis. *See* Nakashima Decl., ECF No. 81-5 at 7. She also reviewed two of the March 30, 2017 articles discussed above. To reiterate, the first was from the New York Times; that article had stated that "the view among Democrats and even some Republicans was that Mr. Nunes was given access to the intelligence reports to divert attention from the investigations into Russian meddling, and to bolster Mr. Trump's debunked claims of having been wiretapped." *See* Matthew Rosenberg, Maggie Haberman, and Adam Goldman, *Trump Aides Gave Reports to Head of House Inquiry*, N.Y. Times, Mar. 30, 2017, at A1. And the second was the Post article to which Nakashima had contributed; that article had stated: "The materials unearthed by Nunes have been used to defend President Trump's baseless claims on Twitter that he had been wiretapped at Trump Tower under a surveillance operation ordered by then-President Barack Obama." *See* Nakashima Ex. L, ECF No. 82-85 at 2, Greg Miller and Karen DeYoung, *Three White House officials tied to files shared with House intelligence chairman*, Washington Post, Mar. 30, 2017.

As she has explained here in a sworn declaration, Nakashima misread those earlier articles to say that it was *Nunes* who had "made the claims that the Obama administration had spied on

5

Trump Tower." *See* Nakashima Decl., ECF No. 81-5 at 13. Nakashima "did not catch this error of understanding" because she "did not recall that Nunes had stated in March 2017 that he did not believe there had been any wiretapping of Trump Tower." *Id*. As for the timing of Nunes's White House visit, she "remembered that news outlets and commentators had reported or suggested that the events happened 'late at night.'" *Id*. at 15.

Later that day, the Post published the first article that allegedly defamed Nunes. It was written by Nakashima, was titled "White House official and former GOP political operative Michael Ellis named as NSA general counsel," and focused largely on opposition to Ellis's appointment. *Id*. But it also covered Nunes's March 2017 White House visit and related claims, stating in relevant part that:

> Ellis, who was chief counsel to Rep. Devin Nunes (R-Calif.), a staunch supporter of President Trump and then-chairman of the House Intelligence Committee, has been at the White House since early 2017, when he became a lawyer on the National Security Council and then this year was elevated to senior director for intelligence.
>
> In March 2017, he gained publicity for his involvement in a questionable episode involving Nunes, who was given access at the White House to intelligence files *that Nunes believed would buttress his baseless claims of the Obama administration spying on Trump Tower.*
>
> News reports stated that Ellis was among the White House officials who helped Nunes see the documents – *reportedly late at night, earning the episode the nickname "the midnight run."*

*See* Exhibit 1, ECF No. 82-1 at 2 (emphasis added).

Eight days later a lawyer representing Nunes demanded a retraction and apology from the Post. *See* Exhibit 3, ECF No. 82-3 at 2. The letter stated that "Nunes never made the 'baseless' claim or *any* claim that the Obama administration spied on Trump Tower," *id*. at 5 (emphasis in original), and that Nakashima and the Post should have known Nunes had said "the exact opposite"

6

given prior reporting.  *Id*.  The letter also argued that Nunes's trip was not "surreptitious" nor made late at night.

Nakashima, Post editors, and Post lawyers reviewed Nunes's letter.  *See* Finn Decl., ECF No. 81-7 at 5; *see also* Nakashima Decl., ECF No. 81-5 at 17–18.  The team "investigated whether there was merit to Nunes's assertions that (1) the 'midnight run' episode never happened, (2) Nunes did not review intelligence files that he believed would buttress his baseless claims of the Obama administration spying on Trump Tower, and (3) Nunes did not make the 'baseless claim or any claim that the Obama Administration spied on Trump Tower."  *See* Finn Decl., ECF No. 81-7 at 5.  It was ultimately decided that a correction and revised article were warranted that would focus on both the statement that *Nunes* had made the "baseless claims" of wiretapping and that the White House visit occurred at night.  *Id*. at 6.

The correction and revision were published on December 7.  The correction stated that the earlier article had "incorrectly attributed claims that the Obama administration spied on Trump Tower to Rep. Devin Nunes (R.-Calif.), rather than to President Trump.  Nunes has said that he did not believe there had been any wiretapping of Trump Tower."  *See* Defense Exhibit 5, ECF No. 82-5 at 2.  As for the revised article, it read:

> "In March 2017, [Michael Ellis] gained publicity for his involvement in a questionable episode involving Nunes, who was given access at the White House to intelligence files that Nunes believed would buttress *Trump's* baseless claims of the Obama administration spying on Trump Tower."

*See* Defense Exhibit 4, ECF No. 82-4 at 2 (emphasis added).  The article also added a sentence stating that the "precise timing of the visit is unclear, and Nunes says it took place during daylight hours."  *Id*.

7

## II. Procedural History

Following a transfer to this Court from the Eastern District of Virginia and the filing of an Amended Complaint, Nunes ultimately asserted here two claims against both Nakajima and the Post: one for defamation arising out of claimed falsehoods in both the November 9 article and the December 7 correction, and one for negligence arising out of the same articles.

Defendants moved to dismiss both claims, and the Court granted in part and denied in part that motion. *See* Memorandum Opinion, ECF No. 41. As for the November 9 article, the Court concluded that Nunes had adequately alleged that it was materially false when it reported that Nunes supported "baseless claims" when he did not. *Id*. at 7. Defendants had argued that the article was "substantially true" because Trump's claims about the Obama administration "spying on Trump Tower" were not "materially different from Nunes's public claims about the Obama administration 'spying on the Trump campaign' and conducting 'surveillance activities' against President Trump and his associates." *Id*. at 6. The Court concluded, however, that the Post's use of the word "baseless" carried defamatory meaning by "insinuating that Nunes is the type of official who would spend his time searching for evidence to support claims with no foundation in fact." *Id*. at 9. The Court also concluded that Nunes had adequately alleged that the article falsely stated that he had made a trip to the White House in the dead of night when he had not, *id*. at 9, and that the statement was plausibly defamatory in suggesting that there was "something untoward" about Nunes's visit the White House. *Id*. And the Court held that Nunes had plausibly alleged actual malice: "[A]t this stage in the proceedings, where the Court is limited to the allegations in the Amended Complaint and the reasonable inferences that can be drawn from them, the Court cannot determine what in fact led to the incorrect statements in the article."

The Court reached a similar result as to the December 2020 correction and revision. The Court rejected Defendants' argument that Nunes could not state a claim that the retraction was

8

materially false because it was substantially true. Although the Post's retraction did note that "Nunes ha[d] stated that he did not believe there had been any wiretapping of Trump Tower," it also added that "Nunes believed [intelligence files] would buttress Trump's baseless claims"—which implied that Nunes did believe the baseless claims. *See* Memorandum Opinion, ECF No. 41 at 12.

The Court, however, granted Defendants' motion to dismiss Nunes's negligence claim, noting that "that claim [wa]s barred by the First Amendment, which requires more than negligence to establish the Post's liability for its speech." *Id*. at 18, n.15 (citing *Moldea v. New York Times Co.*, 22 F.3d 310, 320–21 (D.C. Cir. 1994)).

The Parties thereafter engaged in discovery and Defendants have now moved for moved for summary judgment. *See* Mot. for Summ. J., ECF No. 81.

### III.   Legal Standards

A court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute about a material fact is not "genuine" unless the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the moving party has met its burden, the nonmoving party must then set forth "specific facts showing that there is a genuine issue for trial" to defeat the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986) (quotation omitted). Though the Court "may not resolve genuine disputes of fact in favor of the party seeking summary judgment," *Tolan v. Cotton*, 572 U.S. 650, 656 (2014), the nonmoving party must show more than "[t]he mere existence of a scintilla of evidence in support of" its position, *Anderson*, 477 U.S. at 252. In other words, "there must be evidence on which the [factfinder] could reasonably find for" the nonmoving party. *Id*. (emphasis added). "[C]onclusory allegations" and "unsubstantiated speculation" will not suffice.

*Bell v. E. River Fam. Strengthening Collaborative, Inc.*, 480 F. Supp. 3d 143, 149 (D.D.C. 2020) (quotations omitted).

To succeed on a claim for defamation under D.C. law, a plaintiff must prove: "(1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement [met the requisite standard]; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm." Memorandum Opinion, ECF No. 41 at 5 (quoting *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 858 (D.C. Cir. 2006)). A statement is defamatory "if it tends to injure [the] plaintiff in his trade, profession or community standing, or lower him in the estimation of the community." *Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 594 (D.C. 2000). However, a defamation claim for mere opinion is not actionable; a plaintiff must show that the defendant made a false statement of fact or an opinion that implies a provably false fact. *Id.* at 597.

But the federal constitution places significant limits on state actions for defamation. *See Garrison v. Louisiana*, 379 U.S. 64, 67 (1964) (explaining that "the Constitution limits state power" in defamation cases). Those limitations stem from the recognition that "speech concerning public affairs is more than self-expression; it is the essence of self-government." *Id.* at 74–75. Accordingly, defamation suits by public figures require proof, by clear and convincing evidence, that the allegedly defamatory remarks were published with knowledge they were false or with reckless disregard to their truth.[2] *See* Memorandum Opinion, ECF No. 41 at 9–10 (citing *Masson*

---

[2] "Clear and convincing" evidence is evidence which permits the trier of fact to "reach a firm conviction of the truth on the evidence about which he or she is certain." *United States v. Montague*, 40 F.3d 1251, 1255 (D.C. Cir. 1994). In the context of defamation suits, "[f]ew public figures have been able clearly and convincingly to prove that the scurrilous things said about them were published by someone with 'serious doubts as to the truth of his publication.'"

*v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510 (1991)). More specifically, "the standard of actual malice requires proof not merely that the defamatory publication was false, but that the defendant either knew the statement to be false or that the defendant in fact entertained serious doubts as to the truth of his publication." *Tavoulareas v. Piro*, 817 F.2d 762, 776 (D.C. Cir. 1987) (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)).

### IV. Analysis

Nunes claims that three statements by the Post were defamatory. The Court assesses each in turn.

### A. Nunes's "Baseless Claims" of Spying

The November 9 article stated that *Nunes* had made "baseless claims of the Obama administration spying on Trump Tower." *See* Exhibit 1, ECF No. 82-1 at 2. Defendants seek summary judgment with respect to this statement on several grounds. They contend that no reasonable jury could find that this statement was materially false or that it conveyed defamatory meaning. *See* Mot. for Summ. J., ECF No. 81-2 at 52–54. They also argue that the statement regarding "baseless claims" was substantially true, since Nunes had made a series of false statements to the public in March 2017, including that Trump had been identified in intelligence reports and the White House was not the source of his claims. *Id*. at 53. Nunes's false public statements, according to Defendants, benefitted Trump's wiretapping narrative and thus make the statement in the article neither materially false nor defamatory.

These arguments have considerable force, but the Court need not reach them because Defendants are entitled to summary judgment for another reason: a reasonable jury could not find

---

*See McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1515 (D.C. Cir. 1996) (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)).

by clear and convincing evidence that the statement was made with actual malice.  As noted above, a statement is made with actual malice if the publisher knew the article was false or recklessly disregarded its falsity.  *See Jankovic v. International Crisis Group (Jankovic III)*, 822 F.3d 576, 589–90 (D.C. Cir. 2016).  Defendants argue—and the undisputed materials facts demonstrate—that in writing the statement about *Nunes's* "baseless claims" in November 2020, Nakashima made a mistake.  Upon hearing that Ellis had been selected to serve as general counsel of the NSA, Nakashima ran internet searches to find "a concise way to convey background information about the March 2017 Nunes White House visit in which Ellis was involved."  *See* Mot. for Summ. J., ECF No. 81-2 at 43.  The stories she found "reported that Nunes had successfully 'bolstered' Trump's 'debunked' wiretapping claims, and successfully 'defended' Trump wiretapping claims that were 'baseless.'"  *Id.*; *see also*, Nakashima Decl. Ex. L, ECF No. 82-85 at 2, Greg Miller and Karen DeYoung, *Three White House officials tied to files shared with House intelligence chairman*, Washington Post, Mar. 30, 2017 ("The materials unearthed by Nunes have been used to defend President Trump's baseless claims on Twitter that he had been wiretapped at Trump Tower under a surveillance operation ordered by then-President Barack Obama.").  Defendants argue that Nunes cannot state a plausible claim for defamation based on Nakashima's "good-faith misreading of source material with ambiguities."  *Id*. at 44.

Nunes counters that a reasonable jury could infer from the events of March 2017, including articles that Nakashima herself contributed to, that she acted at least recklessly.  Among other things, he points to the fact that Nakashima had taken notes "from a call with Mr. Nunes's communication director where the entire contents of the 2017 article [by Greg Miller and Karen DeYoung] relating to Mr. Nunes were denied."  Memo in Opp. to Summ. J., ECF No. 84-1 at 29.

But the fact that Nakashima had taken notes bearing Nunes's denials in March 2017 is not clear and convincing evidence that, more than three years later, she acted with actual malice in writing the sentence in question. Even in March 2017, there was significant doubt about certain of Nunes's claims concerning surveillance of the Trump campaign. Although Nunes had not claimed (baselessly) that the Obama administration wiretapped Trump Tower, he did suggest (baselessly) that he had received his information from a whistleblower and that the Trump White House was not aware of it. *See, e.g.*, Nakashima Decl. Ex. 48, ECF No. 82-54 at 2 ("Nunes reviewed the material during a surreptitious visit to the White House grounds last week.").[3]

More important, Defendants have proffered undisputed evidence that Nakashima simply made a mistake when she wrote the sentence in question—and a mistake is not actual malice. Even with the benefit of voluminous discovery, Nunes has failed to identify sufficient facts from which a jury could decide, by clear and convincing evidence, that Nakashima's failure to remember in November 2020 that Nunes had objected to Trump's claims of wiretapping in March 2017 was anything more than an honest mistake. Summary judgment is therefore appropriate as to this statement.

### B. The "Midnight Run"

Nunes also claims that he was defamed by the November 9 statement that his visit to the White House occurred "reportedly late at night, earning the episode the nickname 'the midnight

---

[3] For example, when asked about Nunes's claims regarding surveillance on a March 28, 2017 interview with NBC's Today Show, Senator Lindsey Graham stated that "the problem that [Nunes has] created is he's gone off on a lark by himself sort of an Inspector Clouseau investigation here, trying to find some unmasking information about collection incidental with the Trump campaign and some foreign agent outside of Russia." *See* Nakashima Decl. Ex. 51, ECF No. 82-57 at 6. On March 30, 2017, Eli Lake of Bloomberg View, wrote that, "[Nunes] told me that his source for that information was an intelligence official, not a White House staffer. It turns out, he misled me." *See* Nakashima Decl. Ex. 50, ECF No. 82-56 at 2. Several other media outlets expressed doubt about the basis of Nunes's public statements in March 2017.

run.'" *See* Exhibit 1, ECF No. 82-1 at 2. Defendants argue that this statement was not materially false because his White House visit "was in fact widely known as 'the midnight run' and that numerous accounts reported that it had occurred at night or late at night." And, they argue, it was not defamatory because the statement did not make Nunes appear materially more "odious, infamous, or ridiculous" than his actual conduct. *See* Mot. for Summ. J., ECF No. 81-2 at 47; *see id*. at 55.

These arguments again have considerable force, but the Court again need not reach them because Nunes cannot show by clear and convincing evidence that this statement was made with actual malice. Defendants point to the fact that various March 2017 articles—including ones Nakashima reviewed in November 2020—had referred to Nunes's visit as "the midnight run" and reported that the visit occurred late at night. *See, e.g.*, Julian Borger, *Lawmaker's 'peculiar midnight run' endangers Trump-Russia inquiry*, The Guardian, Mar. 26, 2017 ("Such behavior reportedly includes an unexplained disappearance from an Uber ride with a staffer on Tuesday night, described by his Democratic counterpart as a 'peculiar midnight run.'"); *see also*, Chris Megerian and Joseph Tanfani, *Rep. Devin Nunes plays defense for Trump by going on hard offense against Justice Department*, Los Angeles Times, Jan. 5, 2018 ("It became known as 'the midnight run,' a dark-of-night dash to the White House compound last March 21 by Rep. Devin Nunes to view classified reports two weeks after President Trump's incendiary claim that President Obama was 'tapping my phones' before the 2016 election."). As a result, Defendants argue, Nakashima "had no reason to disbelieve her statement [in the November 9 article] and in fact believed it." *See* Mot. for Summ. J., ECF No. 81-2 at 48.

Nunes responds that it is doubtful that Nakashima, who (as he puts it) "claims that she relied only on her memory and a couple of articles" in reporting on the timing of Nunes's visit,

14

happened to remember "reading only newspapers and sources that played up the 'midnight run' version of the story." *See* Pl. Memo in Opp. To Summ. J., ECF No. 84-1 at 33. But these arguments are not enough. The actual malice standard cannot be satisfied by suggesting that a reporter should have investigated her story more fully; it requires proof that the reporter acted with reckless disregard for the truth. *But see St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) ("[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing."). To meet that "daunting" burden, a reasonable jury would have to find that Defendants "were subjectively aware that it was highly probable that the story was (1) fabricated; (2) so inherently improbable that only a reckless person would have put [it] in circulation; or (3) based wholly on an unverified anonymous telephone call or some other source that [they] had reason to doubt." *Lohrenz v. Donnelly*, 350 F.3d 1272, 1283 (D.C. Cir. 2003) (quoting *Tavoulareas v. Piro*, 817 F.2d 762, 788–89 (D.C. Cir. 1987) (internal quotations omitted)).

Based on the record here, a reasonable could not reach that conclusion. Nakashima has stated in a sworn declaration that she believed the statements to be true. Moreover, several articles in March 2017 had referred to the White House visit as a "dark-of-night dash," *see* ECF No. 85-60 at 2, and a "late-night excursion," *see* ECF No. 85-61 at 5. And Nakashima wrote the single sentence in question three years after the fact, as background in a story about a different subject. Nor did any of the articles she reviewed include a statement from Nunes that his White House visit had occurred in the daytime. *See* Nakashima Decl., ECF No. 81-5 at 16.

### C.     The Correction

As for the Post December 9 correction, Nunes does not challenge its clarification of the timing of his White House visit. He does, however, claim that the statement that he "believed [the intelligence files] would buttress Trump's baseless claims" was false and defamatory because it

15

conveyed that Nunes still believed the "baseless claims" about wiretapping when he did not. *See* Pl. Memo. in Opp. to Summ. J., ECF No. 84-1 at 39.  In particular, he stresses that while the correction correctly attributed the wiretapping claims to Trump, it nonetheless defamed Nunes "by claiming [Nunes] believed that the documents would support President Trump's baseless wiretapping claims." *Id*. at 20.  And he notes that the Court, in partially denying the Post's motion to dismiss, held that a reasonable juror could conclude that the Post's correction meant that Nunes did believe the baseless claims. *See* Memorandum Opinion, ECF No. 41 at 12.  He argues that the correction is defamatory for the same reasons as the original article:  by associating Nunes with "baseless claims," the article gave the impression that he was prone to adopt arguments without merit and thereby hurt his standing.

Defendants again raise various arguments in support of their motion. *See* Mot. for Summ. J., ECF No. 81-2 at 49–51.  Here, the Court concludes that a reasonable jury could not conclude that the correction was materially false.  After all, as Defendants correctly contend, the record demonstrates that Nunes's public statements in March 2017 after the White House visit had "provided some credence to Trump's concerns." Def. Rep. in Supp. of Summ. J., ECF No. 87-1 at 26.[4]  It was therefore not materially false to say that Nunes's comments in March 2017, as

---

[4] For example, on March 22, 2017, Nunes told reporters at a press conference that "while there was not a physical wiretap of Trump Tower . . . other surveillance activities were used against President Trump and his associates." Exhibit 7, ECF No. 82-7 at 2.  Later, he told reporters, "What I have read bothers me, and I think it should bother the president." Exhibit 7, ECF No. 82-9 at 4.  These and similar comments gave the impression – at the height of public debate about President Trump's allegations of wiretapping by the Obama administration – that Nunes thought there was something to President Trump's concerns, even if he was not exactly right about wiretapping. *See, e.g.*, Miller and DeYoung, *Three White House officials tied to files shared with House intelligence chairman*, Washington Post, Mar. 30, 2017("The materials unearthed by Nunes have been used to defend President Trump's baseless claims on Twitter that he had been wiretapped at Trump Tower under a surveillance operation ordered by then-President Barack Obama.").  Indeed, even President Trump believed that Nunes's comments strengthened his allegations. *See, e.g.*, Exhibit 12, ECF No. 82-17 at 6 (Trump:  "Members of

reflected in public reporting around that period, were directed toward bolstering President *Trump's* claims (even if baseless) about wiretapping "by comparing it to other potential evidence of Obama administration surveillance of Trump or his associates." *Id*.

## Conclusion

For the forgoing reasons, the Court grants the Defendant's Motion. An Order will issue contemporaneously with this Opinion.

DATE:  June 14, 2024

                                                                              CARL J. NICHOLS
                                                                              United States District Judge

---

the Donald Trump Transition team possibly including Trump himself were under surveillance during the Obama administration following November's election. House intelligence chairman Devin Nunes told reporters, wow. Nunes said, so that means I'm right.").